**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS; | § | |
| HARROLD INDEPENDENT | § | |
| SCHOOL DISTRICT (TX); | § | |
| STATE OF ALABAMA; | § | |
| STATE OF WISCONSIN; | § | |
| STATE OF WEST VIRGINIA; | § | |
| STATE OF TENNESSEE; | § | |
| ARIZONA DEPARTMENT | § | |
| OF EDUCATION; | § | |
| HEBER-OVERGAARD | § | |
| UNIFIED SCHOOL DISTRICT (AZ); | § | |
| PAUL LEPAGE, GOVERNOR OF | § | |
| THE STATE OF MAINE; | § | |
| STATE OF OKLAHOMA; | § | |
| STATE OF LOUISIANA; | § | |
| STATE OF UTAH; and | § | |
| STATE OF GEORGIA | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| UNITED STATES OF AMERICA; | § | |
| UNITED STATES DEPARTMENT | § | |
| OF EDUCATION; JOHN B. KING, | § | |
| JR., in his Official Capacity as United | § | |
| States Secretary of Education; UNITED | § | |
| STATES DEPARTMENT OF JUSTICE; | § | |
| LORETTA E. LYNCH, in her Official | § | |
| Capacity as Attorney General of the | § | |
| United States; VANITA GUPTA, in her | § | |
| Official Capacity as Principal Deputy | § | |
| Assistant Attorney General; | § | |
| UNITED STATES EQUAL | § | |
| EMPLOYMENT OPPORTUNITY | § | |
| COMMISSION; JENNY R. YANG, in | § | |
| her Official Capacity as the Chair of | § | |
| the United States Equal Employment | § | |
| Opportunity Commission; UNITED | § | |
| STATES DEPARTMENT OF LABOR; | § | |

THOMAS E. PEREZ, in his Official §
Capacity as United States Secretary §
of Labor; DAVID MICHAELS, in his §
Official Capacity as the Assistant §
Secretary of Labor for Occupational §
Safety and Health Administration, §
                                    §
          Defendants.               §

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

The State of Texas, the Harrold Independent School District (Texas), the State of Alabama, the State of Wisconsin, the State of West Virginia, the State of Tennessee, the Arizona Department of Education, the Haber-Overgaard Unified School District (AZ), Paul LePage, in his official capacity as Governor of Maine, the State of Oklahoma, the State of Louisiana, the State of Utah, and the State of Georgia (collectively, "Plaintiffs") seek declaratory relief against the United States of America, the United States Department of Education, John B. King, Jr., in his Official Capacity as United States Secretary of Education, the United States Department of Justice, Loretta E. Lynch, in her Official Capacity as Attorney General of the United States, Vanita Gupta in her Official Capacity as Principal Deputy Assistant Attorney General, the United States Equal Employment Opportunity Commission, Jenny R. Yang, in her Official Capacity as the Chair of the United States Equal Employment Opportunity Commission, United States Department of Labor, Thomas E. Perez, in his Official Capacity as United States Secretary of Labor; and David Michaels, in his Official Capacity as the Assistant Secretary of Labor for Occupational Safety and

Health Administration.

Plaintiffs include a diverse coalition of States, top State officials, and local school districts, spanning from the Gulf Coast to the Great Lakes, and from the Grand Canyon to the Grand Isle, that stand behind the singular principle that the solemn duty of the Federal Executive is to enforce the law of the land, and not rewrite it by administrative fiat.

Defendants have conspired to turn workplaces and educational settings across the country into laboratories for a massive social experiment, flouting the democratic process, and running roughshod over commonsense policies protecting children and basic privacy rights. Defendants' rewriting of Title VII and Title IX is wholly incompatible with Congressional text. Absent action in Congress, the States, or local communities, Defendants cannot foist these radical changes on the nation.

## I. PARTIES

1.    Plaintiff State of Texas is subject to Title VII as the employer of hundreds of thousands through its constituent agencies. The State of Texas also oversees and controls several agencies that receive federal funding subject to Title IX. For example, the School for the Blind and Visually Impaired ("SBVI") and School for the Deaf ("SD") are statutorily created, independent state agencies. Tex. Educ. Code § 30.001 *et seq.* Both are governed by nine-member boards, appointed by the governor and confirmed by the senate, and both have superintendents appointed by the boards and "carry out the functions and purposes of [each] school according to any general policy the board[s] prescribe[]." *Id.* §§ 30.023(e) (SBVI); 30.053(e) (SD).

Currently, SBVI has a total budget of $24,522,116, of which $4,789,974 is identified as federal funds, and SD has a total budget of $28,699,653, of which $1,957,075 is identified as federal funds. As another example, the Texas Juvenile Justice Department (TJJD) is a state agency subject to Title VII and Title IX. Responsible for overseeing youth correction facilities in the State of Texas, TJJD's current budget is $314,856,698, which includes $9,594,137 in federal funding.

2.      Plaintiff Harrold Independent School District ("Harrold ISD") is a state independent public school district based in Harrold, Texas.

