**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS; | § | |
| HARROLD INDEPENDENT | § | |
| SCHOOL DISTRICT (TX); | § | |
| STATE OF ALABAMA; | § | |
| STATE OF WISCONSIN; | § | |
| STATE OF WEST VIRGINIA; | § | |
| STATE OF TENNESSEE; | § | |
| ARIZONA DEPARTMENT | § | |
| OF EDUCATION; | § | |
| HEBER-OVERGAARD | § | |
| UNIFIED SCHOOL DISTRICT (AZ); | § | |
| PAUL LePAGE, Governor of the | § | |
| State of Maine; | § | |
| STATE OF OKLAHOMA; | § | |
| STATE OF LOUISIANA; | § | |
| STATE OF UTAH; | § | |
| STATE OF GEORGIA; | § | |
| STATE OF MISSISSIPPI, | § | |
| by and through Governor Phil Bryant; | § | |
| COMMONWEALTH OF KENTUCKY, | § | |
| by and through | § | |
| Governor Matthew G. Bevin, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:16-cv-00054-O |
| | § | |
| UNITED STATES OF AMERICA; | § | |
| UNITED STATES DEPARTMENT | § | |
| OF EDUCATION; JOHN B. KING, | § | |
| JR., in his Official Capacity as United | § | |
| States Secretary of Education; UNITED | § | |
| STATES DEPARTMENT OF JUSTICE; | § | |
| LORETTA E. LYNCH, in her Official | § | |
| Capacity as Attorney General of the | § | |
| United States; VANITA GUPTA, in her | § | |
| Official Capacity as Principal Deputy | § | |
| Assistant Attorney General; | § | |
| UNITED STATES EQUAL | § | |
| EMPLOYMENT OPPORTUNITY | § | |

COMMISSION; JENNY R. YANG, in          §
her Official Capacity as Chair of       §
the United States Equal Employment      §
Opportunity Commission; UNITED          §
STATES DEPARTMENT OF LABOR;             §
THOMAS E. PEREZ, in his Official        §
Capacity as United States Secretary     §
of Labor; DAVID MICHAELS, in his        §
Official Capacity as the Assistant      §
Secretary of Labor for the Occupational §
Safety and Health Administration,       §
                                        §
              Defendants.               §

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The State of Texas, the Harrold Independent School District (Texas), the State

of Alabama, the State of Wisconsin, the State of West Virginia, the State of

Tennessee, the Arizona Department of Education, the Heber-Overgaard Unified

School District (Arizona), Paul LePage, Governor of the State of Maine, the State of

Oklahoma, the State of Louisiana, the State of Utah, the State of Georgia, the State

of Mississippi, by and through Governor Phil Bryant, and the Commonwealth of

Kentucky, by and through Governor Matthew G. Bevin (collectively, "Plaintiffs") seek

declaratory and other relief against the United States of America, the United States

Department of Education, John B. King, Jr., in his Official Capacity as United States

Secretary of Education, the United States Department of Justice, Loretta E. Lynch,

in her Official Capacity as Attorney General of the United States, Vanita Gupta, in

her Official Capacity as Principal Deputy Assistant Attorney General, the United

States Equal Employment Opportunity Commission, Jenny R. Yang, in her Official

Capacity as Chair of the United States Equal Employment Opportunity Commission, the United States Department of Labor, Thomas E. Perez, in his Official Capacity as United States Secretary of Labor, and David Michaels, in his Official Capacity as the Assistant Secretary of Labor for the Occupational Safety and Health Administration.

Plaintiffs include a diverse coalition of States, top State officials, and local school districts, spanning from the Gulf Coast to the Great Lakes, and from the Grand Canyon to the Grand Isle, that believe that the solemn duty of the executive branch is to enforce the law of the land, and not rewrite it by administrative fiat.

Defendants have conspired to turn workplaces and educational settings across the country into laboratories for a massive social experiment, flouting the democratic process, and running roughshod over commonsense policies protecting children and basic privacy rights. Defendants' rewriting of Title VII and Title IX is wholly incompatible with Congressional text. Defendants cannot foist these radical changes on the nation.

## I.  PARTIES

1.      Plaintiff State of Texas is subject to Title VII as the employer of hundreds of thousands through its constituent agencies. The State of Texas also oversees and controls several agencies that receive federal funding subject to Title IX. For example, the School for the Blind and Visually Impaired ("SBVI") and School for the Deaf ("SD") are statutorily created, independent state agencies. Tex. Educ. Code § 30.001 *et seq*. Both are governed by nine-member boards, appointed by the governor and confirmed by the senate, and both have superintendents appointed by

the boards and "carry out the functions and purposes of [each] school according to any general policy the board[s] prescribe[]." *Id.* §§ 30.023(e) (SBVI); 30.053(e) (SD). Currently, SBVI has a total budget of $24,522,116, of which $4,789,974 is identified as federal funds, and SD has a total budget of $28,699,653, of which $1,957,075 is identified as federal funds. As another example, the Texas Juvenile Justice Department ("TJJD") is a state agency, subject to Title VII and Title IX, responsible for overseeing youth correction facilities in the State of Texas. TJJD's current budget is $314,856,698, which includes $9,594,137 in federal funding.

2.      Plaintiff Harrold Independent School District ("Harrold ISD") is an independent public school district based in Harrold, Wilbarger County, Texas. Additional information about Harrold ISD can be found *infra*.

3.      The Plaintiff States of Alabama, Wisconsin, West Virginia, Tennessee, Oklahoma, Louisiana, Utah, and Georgia are similarly situated to the State of Texas in that one or more of the following circumstances is present: (1) they are employers covered by Title VII, (2) their agencies and departments are subject to Title IX, (3) their agencies and departments receive other federal grant funding that requires, as a condition of the grant, compliance with the Title IX provisions at issue in this lawsuit, or (4) they are suing on behalf of public educational institutions, departments, or agencies in their State that are subject to Title IX.

4.      Plaintiff Arizona Department of Education is the state agency responsible for "[t]he general conduct and supervision of the public school system" in Arizona. ARIZ. CONST. art. XI, § 2; A.R.S. § 15-231.

