# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS; | § | |
| HARROLD INDEPENDENT | § | |
| SCHOOL DISTRICT (TX); | § | |
| STATE OF ALABAMA; | § | |
| STATE OF WISCONSIN; | § | |
| STATE OF WEST VIRGINIA; | § | |
| STATE OF TENNESSEE; | § | |
| ARIZONA DEPARTMENT | § | |
| OF EDUCATION; | § | |
| HEBER-OVERGAARD | § | |
| UNIFIED SCHOOL DISTRICT (AZ); | § | |
| PAUL LePAGE, Governor of the | § | |
| State of Maine; | § | |
| STATE OF OKLAHOMA; | § | |
| STATE OF LOUISIANA; | § | |
| STATE OF UTAH; | § | |
| STATE OF GEORGIA; | § | |
| STATE OF MISSISSIPPI, | § | |
| by and through Governor Phil Bryant; | § | |
| COMMONWEALTH OF KENTUCKY, | § | |
| by and through | § | |
| Governor Matthew G. Bevin, | § | |
|  | § | |
| Plaintiffs, | § | |
|  | § | |
| v. | § | CIVIL ACTION NO. 7:16-cv-00054-O |
|  | § | |
| UNITED STATES OF AMERICA; | § | |
| UNITED STATES DEPARTMENT | § | |
| OF EDUCATION; JOHN B. KING, | § | |
| JR., in his Official Capacity as United | § | |
| States Secretary of Education; UNITED | § | |
| STATES DEPARTMENT OF JUSTICE; | § | |
| LORETTA E. LYNCH, in her Official | § | |
| Capacity as Attorney General of the | § | |
| United States; VANITA GUPTA, in her | § | |
| Official Capacity as Principal Deputy | § | |
| Assistant Attorney General; | § | |
| UNITED STATES EQUAL | § | |
| EMPLOYMENT OPPORTUNITY | § | |

COMMISSION; JENNY R. YANG, in            §
her Official Capacity as Chair of         §
the United States Equal Employment        §
Opportunity Commission; UNITED            §
STATES DEPARTMENT OF LABOR;               §
THOMAS E. PEREZ, in his Official          §
Capacity as United States Secretary       §
of Labor; DAVID MICHAELS, in his          §
Official Capacity as Assistant            §
Secretary of Labor for Occupational       §
Safety and Health Administration,         §
                                          §
            Defendants.                   §

---

## PLAINTIFFS' APPLICATION
## FOR PRELIMINARY INJUNCTION
### (and agreed request for expedited consideration)

---

# TABLE OF CONTENTS

I.   INTRODUCTION...........................................................................................1

II.  FACTS .......................................................................................................2

   A.  Titles VII and IX. .................................................................................2

   B.  Defendants' Revisions of the Law. ........................................................4

   C.  Harrold Independent School District (TX)............................................6

   D.  Nationwide Harm. ................................................................................9

III.  ARGUMENT ...........................................................................................11

   A.  Plaintiffs Are Likely to Prevail on the Merits. ....................................12

     1.  Defendants Repeatedly Violated the Administrative Procedure
       Act ("APA"). ...................................................................................12

       a.  Circumventing Notice and Comment. ........................................12

       b.  Incompatible with Statutory Text. ............................................16

     2.  Defendants Violated the Spending Clause. ....................................19

       a.  No "Clear Notice" of Defendants' New Rules. ...........................19

       b.  Unconstitutional Coercion. .......................................................20

   B.  Plaintiffs and Non-Plaintiffs Will Incur Irreparable Harms. .........................21

   C.  The Balance of Equities Favors Plaintiffs. ...........................................23

   D.  The Public Interest Necessitates a Preliminary Injunction............................23

   E.  Nationwide Injunction. .....................................................................234

IV.  AGREED REQUEST FOR EXPEDITED CONSIDERATION ..........................25

Certificate of Conference ...............................................................................27

Certificate of Service......................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993) ............................................................. 14

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000) ............................................................. 15

*Arlington Cent. Sch. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ............................................................................... 19

*Asgrow Seed Co. v. Winterboer*,
    513 U.S. 179 (1995) ............................................................................... 17

*Ballard v. United States*,
    329 U.S. 187 (1946) ............................................................................... 23

*Batterton v. Marshall*,
    648 F.2d 694 (D.C. Cir. 1980) ............................................................. 13

*Billings v. Atkinson*,
    489 S.W.2d 858 (Tex. 1973) ........................................................... 8, 21

*Brannum v. Overton Cnty. Sch. Bd.*,
    516 F.3d 489 (6th Cir. 2008) ................................................................. 8

*California v. Yamaski*,
    442 U.S. 682 (1979) ............................................................................... 24

*Central Life Ins. Co. v. Burwell*,
    No. 15-5310 (D.C. Cir. July 1, 2016) .................................................. 18

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ......................................................................... 5, 16

*Christensen v. Harris Cnty.*,
    529 U.S. 576 (2000) ................................................................................. 5

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ............................................................................... 13

*Davidson v. Glickman*,
    169 F.3d 996 (5th Cir. 1999) ............................................................... 14

*Doe v. Luzerne Cnty.*,
    660 F.3d 169 (3d Cir. 2011) ................................................................... 8

*Encino Motorcars, LLC v. Navarro*,
    No. 15-415, 2016 WL 3369424 (U.S. June 20, 2016) ............................ 5

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2001) ............................................................. 15

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ............................................................. 24

*Homemakers North Shore, Inc. v. Bowen*,
    832 F.2d 408 (7th Cir. 1987) ............................................................... 14

*Indus. Found. of the S. v. Tex. Indus. Accident Bd.*,
    540 S.W.2d 668 (Tex. 1976), *cert. denied*, 430 U.S. 931 (1977) ......... 8, 21

*INS v. Chadha,*
 462 U.S. 919 (1983) ............................................................... 12
*Jackson Women's Health Org. v. Currier,*
 760 F.3d 448 (5th Cir. 2014) .................................................. 12
*Kansas v. United States,*
 249 F.3d 1213 (10th Cir. 2001) .............................................. 22
*Morton v. Ruiz,*
 415 U.S. 199 (1974) ............................................................... 13
*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan,*
 979 F.2d 227 (D.C. Cir. 1992) .......................................... 13, 14
*Nat'l Mining Ass'n v. McCarthy,*
 758 F.3d 243 (D.C. Cir. 2014) ............................................... 12
*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
 145 F.3d 1399 (D.C. Cir. 1998) ............................................. 24
*Nevada Dep't of Human Res. v. Hibbs,*
 538 U.S. 721 (2003) ............................................................... 19
*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
 434 U.S. 1345 (1977) ............................................................. 22
*NFIB v. Sebelius,*
 132 S. Ct. 2566 (2012) ..................................................... 19, 20
*North Dakota v. EPA,*
 127 F. Supp. 3d 1047 (D.N.D. 2015) ..................................... 22
*Pennhurst State Sch. & Hosp. v. Halderman,*
 451 U.S. 1 (1981) .................................................................. 19
*People v. Falsetta,*
 986 P.2d 182 (Cal. 1999) ......................................................... 7
*Perez v. Mortg. Bankers Ass'n,*
 135 S. Ct. 1199 (2015) ........................................................... 14
*Phillips Petroleum Co. v. Johnson,*
 22 F.3d 616 (5th Cir. 1994) .................................................... 14
*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
 734 F.3d 406 (5th Cir. 2013) .................................................. 22
*Schroer v. Billington,*
 577 F. Supp. 2d 293 (D.D.C. 2008) ....................................... 15
*Sepulveda v. Ramirez,*
 967 F.2d 1413 (9th Cir. 1992) .................................................. 8
*Shell Offshore Inc. v. Babbitt,*
 238 F.3d 622 (5th Cir. 2001) ............................................. 14, 15
*Sheriff v. Gillie,*
 136 S. Ct. 1594 (2016) ..................................................... 19, 23
*South Dakota v. Dole,*
 483 U.S. 203 (1987) ............................................................... 20
*Sprint Corp. v. FCC,*
 315 F.3d 369 (D.C. Cir. 2003) ............................................... 14

*Students and Parents for Privacy et al v. U.S. Dep't of Educ. et al,*
1:16-cv-4945 (N.D. Ill.) ............................................................... 7
*Sullivan v. Stroop,*
496 U.S. 478 (1990) ................................................................... 17
*Texas v. United States,*
809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court,*
2016 WL 3434401, No. 15-674 (June 23, 2016) ................................ 24
*Texas v. United States,*
95 F. Supp. 3d 965 (N.D. Tex. 2015) .............................................. 22
*Thomas Jefferson Univ. v. Shalala,*
512 U.S. 504 (1994) ................................................................... 16
*United States v. North Carolina et al,*
Case No. 1:16-cv-425 (M.D.N.C.) ............................................ 5, 16
*United States v. Virginia,*
518 U.S. 515 (1996) ................................................................ 1, 8
*Virginian Ry. Co. v. Sys. Fed'n No. 40,*
300 U.S. 515 (1937) ................................................................... 24

**Statutes**
105 Ill. Comp. Stat.
    § 5/1A-4 .................................................................................. 11
    § 5/34-18 ................................................................................. 11
16 R.I. Gen. Laws
    § 16-2-9(a) ............................................................................... 11
    § 16-2-9(a)(5) ........................................................................... 11
    § 16-2-9(a)(8) ........................................................................... 11
18 U.S.C.
    § 249 ........................................................................................ 4
    § 249(a)(2) ................................................................................. 4
20 U.S.C.
    § 1681(a) [Title IX] ..................................................................... 3
    § 1686 [Title IX] .................................................................... 3, 17
24 Pa. Stat.
    § 5-507 .................................................................................... 11
    § 7-701 .................................................................................... 11
    § 7-775 .................................................................................... 11
    § 6513 ..................................................................................... 11
28 U.S.C. § 547 ................................................................................ 27
42 U.S.C.
    § 13925(b)(13)(A) ...................................................................... 4
    § 2000e-2 [Title VII] ................................................................... 2
5 U.S.C.
    § 553(b) ................................................................................... 12
    § 553(b)(A) ............................................................................... 12

§ 553(c) ........................................................................................................ 12

ALA. CODE

§ 16-3-11 ...................................................................................................... 10

§16-3-12 ....................................................................................................... 10

§§ 16-8-8 –16-8-12 ...................................................................................... 10

ALASKA ADMIN. CODE tit. IV § 31.010 ........................................................ 10

ALASKA STAT. § 14.07.010–020 .................................................................... 10

ARIZ. REV. STAT.