3.      The Plaintiff States of Alabama, Wisconsin, West Virginia, Tennessee, Oklahoma, Louisiana, Utah, Georgia are similarly situated to the State of Texas in that one or more of the following circumstances is present: (1) they are employers covered by Title VII, (2) their agencies and departments are subject to Title IX, (3) their agencies and departments receive other federal grant funding that requires, as a condition of the grant, compliance with the Title IX provisions at issue in this lawsuit, or (4) they are suing on behalf of public educational institutions, departments, or agencies in their State are subject to Title IX.

4.      Plaintiff Arizona Department of Education is the state agency responsible for "[t]he general conduct and supervision of the public school system" in Arizona.  Ariz. Const. art. XI, § 2.

5.      Plaintiff Heber-Overgaard Unified School District is a public school district with its principal office located in Heber, Arizona.

6.      Plaintiff Paul LePage is the Governor of Maine and Chief Executor of

the State of Maine Constitution and the laws enacted by the Maine State Legislature.

7.      Defendant United States Department of Education ("DOE") is an executive agency of the United States and responsible for the administration and enforcement of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

8.      Defendant John B. King, Jr., is the United States Secretary of Education. In this capacity, he is responsible for the operation and management of the DOE. He is sued in his official capacity.

9.      Defendant United States Department of Justice ("DOJ") is an executive agency of the United States and responsible for the enforcement of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. DOJ has the authority to bring enforcement actions to enforce Title IX. Exec. Order No. 12250, 28 C.F.R. Part 41 app. A (1980).

10.      Defendant Loretta A. Lynch is the Attorney General of the United States and head of DOJ. She is sued in her official capacity.

11.      Defendant Vanita Gupta is Principal Deputy Assistant Attorney General at DOJ and acting head of the Civil Rights Division of DOJ. She is assigned the responsibility to bring enforcement actions under Titles VII and IX. 28 C.F.R. § 42.412. She is sued in her official capacity.

12.      Defendant Equal Employment Opportunity Commission ("EEOC") is a federal agency that administers, interprets, and enforces certain laws, including Title VII. EEOC is, among other things, responsible for investigating employment and hiring discrimination complaints.

13.     Defendant Jenny R. Yang is the Chair of the EEOC. In this capacity, she is responsible for the administration and implementation of policy within the EEOC, including the investigating of employment and hiring discrimination complaints. She is sued in her official capacity.

14.     Defendant United States Department of Labor ("DOL") is the federal agency responsible for supervising the formulation, issuance, and enforcement of rules, regulations, policies, and forms by the Occupational Safety and Health Administration ("OSHA").

15.     Defendant Thomas E. Perez is the United States Secretary of Labor. He is authorized to issue, amend, and rescind the rules, regulations, policies, and forms of OSHA. He is sued in his official capacity.

16.     Defendant David Michaels is the Assistant Secretary of Labor for OSHA. In this capacity, he is responsible for assuring safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance. He is sued in his official capacity.

## II.  JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit concerns the *ultra vires* revision of the term "sex" under multiple provisions of the United States Code. This Court also has jurisdiction to compel an officer of the United States or any federal agency to perform his or her duty pursuant to 28 U.S.C. § 1361.

18.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the United States, several of its agencies, and several of its officers in their official capacity are Defendants; a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and Plaintiff Harrold ISD (TX) is both an employer subject to Title VII, and a recipient of federal monies subject to Title IX restrictions in Harrold, Texas.

19.     The Court is authorized to award the requested declaratory relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202. The Court is authorized to order corrective action under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 611.

## III.  FACTUAL BACKGROUND

### A. Congressional History.

20.     In 1964, Congress enacted Title VII of the Civil Rights Act, making it illegal for employers to invidiously discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2.

21.     Eight years later, Congress passed Title IX of the Education Amendments of 1972, proscribing *invidious* discrimination on the basis of "sex" in federally funded education programs and activities. 20 U.S.C. § 1681(a). Title IX permits institutions to differentiate intimate facilities by sex. 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different

sexes."). Section 1686 was added to address concerns that Title IX would force a college to allow women in dormitories designated for only men, and vice versa. When Senator Birch Bayh first introduced the legislation, Senator Dominick asked about the scope of the law:

> Mr. DOMINICK. The provisions on page 1, under section 601, refer to the fact that no one shall be denied the benefits of any program or activity conducted, et cetera. The words "any program or activity," in what way is the Senator thinking here? *Is he thinking in terms of dormitory facilities, is he thinking in terms of athletic facilities or equipment, or in what terms are we dealing here?* Or are we dealing with just educational requirements?
>
> I think it is important, for example, because we have institutions of learning which, because of circumstances such as I have pointed out, may feel they do not have dormitory facilities which are adequate, or they may feel, as some institutions are already saying, that you cannot segregate dormitories anyway. *But suppose they want to [sexually] segregate the dormitories; can they do it?*
>
> Mr. BAYH. The rulemaking powers referred to earlier, I think, give the Secretary discretion to take care of this particular policy problem. *I do not read this as requiring integration of dormitories between the sexes*, nor do I feel it mandates the [sexual] desegregation of football fields.
>
> What we are trying to do is provide equal access for women and men students to the educational process and the extracurricular activities in a school, where there is not a unique facet such as football involved. We are not requiring that intercollegiate football be desegregated, *nor that the men's locker room be [sexually] desegregated.*