5.      Plaintiff Heber-Overgaard Unified School District is a public school district with its principal office located in Heber, Navajo County, Arizona.

6.      Plaintiff Paul LePage is the Governor of Maine and Chief Executive of the Maine Constitution and the laws enacted by the Maine Legislature. ME. CONST. art. V, Pt. 1, § 1.

7.      Governor Phil Bryant brings this suit on behalf of the State of Mississippi pursuant to Miss. Code Ann. § 7-1-33. Mississippi is similarly situated to the State of Texas and the Plaintiff States in that it (1) is a covered employer under Title VII, (2) its agencies and departments are subject to Title IX, (3) its agencies and departments receive other federal grant funding that requires, as a condition of the grant, compliance with the Title IX provisions at issue in this lawsuit, and (4) many public educational institutions, departments, and agencies in Mississippi are subject to Title IX.

8.      Governor Matthew G. Bevin brings this suit on behalf of the Commonwealth of Kentucky pursuant to the Kentucky Constitution, which provides that the "supreme executive power" shall be vested in the Governor. KY. CONST. § 69. Kentucky is similarly situated to the State of Texas and the Plaintiff States in that it (1) is a covered employer under Title VII, (2) its agencies and departments are subject to Title IX, (3) its agencies and departments receive other federal grant funding that requires, as a condition of the grant, compliance with the Title IX provisions at issue in this lawsuit, and (4) many public educational institutions, departments, and agencies in Kentucky are subject to Title IX.

9.     Defendant United States Department of Education ("DOE") is an executive agency of the United States and responsible for the administration and enforcement of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

10.     Defendant John B. King, Jr., is the United States Secretary of Education. In this capacity, he is responsible for the operation and management of the DOE. He is sued in his official capacity.

11.     Defendant United States Department of Justice ("DOJ") is an executive agency of the United States and responsible for the enforcement of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. DOJ has the authority to bring enforcement actions to enforce Title IX. Exec. Order No. 12250, 28 C.F.R. Part 41 app. A (1980).

12.     Defendant Loretta A. Lynch is the Attorney General of the United States and head of DOJ. She is sued in her official capacity.

13.     Defendant Vanita Gupta is Principal Deputy Assistant Attorney General at DOJ and acting head of the Civil Rights Division of DOJ. She is assigned the responsibility to bring enforcement actions under Titles VII and IX. 28 C.F.R. § 42.412. She is sued in her official capacity.

14.     Defendant Equal Employment Opportunity Commission ("EEOC") is a federal agency that administers, interprets, and enforces certain laws, including Title VII. EEOC is, among other things, responsible for investigating employment and hiring discrimination complaints.

15.     Defendant Jenny R. Yang is Chair of the EEOC. In this capacity, she is responsible for the administration and implementation of policy within the EEOC, including the investigating of employment and hiring discrimination complaints. She is sued in her official capacity.

16.     Defendant United States Department of Labor ("DOL") is the federal agency responsible for supervising the formulation, issuance, and enforcement of rules, regulations, policies, and forms by the Occupational Safety and Health Administration ("OSHA").

17.     Defendant Thomas E. Perez is the United States Secretary of Labor. He is authorized to issue, amend, and rescind the rules, regulations, policies, and forms of OSHA. He is sued in his official capacity.

18.     Defendant David Michaels is the Assistant Secretary of Labor for OSHA. In this capacity, he is responsible for assuring safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance. He is sued in his official capacity.

## II.  JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit concerns the *ultra vires* revision of the term "sex" under multiple provisions of the United States Code. This Court also has jurisdiction to compel an officer of the United States or any federal agency to perform his or her duty pursuant to 28 U.S.C. § 1361.

20.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the United States, several of its agencies, and several of its officers in their official capacity are Defendants; a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and Plaintiff Harrold ISD (TX) is both an employer subject to Title VII, and a recipient of federal monies subject to Title IX restrictions in Harrold, Wilbarger County, Texas.

21.     The Court is authorized to award the requested declaratory relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202. The Court is authorized to order corrective action under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 611.

## III.  FACTUAL BACKGROUND

### A.     Congressional History.

22.     In 1964, Congress enacted Title VII of the Civil Rights Act, making it illegal for employers to invidiously discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2.

23.     Eight years later, Congress passed Title IX of the Education Amendments of 1972, proscribing *invidious* discrimination on the basis of "sex" in federally funded education programs and activities. 20 U.S.C. § 1681(a). Title IX permits institutions to differentiate intimate facilities by sex. 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different

sexes."). Section 1686 was added to address concerns that Title IX would force a school to allow women in facilities designated for men only, and vice versa. When Senator Birch Bayh first introduced the legislation, Senator Dominick asked about the scope of the law:

> Mr. DOMINICK. The provisions on page 1, under section 601, refer to the fact that no one shall be denied the benefits of any program or activity conducted, et cetera. The words "any program or activity," in what way is the Senator thinking here? *Is he thinking in terms of dormitory facilities, is he thinking in terms of athletic facilities or equipment, or in what terms are we dealing here?* Or are we dealing with just educational requirements?
>
> I think it is important, for example, because we have institutions of learning which, because of circumstances such as I have pointed out, may feel they do not have dormitory facilities which are adequate, or they may feel, as some institutions are already saying, that you cannot [sexually] segregate dormitories anyway. *But suppose they want to [sexually] segregate the dormitories; can they do it?*
>
> Mr. BAYH. The rulemaking powers referred to earlier, I think, give the Secretary discretion to take care of this particular policy problem. *I do not read this as requiring integration of dormitories between the sexes*, nor do I feel it mandates the [sexual] desegregation of football fields.
>
> What we are trying to do is provide equal access for women and men students to the educational process and the extracurricular activities in a school, where there is not a unique facet such as football involved. We are not requiring that intercollegiate football be desegregated, *nor that the men's locker room be [sexually] desegregated.*

117 Cong. Rec. 30407 (1971) (emphasis added).

24.    The following year, when Title IX was passed, Senator Bayh again reiterated that this was not meant to force men and women to share intimate facilities where their privacy rights would be compromised:

> Under this amendment, each Federal agency which extends Federal financial assistance is empowered to issue implementing rules and

regulations effective after approval of the President. *These regulations would allow enforcing agencies to permit differential treatment by sex only*—very unusual cases where such treatment is absolutely necessary to the success of the program—such as in classes for pregnant girls or emotionally disturbed students, in sports facilities *or other instances where personal privacy must be preserved*.