§ 15-203(A)(1) ............................................................................................. 10

§ 15-341(A)(1) ............................................................................................. 10

§ 15-341(A)(3) ............................................................................................. 10

ARK. CODE

§ 6-11-105 .................................................................................................... 10

§ 6-13-1301 .................................................................................................. 10

§ 6-21-101 .................................................................................................... 10

CAL. EDUC. CODE

§ 33301 ......................................................................................................... 10

§ 33307 ......................................................................................................... 10

COLO. REV. STAT.

§ 22-2-106 .................................................................................................... 10

§ 22-43.7-107 ........................................................................................... 10-11

CONN. GEN. STAT. §§ 10-240–241 ................................................................ 11

FLA. STAT.

§ 1001.42(2) ................................................................................................ 11

§ 1001.43(1) ................................................................................................ 11

§ 1013.04 ...................................................................................................... 11

GA. CODE

§ 20-2-59 ...................................................................................................... 10

§ 20-2-520 .................................................................................................... 10

Gen. Appropriations Act, 2015–16 Biennium, 84th Tex. Leg., R.S., art. III, § 1 .............11, 13, 21

HAW. CODE R. § 8-39-2 .................................................................................. 11

HAW. REV. STAT.

§ 302A-1101 ................................................................................................. 11

§ 302A-1148 ................................................................................................. 11

§ 302A-1506 ................................................................................................. 11

IDAHO CODE

§ 33-101 ........................................................................................................ 11

§ 33-107 ........................................................................................................ 11

§ 33-601 ........................................................................................................ 11

IND. CODE

§ 20-19-2-2.1 ............................................................................................... 11

§ 20-19-2-14 ................................................................................................ 11

§ 20-26-3-4 ................................................................................................... 11

§ 20-26-5-1 ................................................................................................... 11

IOWA CODE
    § 256.1 .......................................................................................................... 11
    § 274.1 .......................................................................................................... 11
    § 297.9 .......................................................................................................... 11
KAN. STAT. § 72-1033 ........................................................................................ 11
KY. REV. STAT.
    § 156.070 ...................................................................................................... 10
    § 160.290 ...................................................................................................... 10
LSA-R.S. § 17:100.6 .......................................................................................... 10
MASS. GEN. LAWS. ch. 69, § 1B ........................................................................ 11
MASS. GEN LAWS. ch. 71, § 71 .......................................................................... 11
MD. CODE, EDUC.
    § 2-205(b)(1–2) ............................................................................................ 11
    § 4-101 .......................................................................................................... 11
    § 4-108 .......................................................................................................... 11
    § 4-115 .......................................................................................................... 11
ME. REV. STAT. tit. 20-A, §§ 201–406 ............................................................. 10
    § 1001(2) ...................................................................................................... 10
    § 6501 ........................................................................................................... 10
MICH. COMP. LAWS. § 380.483a ........................................................................ 11
MINN. STAT.
    § 123B.02 ...................................................................................................... 11
    § 123B.09 ...................................................................................................... 11
    § 123B.51 ...................................................................................................... 11
MISS. CODE ANN. § 37-7-301 ........................................................................... 10
MO. STAT.
    § 161.092 ...................................................................................................... 11
    § 171.0011(1) ............................................................................................... 11
    § 171.011 ...................................................................................................... 11
    § 177.031 ...................................................................................................... 11
MONT. ADMIN. R. 10.55.908(6) ........................................................................ 11
MONT. CODE § 20-3-324(15) ............................................................................ 11
N.C. GEN. STAT. § 115C-12 .............................................................................. 11
N.D. CENT. CODE
    §§ 15.1-02-04(1)–(2) ................................................................................... 11
    § 15.1-09-33(3) ............................................................................................ 11
N.H. CODE ADMIN. R. Ed § 303.01 ................................................................... 11
N.H. REV. STAT.
    § 186:5 .......................................................................................................... 11
    § 195:6 .......................................................................................................... 11
N.J. STAT.
    § 18A:4-15 .................................................................................................... 11
    § 18A:11-1(c) ............................................................................................... 11

N.M. Stat.
    § 22-2-1(A) ................................................................. 11
    § 22-5-4(H) ................................................................. 11
N.Y. Educ. Law § 414 ................................................... 11
Neb. Rev. Stat.
    § 79-318(6) ................................................................. 11
    § 79-501 ..................................................................... 11
    § 79-526(1) ................................................................. 11
Nev. Rev. Stat.
    § 385.005(1) ............................................................... 11
    § 385.075 ................................................................... 11
    § 386.010(2) ............................................................... 11
    § 386.350 ................................................................... 11
    § 393.010(1) ............................................................... 11
    § 393.010(2) ............................................................... 11
Ohio Rev. Code § 3313.47 ............................................ 11
Okla. Stat. tit. 70, § 5-117 ........................................... 10
Or. Rev. Stat.
    § 332.107 ................................................................... 11
    § 332.155 ................................................................... 11
    § 332.172(5) ............................................................... 11
S.C. Code
    § 59-19-10 ................................................................. 11
    § 59-19-90(1) ............................................................. 11
    § 59-19-90(5) ............................................................. 11
Tenn. Code Ann.
    § 49-1-201 ................................................................. 10
    § 49-1-201(a) ............................................................. 10
    § 49-1-201(c)(5) ......................................................... 10
    § 49-1-302 ................................................................. 10
    § 49-2-203(a)(2) ......................................................... 10
Tex. Educ. Code
    § 4.001(a) ................................................................... 6
    § 4.001(b) ................................................................... 9
    § 11.002 .................................................................. 7, 9
    § 11.051 ..................................................................... 9
    § 11.201 .................................................................. 7, 9
    § 46.008 ..................................................................... 9
Utah Code
    § 53A-1-101 ............................................................... 10
    § 53A-3-402(3) ........................................................... 10
Va. Code
    § 22.1-79 ................................................................... 11
    § 22.1-125 ................................................................. 11

Vᴛ. Sᴛᴀᴛ. tit. 16,
§ 563(3) .................................................................................... 11
§ 563(5) .................................................................................... 11
§ 563(7) .................................................................................... 11
W. Vᴀ. Cᴏᴅᴇ
§ 18-5-1 .................................................................................... 10
§ 18-5-9(4) ................................................................................ 10
Wᴀsʜ. Rᴇᴠ. Cᴏᴅᴇ
§ 28A.150.070 ........................................................................... 11
§ 28A.335.010(1)(b) .................................................................. 11
§ 28A.335.090(1) ...................................................................... 11
Wɪs. Sᴛᴀᴛ.
ch. 115 ...................................................................................... 10
ch. 118 ...................................................................................... 10
Wɪs. Sᴛᴀᴛ. s.
120.12(1) .................................................................................. 10
120.12(12) ................................................................................ 10
120.13(17) ................................................................................ 10
Wʏᴏ. Sᴛᴀᴛ. § 21-3-111 ................................................................... 11

**Other Authorities**

Academic Calendars:
Austin ISD (https://www.austinisd.org/calendar/2016-08) .............................. 25
Dallas ISD (http://www.dallasisd.org/Page/2) ..................................................... 25
Harrold ISD
(http://www.harroldisd.net/vimages/shared/vnews/stories/573b38dd15782/
Harrold%20Calendar%202016-2017-Approved%20February%2015%2C%
202016-Calendar%20Only.pdf) ......................................................... 25
Houston ISD (http://www.houstonisd.org/calendar) ........................................... 25
Wichita Falls ISD
(http://www.wfisd.net/cms/lib/TX01000557/Centricity/Domain/1/16-
17%20calendar%20complete.pdf) .............................................. 25
Aviva Orenstein, *Deviance, Due Process, and the False Promise of Federal
Rule of Evidence 403*, 90 Cornell L. Rev. 1487, 1500 (2005) ..................................... 7
Ginsburg, *The Fear of the Equal Rights Amendment*, Wᴀsʜ. Pᴏsᴛ, Apr. 7,
1975, at A21 ........................................................................................................ 23
H.R. 166, 94th Cong. (1975) ...................................................................................... 18
H.R. 1652, 113th Cong. (2013) .................................................................................... 4
H.R. 2015, 110th Cong. (2007) .................................................................................... 3
H.R. 2074, 96th Cong. (1979) .................................................................................... 18
H.R. 2981, 111th Cong. (2009) .................................................................................... 3
H.R. 14752, 93rd Cong. (1974) ................................................................................. 18
Memorandum from John B. Miles, Director, Directorate of Compliance
Programs, OSHA to Regional Administrators et al (Apr. 6, 1998) ....................... 15