117 Cong. Rec. 30407 (1971) (emphasis added).

22.     The following year, when Title IX was passed, Senator Bayh again reiterated that this was not meant to force men and women to share intimate facilities where their privacy rights would be compromised:

> Under this amendment, each Federal agency which extends Federal financial assistance is empowered to issue implementing rules and

regulations effective after approval of the President. *These regulations would allow enforcing agencies to permit differential treatment by sex only*—very unusual cases where such treatment is absolutely necessary to the success of the program—such as in classes for pregnant girls or emotionally disturbed students, in sports facilities *or other instances where personal privacy must be preserved*.

118 Cong. Rec. 5807 (1972) (emphasis added).

23.     The same concerns were raised when Title IX was debated in the House. Representative Thompson, concerned about men and women using the same facilities, offered an amendment:

> *I have been disturbed however, about the statements that if there is to be no discrimination based on sex then there can be no separate living facilities for the different sexes.* I have talked with the gentlewoman from Oregon (Mrs. Green) and discussed with the gentlewoman an amendment which she says she would accept. *The amendment simply would state that nothing contained herein shall preclude any educational institution from maintaining separate living facilities because of sex.* So, with that understanding I feel that the amendment [exempting undergraduate programs from Title IX] now under consideration should be opposed and I will offer the "living quarters" amendment at the proper time.

117 Cong. Rec. 39260 (1971) (emphasis added). This amendment was eventually introduced and passed. 117 Cong. Rec. 39263 (1971).

**B. Aftermath of Title IX.**

24.     Following the enactment of Title IX, there was broad support behind the policy of maintaining separate intimate facilities for female and male students. The initial rules that the federal government promulgated to implement Title IX permitted schools receiving federal funds to separate restrooms, locker rooms, and shower facilities on the basis of sex. 34 C.F.R. § 106.33. Furthermore, legal scholars defended separate sex intimate facilities as necessary to preserve individual privacy

rights. In a 1975 *Washington Post* editorial, then Columbia Law School Professor Ruth Bader Ginsburg wrote that "[s]eparate places to disrobe, sleep, perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21. And in a 1977 report, the United States Commission on Civil Rights concluded the "the personal privacy principle permits maintenance of separate sleeping and bathroom facilities" for women and men. United States Commission on Civil Rights, SEX BIAS IN THE U.S. CODE 216 (1977).

25.     Meanwhile, Congress repeatedly construed its prohibitions against invidious "sex" discrimination narrowly. In 1974, Representatives Bella Abzug and Edward Koch proposed to amend the Civil Rights Act to add the category of "sexual orientation." H.R. 14752, 93rd Cong. (1974). Congress considered other similar bills during the 1970s. *See* H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979). In 1994, lawmakers introduced the Employment Non-Discrimination Act ("ENDA"), which, like Abzug and Koch's earlier effort, was premised on the understanding that Title VII's protections against invidious "sex" discrimination related only to one's biological sex as male or female. H.R. 4636, 103rd Cong. (1994). In 2007, 2009, and 2011, lawmakers proposed a broader version of EDNA to codify the definition of "sex" that Defendants now embrace. H.R. 3685, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011). In addition, in 2013 and 2015, proposals were made to add to Title IX the category of "gender identity." H.R. 1652, 113th Cong. (2013); S.439, 114th Cong. (2015).

Notwithstanding the success or failure of the aforementioned Congressional proposals, they all affirmed Congress's enduring understanding that "sex," as a protected class, refers only to one's biological sex, as male or female, and not the radical re-authoring of the term now being foisted upon Americans by the collective efforts of Defendants.

26.     Moreover, Congress did overtly choose to extended protections for "gender identity" in other areas of federal law. In 2010, President Obama signed into law hate crimes legislation, 18 U.S.C. § 249, which applies to, *inter alia*, "gender identity." 18 U.S.C. § 249(a)(2). And in 2013, President Obama signed the Violence against Women Reauthorization Act (VAWA), prohibiting recipients of certain federal grants from discriminating on the basis of "sex" and "gender identity." 42 U.S.C. § 13925(b)(13)(A).

27.     According to influential legal treatises, "gender identity" is not within the ambit of Title VII. *See*, *e.g.*, 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 551—52 (4th ed. 2007); 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 475—76 (3d ed. 1996).

28.     Yet the Obama Administration began to rewrite statutes to cover "gender identity" as though they had actually been amended. For example:

- In a 2010 Dear Colleague Letter, the DOE's Office of Civil Rights ("OCR") asserted that "Title IX does protect all students, including . . . transgender (LGBT) students, from sex discrimination." OCR, *Dear Colleague Letter: Harassment and Bullying* 8 (Oct. 26, 2010) (Exhibit A).