118 Cong. Rec. 5807 (1972) (emphasis added).

25.     Privacy was raised when Title IX was debated in the House. Representative Thompson, concerned about men and women using the same intimate facilities, offered an amendment:

> *I have been disturbed however, about the statements that if there is to be no discrimination based on sex then there can be no separate living facilities for the different sexes.* I have talked with the gentlewoman from Oregon (Mrs. Green) and discussed with the gentlewoman an amendment which she says she would accept. *The amendment simply would state that nothing contained herein shall preclude any educational institution from maintaining separate living facilities because of sex.* So, with that understanding I feel that the amendment [exempting undergraduate programs from Title IX] now under consideration should be opposed and I will offer the "living quarters" amendment at the proper time.

117 Cong. Rec. 39260 (1971) (emphasis added). This amendment was eventually introduced and passed. 117 Cong. Rec. 39263 (1971).

## B.     Aftermath of Title IX.

26.     At the time that Title IX was enacted, there was broad support behind the policy of maintaining separate intimate facilities for female and male students. Scholars defended the practice. *See*, *e.g.*, Barbara A. Brown, Thomas I. Emerson, Gail Falk & Ann E. Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women*, 80 YALE L.J. 871, 901 (1971) (discussing the "separation of the sexes in public rest rooms"). A 1971 article in the *Harvard Law Review* candidly

remarked: "[T]here has never been any indication that men have wished to avoid intimate contact with women on a daily basis." Note, *Sex Discrimination and Equal Protection: Do We Need A Constitutional Amendment*?, 84 HARV. L. REV. 1499, 1514 (1971). And a 1972 article in the *Texas Law Review* characterized restrictions on accessing bathrooms and changing areas as a commonsense "response to our society's concern for privacy and modesty." Brian E. Berwick & Carol Oppenheimer, *Marriage, Pregnancy, and the Right to Go to School*, 50 TEX. L. REV. 1196, 1228 n.116 (1972).

27.     Following the enactment of Title IX, there continued to be significant backing for the longstanding arrangement of maintaining sex-separated intimate facilities. The initial rules promulgated to implement Title IX permitted separate restrooms, locker rooms, and shower facilities on the basis of sex. 34 C.F.R. § 106.33. And legal scholars continued to defend sex-separated intimate facilities as necessary to preserve individual privacy rights. In a 1975 *Washington Post* editorial, then Columbia Law School Professor Ruth Bader Ginsburg wrote that "[s]eparate places to disrobe, sleep, perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21 (emphasis added). And in a 1977 report, the United States Commission on Civil Rights concluded the "the personal privacy principle permits maintenance of separate sleeping and bathroom facilities" for women and men. United States Commission on Civil Rights, *Sex Bias in the U.S. Code* 216 (1977). Courts have recognized this privacy concern as well. In 1996, the United States Supreme Court determined that in admitting female students, a

previously all-male military institute must "afford members of each sex privacy from the other sex." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

28.    Congress construes its prohibitions against invidious "sex" discrimination narrowly. In 1974, Representatives Bella Abzug and Edward Koch proposed to amend the Civil Rights Act to *add* the *new* category of "sexual orientation." H.R. 14752, 93rd Cong. (1974). Congress considered other similar bills during the 1970s. *See* H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979). In 1994, lawmakers introduced the Employment Non-Discrimination Act ("ENDA") which, like Rep. Abzug and Koch's earlier effort, was premised on the understanding that Title VII's protections against invidious "sex" discrimination related only to one's biological sex as male or female. H.R. 4636, 103rd Cong. (1994). In 2007, 2009, and 2011, lawmakers proposed a broader version of EDNA to codify protections for "gender identity" in the employment context. H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011). In addition, in 2013 and 2015, proposals were made to *add* to Title IX the *new* category of "gender identity." H.R. 1652, 113th Cong. (2013); S.439, 114th Cong. (2015). Notwithstanding the success or failure of the aforementioned Congressional proposals, they all affirmed Congress's enduring understanding that "sex," as a protected class, refers only to one's biological sex, as male or female, and not the radical re-authoring of the term now being foisted upon Americans by the collective efforts of Defendants.

29.    And when Congress actually did, in one instance, redefine the term "sex"

for the purposes of its prohibitions against invidious "sex" discrimination, the new definition did not encompass "gender identity." Rather, in 1978, Congress broadened the statutory term "sex" to include discrimination "on the basis of pregnancy, childbirth, or related conditions." Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, § (k), 92 Stat. 2076, 2076 (1978). In amending the law in this way, Congress indicated that invidious "sex" discrimination occurs when females and males are not afforded the same avenues for advancement, *i.e.*, when pregnant women may be legally fired or not hired. Thus, this amendment affirmed Congress's long-held view that "sex" refers to biological sex, and not to an individual's self-perception of his or her "gender identity."

### C.    Secondary Sources.

30.    According to standard legal treatises, "gender identity" is not within the ambit of Title VII. *See*, *e.g.*, Margaret C. Jasper, *Employment Discrimination Law Under Title VII* 45 (2d ed. 2008) (stating that Title VII makes it unlawful "to discriminate against any employee or applicant for employment because of his or her sex"); Mack A. Player, *Employment Discrimination Law* 239 (1988) (providing that the term "sex" for the purposes of Title VII generally refers to the division of organisms into biological sexes); Charles A. Sullivan et al, *Federal Statutory Law of Employment Discrimination* 161 (1980) (same). Indeed, "gender identity" was a virtually unrecognized construct among legal academics when Title VII and Title IX became law. It was not even mentioned in a law review article on the subject of Title VII or Title IX until the 1980s.