Nondiscrimination on the Basis of Sex in Education Programs
  40 Fed. Reg. 24128 (June 20, 1974)..........................................................14
Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, § (k),
  92 Stat. 2076, 2076 (1978) ........................................................................4
S. 439, 114th Cong. (2015).............................................................................4
S. 811, 112th Cong. (2011)..............................................................................3
S. 2081, 96th Cong. (1979)...........................................................................18
*The Emerging Tort of Intrusion*, 55 Iowa L. Rev. 718 (1970) .......................7

## Rules

34 C.F.R. § 106.33 .....................................................................................1, 14
Fed. R. Civ. P. 65 ..........................................................................................24

## Constitutional Provisions

ALASKA CONST. art. VII, § 1 ..........................................................................10
ARK. CONST. art. XIV, § 4...............................................................................10
CAL. CONST. art. IX, § 2 .................................................................................10
CAL. CONST. art. IX, § 7 .................................................................................10
COLO. CONST. art. IX, § 9 ...............................................................................10
CONN. CONST. art. VIII, § 1 ............................................................................11
FLA. CONST. art. IX, § 2 .................................................................................11
HAW. CONST. art. X, §§ 2–3 ...........................................................................11
IDAHO CONST. art. IX, §§ 1–2 ........................................................................11
ILL. CONST. art. X, § 2 ...................................................................................11
IND. CONST. art. VIII, § 8 ...............................................................................11
IND. CONST. art. VIII, § 1 ...............................................................................11
IOWA CONST. art. IX, 2nd, § 1 .......................................................................11
KAN. CONST. art. VI, § 2 ................................................................................11
LA. CONST. art VIII, § 3..................................................................................10
MD. CONST. art. VIII, § 1 ...............................................................................11
MICH. CONST. art. VIII, § 2 ............................................................................11
MICH. CONST. art. VIII, § 3 ............................................................................11
MINN. CONST. art. XIII, § 1 ............................................................................11
MO. CONST. art. IX, § 1 ..................................................................................11
MONT. CONST. art. X, § 8................................................................................11
MONT. CONST. art X, § 9.................................................................................11
N.C. CONST. art. IX, § 5 .................................................................................11
N.J. CONST. art. VIII, § 4 ................................................................................11
N.M. CONST. art. XII, § 6 ...............................................................................11
N.Y. CONST. art. XI, § 1..................................................................................11
NEB. CONST. art. VII, § 2 ...............................................................................11
NEV. CONST. art. XI, § 1.................................................................................11
OHIO CONST. art. VI, § 3 ................................................................................11
OHIO CONST. art. VI, § 4 ................................................................................11
OKLA. CONST. art. XIII, § 5 ............................................................................10
PA. CONST. art. III, § 14 .................................................................................11

S.C. CONST. art. XI, § 3 ........................................................................................ 11

TEX. CONST. art. 7, § 1 ............................................................................................ 9

U.S. CONST. art. I, § 8, cl. 1 .................................................................................. 19

VA. CONST. art. VIII, § 4 ....................................................................................... 11

VA. CONST. art. VIII, § 7 ....................................................................................... 11

W. VA. CONST. art. XII, § 2 .................................................................................... 10

# I.   INTRODUCTION

On May 13, 2016, following years of incremental preambles ("guidances," "interpretations," and the like), Defendants informed the nation's schools that they must immediately allow students to use the bathrooms, locker rooms and showers of the student's choosing, or risk losing Title IX-linked funding. And employers that refuse to permit employees to utilize the intimate areas of their choice face legal liability under Title VII. These new mandates, putting the federal government in the unprecedented position of policing public school property and facilities, *inter alia*, run roughshod over clear lines of authority, local policies, and unambiguous federal law.

When President Nixon signed Title IX, no one believed that the law opened all bathrooms and other intimate facilities to members of both sexes. True to this understanding, the law's initial implementing regulations permitted schools to provide "separate toilet, locker rooms, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, and no aspect of the law sought to exercise federal management over the real property and physical facilities of the nation's public schools. Periodicals from the *Washington Post* to the *Harvard Law Review* expressed support for designating separate bathrooms for men and women, and the Supreme Court would ultimately rule, in 1994, that educational institutions must "afford members of each sex privacy from the other sex." *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

Title VII and Title IX prohibit invidious discrimination on the basis of "sex." Defendants now contend that the statutory term "sex" in these laws encompasses notions of "gender identity," defined as "an individual's internal sense of gender." *See*, *e.g.*, ECF No. 6 Ex. J at 1. And they demand that men and women, boys and girls, have access to restrooms or other intimate facilities that match their "gender identity," not their biological sex. Defendants' actions are unlawful.

First, Defendants skirted the notice and comment process—a necessity for legislative rules. Second, the new mandates are incompatible with Title VII and Title

IX. Third, the mandates violate the clear notice and anti-coercion requirements controlling the federal government's power to attach strings to spending programs.

Nationwide relief is necessary to prevent the irreparable harm that the new mandates will cause. Across the nation, non-federal officials are authorized to formulate and enforce policies to ensure safe and productive educational and workplace environments. This includes the regulation of physical buildings and facilities, including public school restrooms, locker rooms, and shower rooms. Unless enjoined, the new mandates will deny the public interest in the continued operation of otherwise valid policies protecting the safety of students in public educational institutions, and workers in myriad places of employment.

## II.   FACTS

This case revolves around the statutory term "sex" in two federal laws enacted several decades ago: Title VII of Civil Rights Act of 1964 ("Title VII") and Title IX of the Education Amendments of 1972 ("Title IX").

### A.    Titles VII and IX.

Title VII makes it illegal for employers to invidiously discriminate on the basis of "sex," *inter alia*. 42 U.S.C. § 2000e-2. When the law passed, the statutory term "sex" was commonly understood to refer to the physiological differences between men and women. ECF No. 6 at ¶ 36. "Gender identity"—the term that Defendants now contend is within the meaning of the term "sex"—is not found in the text or legislative history of that statute. Nor was "gender identity" ascribed to be synonymous with "sex" at the time Title VII became law.

Early users of "gender identity"—the term was first introduced around 1963— distinguished it from "sex" on the ground that "gender" has "psychological or cultural rather than biological connotations." *Id*. at ¶¶ 33–34. "Biological sex," they explained, is not the same as "socially assigned gender." *Id*. at ¶ 35. While "sex" cannot be changed, "gender" is more fluid. Anyone can "simply elect" their "gender." *Id*.

Eight years after enacting Title VII, Congress passed Title IX, proscribing invidious discrimination on the basis of "sex" in federally funded education programs. 20 U.S.C. § 1681(a). When Title IX passed, "sex" and "gender identity" remained distinct. "Sex" described physiological differences between the sexes, while "gender" referred to social and cultural roles. ECF No. 6 at ¶¶ 33–36. The debate over Title IX concerned invidious "sex" discrimination and guaranteeing women equal access to education, not "gender identity" discrimination. Lawmakers used the term "sex" repeatedly, referring to the biological distinction between women and men. *Id*. at ¶¶ 23–25. "Gender identity" appears in neither the statute's text nor legislative history.

Title IX generated a prolonged discussion in Congress over the privacy interests of students in intimate facilities. Lawmakers expressed concerns, for example, that Title IX would force the sexes to share the same sleeping quarters. ECF No. 6 at ¶¶ 23–25. Supporters of Title IX tried to reassure their colleagues that the legislation would not lead to such an absurd result. *Id*. at ¶¶ 23–24. The legislation, they insisted, would not open locker rooms to members of both sexes or otherwise violate the personal privacy rights of students. *Id*. The impasse ended when lawmakers amended the proposed law to expressly permit institutions to differentiate intimate facilities by biological "sex." 20 U.S.C. § 1686.

Support for maintaining different restrooms, locker rooms, and other intimate facilities for females and males was widespread at the time Title IX passed. Scholars, including future Supreme Court Justice Ruth Bader Ginsburg, defended the longstanding practice. ECF No. 6 at ¶¶ 26–27.

Beginning in the 1970s, Congress reaffirmed on numerous occasions that the statutory term "sex" in Title VII and Title IX refers to the physiological characteristics of females and males. *Id*. at ¶ 28. Lawmakers debated proposals to *add* the *new* category of "gender identity" to Title VII, *see* H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011), and Title IX, *see*

H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). And the *one* instance when Congress actually amended "sex" in Title VII to cover discrimination "on the basis of pregnancy, childbirth, or related conditions," it did so to ensure that pregnant and post-partum *women* face the same opportunities for advancement as *men*. Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, § (k), 92 Stat. 2076, 2076 (1978).

**B.      Defendants' Revisions of the Law.**

Other federal statutes acknowledge the emergence of "gender" and "gender identity" as concepts distinct from "sex."[1] The 2013 reauthorization of the Violence Against Women Act (VAWA) prohibits recipients of certain federal grants from invidiously discriminating on the basis of both "sex" *and* "gender identity." 42 U.S.C. § 13925(b)(13)(A). In 2010, the President signed hate crimes legislation, 18 U.S.C. § 249, which applies to, *inter alia*, "gender identity." *Id.* § 249(a)(2).

While Congress has expressly added "gender identity" in other civil rights statutes, it has not changed the terms of Title VII and Title IX. Since 2010, however, Defendants have ignored the clear text of Title VII and IX and operated as if Congress included "gender identity" next to "sex" in every civil rights statute. For example:

- In a 2010 Dear Colleague Letter, the Department of Education's ("DOE") Office for Civil Rights ("OCR") asserted that "Title IX does protect all students, including . . . transgender (LGBT) students, from sex discrimination."