- In 2014, OCR stated that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity." OCR, *Questions and Answers on Title IX and Sexual Violence* B-2 (Apr. 29, 2014) (Exhibit B).

- Attorney General Eric Holder issued a memo in 2014 concluding that Title VII's prohibition of sexual discrimination "encompasses discrimination based on gender identity, including transgender status." DOJ, Memorandum from the Attorney General, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* 2 (Dec. 15, 2014) (Exhibit C).

- And in 2015, OSHA announced that it had published "guidance" for employers regarding restroom access for individuals who identify with the sex opposite their own. Press Release, OSHA, *OSHA publishes guide to restroom access for transgender workers* (June 1, 2015), *available at* https://www.osha.gov/newsrelease/trade-20150601.html.   OSHA's   so-called guidance concluded that "all employees should be permitted to use the facilities that correspond with their gender identity," which is "internal" and could be "different from the sex they were assigned at birth." OSHA, *A guide to Restroom Access for Transgender Workers* (2015) (Exhibit D)

Finally, in 2016, the Obama Administration's disregard for federal law as written—and the ability to maintain separate sex intimate facilities—reached its nadir in the

wake of events in North Carolina.

## C. North Carolina.

29.    On February 22, 2016, the City Council of Charlotte, North Carolina, amended the city's Non-Discrimination Ordinance (Exhibit E), requiring that every government and business bathroom and shower be simultaneously open to both sexes. In other words, Charlotte outlawed the right to maintain separate sex intimate facilities throughout the city. The North Carolina General Assembly then passed the Public Facilities Privacy and Security Act ("the Act") (Exhibit F), preempting the Charlotte ordinance and providing that public employees and public school students use bathrooms and showers correlating with their biological sex, defined as the sex noted on their birth certificate. The Act does not establish a policy for private businesses and permits accommodations based on special circumstances.

30.    After signing the Act, North Carolina Governor Patrick L. McCrory issued Executive Order 93 to Protect Privacy and Equality ("EO 93") (Exhibit G). EO 93 expanded non-discrimination protections to state employees on the basis of "gender identity," while simultaneously affirming that cabinet agencies should require multiple occupancy intimate facilities, like bathrooms, to be designated for use only by persons based on their biological sex. EO 93 directed agencies to make reasonable accommodations when practicable.

31.    Nevertheless, on May 3, 2016, the EEOC released a document titled "Fact Sheet: Bathroom Access Rights for Transgender Employees Under Title VII of the Civil Rights Act of 1964" ("Fact Sheet") (Exhibit H). The Fact Sheet states that

Title VII's prohibition of invidious discrimination on the basis of "sex" also now extends to "gender identity." It further provides that employers that do not allow employees to use the bathroom and other intimate facilities of their choosing are liable for unlawful discrimination on the basis of "sex."

32.     Then, on May 4, 2016, DOJ sent Governor McCrory a letter (Exhibit I), declaring that the Act and EO 93 violate both Title VII and Title IX. DOJ threatened to "apply to [an] appropriate court for an order that will ensure compliance with" its *ultra vires* rewriting of the law.

33.     On May 9, 2016, DOJ sued North Carolina, asserting that both the Act and EO 93 are impermissible under federal law.

**D. The DOJ / DOE Dear Colleague Letter.**

34.      On May 13, 2016, DOJ and DOE issued a joint "Dear Colleague Letter" ("the Letter") (Exhibit J), officially foisting its new version of federal law on the more than 100,000 elementary and secondary schools that receive federal funding.

35.     The Letter contends that Title IX's prohibition of invidious "sex" discrimination also somehow encompasses discrimination based on "gender identity." Further, it advises that schools taking a different view of Title IX face legal action and the loss of federal funds. The Letter concerns "*Title IX obligations* regarding transgender students" and provides insight as to the manner in which DOE and DOJ will evaluate how schools "are complying with their *legal obligations*" (emphasis added). It refers to an accompanying document collecting examples from school policies and recommends that school officials comb through the document "for

practical ways to meet *Title IX's requirements*" (same). Indeed, the Letter amounts to "*significant guidance*" (emphasis in original).

36.     According to the Letter, schools must treat a student's "gender identity" as the student's "sex" for purposes of Title IX compliance, with one notable exception. "Gender identity," the Letter explains, refers to a person's "internal sense of gender," without regard for biological sex. It can be the same as a person's biological sex, or different. The Letter provides that no medical diagnosis or treatment requirement is a prerequisite to selecting one's "gender identity," nor is there any form of temporal requirement. In other words, a student can choose one "gender identity" on one particular day or hour, and then another one the next. And students of any age may establish a "gender identity" different from their biological sex simply by notifying the school administration—the involvement of a parent or guardian is not necessary.