31.     "Gender identity" is a relatively recent addition to the social science lexicon. The 1992 National Health and Social Life Survey did not ask about men or women that identify as the opposite sex, nor did the first four waves of data collection of the National Longitudinal Study of Adolescent Health (begun in 1994 and last fielded in 2008). And the Centers for Disease Control and Prevention ("CDC") has so far passed on doing so. Brian W. Ward et al, *Sexual Orientation and Health Among U.S. Adults: National Health Interview Survey, 2013*, 77 NATIONAL HEALTH STATISTICS REPORTS 2 (2014).

32.     Among the general public, "gender identity" also became a familiar concept only of late. Law Professor Gail Heriot, a member of the United States Commission on Civil Rights, noted in her recent Congressional testimony that the 1991 Compact Oxford English Dictionary does not define "transgender." *The Federal Government on Autopilot: Delegation of Regulatory Authority to an Unaccountable Bureaucracy: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 13 (2016) (statement of Gail Heriot, Member, U.S. Comm'n on Civil Rights). Likewise, newspapers such as the *Washington Post* and the *New York Times* did not use the term throughout the 1960s and 1970s. *Id.*

33.     While not a widely used term at the time President Nixon signed Title IX into law, "gender identity" was first used in 1963 at the 23rd International Psycho-Analytical Congress in Stockholm. David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles*, 1945–2001, ARCHIVES OF SEXUAL BEHAVIOR, Apr. 2004, at 93. Notably, early users of "gender" and "gender identity"

understood these terms to mean something *different* than "sex."

34.    In the 1950s, John Money, a psychologist at Johns Hopkins University, introduced "gender"—previously a grammatical term only—into scientific discourse. Joanne Meyerowitz, *A History of "Gender,"* 113 THE AMERICAN HISTORICAL REVIEW 1346, 1353 (2008). Money believed that an individual's "gender role" was not determined at birth but was acquired early in a child's development much in the same fashion that a child learns a language. John Money et al, *Imprinting and the Establishment of Gender Role*, 77 A.M.A. ARCHIVES OF NEUROLOGY AND PSYCHIATRY 333–36 (1957). Robert Stoller, the UCLA psychoanalyst who first used the term "gender identity," was another early adopter of the terminology of "gender." He wrote in 1968 that gender had "psychological or cultural rather than biological connotations." Robert J. Stoller, *Sex and Gender: On the Development of Masculinity and Femininity* 9 (1968).  To him, "sex was biological but gender was social." Haig, *supra*, at 93.

35.    In 1969, Virginia Prince, who is credited with coining the term "transgender," echoed the view that "sex" and "gender" are distinct: "I, at least, know the difference between sex and gender and have simply elected to change the latter and not the former. . . . I should be termed 'trasngenderal.'" *The Federal Government on* Autopilot, 114th Cong. 13 (Heriot statement) (quoting Virginia Prince, *Change of Sex or Gender*, 10 TRANSVESTIA 53, 60 (1969)). And in the 1970s, feminist scholars joined the chorus differentiating "biological sex" from "socially assigned gender." Haig, *supra*, at 93 (quoting Ethel Tobach, 41 *Some Evolutionary Aspects of Human*

*Gender*, AMERICAN JOURNAL OF ORTHOPSYCHIATRY 710 (1971)).

36.    The meaning of the term "sex" has remained unchanged since the enactment of Title VII and Title IX. Around the time that these laws passed, nearly every dictionary definition of "sex" referred to physiological distinctions between females and males, particularly with respect to their reproductive functions. *See, e.g.,* AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . ."); 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."). Even today, "sex" continues to refer to biological differences between females and males. *See, e.g.,* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1331 (5th ed. 2014) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); Sari L. Reisner et al, *"Counting" Transgender and Gender-Nonconforming Adults in Health Research*, TRANSGENDER STUDIES QUARTERLY, Feb. 2015, at 37 ("Sex refers to biological differences among females and males, such as genetics, hormones, secondary sex characteristics, and anatomy.").

37.     The meaning of "gender" has also remained essentially the same since the term was introduced as a means of drawing a distinction between biological "sex" and social "gender." *See*, *e.g.*, Reisner et al, *supra*, at 37 ("Gender typically refers to cultural meanings ascribed to or associated with patterns of behavior, experience, and personality that are labeled as feminine or masculine."). This usage of "gender" is also more commonplace now. For example, the 2010 New Oxford American Dictionary distinguishes between "sex," defined in biological terms, and "gender," defined in social and cultural terms. NEW OXFORD AMERICAN DICTIONARY 721–22, 1600 (3d ed. 2010).

### D.     Defendants' Revisions of the Law.

38.     Current federal law reflects the emergence of "gender" and "gender identity" as concepts distinct from "sex." Congress chose recently to extend protections for "gender identity" in certain areas of federal law. In 2010, President Obama signed into law hate crimes legislation, 18 U.S.C. § 249, which applies to, *inter alia*, "gender identity." *Id.* § 249(a)(2). The 2013 reauthorization of the Violence Against Women Act (VAWA) prohibits recipients of certain federal grants from discriminating on the basis of both "sex" *and* "gender identity." 42 U.S.C. § 13925(b)(13)(A).

39.     While Congress has added "gender identity" next to "sex" in other areas of federal law, it has not changed the terms of Title VII and Title IX. These laws continue to prohibit unlawful discrimination on the basis of "sex." Since 2010,

however, Defendants have pretended that these statutes were actually amended to cover the distinct concept of "gender identity." For example:

- In a 2010 Dear Colleague Letter, the DOE's Office for Civil Rights ("OCR") asserted that "Title IX does protect all students, including . . . transgender (LGBT) students, from sex discrimination." OCR, *Dear Colleague Letter: Harassment and Bullying*, at 8 (Oct. 26, 2010) (Exhibit A).

- In April 2014, OCR stated that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity." OCR, *Questions and Answers on Title IX and Sexual Violence*, at B-2 (Apr. 29, 2014) (Exhibit B).

- Attorney General Eric Holder issued a memo in December 2014 concluding that Title VII's reference to "sex" "encompasses discrimination based on gender identity, including transgender status." DOJ, Memorandum from the Attorney General, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964*, at 2 (Dec. 15, 2014) (Exhibit C).