- In April 2014, OCR stated that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity."

- In December 2014, Attorney General Eric Holder issued a memo concluding that Title VII's reference to "sex" "encompasses discrimination based on gender identity, including transgender status."

- In June 2015, the Occupational Safety and Health Administration ("OSHA") declared that "all employees should be permitted to use the facilities that correspond with their gender identity," which is "internal" and could be

---

[1] Although "gender" and "gender identity" are more recognized concepts now, their meaning has remained basically the same since the 1960s. ECF No. 6 at ¶ 37. Likewise, "sex" continues to refer to "biological differences between females and males," *id.* at ¶ 36, just as the term has done for decades.

"different from the sex they were assigned at birth."[2]

The recent events in North Carolina demonstrate Defendants' commitment to target those that comply with federal law, *as written by Congress*. After the City of Charlotte made the maintenance of separate-sex intimate facilities unlawful, on February 22, 2016, the North Carolina General Assembly preempted the Charlotte ordinance, restored the *status quo*, and gave public employees and public school students access to bathrooms and showers corresponding to their biological sex.[3]

Nevertheless, on May 3, 2016, Defendant Equal Employment Opportunity Commission ("EEOC") released a "Fact Sheet," stating that Title VII's prohibition of invidious "sex" discrimination extends to "gender identity."[4] And on May 4, 2016, Defendant Department of Justice ("DOJ") declared that North Carolina's law pertaining to restroom use violates both Title VII and Title IX. ECF No. 6 at ¶ 43. Five days later, DOJ sued North Carolina, asserting that its preservation of distinctive male and female intimate facilities is now impermissible. *United States v. North Carolina et al.*, Case No. 1:16-cv-425 (M.D.N.C.). Finally, on May 13, 2016, DOJ and DOE issued a joint "Dear Colleague Letter" ("the Joint Letter"), through which it then foisted its new rule—adding "gender identity" as a category to Title IX— beyond the workplace and now upon the more than 100,000 elementary and secondary schools that receive federal funding. ECF No. 6 at ¶ 45.

The Joint Letter requires schools receiving Title IX-linked funding to allow students access to the restrooms, locker rooms, and other intimate facilities matching

---

[2] ECF No. 6 at ¶ 39.
[3] The North Carolina law does not establish a policy for private businesses and permits accommodations based on special circumstances.
[4] Of course, agency "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 586–87 (2000) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *see also Encino Motorcars, LLC v. Navarro*, No. 15-415, 2016 WL 3369424, at *6 (U.S. June 20, 2016) (holding that *Chevron* deference is not warranted where the agency fails to follow the correct procedures in issuing the regulation).

their chosen "gender identity" at any given time.[5] The basis for this mandate is the now familiar assertion that Defendants have been making since 2010—namely, that Title IX's prohibition of invidious "sex" discrimination encompasses the separate category of "gender identity." *Id.* at ¶ 46. According to the Joint Letter, schools that read Title IX as written and understood at the time of enactment—that "sex" means biological sex—face legal action and the loss of federal funds. *Id.*[6]

### C.    Harrold Independent School District (TX).

The mission of Harrold Independent School District ("Harrold ISD") is "to ensure that all Texas children have access to a quality education that enables them to achieve their full potential and fully participate now and in the future in the social, economic, and educational opportunities in our state and nation." Thweatt Decl. Ex. P at Att. 1; TEX. EDUC. CODE § 4.001(a). Like many smaller school districts, all students in Harrold ISD are educated in a single building and share bathrooms and other intimate facilities with the faculty and employees of Harold ISD. *Id.* at ¶ 6.

Texas, like others, requires that schools "maintain a safe and disciplined environment conducive to student learning." *Id.* at Att. 1. Therefore, on May 23, 2016, at a regular meeting, school board members ("the Board") of Harrold ISD adopted in writing its longstanding policy ("the Policy") limiting multiple occupancy bathrooms and locker rooms to usage by persons based on their biological sex. The Policy also allows for accommodations. ECF No. 6 at ¶ 51. Harrold ISD is directly empowered by

---

[5] No medical diagnosis or treatment requirement is a prerequisite to selecting one's "gender identity," nor is there any form of temporal requirement. ECF No. 6 at ¶ 47. In other words, a student can choose one "gender identity" on one particular day or hour, and then another one the next. And students of any age may establish a "gender identity" different from their biological sex simply by notifying the school administration—the involvement of a parent or guardian is not necessary. *Id.*

[6] Defendants' actions are not expressly limited to impacts upon traditional public education. Plaintiffs and their agencies receive many federal grants that condition receipt upon compliance with Title IX. For example, the Wisconsin Department of Health Services receives a grant from the federal government to conduct educational programs related to extreme weather. In the past, Wisconsin has used this grant to conduct educational conferences in Madison, Wisconsin. Although Defendants have not expressly identified what it would mean for these educational conferences to be compliant with Title IX in the context of Defendants' new interpretation of that law, the grant itself specifically requires compliance with Title IX. McKeown Decl. Ex. O.

Texas to adopt the policy. *See*, *e.g.*, TEX. EDUC. CODE §§ 11.002, 11.201.

All of the restrooms and other intimate areas at Harrold ISD are designated either female or male, both before and after the enactment of the Policy. Thweatt Decl. Ex. P at ¶ 6. The school district has no "single user" restrooms—that is, facilities that are open to one person at a time. *Id*. Accordingly, complying with the demands of Defendants would force Harrold ISD to simultaneously open all of its intimate areas to both females and males. That, in turn, would conflict with both Harrold ISD's policies and Texas law, as well as Texas's educational mission.

First, complying with Defendants' mandates would force the district to sanction unsafe spaces. *Id*. at ¶ 7. Students using school restrooms and other intimate facilities are unprotected from others who can take advantage of the privacy of these areas to commit untoward acts. "By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence." *People v. Falsetta*, 986 P.2d 182, 188 (Cal. 1999). *Cf.* Aviva Orenstein, *Deviance, Due Process, and the False Promise of Federal Rule of Evidence 403*, 90 Cornell L. Rev. 1487, 1500 (2005) ("Rape and child molestation are notoriously hard to prove because the crimes often occur in secret . . . .").

Second, complying with Defendants' mandates opens the district itself to lawsuits from parents and students trying to maintain personal safety and dignity. Thweatt Decl. Ex. P at ¶ 5. Before Defendants issued the Joint Letter, Palantine, Illinois School District 211 adopted a policy functionally embracing Defendants' new rules and is currently defending a lawsuit brought by more than 140 parents and students under federal and Illinois law. *See id*.; *Students and Parents for Privacy et al v. U.S. Dep't of Educ. et al*, 1:16-cv-4945 (N.D. Ill.). Privacy intrusions give rise to liability because they cause "mental suffering, shame, or humiliation" and are inconsistent with society's rules of civility. Comment, *The Emerging Tort of Intrusion*, 55 Iowa L. Rev. 718, 719 (1970). Like all jurisdictions, Texas provides civil remedies

for those whose reasonable expectation of privacy has been violated. *See, e.g., Indus. Found. of the S. v. Tex. Indus. Accident Bd.,* 540 S.W.2d 668, 682 (Tex. 1976), *cert. denied,* 430 U.S. 931 (1977) (recognizing right to "freedom from public disclosure of embarrassing private facts"); *Billings v. Atkinson,* 489 S.W.2d 858, 859–61 (Tex. 1973) (recognizing right to be free of intrusion into plaintiff's seclusion).[7] Third, Harrold ISD lacks the resources to comply with Defendants' mandates in a manner that protects safety and personal privacy as central to its maintenance of "a safe and disciplined environment conducive to student learning," among other things. Thweatt Decl. Ex. P at ¶ 3 & Att. 1. To try to comply with the inconsistent and competing mandates of both Defendants and other applicable law, if at all possible, the school district has to build "single user" restrooms or otherwise transform its current restrooms and intimate areas into "single user" facilities open to members of both sexes. *Id.* at ¶ 8. From Harrold ISD's point of view, reconfiguring all of its intimate facilities into "single user" facilities is the only possible way to safely provide both sexes with simultaneous access to intimate facilities. *Id.* But Harrold ISD does not have the money to construct "single user" restrooms. *Id.* at ¶¶ 6, 8.

Notwithstanding resources, transforming all intimate facilities into Defendants' vision of what is now acceptable is massively disruptive and inconsistent with Harrold's educational mission. Defendants' new mandate goes much further than bathrooms—it also compels the construction of individual dressing rooms and showers to protect the safety and privacy of students using locker rooms. Yet, this is

---

[7] Federal courts also acknowledge the reasonable expectation of privacy in an individual's not having to expose his or her unclothed body in the presence of the opposite sex. *See Doe v. Luzerne Cnty.,* 660 F.3d 169, 176–77 (3d Cir. 2011) (recognizing an individual's reasonable expectation of privacy in their partially clothed body exists "particularly while in the presence of members of the opposite sex"); *Brannum v. Overton Cnty. Sch. Bd.,* 516 F.3d 489, 494 (6th Cir. 2008) (explaining that "the constitutional right to privacy . . . includes the right to shield one's body from exposure to viewing by the opposite sex"); *Sepulveda v. Ramirez,* 967 F.2d 1413, 1416 (9th Cir. 1992) (finding a parolee has a right not to be observed producing a urine sample by an officer of the opposite sex). These cases are in line with the Supreme Court's admonition that public entities must "afford members of each sex privacy from the other sex." *United States,* 518 U.S. at 550 n.19.

completely impractical and counterproductive to team athletics. While DOE says that schools may field separate men's and women's athletic teams, ECF No. 6 at ¶ 48, those teams must prepare for their games in separate, individualized dressing rooms. And at halftime and after games, under Defendants' vision, schools that both field athletic teams *and* take privacy and security seriously by not mixing the sexes in intimate settings will require their players to retire to individual dressing areas.