37.     In the case of athletics, however, the Letter does *not* require schools to treat a student's "gender identity" as the student's sex for the purpose of Title IX compliance.  Instead, the Letter basically leaves intact Title IX regulations allowing schools to restrict athletic teams to members of one biological sex. The only change that the Letter makes to athletic programs is that schools may not "rely on overly broad generalizations or stereotypes" about students. Otherwise, differentiating sports teams on the basis of sex—not "gender identity"—is consistent with the Letter. The Letter's disparate treatment of bathrooms and showers, on the one hand, and athletics, on the other, demonstrates that DOE/DOJ is not simply demanding that schools abide by Title IX (as reinterpreted to substitute "gender identity" for "sex").

Rather, the Letter tries to rewrite Title IX by executive fiat, mandating all bathrooms and showers open to both sexes, while simultaneously permitting different sex athletics subject to limited exceptions. The new policy has no basis in law.

38.     Adapting to the new circumstances put forth by DOE and DOJ requires seismic changes in the operations of the nation's school districts. Schools subject to Title IX must allow students to choose the restrooms, locker rooms, and other intimate facilities that match their chosen "gender identity" on any given day. Single-sex classes, schools, and dormitories must also be open to students based on their chosen "gender identity."

39.     On May 16, 2016, the Attorneys General of Oklahoma, Texas, and West Virginia sent DOJ and DOE a letter (Exhibit K) requesting clarification on the effect of the letter on agencies within these States. DOJ and DOE did not respond.

**E. Harrold Independent School District (TX).**

40.     On May 23, 2016, school board members of the Harrold ISD ("the Board") convened a regular session. At the session, the Board adopted a policy ("the Policy") (Exhibit L) consistent with its current practice. The Policy, which applies to students and employees of the Harrold ISD, limits multiple occupancy bathrooms and locker rooms to usage by persons based on their biological sex. The Policy also allows for accommodations.

41.     After adopting the Policy, the Board requested representation (Exhibit M) from the Office of the Attorney General (OAG) of Texas, under Texas Education

Code § 11.151(e), to determine whether the Policy is in conflict with federal law and, if so, whether the Policy is enforceable. The OAG agreed to represent the Board.

42.     Harrold ISD is subject to Title VII and receives federal funding subject to Title IX. In 2015–16, Harrold ISD operated on a total annual budget exceeding $1.4 million, with the federal portion amounting to approximately $117,000.

43.     The Defendants' "significant guidance" Letter of May 13, 2016, (Exhibit J) reiterates that Title IX and its implementing regulations apply to "educational programs and activities operated by recipients of Federal financial assistance" and that schools agree to same "as a condition of receiving federal assistance."

44.     Thus, the federal government would be legally entitled to deny federal funds that comprise a substantial portion of Harrold ISD's budget if Harrold ISD chooses to follow its Policy instead of the new rules, regulations, guidance and interpretations of Defendants.

**F. Arizona Plaintiffs.**

45.     Plaintiffs Arizona Department of Education, by and through Superintendent of Public Instruction Diane Douglas, and Heber-Overgaard Unified School District (collectively, the "Arizona Plaintiffs") have requested that Arizona Attorney General Mark Brnovich represent them in the present litigation.  Arizona Attorney General Mark Brnovich deems it necessary to represent the Arizona Plaintiffs. Arizona Department of Education Guideline and Procedure Doc. No. HR-20 (Exhibit N), which applies to all Arizona Plaintiffs, provides that "It is not . . . discriminatory for a school to offer separate housing, toilet, athletic and other

facilities on the basis of sex, so long as the facilities provided to each sex are comparable."

### G. Federal Education Funding.

46.    The threatened loss of all federal funding for state and local education programs would have a major effect on State education budgets. All fifty States receives a share of the $69,867,660,640 in annual funding that the Federal Government directs to state and local education. DOE, *Funds for State Formula-Allocated and Selected Student Aid Programs, U.S. Dep't of Educ. Funding* at 120 *available at* http://www2.ed.gov/about/overview/budget/statetables/index.html (charts listing the amount of federal education funding by program nationally and by state). DOE estimates that the federal government will spend over $36 billion in State and local elementary and secondary education, and over $30 billion in State and local postsecondary education programs in 2016.

47.    Not counting funds paid directly to state education agencies, or funds paid for non-elementary and secondary programs, the national amount of direct federal funding to public elementary and secondary schools alone exceeds $55,862,552,000 on average annually—which amounts to 9.3 percent of the average State's total revenue for public elementary and secondary schools, or $1,128 per pupil. Texas's public elementary and secondary schools, for example, receive an average of $5,872,123,000 annually, or $1,156 per pupil, which amounts to about 11.7 percent of the State's revenue for public elementary and secondary schools.