- And in 2015, OSHA published a "guide" for employers regarding restroom access for employees who identify as the opposite sex. Press Release, OSHA, *OSHA publishes guide to restroom access for transgender workers* (June 1, 2015). OSHA's guidance concluded that

> "all employees should be permitted to use the facilities that correspond
> with their gender identity," which is "internal" and could be "different
> from the sex they were assigned at birth." OSHA, *A Guide to Restroom
> Access for Transgender Workers* (2015) (Exhibit D).

In 2016, Defendants' disregard for federal law as written—and the ability to maintain sex-separated intimate facilities—reached its nadir in the wake of events in North Carolina.

### E.  North Carolina.

40.    On February 22, 2016, the City Council of Charlotte, North Carolina, amended the city's Non-Discrimination Ordinance (Exhibit E), requiring that every government and business bathroom and shower, however designated, be simultaneously open to both sexes. In other words, Charlotte outlawed the right to maintain separate sex intimate facilities throughout the city. The North Carolina General Assembly then passed the Public Facilities Privacy and Security Act ("the Act") (Exhibit F), preempting the Charlotte ordinance and providing that public employees and public school students use bathrooms and showers correlating with their biological sex, defined as the sex noted on their birth certificate. The Act does not establish a policy for private businesses and permits accommodations based on special circumstances.

41.    After signing the Act, on April 12, 2016, North Carolina Governor Patrick L. McCrory issued Executive Order No. 93 to Protect Privacy and Equality ("EO 93") (Exhibit G). EO 93 expanded non-discrimination protections to state

employees on the basis of "gender identity," while simultaneously affirming that cabinet agencies should require multiple occupancy intimate facilities, like bathrooms, to be designated for use only by persons based on their biological sex. EO 93 directed cabinet agencies to make reasonable accommodations when practicable.

42.     Nevertheless, on May 3, 2016, the EEOC released a document titled "Fact Sheet: Bathroom Access Rights for Transgender Employees Under Title VII of the Civil Rights Act of 1964" ("Fact Sheet") (Exhibit H). The Fact Sheet states that Title VII's prohibition of invidious discrimination on the basis of "sex" also now extends to "gender identity." It further provides that employers that do not allow employees to use the bathroom and other intimate facilities of their choosing are liable for unlawful discrimination on the basis of "sex."

43.     Then, on May 4, 2016, DOJ sent Governor McCrory a letter (Exhibit I), declaring that the Act and EO 93 violate both Title VII and Title IX. DOJ threatened to "apply to [an] appropriate court for an order that will ensure compliance with" its *ultra vires* rewriting of the law.

44.     On May 9, 2016, DOJ sued North Carolina, asserting that both the Act and EO 93 are impermissible under federal law.

**F.      The DOJ / DOE Joint Letter.**

45.      On May 13, 2016, DOJ and DOE issued a joint letter ("the Joint Letter")
(Exhibit J), officially foisting its new version of federal law on the more than 100,000
elementary and secondary schools that receive federal funding.

46.      The Joint Letter contends that Title IX's prohibition of invidious "sex"
discrimination also somehow encompasses discrimination based on "gender identity."
Further, it advises that schools taking a different view of Title IX face legal action
and the loss of federal funds. The Joint Letter concerns "*Title IX obligations* regarding
transgender students" and provides insight as to the manner in which DOJ and DOE
will evaluate how schools "are complying with their *legal obligations*" (emphasis
added). It refers to an accompanying document collecting examples from school
policies and recommends that school officials comb through the document "for
practical ways to meet *Title IX's requirements*" (same). Indeed, the Joint Letter
amounts to "*significant guidance*" (emphasis in original).

47.      According to the Joint Letter, schools must treat a student's "gender
identity" as the student's "sex" for purposes of Title IX compliance, with one notable
exception. "Gender identity," the Joint Letter explains, refers to a person's "internal
sense of gender," without regard to one's biological sex. One's "gender identity" can
be the same as a person's biological sex, or different. The Joint Letter provides that
no medical diagnosis or treatment requirement is a prerequisite to selecting one's
"gender identity," nor is there any form of temporal requirement. In other words, a
student can choose one "gender identity" on one particular day or hour, and then the

opposite one the next. And students of any age may establish a "gender identity" different from their biological sex simply by notifying the school administration—the involvement of a parent or guardian is not necessary.

48.     In the case of athletics, however, the Joint Letter does *not* require schools to treat a student's "gender identity" as the student's "sex" for the purpose of Title IX compliance. Instead, the Joint Letter basically leaves intact Title IX regulations allowing schools to restrict athletic teams to members of one biological sex. The only change that the Joint Letter makes to athletic programs is that schools may not "rely on overly broad generalizations or stereotypes" about students. Otherwise, differentiating sports teams on the basis of "sex"—not "gender identity"— is consistent with the Joint Letter. The Joint Letter's disparate treatment of bathrooms and showers, on the one hand, and athletic teams, on the other, demonstrates that DOJ/DOE is not simply demanding that schools abide by Title IX (as misinterpreted to somehow include "gender identity"). Rather, the Joint Letter tries to rewrite Title IX by executive fiat, mandating all bathrooms and showers to be simultaneously open to both sexes, while concurrently permitting different sex athletics subject to limited exceptions. The new policy has no basis in law.

49.     Adapting to the new demands of DOJ and DOE requires significant changes in the operations of the nation's school districts. Schools subject to Title IX must allow students to choose the restrooms, locker rooms, and other intimate facilities that match their chosen "gender identity" at any given time. Single-sex

classes, schools, and dormitories must also be open to students based on their chosen "gender identity."

50.     On May 17, 2016, the Attorneys General of Oklahoma, Texas, and West Virginia sent DOJ and DOE a letter (Exhibit K) requesting clarification on the effect of the Joint Letter on agencies within these States. DOJ and DOE did not respond.

### G.     Harrold Independent School District (TX).

51.     On May 23, 2016, school board members of the Harrold ISD ("the Board") convened a regular session. At the session, the Board adopted a policy ("the Policy") (Exhibit L) consistent with its current practice. The Policy, which applies to students and employees of the Harrold ISD, limits multiple occupancy bathrooms and locker rooms to usage by persons based on their biological sex. The Policy also allows for accommodations.