Harrold ISD risks losing a substantial amount of federal funding under the Joint Letter. The school district is subject to Title VII and receives federal funding subject to Title IX. Thweatt Decl. Ex. P at ¶ 4. In 2015–16, Harrold ISD's budget exceeded $1.4 million, including about $117,000 in federal dollars. *Id.*

### D.    Nationwide Harm.

The new mandate harms school districts from coast to coast by usurping lawful authority over the regulation of educational institutions and the management of their facilities. It also jeopardizes billions of dollars of federal funding.

Laws in Texas delegate power to officials to manage educational facilities, including physical control over restrooms, locker rooms, and other intimate areas.[8]

---

[8] Texas requires its Legislature to establish, support and maintain a public school system to ensure the "general diffusion of knowledge" that is "essential to the preservation of the liberties and rights of the people." TEX. CONST. art. 7, § 1. The Texas Education Code declares that "school campuses will maintain a safe and disciplined environment conducive to student learning." TEX. EDUC. CODE § 4.001(b). School districts have the primary responsibility for implementing a system of public education in accordance with the Code. *Id.* § 11.002. School districts are governed by a board of trustees. *Id.* § 11.051. These boards oversee the management of the districts, including the performance of the superintendents. *Id.* A superintendent is the educational leader and the chief executive officer of a school district. *Id.* § 11.201. Superintendents oversee compliance with the standards for school facilities established by the TEA Commissioner under Texas Education Code § 46.008, and ensure the adoption and enforcement of student disciplinary rules. *Id.* The Texas public school system consists of 1,219 school districts and charters, serving approximately 5.23 million students. TEA, Pocket Edition 2014–15 Texas Public School Statistics, available at http://tea.texas.gov/communications/pocket-edition/. The regulation and administration of physical buildings and facilities within Texas public schools is generally the province of the individual school districts and the TEA.

The other Plaintiffs (Alabama,[9] Wisconsin,[10] West Virginia,[11] Tennessee,[12] Arizona,[13] Maine,[14] Oklahoma,[15] Louisiana,[16] Utah,[17] Georgia,[18] Mississippi,[19] and Kentucky[20]), and *all* other states,[21] are the same. Yet, the Joint Letter arrogates to Defendants

---

[9] Alabama law authorizes state, county, and city boards of education to control school buildings and property. ALA. CODE §§ 16-3-11, 16-3-12 (state boards); 16-8-8–16-8-12 (city and county boards).

[10] In Wisconsin, local school boards and officials govern public school operations and facilities, *see* WIS. STAT. ch. 118, with the Legislature providing additional supervisory powers to a Department of Public Instruction. *See* WIS. STAT. ch. 115. School boards and local officials are vested with the "possession, care, control and management of the property and affairs of the school district," WIS. STAT. s. 120.12(1), and must regulate the use of school property and facilities. *See, e.g.*, WIS. STAT. s. 120.13(17). Wisconsin law also requires school boards to "[p]rovide and maintain enough suitable and separate toilets and other sanitary facilities for both sexes." WIS. STAT. s. 120.12(12).

[11] West Virginia law establishes state and local boards of education, W. VA. CONST. art. XII, § 2 (state); W. VA. CODE § 18-5-1 *et. seq.* (local), and charges the latter to ensure the "good order of the school grounds, buildings, and equipment." *Id*. at § 18-5-9(4).

[12] In Tennessee, the state board of education sets statewide academic policies, TENN. CODE ANN. § 49-1-302, and the department of education is responsible for implementing those polices. TENN. CODE ANN. § 49-1-201. Each local board of education has the duty to "[m]anage and control all public schools established or that may be established under its jurisdiction." TENN. CODE ANN. § 49-2-203(a)(2). The State Board is also responsible for "implementation of law" established by the General Assembly, TENN. CODE ANN. § 49-1-201(a), and ensuring that the "regulations of the state board of education are faithfully executed." TENN. CODE ANN. § 49-1-201(c)(5).

[13] Arizona law establishes state and local boards of education, ARIZ. REV. STAT. § 15-203(A)(1) (state), § 15-341(A)(1) (local), and empowers local school districts to "[m]anage and control the school property within its district," § 15-341(A)(3).

[14] Maine provides for state and local control over public education. While state education authorities supervise the public education system, ME. REV. STAT. tit. 20-A, §§ 201–406, local school boards retain control over management of all school property, including care of school buildings. *Id*. § 1001(2). And Maine law provides requirements related to school restrooms. *Id*. § 6501.

[15] Oklahoma law establishes a state board of education to supervise public schools. OKLA. CONST. art. XIII, § 5. Local school boards are authorized by the board to operate and maintain school facilities and buildings. OKLA. STAT. tit. 70, § 5-117.

[16] In Louisiana, a state board of education oversees public schools, LA. CONST. art VIII, § 3, while local school boards are charged with the management, administration, and control of buildings and facilities within their jurisdiction. LSA-R.S. § 17:100.6.

[17] Utah law provides for state and local board of educations, UTAH CODE § 53A-1-101, and authorizes the local boards to exercise control over school buildings and facilities. *Id*. § 53A-3-402(3).

[18] Georgia places public schools under the control of a board of education, GA. CODE § 20-2-59, and delegates control over local schools, including the management of school property, to county school boards govern local schools. *Id*. § 20-2-520.

[19] In Mississippi, the state board of education oversees local school boards, which exercise control over local school property. MISS. CODE ANN. § 37-7-301.

[20] In Kentucky, the state board of education governs the state's public school system, KY. REV. STAT. § 156.070, while local boards of education control "*all* public school property" within their jurisdictions, and can make and adopt rules applicable to such property. *Id*. § 160.290.

[21] ALASKA CONST. art. VII, § 1; ALASKA STAT. § 14.07.010–020; ALASKA ADMIN. CODE tit. IV § 31.010. ARK. CONST. art. XIV, § 4; ARK. CODE §§ 6-11-105, 6-13-1301, 6-21-101. CAL. CONST. art. IX, §§ 2, 7; CAL. EDUC. CODE §§ 33301, 33307. COLO. CONST. art. IX, § 9; COLO. REV. STAT. §§ 22-2-106, 22-43.7-

administrative and enforcement responsibility over that which has always belonged to non-federal authorities.

With respect to federal funding, Plaintiffs will lose substantial revenue if forced to forfeit Title-IX linked subsidies. For example, for the fiscal year ending August 31, 2016 (FY16), the total TEA budget is $27,732,858,771 of which $5,028,581,142 is federal funds (18.13%). *See* Gen. Appropriations Act, 2015–16 Biennium, 84th Tex. Leg., R.S., art. III, § 1. For the fiscal year ending August 31, 2017 (FY17), the total TEA budget is $26,770,218,901 of which $5,114,263,422 is federal funds (19.10%). *Id*. The figures for Plaintiffs,[22] and nationwide,[23] are comparable.

## III. ARGUMENT

Four equitable factors govern Plaintiffs' injunctive request: (1) whether there

---

107. Conn. Const. art. VIII, § 1; Conn. Gen. Stat. §§ 10-240–241. Fla. Const. art. IX, § 2; Fla. Stat. §§ 1001.42(2), .43(1); § 1013.04. Haw. Const. art. X, §§ 2–3, Haw. Rev. Stat. §§ 302A-1101, 302A-1148, 302A-1506; Haw. Code R. § 8-39-2. Idaho Const. art. IX, §§ 1–2; Idaho Code §§ 33-101, 33-107, 33-601. Ill. Const. art. X, § 2; 105 Ill. Comp. Stat. §§ 5/1A-4, 34-18. Ind. Const. art. VIII, §§ 1, 8; Ind. Code §§ 20-19-2-2.1, 20-19-2-14, 20-26-5-1, 20-26-3-4. Iowa Const. art. IX, 2nd, § 1; Iowa Code §§ 256.1, 274.1, 297.9. Kan. Const. art. 6, § 2; Kan. Stat. § 72-1033. Md. Const. art. VIII, § 1; Md. Code, Educ. §§ 2-205(b)(1–2), 4-101, 4-108, 4-115. Mass. Gen. Laws. ch. 69, § 1B; ch. 71 § 71. Mich. Const. art. VIII, §§ 2–3; Mich. Comp. Laws. § 380.483a. Minn. Const. art. XIII, § 1; Minn. Stat. §§ 123B.02, .09, .51. Mo. Const. art. IX, § 1; Mo. Stat. §§ 161.092, 171.011, 171.0011(1), 177.031. Mont. Const. art. X, §§ 8, 9; Mont. Code § 20-3-324(15); Mont. Admin. R. 10.55.908(6). Neb. Const. art. VII, § 2; Neb. Rev. Stat. §§ 79-318(6), 79-501, 79-526(1). Nev. Const. art. XI, § 1; Nev. Rev. Stat. §§ 385.075, 385.005(1), 386.010(2), 386.350; 393.010(1), (2). N.H. Rev. Stat. §§ 186:5, 195:6; N.H. Code Admin. R. Ed § 303.01. N.J. Const. art. VIII, § 4; N.J. Stat. §§ 18A:11-1(c), 18A:4-15. N.M. Const. art. XII, § 6; N.M. Stat. §§ 22-2-1(A), 22-5-4(H). N.Y. Const. art. XI, § 1; N.Y. Educ. Law § 414. N.C. Const. art. IX, § 5; N.C. Gen. Stat. § 115C-12. N.D. Cent. Code §§ 15.1-02-04(1)–(2), 15.1-09-33(3). Ohio Const. art. VI, §§ 3, 4; Or. Rev. Stat. §§ 332.107, 332.155, 332.172(5); Ohio Rev. Code § 3313.47. Pa. Const. art. III, § 14; 24 Pa. Stat. §§ 5-507, 7-701, 7-775, 6513. 16 R.I. Gen. Laws § 16-2-9(a), (a)(5), (a)(8). S.C. Const. art. XI, § 3; S.C. Code §§ 59-19-10; 59-19-90(1), (5). Vt. Stat. tit. 16, § 563(3), (5), (7). Va. Const. art. VIII, §§ 4, 7. Va. Code §§ 22.1-79, 22.1-125. Wash. Rev. Code §§ 28A.150.070, 28A.335.010(1)(b), 28A.335.090(1). Wyo. Stat. § 21-3-111.