48.    Alabama's public elementary and secondary schools, for example,

receive an average of $850,523,000 annually, or $1,142 per pupil, which amounts to about 11.8 percent of the State's revenue for public elementary and secondary schools. West Virginia's public elementary and secondary schools, for example, receive an average of $380,192,000 annually, or $1,343 per pupil, which amounts to about 10.7 percent of the State's revenue for public elementary and secondary schools. Wisconsin's public elementary and secondary schools, for example, receive an average of $850,329,000 annually, or $975 per pupil, which amounts to about 7.9 percent of the State's revenue for public elementary and secondary schools.  The percentages in the other States are comparable. Nat'l Ctr. For Educ. Statistics, U.S. Dep't of Educ. & Institute of Educ. Sciences, Digest of Education Statistics, Tab. 235.20, *available at* https://nces.ed.gov/programs/digest/d15/tables/dt15_235.20.asp?current=yes.

## IV.  CLAIMS FOR RELIEF

### COUNT ONE

### Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Being Imposed Without Observance of Procedure Required by Law

49.    The allegations in paragraphs 1 through 48 are reincorporated herein.

50.    The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

51.    Defendants are "agencies" under the APA, *id.* § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

52.     With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. *Id.* § 553.

53.     Defendants failed to properly engage in notice-and-comment rulemaking in promulgating the new rules, regulations, guidance, and interpretations described herein.

## COUNT TWO

### Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful by Exceeding Congressional Authorization

54.     The allegations in paragraphs 1 through 53 are reincorporated herein.

55.     The new rules, regulations, guidance and interpretations described herein constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

56.     The Defendants are "agencies" under the APA, *id.* § 701(b)(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA. *Id.* § 701(b)(2).

57.     The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C).

58.     The new rules, regulations, guidance and interpretations described herein go so far beyond any reasonable reading of the relevant Congressional text such that the new rules, regulations, guidance and interpretations functionally

exercise lawmaking power reserved only to Congress. U.S. CONST. art. I, § 1 ("*All legislative powers herein granted shall be vested in . . . Congress*") (emphasis added); The Federalist No. 48, at 256 (James Madison) (Carey and McClellan eds. 1990) (noting that "[i]t is not unfrequently a question of real nicety in legislative bodies whether the operation of a particular measure will, or will not, extend beyond the legislative sphere," but that "the executive power [is] restrained within a narrower compass and . . . more simple in its nature").

59.     The new rules, regulations, guidance and interpretations described herein also violate separation of powers principles by purporting to expand federal court jurisdiction to cover whether persons of both sexes have a right to use previously separate sex intimate facilities, an issue on which Congress has not intended to legislate. Only Congress, not an agency, can expand federal court jurisdiction, U.S. CONST. art. III, § 1-2; *Vaden v. Discover Bank*, 556 U.S. 49, 59 n.9 (2009); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("[Federal courts] possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.) (internal citations omitted); *Kline v. Burke Const. Co.*, 260 U.S. 226, 234 (1922) ("[A] court created by the general government derives its jurisdiction wholly from the authority of Congress . . . . provided it be not extended beyond the boundaries fixed by the Constitution."), and the Defendants' attempt to do so as described herein violates the constitutional separation of powers.

60.    Because the new rules, regulations, guidance and interpretations are not in accordance with the law articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

## COUNT THREE

### Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful by Violating the Tenth Amendment

61.    The allegations in paragraphs 1 through 60 are reincorporated herein.

62.    The new rules, regulations, guidance and interpretations described herein constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

63.    The federal government is one of limited, enumerated powers; all others—including a general police power—are reserved to the States. *See United States v. Morrison*, 529 U.S. 598, 617–19 (2000). The States' police power includes the "protection of the safety of persons," *Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 82 (1946), the "general power of governing," *NFIB*, 132 S. Ct. at 2578, and the "authority to enact legislation for the public good," *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014).

64.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X.

65.    The new rules, regulations, guidance and interpretations described herein violate the Tenth Amendment because they effectively commandeer the

States' historic and well-established regulation of civil privacy law. *New York v. United States*, 505 U.S. 144, 162 (1992) ("While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.").

66.     The new rules, regulations, guidance and interpretations described herein unlawfully attempt to preempt State law regarding rights of privacy because historic powers reserved to the States, such as civil privacy protections, cannot be superseded by federal act, "unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *Gregory v. Ashcroft*, 501 U.S. 452, 460–70 (1991). As explained herein, not only is there no evidence that Congress intended to regulate civil privacy circumstances within the States, but legislative history demonstrates that Congress expressed its clear intent to *not* encroach upon the traditional State role in safeguarding privacy expectations in the workplace, public accommodations, and educational settings.

67.     Because the new rules, regulations, guidance and interpretations are not in accordance with the law as articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

## COUNT FOUR

**Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance, and Interpretations at Issue Are Unlawful by Violating the Fourteenth Amendment**

68.     The allegations in paragraphs 1 through 67 are reincorporated herein.

69.     The new rules, regulations, guidance and interpretations described herein constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

70.     The Fourteenth Amendment guarantees "equal protection of the laws." U.S. CONST. amend. XIV, § 1. The new rules, regulations, and interpretations violate the Fourteenth Amendment because they treat similarly situated students and employees different.