52.     After adopting the Policy, the Board requested representation (Exhibit M) from the Office of the Attorney General ("OAG") of Texas, under Texas Education Code § 11.151(e), to determine whether the Policy is in conflict with federal law and, if so, whether the Policy is enforceable. The OAG agreed to represent the Board.

53.     Harrold ISD is subject to Title VII and receives federal funding subject to Title IX. In 2015–16, Harrold ISD operated on a total annual budget exceeding $1.4 million, with the federal portion amounting to approximately $117,000.

54.     Defendants have indicated they will enforce their revision of federal law against entities, such as Harrold ISD, that do not obey the new obligations unlawfully imposed on them. The Joint Letter of May 13, 2016, (Exhibit J) states that Title IX

and its implementing regulations apply to "educational programs and activities operated by recipients of Federal financial assistance" and that schools agree to same "as a condition of receiving federal assistance." According to its website, DOE "vigorously enforces Title IX to ensure that institutions that receive federal financial assistance from [DOE] comply with the law." DOE, http://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html. And federal regulations provide for mandatory investigations into recipients of Title IX-linked funds who discriminate on the basis of "sex." 34 C.F.R. §§ 100.7(a), 100.8, 106.71 (incorporating Title VI procedures).

55.    Thus, the federal government possesses the ability to deny federal funds that comprise a substantial portion of Harrold ISD's budget if Harrold ISD chooses to follow its Policy instead of the new rules, regulations, guidance and interpretations of Defendants. As a result, Harrold ISD must budget and reallocate resources now in order to prepare for the prospective loss of federal funding.

**H.    Arizona Plaintiffs.**

56.    Plaintiffs Arizona Department of Education, by and through Superintendent of Public Instruction Diane Douglas, and Heber-Overgaard Unified School District (collectively, the "Arizona Plaintiffs") have requested that Arizona Attorney General Mark Brnovich represent them in the present litigation. Arizona Attorney General Mark Brnovich deems it necessary to represent the Arizona Plaintiffs. Arizona Department of Education Guideline and Procedure Doc. No. HR-20 (Exhibit N), which applies to all Arizona Plaintiffs, provides that "It is not . . .

discriminatory for a school to offer separate housing, toilet, athletic and other facilities on the basis of sex, so long as the facilities provided to each sex are comparable." Exhibit N, at 2.

## I.   Federal Education Funding.

57.   The loss of all federal funding for state and local education programs will have a major effect on State and local education budgets. The $69,867,660,640 in annual funding makes its way to all 50 states. DOE, *Funds for State Formula-Allocated and Selected Student Aid Programs, U.S. Dep't of Educ. Funding*, at 120, *available at* http://www2.ed.gov/about/overview/budget/statetables/index.html (charts listing the amount of federal education funding by program nationally and by state). DOE estimates that the federal government will spend over $36 billion in State and local elementary and secondary education, and over $30 billion in State and local postsecondary education programs in 2016.

58.   Not counting funds paid directly to state education agencies, or funds paid for non-elementary and secondary programs, the national amount of direct federal funding to public elementary and secondary schools alone exceeds $55,862,552,000 on average annually—which amounts to 9.3 percent of the average State's total revenue for public elementary and secondary schools, or $1,128 per pupil. Texas's public elementary and secondary schools, for example, receive an average of $5,872,123,000 in federal funds annually, or $1,156 per pupil, which amounts to about 11.7 percent of the State's revenue for public elementary and secondary schools.

59.     Alabama's public elementary and secondary schools, for example, receive an average of $850,523,000 in federal funds annually, or $1,142 per pupil, which amounts to about 11.8 percent of the State's revenue for public elementary and secondary schools. West Virginia's public elementary and secondary schools, for example, receive an average of $380,192,000 in federal funds annually, or $1,343 per pupil, which amounts to about 10.7 percent of the State's revenue for public elementary and secondary schools. Wisconsin's public elementary and secondary schools, for example, receive an average of $850,329,000 in federal funds annually, or $975 per pupil, which amounts to about 7.9 percent of the State's revenue for public elementary and secondary schools. The percentages in other States are comparable. Nat'l Ctr. For Educ. Statistics, U.S. Dep't of Educ. & Institute of Educ. Sciences, *Digest of Education Statistics*, Tab. 235.20, *available at* https://nces.ed.gov/programs/digest/d15/tables/dt15_235.20.asp?current=yes.

## IV.  CLAIMS FOR RELIEF

### COUNT ONE

### Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Being Imposed Without Observance of Procedure Required by Law

60.     The allegations in paragraphs 1 through 59 are reincorporated herein.

61.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

62.     The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." *Id*. § 706(2)(D).

63.     With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. *Id*. § 553.

64.     Defendants failed to properly engage in notice-and-comment rulemaking in promulgating the new rules, regulations, guidance and interpretations described herein.

## COUNT TWO

### Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful by Exceeding Congressional Authorization

65.     The allegations in paragraphs 1 through 64 are reincorporated herein.

66.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

67.     The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(B)–(C).

68.     The new rules, regulations, guidance and interpretations described herein go so far beyond any reasonable reading of the relevant Congressional text such that the new rules, regulations, guidance and interpretations functionally exercise lawmaking power reserved only to Congress. U.S. CONST. art. I, § 1 ("*All* legislative powers herein granted shall be vested in . . . Congress") (emphasis added); The Federalist No. 48, at 256 (James Madison) (Carey and McClellan eds. 1990) (noting that "[i]t is not unfrequently a question of real nicety in legislative bodies whether the operation of a particular measure will, or will not, extend beyond the legislative sphere," but that "the executive power [is] restrained within a narrower compass and . . . more simple in its nature").