[22] Arizona receives more than $1 billion in federal education funding, equal to 19.1 percent of the public education budget. Zara Decl. Ex. Q at ¶ 6. Plaintiff Heber-Overgaard Unified School District would lose approximately $694,976 in federal funds, more than 15 percent of the district's total budget. Tenney Decl. Ex. R at ¶ 5. Kentucky receives nearly $900 million in federal education funding, equal to 17.6 percent of its primary and secondary public education budget. Harman Decl. Ex. S at ¶ 5. Tennessee receives more than $1.1 billion dollars in federal funding, equal to 18.6 percent of its projected primary and secondary public education budget. Foley Decl. Ex. T at ¶ 6. Alabama receives over $246 million in federal funds for primary and secondary public education. Craig Aff. Ex. U at ¶ 3.
[23] ECF No. 6 at ¶¶ 57, 59.

is a substantial likelihood that the Plaintiffs will prevail on the merits; (2) whether there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) whether the threatened injury outweighs the threatened harm, if any, to the Defendants; and (4) whether granting the preliminary injunction will serve the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). All four factors weigh in Plaintiffs' favor.

### A.   Plaintiffs Are Likely to Prevail on the Merits.

### 1.   Defendants Repeatedly Violated the Administrative Procedure Act ("APA").

Defendants violated the APA by adopting substantive rules (labeled as regulations, guidance, and interpretations) that (1) they are enforcing, and intend to continue to enforce, without notice and comment; and (2) are contrary to the statutory text enacted by Congress.

### a.   Circumventing Notice and Comment.

An agency must provide notice of a proposed rule in the *Federal Register* and afford an opportunity for others to present their views. 5 U.S.C. §§ 553(b)–(c). Regulatory instruments that are rules within the meaning of section 553 are called "legislative" or "substantive" rules to differentiate them from "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," which are exempted from the notice and comment requirements. *Id.* § 553(b)(A); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) ("Legislative regulations have 'the force and effect of law' and may be promulgated only after public notice and comment") (quoting *INS v. Chadha*, 462 U.S. 919, 986 n.19 (1983)).

The various instruments Defendants have promulgated to undermine the text of Titles VII and IX are rules for three reasons: (1) they grant rights while also imposing significant obligations; (2) they amend prior legislative rules or longstanding agency practice; and (3) they bind the agencies and regulated entities.

First, agency rules that affect rights and obligations are legislative. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *Morton v. Ruiz*, 415 U.S. 199, 232 (1974); *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 238 (D.C. Cir. 1992). "The rights, conduct, obligations, and interests affected by legislative, binding rules cover a broad range." *Batterton v. Marshall*, 648 F.2d 694, 702 n.30 (D.C. Cir. 1980). In *Chrysler*, the Supreme Court held that regulations requiring Chrysler and other businesses with government contracts to furnish reports about their affirmative-action programs were legislative rules because they affected the rights of contractors. *Chrysler*, 441 U.S. at 303. The Court reasoned that the agency could not affect the rights of contractors without complying with the APA. *Id*. And in *Ruiz*, the Court ruled that the agency needed to submit eligibility requirements to APA procedures before denying federal benefits to members of a Native American tribe. *Ruiz*, 415 U.S. at 236.

Here, Defendants have affected the rights and obligations of employers, public schools, and students across the country. Under the Joint Letter, Title-IX linked funds are not available to otherwise eligible schools that refuse to open their restrooms to both sexes. This substantive change has enormous consequences. Plaintiff Harrold ISD would lose approximately $117,000 in federal funds, more than 8 percent of the district's total budget. Thweatt Decl. Ex. P at ¶ 4. Plaintiff Heber-Overgaard Unified School District would lose approximately $694,976 in federal funds, more than 15 percent of the district's total budget. Tenney Decl. Ex. R at ¶ 5. Texas, Arizona, Kentucky, and Tennessee would forfeit nearly a fifth of their budgets for elementary and secondary public schools. *See* Gen. Appropriations Act, 2015–16 Biennium, 84th Tex. Leg., R.S., art. III, § 1; n.21, *supra*. The "legitimate expectation" of these public schools to millions or billions in federal funds may "not be extinguished" by a new bathroom regulation that was "not promulgated in accordance with . . . the Administrative Procedure Act." *Ruiz*, 415 U.S. at 236.

Second, "[i]t is a fundamental tenet of administrative law that: 'If a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, *of course*, an amendment to a legislative rule must itself be legislative.'"[24] *Sullivan,* 979 F.2d at 235 (internal quotations omitted) (emphasis added). As Judge Easterbrook explained: "When an agency gets out the Dictionary of Newspeak and pronounces that for purposes of its regulation war is peace, it has made a substantive change for which the APA may require procedures." *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408, 412 (7th Cir. 1987). The Fifth Circuit has required notice and comment for regulatory instruments that conflict with existing rules, *Phillips Petroleum Co. v. Johnson,* 22 F.3d 616 (5th Cir. 1994), add conditions to them, *Davidson v. Glickman*, 169 F.3d 996 (5th Cir. 1999), or represent a significant departure from established and consistent agency practice, *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001).

Defendants have changed existing legislative rules and longstanding agency practice. By requiring schools receiving Title IX-linked funds to open all intimate facilities to both sexes, the Joint Letter repeals the existing rule that recipients "may provide *separate* toilet, locker room, and shower facilities on the basis of *sex*." 34 C.F.R. § 106.33 (emphasis added). As the existing rule is legislative, Nondiscrimination on the Basis of Sex in Education Programs 40 Fed. Reg. 24128, 24141 (June 20, 1974) (giving notice of rules effectuating Title IX, including the regulation providing for sex-separated intimate facilitates), the Joint Letter is as well. *Am. Mining Cong. v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1112 (D.C. Cir. 1993) (rules amending prior legislative rules are legislative). As such, the Joint Letter cannot change the prior rule, 34 C.F.R. § 106.33, without notice and comment. *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003) (new rules that cause

---

[24] This is distinguishable from amending a previous *interpretative* rule. *Cf. Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015).

substantive changes to prior regulations must undergo APA procedures).

Other regulatory instruments issued by Defendants are also subject to the APA. The 2014 Holder memo repudiated DOJ's practice of opposing Title VII claims grounded in "transgender discrimination." *See*, *e.g.*, Def. Mot. to Dismiss at 3–4, *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008). And the 2015 OHSA rule (or so-called "guidance") abjured the agency's prior rule requiring employers to provide "toilet rooms separate for each sex." Memorandum from John B. Miles, Director, Directorate of Compliance Programs, OSHA to Regional Administrators et al (Apr. 6, 1998).[25] These documents mark a significant departure from prior requirements and thus necessitate notice and comment. *Babbitt*, 238 F.3d at 630.

Third, an agency rule is legislative "if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2001) (citation omitted). Defendants' various regulatory instruments meet both criteria. From beginning to end, each document reads like an edict. They "command," they "require," they "order," they "dictate." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

The Joint Letter uses "must" 15 times, and "requirement" and "required" 10 times. In no uncertain terms, the Joint Letter dictates how DOE and DOJ officials are to enforce Title IX. The Letter is signed by the officials responsible for bringing enforcement actions under Title IX, and it explains "how the Departments will evaluate whether covered entities are complying with their legal obligations."

Defendants' other regulatory instruments are also binding on their face. The 2014 Holder Memo definitively bars DOJ attorneys from arguing that Title VII does not encompass discrimination on the basis of "gender identity." ECF No. 6 Ex. C. The 2015 OSHA guidance concludes that employees have the right to access the restroom

---

[25] The 1998 Miles memo is available online at https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIONS&p_id=22932.

of their choosing under federal law. *Id*. Ex. D. And the EEOC Fact Sheet states that the agency "*enforces* Title VII" as though that statute actually prohibits employment discrimination on the basis of "gender identity." *Id*. Ex. H.

Finally, context indicates that Defendants' official statements will control agency enforcement actions. The Joint Letter marks just the latest event—not the beginning—of Defendants' coordinated, multi-year effort to revise Title VII and Title IX by executive fiat. Previously, DOE, OSHA, DOJ, and EEOC all announced in official statements that "gender identity" is a new, enforceable category under federal law. The Joint Letter takes the most recent step of notifying the public about Defendants' revisions. And lest there is any doubt in the seriousness of DOE, OSHA, DOJ, and EEOC's convictions about their new laws, DOJ's suit against North Carolina (*United States v. North Carolina et al*, Case No. 1:16-cv-425 (M.D.N.C.)) dispels any illusions. Defendants will enforce, by any means available, their new laws against public schools, employers, and others across the nation that do not comply.