71.     The new rules, regulations, guidance and interpretations described herein violate the Fourteenth Amendment because they treat similarly situated students and employees differently. The new rules, regulations, guidance and interpretations described herein provide access to all restrooms and showers for individuals who self-identify as the opposite sex. But if the right or ability to use the intimate facilities of one's choosing extends only to those who self-identify as the opposite sex then the new rules, regulations, guidance and interpretations treat unequally students and employees that require access to intimate areas.

72.     Due to the new rules, regulations, guidance and interpretations described herein, Defendants are selectively enforcing new principles differently as to similarly situated students and employees, which violates the principle of equal

protection contained within the Fourteenth Amendment

73.     Because the new rules, regulations, guidance and interpretations are not in accordance with the law articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

## COUNT FIVE

**Relief Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Unlawfully Attempt to Abrogate State Sovereign Immunity.**

74.     The allegations in paragraphs 1 through 73 are reincorporated herein.

75.     The new rules, regulations, guidance and interpretations improperly abrogate the States' sovereign immunity without supporting Congressional findings.

76.     The Supreme Court has acknowledged Congress's abrogation of the States' sovereign immunity in the employment context, but only on the basis of Congressional findings and concerns about State workplace discrimination regarding unequal treatment between men and women, and not an employee's decision on whether they choose to define themselves as a man or woman. *See, e.g., Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 and n.2 (2003) (observing that the FMLA aims to promote the goal of equal employment opportunity for women and men).

77.     In adopting their new rules, regulations, guidance and interpretations, the Defendants point to no Congressional findings about invidious discrimination by the States (or any other employer) based on "gender identity." Indeed, the Defendants did not even consider whether Congress intended the term "sex" to include an individual's right to choose their sex, or properly refers to "sex" as an immutable,

biological fact established at one's birth. The Defendants cannot expand abrogation of the State's sovereign immunity by rewriting the definition of "sex" as it was originally adopted by Congress.

## COUNT SIX

### Relief Under 5 U.S.C. § 706 (APA) that new Rules, Regulations, Guidance and Interpretations at Issue Are Arbitrary and Capricious

78.     The allegations in paragraphs 1 through 77 are reincorporated herein.

79.     The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

80.     Defendants' actions—rewriting federal law to suit their own policy preferences—are arbitrary and capricious and not otherwise in accordance with the law. Defendants' actions are arbitrary and capricious because they interfere with local schools by unilaterally redefining the statutory term "sex"—long and widely accepted to be a biological category—to include "gender identity." Title IX and Title VII do not refer to "gender identity." Nor does 34 C.F.R. § 106.33, which expressly authorizes separate restrooms and locker rooms "on the basis of sex." The federal laws at issue prohibit disparate treatment "on the basis of sex," 20 U.S.C. § 1681(a); 34 C.F.R. § 106.33, a term long understood unambiguously to be a biological category based principally on male or female reproductive anatomy, and not one that includes self-proclaimed "gender identity."

## COUNT SEVEN

**Relief Under 5 U.S.C. § 706 (APA) that new Rules, Regulations, Guidance and Interpretations at Issue Are Arbitrary and Capricious**

81.     The allegations in paragraphs 1 through 80 are reincorporated herein.

82.     The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

83.     Under PREA (Prison Rape Elimination Act), 42 U.S.C. § 15601 *et seq.*, those that identify as the sex opposite their biological sex have the option to shower separately. 28 C.F.R. § 115.42(f). Coupling this element in PREA with the new rules, regulations, guidance and interpretations at issue (where everyone may identify as the opposite sex, if they choose to do so) means that *every* inmate has the right to take a separate shower, which is an untenable position (and, thus, arbitrary and capricious), especially within a correctional circumstance.

## COUNT EIGHT

**Relief Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful and Violate Constitutional Standards of Clear Notice**

84.     The allegations in paragraphs 1 through 83 are reincorporated herein.

85.     The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

86.     When Congress exercises its Spending Clause power, principles of federalism require that conditions on Congressional funds must enable the recipient

"clearly understand," from the language of the law itself, the conditions to which they are agreeing to when accepting the federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Further, the ex-post interpretation in the new rules is not in accord with the interpretation that existed when the States opted into the spending program. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (providing that a state's obligation under cooperative federalism program "generally should be determined by reference to the law in effect when the grants were made").

87.     The text employed by Congress does not support the term "sex" as anything other than one's immutable, biological sex as determined at birth. Rather, Congress expressed its intent to cover "gender identity," as a protected class, in *other* pieces of legislation. *See, e.g.*, 18 U.S.C. § 249(a)(2)(A); 42 U.S.C. § 13925(b)(13)(A). In those pieces of legislation, Congress includes "gender identity" along with "sex," thus evidencing its intent for "sex" to retain its original and only meaning—one's immutable, biological sex as determined at birth.