69.     The new rules, regulations, guidance and interpretations described herein also violate separation of powers principles by purporting to expand federal court jurisdiction to cover whether persons of both sexes have a right to use previously separate sex intimate facilities, an issue on which Congress has not intended to legislate. Only Congress, not an agency, can expand federal court jurisdiction, U.S. CONST. art. III, § 1-2; *Vaden v. Discover Bank*, 556 U.S. 49, 59 n.9 (2009); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("[Federal courts] possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.) (internal citations omitted); *Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922) ("[A] court created by the general government derives its jurisdiction wholly from the authority of Congress . . . provided it be not extended

beyond the boundaries fixed by the Constitution."), and the Defendants' attempts to do so as described herein violates the constitutional separation of powers.

70.     Because the new rules, regulations, guidance and interpretations are not in accordance with the law articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

## COUNT THREE

### Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful by Violating the Tenth Amendment

71.     The allegations in paragraphs 1 through 70 are reincorporated herein.

72.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

73.     The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C).

74.     The federal government is one of limited, enumerated powers; all others—including a general police power—are reserved to the States. *See United States v. Morrison*, 529 U.S. 598, 617–19 (2000). The States' police power includes the "protection of the safety of persons," *Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80,

82 (1946), the "general power of governing," *NFIB v. Sebelius*, 132 S. Ct. 2566, 2578 (2012), and the "authority to enact legislation for the public good," *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014).

75.     The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X.

76.     The new rules, regulations, guidance and interpretations described herein violate the Tenth Amendment because they effectively commandeer the States' historic and well-established regulation of civil privacy law. *New York v. United States*, 505 U.S. 144, 162 (1992) ("While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.").

77.     The new rules, regulations, guidance and interpretations described herein unlawfully attempt to preempt State law regarding rights of privacy because historic powers reserved to the States, such as civil privacy protections, cannot be superseded by federal act, "unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *Gregory v. Ashcroft*, 501 U.S. 452, 460–70 (1991). As explained herein, not only is there no evidence that Congress intended to regulate civil privacy circumstances within the States, but legislative history demonstrates that Congress expressed its clear intent to *not* encroach upon the traditional State

role in safeguarding privacy expectations in the workplace, public accommodations, and educational settings.

78.     Because the new rules, regulations, guidance and interpretations are not in accordance with the law as articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

## COUNT FOUR

### Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful by Violating the Equal Protection of Law

79.     The allegations in paragraphs 1 through 78 are reincorporated herein.

80.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

81.     The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(B)–(C).

82.     The new rules, regulations, guidance and interpretations violate the constitutional right to the equal protection of law because they treat similarly situated individuals differently. For example, under Defendants' new rules, a female who proclaims a male "gender identity" can use either the men's or women's restroom,

but a female who proclaims a female "gender identity" may use only the women's restroom. Thus, not all men or women are treated the same.

83.   Because the new rules, regulations, guidance and interpretations are not in accordance with the law articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

## COUNT FIVE

**Relief Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Unlawfully Attempt to Abrogate State Sovereign Immunity**

84.   The allegations in paragraphs 1 through 83 are reincorporated herein.

85.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

86.   The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(B)–(C).

87.   The new rules, regulations, guidance and interpretations improperly abrogate the States' sovereign immunity without supporting Congressional findings.

88.   The Supreme Court acknowledges Congress's abrogation of the States' sovereign immunity in the employment context, but only on the basis of

Congressional findings and concerns about unequal treatment between men and women, and not an employee's decision on whether they declare themselves male or female. *See, e.g., Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 and n.2 (2003) (observing that the FMLA aims to promote the goal of equal employment opportunity for women and men).

89.     In adopting their new rules, regulations, guidance and interpretations, the Defendants point to no Congressional findings about invidious discrimination based on "gender identity." Indeed, the Defendants ignore the complete lack of any Congressional intent that the term "sex" include an individual's right to choose his or her sex. The Defendants cannot expand abrogation of the State's sovereign immunity by rewriting the meaning of "sex" employed by Congress.

## COUNT SIX

### Relief Under 5 U.S.C. § 706 (APA) that new Rules, Regulations, Guidance and Interpretations at Issue Are Arbitrary and Capricious in that they Interfere with Local Schools

90.     The allegations in paragraphs 1 through 89 are reincorporated herein.

91.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

92.    The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

93.    Defendants' actions—rewriting federal law to suit their own policy preferences—are arbitrary and capricious and not otherwise in accordance with the law. Defendants' actions are arbitrary and capricious because they interfere with local schools by unilaterally changing the statutory term "sex"—long and widely accepted to be a biological category—to include "gender identity." Title IX and Title VII do not refer to "gender identity." Nor does 34 C.F.R. § 106.33, which expressly authorizes separate restrooms and locker rooms "on the basis of sex." The federal laws at issue prohibit disparate treatment "on the basis of sex," 20 U.S.C. § 1681(a); 34 C.F.R. § 106.33, a term long understood unambiguously to be a biological category based principally on male or female reproductive anatomy, and not one that includes self-proclaimed "gender identity."

### COUNT SEVEN

### Relief Under 5 U.S.C. § 706 (APA) that new Rules, Regulations, Guidance and Interpretations at Issue Are Arbitrary and Capricious in that they Conflict with Federal Law

94.    The allegations in paragraphs 1 through 93 are reincorporated herein.

95.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

96.     The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

97.     Under PREA (Prison Rape Elimination Act), 42 U.S.C. § 15601 *et seq.*, those that identify as the opposite sex have the option to shower separately. 28 C.F.R. § 115.42(f). Coupling this element in PREA with the new rules, regulations, guidance and interpretations at issue (where everyone may identify as the opposite sex, if they choose to do so) means that *every* inmate can exercise a right to take a separate shower, which is an untenable position (and, thus, arbitrary and capricious), especially within a correctional circumstance.

## COUNT EIGHT

**Relief Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful and Violate Constitutional Standards of Clear Notice**

98.     The allegations in paragraphs 1 through 97 are reincorporated herein.

99.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id.* § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

100.   The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(B)–(C).

101.   When Congress exercises its Spending Clause power, conditions on Congressional funds must enable the recipient to "clearly understand," from the language of the law itself, the conditions to which they are agreeing to when accepting the federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Defendants' *ex-post* rules, regulations, guidance and interpretations described herein are not in accord with the understanding that existed when the States opted into the programs. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (providing that a state's obligation under cooperative federalism program "generally should be determined by reference to the law in effect when the grants were made").