### b.      Incompatible with Statutory Text.

The APA prohibits agencies from issuing rules contrary to the unambiguous intent of Congress. *See, e.g.*, *Chevron,* 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). The text, structure, and history of Titles VII and IX all demonstrate Congress's unambiguous intent to prohibit invidious discrimination on the basis of "sex," not "gender" or "gender identity." As shown herein, "gender identity" is a wholly different concept from "sex," and not a subset or reasonable interpretation of the term "sex" in Titles VII or IX. The meaning of the terms "sex," on the one hand, and "gender identity," on the other, both now and at the time Titles VII and IX were enacted, forecloses alternate constructions. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (explaining that an agency interpretation must be consistent with the

given meaning of a term when official action was taken).

The text of Titles VII and IX prohibits invidious discrimination "on the basis of sex." Because these statutes do not define "sex," the ordinary meaning prevails. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."). When Titles VII and IX passed, virtually every dictionary definition of "sex" referred to physiological distinctions between females and males, particularly with respect to their reproductive functions. ECF No. 6 at ¶ 36. Clearly, a biologically-grounded meaning of "sex" is what Congress had in mind when it enacted Title IX. Otherwise, it would not have enacted section 1686, which provides that: "Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for *the different sexes*." 20 U.S.C. § 1686 (emphasis added). The qualifier "different" before "sexes" signals that Congress was referring to the two biological sexes, and "identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (internal quotation marks and citations omitted). Thus, Title IX's admonitions "on the basis of *sex*" (emphasis added) refer to biological sex.

Not least, the legislative history removes any doubt that Congress understood the term "sex" in Title IX to mean the physiological differences between females and males. When the law was debated, lawmakers focused on the effect that the law would have in ensuring that public educational institutions afforded women and men equal avenues for advancement. "Gender identity" was never mentioned during the debate. Members of Congress focused their attention on the implications of removing barriers "on the basis of sex" across public institutions. Some feared, for example, that Title IX would force colleges to open sex-specific dormitories to both sexes. This apprehension was based on the universal understanding—not once questioned by

anyone in Congress—that the law's designation of "sex" was about biological sex.[26]

"Gender" and "gender identity," as distinctive terms and concepts, emerged shortly before the enactments of both Titles VII and IX. The first users of "gender" and "gender identity" understood these terms to mean something *different* than "sex." Robert Stoller, the UCLA psychoanalyst who introduced the term "gender identity," wrote in 1968 that gender had "psychological or cultural rather than biological connotations." ECF No. 6 at ¶ 34. Similarly, Virginia Prince, who is credited with coining the term "transgender," echoed the view that "sex" and "gender" are distinct: "I, at least, know the difference between sex and gender and have simply elected to change the latter and not the former." *Id.* at ¶ 35. And in the 1970s, feminist scholars joined the chorus differentiating "biological sex" from "socially assigned gender." *Id.*

Congress has expressly affirmed that "sex" and "gender identity" are two distinct and entirely separate concepts. ECF No. 6 at ¶ 38. With regard to Title VII and Title IX, Congress considered *amending* the law on several occasions to cover "gender identity." It did not. *Id.* at ¶ 28. Yet, in other civil rights statutes, Congress made the opposite policy choice and extended protection to individuals based on both "sex" and "gender identity." *Id.* at ¶ 38. The statutory term "sex" *remains* as clear and unambiguous as it was when both Title VII and Title IX were enacted. Defendants cannot rewrite these laws simply because they do not agree with Congress's policy choices. *Central Life Ins. Co. v. Burwell*, No. 15-5310, at *5 (D.C. Cir. July 1, 2016) ("Disagreeing with Congress's expressly codified policy choices isn't a luxury that

---

[26] In the immediate aftermath of Title IX, Congress continued to construe "sex" narrowly. In 1974, Representatives Bella Abzug and Edward Koch proposed to amend the Civil Rights Act to add the category of "sexual orientation." H.R. 14752, 93rd Cong. (1974). Congress considered other similar bills during the 1970s, *see* H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979), all of which were premised on the understanding that Title VII's protections against invidious "sex" discrimination related only to one's biological sex as male or female.

administrative agencies enjoy").[27]

## 2. Defendants Violated the Spending Clause.

Defendants' actions are unconstitutional because they violate the "clear notice" and anti-coercion principles of the Spending Clause.

### a. No "Clear Notice" of Defendants' New Rules.

The Spending Clause provides that Congress may "pay the Debts and provide for the . . . general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Conditions on federal funds given must enable local officials to "clearly understand," from the language of the law itself, the conditions to which they are agreeing. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (clear notice was not provided when the text of the law "does not even hint" that fees must be paid to a prevailing party, even though the legislative history indicated otherwise); *NFIB*, 132 S. Ct. at 2606 (Congress's power to legislate under the Spending Clause "does not include surprising participating States with post-acceptance or retroactive conditions." (quoting *Pennhurst*, 451 U.S. at 25)).

Title IX does not say (or even hint) that the receipt of federal education funding is conditioned on opening all restrooms and locker rooms to both sexes. To the contrary, Title IX allows for the separation of intimate living facilities "on the basis

---

[27] As a matter of constitutional avoidance, moreover, "sex" in Title VII should be construed in accordance with the term's plain meaning. Plaintiffs are subject to Title VII employment discrimination suits under Defendants' new rules. However, Congress cannot abrogate sovereign immunity without supporting findings or an otherwise clear statement of its intention to extend federal jurisdiction. ECF No. 6 at ¶¶ 84–89; *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726, 728 n.2 (2003). Since Congress did not manifest intent in Title VII to subject governmental employers to lawsuits on the basis of "gender identity," the statutory language should be construed in a manner that is consistent with the Eleventh Amendment. *Sheriff v. Gillie*, 136 S. Ct. 1594, 1602 (2016) (finding "no cause" for construing federal law "in a manner than interferes with the States' arrangements for conducting their own governments") (internal quotations omitted).

of sex." The Joint Letter is an unlawful attempt to rewrite the terms attached to Title IX monies. Because Congress did not provide clear notice that funds subject to Title IX were linked to an "all comers" restroom and intimate areas policy—and in fact *allowed* separate-sex facilities—the Joint Letter is unconstitutional.

### b. Unconstitutional Coercion.

"Congress may use its spending power to create incentives for States to act in accordance with federal policies, but when pressure turns to compulsion, the legislation runs contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602. When conditions on the receipt of funds "take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the states to accept policy changes." *Id.* at 2604; *cf. South Dakota v. Dole*, 483 U.S. 203, 211 (1987). And, in any event, the threatened loss of 10 percent of one's budget "is economic dragooning that leaves [non-federal governments] with no real option but to acquiesce" to the federal demands. *Id.* at 2605.

In *NFIB*, the Supreme Court addressed whether the federal government crossed the line that separates appropriate spending conditions from the proverbial "gun to the head." *Id.* at 2602–04. In *NFIB*, the new condition foisted upon the States risked eliminating *all* of their federal Medicaid funding. *Id.* In *Dole*, however, the new condition threatening the loss of only 5 percent of the State's federal highway funds was not unconstitutional. *Dole*, 483 U.S. at 211.

As with *NFIB*, the entities that do not comply with the Joint Letter risk losing *all* of their federal education funding. And the "financial 'inducement' [Defendants] ha[ve] chosen is much more than 'relatively mild encouragement.'" *NFIB*, 132 S. Ct. at 2604. School districts throughout the country receive a share of the $69,867,660,640 in annual funding that the federal government directs to education. ECF No. 6 at ¶ 57. Federal funds amount to approximately 9.3 percent of total spending on public elementary and secondary education nationwide, or roughly

$1,000 per pupil. *Id.* at ¶ 58.

The Joint Letter is clearly "economic dragooning." As to Texas, this "gun to the head" jeopardizes nearly twenty percent of its projected budget for elementary and secondary public schools over the next fiscal year. *See* Gen. Appropriations Act, 2015–16 Biennium, 84th Tex. Leg., R.S., art. III, § 1. Arizona, Tennessee, and Kentucky would receive 19.1, 18.6, and 17.6 percent of the same. *See* n.21, *supra*. The percentages in other jurisdictions are comparable. ECF No. 6 at ¶¶ 57, 59. Accordingly, the conditions in the Joint Letter amount to unconstitutional coercion.

### B.    Plaintiffs and Non-Plaintiffs Will Incur Irreparable Harms.

Defendants' actions cause irreparable harm by forcing policy changes, imposing drastic financial consequences, and usurping legitimate authority.

First, the new mandates present a Hobson's choice between violating federal rules (labeled as regulations, guidance, and interpretations) on the one hand, and transgressing longstanding policies and practices, on the other. Defendants' unlawful mandates conflict with the protections for personal privacy afforded under law. *See, e.g.*, *Indus. Found. of the S.*, 540 S.W.2d at 682; *Billings*, 489 S.W.2d at 859–61; n.6, *supra*. They are also irreconcilable with countless policies regarding restrooms, showers, and intimate facilities. *See, e.g.*, Thweatt Decl. Ex. P at ¶¶ 5–7; WIS. STAT. s. 120.12(12) (requiring school boards to "[p]rovide and maintain enough suitable and separate toilets and other sanitary facilities for both sexes."). And they threaten to override the practice in the countless schools that differentiate intimate facilities on the basis of sex consistent with Title IX, federal regulations, and laws protecting personal privacy and dignity.