## COUNT NINE

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful and Unconstitutionally Coercive

88.     The allegations in paragraphs 1 through 87 are reincorporated herein.

89.     By placing in jeopardy a substantial percentage of Plaintiffs' budgets if they refuse to comply with the new rules, regulations, guidance and interpretations of Defendants, Defendants have left Plaintiffs no real choice but to acquiesce in such policy. *See NFIB v. Sebelius*, 132 S. Ct. 2566, 2605 (2012) ("The threatened loss of

over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce . . . .").

90.     "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB*, 132 S. Ct. at 2602 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "Congress may use its spending power to create incentives for [entities] to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.* (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Id.*

91.     "[T]he financial 'inducement' [Defendants have] chosen is much more than 'relatively mild encouragement' – it is a gun to the head." *Id.* at 2604. When conditions on the receipt of funds "take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the states to accept policy changes." *Id.*; *cf. South Dakota v. Dole*, 483 U.S. 203, 211 (1987).

92.     Furthermore, the Spending Clause requires that the entities "voluntarily and knowingly accept[]" the conditions for the receipt of federal funds. *NFIB*, 132 S. Ct. at 2602 (quoting *Halderman*, 451 U.S. at 17).

93.     Because Defendants' new rules, regulations, guidance and interpretations change the conditions for the receipt of federal funds *after* the states

had already accepted Congress's original conditions, the Court should declare that the new rules, regulations, guidance and interpretations are unconstitutional because they violate the Spending Clause.

## COUNT TEN

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 611 (RFA) that the new Rules, Regulations, Guidance and Interpretations Were Issued Without a Proper Regulatory Flexibility Analysis

94.     The allegations in paragraphs 1 through 93 are reincorporated herein.

95.     Before issuing any of the new rules, regulations, guidance and interpretations at issue, Defendants failed to prepare and make available for public comment an initial and final regulatory flexibility analysis as required by the RFA. 5 U.S.C. § 603(a). An agency can avoid performing a flexibility analysis if the agency's top official certifies that the rule will not have a significant economic impact on a substantial number of small entities. *Id*. § 605(b). The certification must include a statement providing the factual basis for the agency's determination that the rule will not significantly impact small entities. *Id*.

96.     None of the Defendants even attempted such a certification. Thus, the Court should declare Defendants' new rules, regulations, guidance and interpretations unlawful and set them aside.

## V.  DEMAND FOR JUDGMENT

Plaintiffs respectfully request the following relief from the Court:

97. A declaration that the new rules, regulations, guidance and interpretations are unlawful and must be set aside as actions taken "without observance of procedure required by law" under the APA;

98. A declaration that the new rules, regulations, guidance and interpretations are substantively unlawful under the APA;

99. A declaration that the new rules, regulations, guidance and interpretations are arbitrary and capricious under the APA;

100. A declaration that the new rules, regulations, guidance and interpretations are invalid because they abrogate Plaintiffs' sovereign immunity;

101. A declaration that the new rules, regulations, guidance and interpretations are invalid because Defendants failed to conduct the proper regulatory flexibility analysis required by the RFA.

102. A vacatur, as a consequence of each or any of the declarations aforesaid, as to the Defendants' promulgation, implementation, and determination of applicability of the "significant guidance" document, and its terms and conditions, along with all related rules, regulations, guidance and interpretations, as issued and applied to Plaintiffs and similarly situated parties throughout the United States, within the jurisdiction of this Court.

103. Preliminary relief, enjoining the new rules, regulations, guidance and interpretations from having any legal effect;

104.   A final, permanent injunction preventing the Defendants from implementing, applying, or enforcing the new rules, regulations, and guidance interpretations; and

105.   All other relief to which the Plaintiffs may show themselves to be entitled, including attorneys' fees and costs of courts.

Respectfully submitted,

| | |
|---|---|
| LUTHER STRANGE<br>Attorney General of Alabama | KEN PAXTON<br>Attorney General of Texas |
| BRAD D. SCHIMEL<br>Attorney General of Wisconsin | JEFFREY C. MATEER<br>First Assistant Attorney General |
| PATRICK MORRISEY<br>Attorney General of West Virginia | BRANTLEY STARR<br>Deputy First Assistant Attorney General |
| HERBERT SLATERY, III<br>Attorney General of Tennessee | PRERAK SHAH<br>Senior Counsel to the Attorney General |
| MARK BRNOVICH<br>Attorney General of Arizona | ANDREW LEONIE<br>Associate Deputy Attorney General for<br>Special Litigation |
| SCOTT PRUITT<br>Attorney General of Oklahoma | AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for<br>Special Litigation |
| JEFF LANDRY<br>Attorney General of Louisiana | |
| | /s/ Austin R. Nimocks<br>AUSTIN R. NIMOCKS<br>Texas Bar No. 24002695 |
| SEAN REYES<br>Attorney General of Utah | Austin.Nimocks@texasattorneygeneral.gov |
| SAM OLENS<br>Attorney General of Georgia | Special Litigation Division<br>P.O. Box 12548, Mail Code 001<br>Austin, Texas 78711-2548 |
| | *ATTORNEYS FOR PLAINTIFFS* |