102.   The text employed by Congress does not support understanding the term "sex" in the manner put forth by Defendants. Congress expressed its intent to cover "gender identity," as a protected class, in *other* pieces of legislation, *see*, *e.g.*, 18 U.S.C. § 249(a)(2)(A); 42 U.S.C. § 13925(b)(13)(A), but not Title IX. In *other* legislation, Congress included "gender identity" along with "sex," thus evidencing its intent for "sex" in Title IX to retain its original and only meaning—one's immutable, biological sex as acknowledged at or before birth.

## COUNT NINE

## Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, Guidance and Interpretations at Issue Are Unlawful and Unconstitutionally Coercive

103.   The allegations in paragraphs 1 through 102 are reincorporated herein.

104.   Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new rules, regulations, guidance and interpretations described herein are "rules" under the APA, *id*. § 551(4), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704.

105.   The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(B)–(C).

106.   By placing in jeopardy a substantial percentage of Plaintiffs' budgets if they refuse to comply with the new rules, regulations, guidance and interpretations of Defendants, Defendants have left Plaintiffs no real choice but to acquiesce in such policy. *See NFIB*, 132 S. Ct. at 2605 ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce . . . .").

107.   "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB*, 132 S. Ct. at 2602 (quoting *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 451 U.S. 1, 17 (1981)). "Congress may use its spending power to create incentives for [entities] to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.* (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Id.*

108.   "[T]he financial 'inducement' [Defendants have] chosen is much more than 'relatively mild encouragement' – it is a gun to the head." *Id.* at 2604. When conditions on the receipt of funds "take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the states to accept policy changes." *Id.*; *cf. South Dakota v. Dole*, 483 U.S. 203, 211 (1987).

109.   Furthermore, the Spending Clause requires that entities "voluntarily and knowingly accept[]" the conditions for the receipt of federal funds. *NFIB*, 132 S. Ct. at 2602 (quoting *Halderman*, 451 U.S. at 17).

110.   Because Defendants' new rules, regulations, guidance and interpretations change the conditions for the receipt of federal funds *after* the acceptance of Congress's original conditions, the Court should declare that the new rules, regulations, guidance and interpretations are unconstitutional because they violate the Spending Clause.

## COUNT TEN

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 (DJA) and 5 U.S.C. § 611 (RFA) that the new Rules, Regulations, Guidance and Interpretations Were Issued Without a Proper Regulatory Flexibility Analysis

111.   The allegations in paragraphs 1 through 110 are reincorporated herein.

112.   Before issuing any of the new rules, regulations, guidance and interpretations at issue, Defendants failed to prepare and make available for public comment an initial and final regulatory flexibility analysis as required by the RFA. 5 U.S.C. § 603(a). An agency can avoid performing a flexibility analysis if the agency's top official certifies that the rule will not have a significant economic impact on a substantial number of small entities. *Id*. § 605(b). The certification must include a statement providing the factual basis for the agency's determination that the rule will not significantly impact small entities. *Id*.

113.   The new rules, regulations, guidance and interpretations impact a substantial number of small entities because they require public schools receiving Title IX-linked funds either to comply or lose a significant portion of their budgets. None of the Defendants even attempted such a certification. Thus, the Court should declare Defendants' new rules, regulations, guidance and interpretations unlawful and set them aside.

## V.  DEMAND FOR JUDGMENT

Plaintiffs respectfully request the following relief from the Court:

114.   A declaration that the new rules, regulations, guidance and interpretations are unlawful and must be set aside as actions taken "without observance of procedure required by law" under the APA;

115.   A declaration that the new rules, regulations, guidance and interpretations are substantively unlawful under the APA;

116.   A declaration that the new rules, regulations, guidance and interpretations are arbitrary and capricious under the APA;

117.   A declaration that the new rules, regulations, guidance and interpretations are invalid because they abrogate Plaintiffs' sovereign immunity;

118.   A declaration that the new rules, regulations, guidance and interpretations are invalid because Defendants failed to conduct the proper regulatory flexibility analysis required by the RFA.

119.   A vacatur, as a consequence of each or any of the declarations aforesaid, as to the Defendants' promulgation, implementation, and determination of applicability of the Joint Letter, and its terms and conditions, along with all related rules, regulations, guidance and interpretations, as issued and applied to Plaintiffs and similarly situated parties throughout the United States, within the jurisdiction of this Court.

120.   Preliminary relief, enjoining the new rules, regulations, guidance and interpretations from having any legal effect;

121.   A final, permanent injunction preventing the Defendants from implementing, applying, or enforcing the new rules, regulations, guidance and interpretations; and

122.   All other relief to which the Plaintiffs may show themselves to be entitled, including attorneys' fees and costs of court.

Respectfully submitted,

| | |
|---|---|
| LUTHER STRANGE<br>Attorney General of Alabama | KEN PAXTON<br>Attorney General of Texas |
| BRAD D. SCHIMEL<br>Attorney General of Wisconsin | JEFFREY C. MATEER<br>First Assistant Attorney General |
| PATRICK MORRISEY<br>Attorney General of West Virginia | BRANTLEY STARR<br>Deputy First Assistant Attorney General |
| HERBERT SLATERY, III<br>Attorney General of Tennessee | PRERAK SHAH<br>Senior Counsel to the Attorney General |
| MARK BRNOVICH<br>Attorney General of Arizona | ANDREW LEONIE<br>Associate Deputy Attorney General for<br>Special Litigation |
| SCOTT PRUITT<br>Attorney General of Oklahoma | AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for<br>Special Litigation |
| JEFF LANDRY<br>Attorney General of Louisiana | /s/ Austin R. Nimocks<br>AUSTIN R. NIMOCKS<br>Texas Bar No. 24002695<br>Austin.Nimocks@texasattorneygeneral.gov |
| SEAN REYES<br>Attorney General of Utah | Special Litigation Division<br>P.O. Box 12548, Mail Code 001<br>Austin, Texas 78711-2548 |
| SAM OLENS<br>Attorney General of Georgia | *ATTORNEYS FOR PLAINTIFFS* |