Second, the public schools that maintain separate intimate facilities for male and female students will suffer significant financial penalties. Schools in Texas, Arizona, Tennessee, and Kentucky, for example, would forfeit nearly twenty percent of their budgets. Heber-Overgaard Unified School District would lose more than 15

percent of the district's total budget, Tenney Decl. Ex. R at ¶ 5, while Harrold ISD would surrender nearly 10 percent of its budget. Thweatt Decl. Ex. P. at ¶ 4. A sudden loss of so large a source of revenue would significantly impact the ability of affected public schools to continue to provide quality education to all of their students.

Finally, Defendants' mandate in search of an actual problem threatens Plaintiffs' interest in establishing policies and managing their own workplaces and educational facilities. Sovereigns suffer an irreparable harm when their duly enacted laws or policies are enjoined. *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws"); *Texas v. United States,* 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015) ("[W]henever an enactment of a state's people is enjoined, the state suffers irreparable injury."). Here, Defendants' rules remove from all non-federal officials their own authority to create and enforce their own rules and regulations for their workplaces and educational environments. This unlawful interference amounts to irreparable harm to Plaintiffs' sovereign interest. *Kansas v. United States,* 249 F.3d 1213, 1227 (10th Cir. 2001) (holding that erroneous tribal gaming commission decision amounts to an irreparable injury to the state's sovereign interest); *North Dakota v. EPA,* 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (states suffer irreparable harm where defective federal regulation would divest them of their sovereignty over intrastate waters); *Texas,* 95 F. Supp. 3d at 981–82 (irreparable injury occurs when invalid federal rules require states to disregard its laws).[28]

---

[28] The analysis of this section would also apply to Plaintiffs' equal protection claim, ECF No. 6 at

### C. The Balance of Equities Favors Plaintiffs.

On one side of this dispute are the needs and expectations of countless school children, parents, employers, employees, lawmakers, and others who acknowledge that "the two sexes are not fungible," *Ballard v. United States*, 329 U.S. 187, 193 (1946), and reasonably believe that "[s]eparate places to disrobe, sleep, perform personal bodily functions are permitted, in some situations required, by regard for individual privacy," Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21. On the other side are a series of unlawful edicts that invade more than privacy and dignity, but the sovereign prerogatives of non-federal authorities. The net negative impact on Plaintiffs' sovereignty, if Defendants' mandates are allowed to stand, may be challenging to quantify.

Plaintiffs face a real and substantial threat to their rights and sovereign authority by Defendants' unlawful rules. Defendants view their new rules as carrying the force of law, even though they were unlawfully adopted and should be set aside. Indeed, Defendants' have shown their appetite to enforce their new rules by suing North Carolina and in their subsequent refusal to publically disavow the nationwide applicability of those rules.

### D. The Public Interest Necessitates a Preliminary Injunction.

In addition to preserving fundamental standards of privacy and dignity, especially within the workplace and educational facilities, the public maintains an abiding interest in upholding the separation of powers, which reserves the law-making process to those that they elected—Congress—and mandates that legislative rules are promulgated in accordance with the statutory framework that Congress provided. Defendants' unlawful rules go far beyond lawful administrative interpretations; Defendants are attempting to rewrite the law. The public interest is

---

¶¶ 79–83, which is sufficient to establish irreparable harm. And to avoid conflict with the constitutional right of equal protection, the statutory term "sex" in Titles VII and IX should be read consistent with the term's plain meaning. *See* n.26, *supra*; *Sheriff*, 136 S. Ct. at 1602.

disserved if Defendants are not enjoined from enforcing the unlawful rules. A preliminary injunction can protect the public from Defendants.

A preliminary injunction also serves the public interest because Defendants' new mandates directly conflict with the statutory policy of Congress, which "is in itself a declaration of the public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937). And Plaintiffs are tasked with providing safe and appropriate facilities, including restrooms, locker rooms, and showers to members of the public. Defendants' new rules directly impinge the public interest in this endeavor as well.

### E. Nationwide Injunction.

This Court has jurisdiction to grant injunctive relief under Fed. R. Civ. P. 65. "The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *California v. Yamaski*, 442 U.S. 682, 702 (1979). This Court has jurisdiction to enter an injunction against Defendants on a nationwide basis. *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("[T]he Constitution vests the District Court with 'the judicial power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction."), *aff'd by an equally divided court*, 2016 WL 3434401, No. 15-674 (June 23, 2016).

Here, a nationwide injunction is proper because Defendants' rules are facially invalid: among other reasons, they are inconsistent with, and contrary to, the text of Titles VII and IX, and they were not issued with the requisite notice-and-comment procedure. And where a party brings a facial challenge alleging that agency action violated the APA, a nationwide injunction is appropriate. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407–08, 1409 (D.C. Cir. 1998) (invalidating rule and enjoining Army Corps from nationwide application); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court

determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

Finally, Plaintiffs consist of multiple sovereigns and officials. The sovereign prerogatives that Plaintiffs filed suit to defend are universal and codified everywhere. *See* nn.7–20, *supra*. Thus, Defendants' new rules apply in other jurisdictions beyond those directly represented here by Plaintiffs. Because the scope of the irreparable injury is national, and because Defendants' rules are invalid, the injunction should be nationwide in scope.

## IV. AGREED REQUEST FOR EXPEDITED CONSIDERATION

Defendants' new rules have unleashed uncertainty, and the 2016–2017 school year will commence shortly.[29] Under the Court's local rules, Defendants' response to this Application for Preliminary Injunction will be due on or about Thursday, Aug. 4, 2016, making Plaintiffs' reply due on or about Thursday, Aug. 18, 2016. To provide clarity to educational authorities *before* the 2016–2017 school year commences, ***parties agree*** to the following:

1) that Defendants' response, if any, to this Application for Preliminary Injunction is due no later than Wednesday, July 27, 2016,

2) that Plaintiffs' reply is due no later than Wednesday, Aug. 3, 2016,

3) that any hearing and disposition of this Application for Preliminary Injunction be provided as soon as practicable after that time, and

4) that the Court hold a hearing, if any, at a location of the Court's choosing, on August 8 or 9, 2016.

---

[29] In Texas, most public school districts will begin school around Aug. 22, 2016, though many extra-curricular activities will already be in full swing well before the first day of school. *See, e.g.*, the Academic Calendars of the Harrold ISD (http://www.harroldisd.net/vimages/shared/vnews/stories/573b38dd15782/Harrold%20Calendar%202016-2017-Approved%20February%2015%2C%202016-Calendar%20Only.pdf), Wichita Falls ISD (http://www.wfisd.net/cms/lib/TX01000557/Centricity/Domain/1/16-17%20calendar%20complete.pdf), Austin ISD (https://www.austinisd.org/calendar/2016-08), Dallas ISD (http://www.dallasisd.org/Page/2), and Houston ISD (http://www.houstonisd.org/calendar).

Respectfully submitted this the 6th day of July, 2016,

| | |
|---|---|
| LUTHER STRANGE<br>Attorney General of Alabama | KEN PAXTON<br>Attorney General of Texas |
| BRAD D. SCHIMEL<br>Attorney General of Wisconsin | JEFFREY C. MATEER<br>First Assistant Attorney General |
| PATRICK MORRISEY<br>Attorney General of West Virginia | BRANTLEY STARR<br>Deputy First Assistant Attorney General |
| HERBERT SLATERY, III<br>Attorney General of Tennessee | PRERAK SHAH<br>Senior Counsel to the Attorney General |
| MARK BRNOVICH<br>Attorney General of Arizona | ANDREW LEONIE<br>Associate Deputy Attorney General for<br>Special Litigation |
| SCOTT PRUITT<br>Attorney General of Oklahoma | AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for<br>Special Litigation |
| JEFF LANDRY<br>Attorney General of Louisiana | |
| SEAN REYES<br>Attorney General of Utah | /s/ Austin R. Nimocks<br>AUSTIN R. NIMOCKS<br>Texas Bar No. 24002695<br>Austin.Nimocks@texasattorneygeneral.gov |
| SAM OLENS<br>Attorney General of Georgia | Special Litigation Division<br>P.O. Box 12548, Mail Code 001<br>Austin, Texas 78711-2548 |
| | *ATTORNEYS FOR PLAINTIFFS* |

## CERTIFICATE OF CONFERENCE

Counsel for Plaintiffs sought conference via e-mail on the morning of Tuesday, July 5, 2016 with counsel for Defendants. Because Defendants have yet to answer or otherwise appear in this matter, counsel for Plaintiffs sought conference via e-mail with the United States Attorney for the Northern District of Texas, John Parker, at john.parker@usdoj.gov, and the Chief of the Civil Division for the Northern District of Texas, Steve P. Fahey, at steve.p.fahey@usdoj.gov. Because the United States of America is represented in every district of the country by the United States Attorney, this method provides sufficient notice given the time sensitive nature of the issues involved. *See* 28 U.S.C. § 547 (". . . each United States Attorney, within his district, shall . . . defend, for the government, all civil actions . . . in which the United States is concerned . . . ."). In that e-mail, counsel for Plaintiffs provided a copy of its Amended Complaint (ECF No. 6) and this motion, and inquired as to whether this motion was agreed to or opposed.

On Wednesday, July 6, 2016, counsel for Plaintiffs spoke with Megan Crowley of the U.S. Department of Justice. Ms. Crowley advised that while Defendants are opposed to the application for preliminary injunction, they are willing to agree to an expedited briefing schedule, as is represented herein.

/s/ Austin R. Nimocks
Austin R. Nimocks

## CERTIFICATE OF SERVICE

I, Austin R. Nimocks, hereby certify that on this the 6th day of July, 2016, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Austin R. Nimocks*
Austin R. Nimocks