Civil Action No. 7:16-cv-00054-O

---

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

---

STATE OF TEXAS, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

---

**STATES' AMICUS CURIAE BRIEF IN OPPOSITION TO
PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION**

---

ROBERT W. FERGUSON
  *Attorney General of Washington*

Noah G. Purcell, WSBA 43492
  *Solicitor General*

Alan D. Copsey, WSBA 23305
  *Deputy Solicitor General*
  *Counsel of Record

Colleen M. Melody, WSBA 42275
  *Assistant Attorney General*

PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200 (office)
(360) 664-2963 (fax)
alan.copsey@atg.wa.gov

ERIC T. SCHNEIDERMAN
  *Attorney General of New York*

Barbara D. Underwood
  *Solicitor General*

Anisha S. Dasgupta
  *Deputy Solicitor General*

Holly A. Thomas
  *Special Counsel to the Solicitor General*

Claude S. Platton
  *Senior Assistant Solicitor General*

120 Broadway
New York, NY 10271
(212) 416-8020

*Additional Amici Listed On Signature Page*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

ARGUMENT ........................................................................................................................4

A.     Plaintiffs Have Shown No Irreparable Injury; Their Alleged Harms of
       Increased Crime, Building Costs, and Lost Title IX Funding Are
       Speculative and Avoidable ......................................................................................5

       1.      Speculation About Bathroom Crime Does Not Show Irreparable
               Harm ............................................................................................................6

       2.      Plaintiffs' Complaints About Construction Costs Misconstrue the
               Federal Requirements and Ignore Effective Alternatives ..........................8

       3.      Plaintiffs' Potential Loss of Title IX Funds Is Not Imminent, and
               Could be Avoided Through a Stay ............................................................11

       4.      Plaintiffs' Alleged "Sovereignty" Harm is Not Legally Cognizable ....................13

B.     The Balance of Equities and Public Interest Favor Denying Plaintiffs'
       Motion ...................................................................................................................14

       1.      The Federal Guidance Will Help Reduce the Significant Levels of
               Discrimination Transgender People Experience and the Harms that
               Flow From Such Discrimination ..............................................................14

               a.      Transgender people experience harassment that causes
                       serious damage .............................................................................15

               B.      Policies that promote tolerance and inclusion of
                       transgender people can reduce harms caused by
                       discrimination .............................................................................19

       2.      The Public Interest Weighs Against Granting an Injunction Based
               on Negative Attitudes or Fear ..................................................................22

C.     Nationwide Injunctive Relief Is Inappropriate ....................................................25

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*ADT, LLC v. Capital Connect, Inc.*
145 F. Supp. 3d 671 (N.D. Tex. 2015) ............................................................... 6, 12

*Bluefield Water Ass'n, Inc. v. City of Starkville*
577 F.3d 250 (5th Cir. 2009) ............................................................................... 14

*City of Cleburne v. Cleburne Living Ctr.*
473 U.S. 432 (1985)............................................................................................. 23

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*
710 F.3d 579 (5th Cir. 2013) ................................................................................. 5

*Digital Generation, Inc. v. Boring*
869 F. Supp. 2d 761 (N.D. Tex. 2012) ............................................................. 4, 13

*Elite Rodeo Ass'n v. Prof'l Rodeo Cowboys Ass'n, Inc.*
No. 3:15-cv-03609-M, 2016 WL 429886 (N.D. Tex. Feb. 4, 2016) ................... 4-5

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*
762 F.2d 464 (5th Cir. 1985) ................................................................................. 5

*G.G. by Grimm v. Gloucester Cty. Sch. Bd.*
822 F.3d 709 (4th Cir. Apr. 19, 2016),
*reh'g denied*, 2016 WL 3080263 (May 31, 2016)............................................. 6, 18

*Glenn v. Brumby*
663 F.3d 1312 (11th Cir. 2011) ........................................................................... 23

*Google, Inc. v. Hood*
822 F.3d 212 (5th Cir. 2016) ................................................................................. 8

*Hall's IV & Institutional Pharmacy, Inc. v. Prime Therapeutics LLC*
No. 4:16-cv-19-O, 2016 WL 462054 (N.D. Tex. Jan. 29, 2016).............................. 4

*Holland Am. Ins. Co. v. Succession of Roy*
777 F.2d 992 (5th Cir. 1985) ............................................................................. 4, 6

*Hollon v. Mathis Indep. Sch. Dist.*
491 F.2d 92 (5th Cir. 1974) ................................................................................. 24

*Janvey v. Alguire*
647 F.3d 585 (5th Cir. 2011) ................................................................................. 6

*Ladd v. Livingston*
777 F.3d 286 (5th Cir. 2015) ................................................................................. 5

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*
760 F.2d 618 (5th Cir. 1985) ................................................................................. 5

*Orth v. Wis. State Emps. Union Council*
No. 07-C-149, 2007 WL 1029220 (E.D. Wis. Mar. 29, 2007)............................... 13

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*
  600 F.3d 562 (5th Cir. 2010) ................................................................. 5

*Roho, Inc. v. Marquis*
  902 F.2d 356 (5th Cir. 1990) ............................................................... 24

*Romer v. Evans*
  517 U.S. 620 (1996)............................................................................. 23

*Soltex Polymer Corp. v. Fortex Indus., Inc.*
  832 F.2d 1325 (2d Cir. 1987) .............................................................. 24

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*
  608 F.3d 200 (5th Cir. 2010) ............................................................... 14

*Weinberger v. Romero-Barcelo*
  456 U.S. 305 (1982)............................................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008).......................................................................... 5, 14

## STATUTES

Cal. Civ. Code § 51(b) ............................................................................. 2

Cal. Educ. Code § 220, 221.5 .................................................................. 2

Cal. Gov't Code §§ 12926, 12940, 12949, 12955 ................................... 2

Colo. Rev. Stat. § 24-34-301(7), -402, -502, -601 ................................. 3

Conn. Gen. Stat. § 10-15c ........................................................................ 3

Conn. Gen. Stat. § 46a-51(21), -60, -64, -64c ........................................ 3

D.C. Code § 2-1401.02(12A) .................................................................. 2

D.C. Code § 2-1402.11, .21, .31, .41 ...................................................... 2

Del. Code Ann. tit. 19, § 711 ................................................................... 3

Del. Code Ann. tit. 6, §§ 4501, 4603(b) ................................................. 3

Haw. Rev. Stat. § 368-1 ........................................................................... 2

Haw. Rev. Stat. § 489-2 ........................................................................... 2

Haw. Rev. Stat. § 515-2 ........................................................................... 2

775 Ill. Comp. Stat. 5/1-102.................................................................... 2

775 Ill. Comp. Stat. 5/1-103 (O-1).......................................................... 2

Iowa Code § 216.2(10) ................................................................................ 2

Iowa Code § 216.6, .7, .8, .9 ...................................................................... 2

Mass. Gen. Laws, ch. 4, § 7, Fifty-ninth .................................................. 3

Mass. Gen. Laws, ch. 76, § 5 ..................................................................... 3

Mass. Gen. Laws, ch. 151B, § 4 ................................................................. 3

Mass. Gen. Laws, ch. 272, §§ 92A, 98 ...................................................... 3

Md. Code Ann., State Gov't §§ 20-304, -606, -705 ................................... 3

Me. Rev. Stat. Ann. tit. 5, § 4553(9-C) ..................................................... 2

Me. Rev. Stat. Ann. tit. 5, § 4571, 4581, 4591, 4601 .............................. 2

Minn. Stat. § 363A.03(44), .08, .09, .11, .13 ............................................ 2

N.J. Stat. Ann. § 10:5-4, -12 ...................................................................... 2

N.J. Stat. Ann. § 10:5-5(l), (rr) ................................................................. 2

N.M. Stat. Ann. § 28-1-2(Q) ................................................................... 2-3

N.M. Stat. Ann. § 28-1-7(A), (G) ............................................................... 2

N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13(c)(1) ................................ 3

Nev. Rev. Stat. § 118.100 ........................................................................... 3

Nev. Rev. Stat. § 613.310(4) ...................................................................... 3

Nev. Rev. Stat. § 651.050 ........................................................................... 3

Or. Rev. Stat. § 174.100(7) ........................................................................ 3

Or. Rev. Stat. § 659.850 ............................................................................. 3

Or. Rev. Stat. § 659A.006 .......................................................................... 3

R.I. Gen. Laws § 11-24-2.3 ......................................................................... 2

R.I. Gen. Laws § 28-5-6(11) ....................................................................... 2

R.I. Gen. Laws § 34-37-3(9) ....................................................................... 2

Vt. Stat. Ann. tit. 1, § 144 .......................................................................... 3

Vt. Stat. Ann. tit. 9, §§ 4501-4502 ............................................................ 3

Vt. Stat. Ann. tit. 21, § 495 ........................................................................ 3

Wash. Rev. Code 28A.642.010 ................................................................... 2

Wash. Rev. Code 49.60.040(26) ................................................................. 2

Wash. Rev. Code 49.60.180, .215, .222 ..................................................... 2

# REPORT & SURVEYS

*2015 U.S. Transgender Survey*
    (Nat'l Ctr. for Transgender Equality July 2016),
    http://www.ustranssurvey.org/s/USTS-Preliminary-Findings-July-2016-2.pdf........................18

Andrew R. Flores et al.,
    *How Many Adults Identify as Transgender in the United States?*
    (Williams Inst. June 2016),
    http://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-
    Identify-as-Transgender-in-the-United-States.pdf................................................1, 14

Ann P. Haas et al.,
    *Suicide Attempts among Transgender and Gender Non-Conforming Adults:*
    *Findings of the National Transgender Discrimination Survey*
    (Am. Found. for Suicide Prevention and Williams Inst. Jan. 2014),
    http://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-
    Suicide-Report-Final.pdf ................................................................17

Ann Whalen & David Esquith,
    *Examples of Policies and Emerging Practices for Supporting Transgender Students*
    (U.S. Dep't of Educ. May 2016),
    http://www2.ed.gov/about/offices/list/oese/oshs/emergingpractices.pdf ...................9

Catherine E. Lhamon & Vanita Gupta,
    *Dear Colleague Letter on Transgender Students*
    (U.S. Dep't of Educ. & U.S. Dep't of Just. May 13, 2016),
    http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-
    ix-transgender.pdf ......................................................................9

Colo. Ass'n of Sch. Bds., Colo. Ass'n of Sch. Execs., Colo. Educ. Ass'n & One Colo.,
    *Guidance for Educators Working with Transgender and Gender*
    *Nonconforming Students* (2013),
    https://cdpsdocs.state.co.us/safeschools/Resources/One%20Colorado/One
    CO%20Transgender_Guidance.pdf ........................................................10

Conn. Safe Sch. Coal.,
    *Guidelines for Connecticut Schools to Comply with Gender Identity and*
    *Expression Non-Discrimination Laws* (Apr. 2012),
    http://www.ct.gov/chro/lib/chro/Guidelines_for_Schools_on_Gender_Identity_
    and_Expression_final_4-24-12.pdf .................................................. 10-11

D.C. Pub. Schs.,
    *Transgender and Gender-Nonconforming Policy Guidance* (June 2015),
    http://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/
    DCPS%20Transgender%20Gender%20Non%20Conforming%20Policy
    %20Guidance.pdf........................................................................10

Eli Coleman et al.,
*Standards of Care for the Health of Transsexual, Transgender, and
Gender-Nonconforming People*
(World Prof'l Ass'n for Transgender Health 2012),
https://amo_hub_content.s3.amazonaws.com/Association140/files/Standards
%20of%20Care,%20V7%20Full%20Book.pdf ........................................................................4

Emily A. Greytak et al.,
*Harsh Realities: The Experiences of Transgender Youth in Our Nation's
Schools, Gay, Lesbian and Straight Education Network* (GLSEN 2009),
http://www.glsen.org/sites/default/files/Harsh%20Realities.pdf .................................. 15-16, 19

Human Rights Campaign,
*Cities and Counties with Non-Discrimination Ordinances that Include
Gender Identity* (Jan. 28, 2016),
http://www.hrc.org/resources/cities-and-counties-with-non-discrimination-
ordinances-that-include-gender (last visited July 20, 2016) ......................................................3

Jaime M. Grant et al.,
*Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*
(Nat'l Ctr. for Transgender Equality and Nat'l Gay and Lesbian Task Force 2011),
http://www.transequality.org/sites/default/files/docs/resources/NTDS_
Report.pdf ....................................................................................................................15-17, 22-23

Jody L. Herman,
*Gendered Restrooms and Minority Stress: The Public Regulation of
Gender and its Impact on Transgender People's Lives*
(Williams Inst. June 2013),
http://williamsinstitute.law.ucla.edu/wp-content/uploads/Herman-Gendered-
Restrooms-and-Minority-Stress-June-2013.pdf .................................................................. 17-18

Joseph G. Kosciw et al.,
*The 2013 National School Climate Survey: The Experiences of Lesbian, Gay,
Bisexual and Transgender Youth in Our Nation's Schools* (GLSEN 2014),
http://www.glsen.org/sites/default/files/2013%20National%20School%20Clim
ate%20Survey%20Full%20Report_0.pdf .................................................................... 15-16, 18

Mark L. Hatzenbuehler & Katherine M. Keyes,
*Inclusive Anti-bullying Policies and Reduced Risk of Suicide Attempts in
Lesbian and Gay Youth*,
53 J. Adolescent Health S21 (2012 & Supp. 2013),
http://www.jahonline.org/article/S1054-139X(12)00354-0/fulltext.........................................20

Mass. Dep't of Elementary and Secondary Educ.,
*Guidance for Massachusetts Public Schools, Creating a Safe and
Supportive School Environment* (2013),
http://www.doe.mass.edu/ssce/GenderIdentity.pdf .................................................................10

Matt Motyl et al.,
*How ideological migration geographically segregates groups*,
51 J. Experimental Soc. Psychol. 1 (2014),
http://tinyurl.com/j8pkoul ............................................................................21

Md. State Dep't of Educ.,
*Providing Safe Spaces for Transgender and Gender Non-Conforming Youth:*
*Guidelines for Gender Identity Non-Discrimination* (Oct. 2015),
http://marylandpublicschools.org/MSDE/divisions/studentschoolsvcs/student_s
ervices_alt/docs/ProvidingSafeSpacesTransgendergenderNonConformingYout
h012016.pdf ............................................................................ 10-11

N.Y. State Educ. Dep't,
*Guidance to School Districts for Creating a Safe and Supportive School*
*Environment for Transgender and Gender Nonconforming Students*
(July 2015),
http://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidance
FINAL.pdf ............................................................................ 10-11

Or. Dep't of Educ.,
*Guidance to School Districts: Creating a Safe and Supportive School*
*Environment for Transgender Students* (May 5, 2016),
http://www.ode.state.or.us/groups/supportstaff/hklb/schoolnurses/
transgenderstudentguidance.pdf ............................................................................10

*Qualified and Transgender: A report on resume testing for employment*
*discrimination based on gender identity*
(District of Columbia Office of Human Rights 2015),
http://ohr.dc.gov/sites/default/files/dc/sites/ohr/publication/attachments/Qualifi
edAndTransgender_FullReport_1.pdf ............................................................................16

R.I. Dep't of Educ.,
*Guidance for Rhode Island Schools on Transgender and Gender*
*Nonconforming Students* (June 2016),
http://www.thriveri.org/documents/Guidance.for.RhodeIsland.Schools.o
n.Transgender.and.Gender.Nonconforming.Students-2016.pdf ......................................... 10-11

Tonei Glavinic,
*Research Shows Lack of Support for Transgender and Gender-*
*Nonconforming Youth in U.S. School Systems*,
2 Inquiries J. 1 (2010),
http://www.inquiriesjournal.com/articles/135/research-shows-lack-of-support-
for-transgender-and-gender-nonconforming-youth-in-us-school-systems ..............................15

Vt. Agency of Educ.,
*Best Practices for Schools Regarding Transgender and Gender*
*Nonconforming Students* (2016),
http://education.vermont.gov/documents/edu-transgender-guidelines-for-
schools.pdf ............................................................................10

## NEWS / NEWSPAPERS

Alexa Ura,
*For Transgender Boy, Bathroom Fight Just Silly*, Texas Trib. (June 14, 2016),
https://www.texastribune.org/2016/06/14/transgender-boy-normalcy-trumps-
bathrooms/...................................................................................................................20

David Crary,
*Debate over transgender bathroom access spreads nationwide*, Salt Lake Trib.,
May 10, 2016,
http://www.sltrib.com/home/3875520-155/debate-over-transgender-bathroom-
access-spreads ...........................................................................................................7

Fox News Sunday,
*Gov. McCrory on showdown over NC's transgender bathroom law* (May 8,
2016),
http://www.foxnews.com/trans
cript/2016/05/08/manafort-on-trump-fight-to-rally-gop-defeat-democrats-gov-
mccrory-on-show
down/........................................................................................................................8

Laura Ungar,
*Transgender people face alarmingly high risk of suicide*, USAToday (Aug. 16,
2015),
http://www.usatoday.com/story/news/nation/2015/08/16/transgender-
individuals-face-high-rates--suicide-attempts/31626633/ ......................................17

Wynne Parry,
*Gender Dysphoria: DSM-5 Reflects Shift In Perspective On Gender Identity*,
HuffingtonPost (June 4, 2013),
http://www.huffingtonpost.com/entry/gender-dysphoria-dsm-5_n_3385287 .........19

## LEGISLATIVE REPORTS

Cal. Assem. Com. on Educ., Rep. on Assem. Bill No. 1266, 2013-2014
Reg. Sess., *as introduced,* Feb. 22, 2013,
https://leginfo.legislature.ca.gov/faces/billHistory
Client.xhtml?bill_id=201320140AB1266 ............................................................20

Cal. Sen. Comm. on Educ.,
Rep. on Assem. Bill No. 1266, 2013-2014 Reg. Sess.,
*as amended*, Apr. 25, 2013,
http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1251-1300/ab_12
66_cfa_20130610_160930_sen_comm.html ...........................................................7

## WEB-BASED INFORMATION / LOCATIONS

American Psychological Ass'n,
*Answers to Your Questions About Transgender People, Gender Identity and
Gender Expression: Is Being Transgender a Mental Disorder?,*
http://www.apa.org/topics/lgbt/transgender.aspx (last visited July 21, 2016) ......................4, 19

Calif. Sch. Bds. Ass'n,
*Final Guidance: AB 1266, Transgender and Gender Nonconforming Students,
Privacy, Programs, Activities & Facilities* (Mar. 2014),
https://www.csba.org/Advocacy/~/media/CSBA/Files/Advocacy/ELA/2014_03
_AB1266_FinalGuidance.ashx ................................................................................................10

Christy Mallory & Brad Sears,
*Discrimination, Diversity, and Development: The Legal and Economic
Implications of North Carolina's HB2* 2 (Williams Inst. May 2016),
http://tinyurl.com/gtuelbq ........................................................................................................21

Deloitte point of view,
*Only Skin Deep? Re-examining the business case for diversity* (Sept. 2011),
http://tinyurl.com/hs3wef6 (last visited July 20, 2016) ..........................................................21

Equality Matters,
*Texas Experts Debunk The Transgender "Bathroom Predator" Myth Ahead
Of HERO Referendum* (Oct. 15, 2015),
http://equalitymatters.org/factcheck/201510150001 (last visited July 21, 2016) ......................8

Greta R. Bauer et al.,
*Intervenable factors associated with suicide risk in transgender persons:
a respondent driven sampling study in Ontario, Canada*
(BMC Public Health June 2015),
http://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-015-1867-2 ...................22

Human Rights Campaign Found.,
*Corporate Equality Index 2016,*
http://tinyurl.com/p2mfq9m (last visited July 20, 2016) ........................................................21

Iowa Dep't of Educ.,
*Equality for transgender students (February 2015 School Leader Update),*
https://www.educateiowa.gov/resources/laws-and-regulations/legal-
lessons/equality-transgender-students-february-2015-school...................................................10

Kristie L. Seelman et al.,
*Invisibilities, Uncertainties and Unexpected Surprises: The Experiences of
Transgender and Gender Non-Conforming Students,Sstaff, and Faculty at
Colleges and Universities in Colorado* (2012),
https://portfolio.du.edu/downloadItem/221246 ......................................................................18

Kristie L. Seelman,
*Transgender Adults' Access to College Bathrooms and Housing and the
Relationship to Suicidality*, J. of Homosexuality (2016),
http://www.tandfonline.com/doi/pdf/10.1080/00918369.2016.1157998 ...........................18, 20

Letter from Chiefs William G. Brooks III & Bryan Kyes to Senator William N. Brownsberger & Rep. John V. Fernandes re: Protecting Transgender Individuals in Places of Public Accommodation (Oct. 1, 2015), http://www.mass.gov/ago/docs/policy/2016/ew-le.pdf ...........................................................7

Los Angeles Unified School District, http://achieve.lausd.net/about (last visited July 25, 2016).........................................................7

Luke Malone, *Transgender Suicide Attempt Rates are Staggering* (Vocativ Mar. 5, 2015), http://www.vocativ.com/culture/lgbt/transgender-suicide/......................................................17

Nat'l Ctr. for Transgender Equality, *Housing & Homelessness*, http://www.transequality.org/issues/housing-homelessness (last visited July 21, 2016) ........................................................................................................17

Nat'l Ctr. for Transgender Equality, *Transgender Terminology* (Jan. 15, 2014), http://www.transequality.org/issues/resources/transgender-terminology (last visited July 21, 2016) ..........................................................................................................4

National Task Force to End Sexual and Domestic Violence Against Women, *Full And Equal Access For The Transgender Community* (Apr. 21, 2016), http://4vawa.org/ (last visited July 21, 2016).............................................................................7

Pew Research Ctr., *Data Trend: Gay Marriage*, http://tinyurl.com/zyl3s48 (last visited July 21, 2016) .............................................................21

U.S. Dep't of Justice, *Title IX Legal Manual*, https://www.justice.gov/crt/title-ix#VII.%C2%A0%20Federal%20Funding%20 Agency%20Methods%20to%20Enforce%20Compliance.......................................................12

Wash. Office of Super. of Pub. Instruction, *Prohibiting Discrimination in Washington Public Schools* (Feb. 2012), http://www.k12.wa.us/Equity/ProhibitingDiscrimination.aspx .................................................10

Wash. State Human Rights Comm'n, *Frequently Asked Questions Regarding WAC 162-32-060 Gender-segregated Facilities* (Jan. 15, 2016), http://www.hum.wa.gov/admin/functions/file_views.php?media_id=223 .................................9

## INTRODUCTION

Texas and its co-plaintiffs ask this Court to impose a nationwide preliminary injunction based on speculative and inaccurate claims of harm to them and the public. But respecting the civil rights of transgender individuals will cause Plaintiffs no harm. Their allegations of safety risks are unsupported hyperbole, their claimed loss of federal funding is distant and avoidable, and their claims of massive renovation costs lack support in the law and the record.

While Plaintiffs' claimed harms are hypothetical, the discrimination suffered by transgender individuals is all too real. Such discrimination harms transgender individuals at work, at school, and in public, causing tangible economic, emotional, and health consequences. To prevent such harms, many States protect transgender people from discrimination. The States that file this brief—Washington, New York, California, Connecticut, Delaware, Illinois, Maryland, Massachusetts, New Hampshire, New Mexico, Oregon, Vermont, and the District of Columbia (the Amici States)—do so because our shared experience demonstrates that protecting transgender individuals from discrimination benefits all members of the public. And contrary to Plaintiffs' claims, our shared experience demonstrates that protecting the civil rights of our transgender friends, relatives, classmates, and colleagues creates no public safety threat and imposes no meaningful financial burden.

The bottom line is that the federal guidance at issue here threatens no imminent harm to Plaintiffs and is strongly in the public interest. The Court should deny preliminary relief.

## FACTUAL BACKGROUND

Nearly 1.5 million people in the United States identify as transgender.[1] Beginning nearly

---

[1] Andrew R. Flores et al., *How Many Adults Identify as Transgender in the United States?* 3-4 (Williams Inst. June 2016), http://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf.

a quarter century ago, States began providing explicit civil rights protections for transgender people. Currently, nineteen States and the District of Columbia offer such protections, either through their definitions of sex discrimination or by prohibiting discrimination based on gender identity. These States are Minnesota, Rhode Island, California, New Mexico, Maine, Hawaii, Washington, Illinois, New Jersey, Iowa, Vermont, Oregon, Colorado, Connecticut, Nevada, Massachusetts, Delaware, Maryland, and New York.[2] Meanwhile, at least 225 local

---

[2] Minnesota (1993): Minn. Stat. § 363A.03(44) (definition); Minn. Stat. § 363A.08 (employment); Minn. Stat. § 363A.09 (housing); Minn. Stat. § 363A.11 (public accommodations); Minn. Stat. § 363A.13 (education).

Rhode Island (2001): R.I. Gen. Laws § 11-24-2.3 (public accommodations); R.I. Gen. Laws § 28-5-6(11) (employment); R.I. Gen. Laws § 34-37-3(9) (housing).

California (2003): Cal. Gov't Code §§ 12926, 12949 (employment). (2011): Cal. Civ. Code § 51(b) (public accommodations); Cal. Educ. Code § 220 (education); Cal. Gov't Code § 12940 (employment); Cal. Gov't Code § 12955 (housing). (2013): Cal. Educ. Code § 221.5 (schools).

New Mexico (2003): N.M. Stat. Ann. § 28-1-2(Q) (definition); N.M. Stat. Ann. § 28-1-7(A) (employment); N.M. Stat. Ann. § 28-1-7(F) (public accommodations); N.M. Stat. Ann. § 28-1-7(G) (housing).

Maine (2005): Me. Rev. Stat. Ann. tit. 5, § 4553(9-C) (definition); Me. Rev. Stat. Ann. tit. 5, § 4571 (employment); Me. Rev. Stat. Ann. tit. 5, § 4581 (housing); Me. Rev. Stat. Ann. tit. 5, § 4591 (public accommodations); Me. Rev. Stat. Ann. tit. 5, § 4601 (education).

Hawaii (2005): Haw. Rev. Stat. § 515-2 (housing). (2006): Haw. Rev. Stat. § 489-2 (public accommodations). (2011): Haw. Rev. Stat. § 368-1 (employment, housing, public accommodations, and access to state financial assistance).

Washington (2006): Wash. Rev. Code 49.60.040(26) (definition); Wash. Rev. Code 49.60.180 (employment); Wash. Rev. Code 49.60.215 (public accommodations); Wash. Rev. Code 49.60.222 (housing). (2010): Wash. Rev. Code 28A.642.010 (schools).

Illinois (2006): 775 Ill. Comp. Stat. 5/1-102 (housing, employment, public accommodations including schools); 775 Ill. Comp. Stat. 5/1-103 (O-1) (definition).

New Jersey (2006): N.J. Stat. Ann. § 10:5-4 (public accommodations, schools, housing); N.J. Stat. Ann. § 10:5-5(l), (rr) (definitions); N.J. Stat. Ann. § 10:5-12 (employment).

District of Columbia (2006): D.C. Code § 2-1401.02(12A) (definition); D.C. Code § 2-1402.11 (employment); D.C. Code § 2-1402.21 (housing); D.C. Code § 2-1402.31 (public accommodations); D.C. Code § 2-1402.41 (education).

Iowa (2007): Iowa Code § 216.6 (employment); Iowa Code § 216.7 (public accommodations); Iowa Code § 216.8 (housing); Iowa Code § 216.9 (education); Iowa Code § 216.2(10) (definition).

governments, including at least 40 counties or cities in the Plaintiff States, also prohibit discrimination based on gender identity or expression.[3] Whether included within other defined terms, such as sex or sexual orientation, or defined as a standalone protected class, the meaning of "gender identity" is generally consistent across these States as "a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth."[4] "Transgender," meanwhile, is "a term for people whose gender identity,

---

Vermont (2007): Vt. Stat. Ann. tit. 1, § 144 (definition); Vt. Stat. Ann. tit. 9, §§ 4501-4502 (public accommodations, housing); Vt. Stat. Ann. tit. 21, § 495 (employment).

Oregon (2008): Or. Rev. Stat. § 174.100(7) (definition); Or. Rev. Stat. § 659A.006 (employment, public accommodations, housing); Or. Rev. Stat. § 659.850 (education).

Colorado (2008): Colo. Rev. Stat. § 24-34-301(7) (definition); Colo. Rev. Stat. § 24-34-402 (employment); Colo. Rev. Stat. § 24-34-502 (housing); Colo. Rev. Stat. § 24-34-601 (public accommodations, schools).

Connecticut (2011): Conn. Gen. Stat. § 10-15c (schools); Conn. Gen. Stat. § 46a-51(21) (definition); Conn. Gen. Stat. § 46a-60 (employment); Conn. Gen. Stat. § 46a-64 (public accommodations); Conn. Gen. Stat. § 46a-64c (housing).

Nevada (2011): Nev. Rev. Stat. § 118.100 (housing); Nev. Rev. Stat. § 613.310(4) (employment); Nev. Rev. Stat. § 651.050 (public accommodations).

Massachusetts (2011): Mass. Gen. Laws, ch. 4, § 7, Fifty-ninth (definition); Mass. Gen. Laws, ch. 76, § 5 (schools); Mass. Gen. Laws, ch. 151B, § 4 (employment, housing, credit). (2016): Mass. Gen. Laws, ch. 272, §§ 92A, 98 (public accommodations) (as amended by Mass. St. 2016, ch. 134).

Delaware (2013): Del. Code Ann. tit. 6, § 4501 (public accommodations); Del. Code Ann. tit. 6, § 4603(b) (housing); Del. Code Ann. tit. 19, § 711 (employment).

Maryland (2014): Md. Code Ann., State Gov't § 20-304 (public accommodations); Md. Code Ann., State Gov't § 20-606 (employment); Md. Code Ann., State Gov't § 20-705 (housing).

New York (2016): N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13(c)(1) (interpreting the N.Y. Exec. Law, art. 15 (Human Rights Law) definition of "sex" to include gender identity).

[3] Human Rights Campaign, *Cities and Counties with Non-Discrimination Ordinances that Include Gender Identity* (Jan. 28, 2016), http://www.hrc.org/resources/cities-and-counties-with-non-discrimination-ordinances-that-include-gender (last visited July 20, 2016).

[4] Mass. Gen. Laws, ch. 4, § 7, Fifty-ninth; *see also, e.g.*, N.M. Stat. Ann. § 28-1-2(Q) (defining gender identity as "a person's self-perception . . . as a male or female based upon the

expression or behavior is different from those typically associated with their assigned sex at birth."[5] The American Psychological Association recognizes that transgender people have been part of cultures worldwide "from antiquity until the present day," and that being transgender is natural and not any form of pathology.[6]

## ARGUMENT

Discrimination against transgender people causes stigma, isolation, and exclusion. By contrast, as the experience of the Amici States shows, policies that allow employees, students, and members of the public to use facilities consistent with their gender identity promote safe and inclusive communities, workplaces, and schools, a benefit that accrues to all.

Because the antidiscrimination guidance provided by the federal government here will overwhelmingly benefit the public, Plaintiffs cannot meet their burden to obtain the "extraordinary and drastic remedy" of a preliminary injunction.[7] Plaintiffs must show "'(1) a

---

person's appearance, behavior or physical characteristics that are in accord with or opposed to the person's physical anatomy, chromosomal sex or sex at birth").

[5] Nat'l Ctr. for Transgender Equality, *Transgender Terminology* (Jan. 15, 2014), http://www.transequality.org/issues/resources/transgender-terminology (last visited July 21, 2016) (defining "gender identity" as "[a]n individual's internal sense of being male, female, or something else").

[6] American Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity and Gender Expression: Is Being Transgender a Mental Disorder?*, http://www.apa.org/topics/lgbt/transgender.aspx (last visited July 21, 2016) ("identifying as transgender does not constitute a mental disorder"); *see also* Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 4 (World Prof'l Ass'n for Transgender Health 2012), https://amo_hub_content.s3.amazonaws.com/ Association140/files/Standards%20of%20Care,%20V7%20Full%20Book.pdf ("[T]he "expression of gender characteristics, including identities, that are not stereotypically associated with one's assigned sex at birth is a common and culturally diverse human phenomenon [that] should not be judged as inherently pathological or negative." (Second alteration in source.)).

[7] *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *Elite Rodeo Ass'n v. Prof'l Rodeo Cowboys Ass'n, Inc.*, No. 3:15-cv-03609-M, 2016 WL 429886, at *3 (N.D. Tex. Feb. 4, 2016); *Hall's IV & Institutional Pharmacy, Inc. v. Prime Therapeutics LLC*, No. 4:16-cv-19-O, 2016 WL 462054, at *2 (N.D. Tex. Jan. 29, 2016); *Digital Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 772 (N.D. Tex. 2012).

likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.'"[8] Though a failure to meet any of these elements would require denying injunctive relief,[9] Plaintiffs here are unable to satisfy any of the four elements. Rather than restate Defendants' thorough and accurate demolition of Plaintiffs' claim of likelihood of success on the merits, the Amici States will focus on the other three elements of injunctive relief.

A.    **Plaintiffs Have Shown No Irreparable Injury; Their Alleged Harms of Increased Crime, Building Costs, and Lost Title IX Funding Are Speculative and Avoidable**

To obtain a preliminary injunction, Plaintiffs must demonstrate that "irreparable injury is *likely* in the absence of an injunction."[10] "Speculative injury is not sufficient,"[11] and the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[s] heavily against a claim of irreparable harm."[12] As the Amici States' positive experience with antidiscrimination laws protecting transgender people shows, Plaintiffs' claim of irreparable harm is baseless.

---

[8] *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (quoting *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014)).

[9] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

[10] *Elite Rodeo Ass'n*, 2016 WL 429886, at *3 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in *Winter*)); *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 569 (5th Cir. 2010).

[11] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (quoting *Holland Am. Ins. Co.*, 777 F.2d at 997).

[12] *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985).

1.      **Speculation About Bathroom Crime Does Not Show Irreparable Harm**

In support of their request for a preliminary injunction, Plaintiffs repeatedly raise a concern for safety in "school restrooms and other intimate facilities."[13] But despite Plaintiffs' alarming references to "unsafe spaces," "sex crimes," and "[r]ape and child molestation,"[14] their predicted harms are speculative and conflict with the direct experience of the Amici States.[15]

First, Plaintiffs cite no data or tangible evidence in support of the claim that allowing people to use bathrooms corresponding with their gender identity will lead to increased violence or crime in restrooms. Instead, Plaintiffs' evidence is limited to one Texas school administrator's conjecture about "those who may take advantage of the federal 'mixed restroom' guidance policy to engage in inappropriate activities."[16] This thin, speculative allegation of harm cannot serve as the basis for a preliminary injunction.[17]

Second, in States where antidiscrimination protections are already the law, Plaintiffs' predicted safety harm has never materialized. Former Snohomish County Sheriff John Lovick described Washington State's experience: "We've protected gay and transgender people from

---

[13] *See* Plaintiffs' Application For Preliminary Injunction (Pls.' Mot.) at 19, *Texas v. United States*, No. 7:16-cv-00054-O (N.D. Tex. July 6, 2016), ECF No. 11; *see also id.* at 14, 21-20 (describing state need to "protect[] the safety of students in public educational institutions, and workers in myriad places of employment," "protect[] safety," "maintain personal safety," and "protect the safety and privacy of students").

[14] *Id.* at 19.

[15] *Cf. Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011) (requiring a party seeking preliminary injunction to show "that the threatened harm is more than mere speculation"); *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015) ("To be considered irreparable, the injury in question must [be] imminent and cannot be speculative.").

[16] *See* Pls.' Mot., Ex. P, ¶ 5 (Decl. of David Thweatt, Harrold Independent School District Superintendent).

[17] *See Holland Am. Ins. Co.*, 777 F.2d at 997 ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."); *see also G.G. by Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 723 n.11 (4th Cir. Apr. 19, 2016), *reh'g denied*, 2016 WL 3080263 (May 31, 2016) (rejecting school board's "amorphous" and "vague" concern that a transgender student's "use of the boys' restroom creates a safety issue").

discrimination in Washington for 10 years, with no increase in public safety incidents as a result. It's important to remember that indecent exposure, voyeurism, and sexual assault, are already illegal, and police use those laws to keep people safe."[18] Similarly, in 2013, the Los Angeles Unified School District—the second largest district in the country, with more than 640,000 K-12 students—reported to the California Legislature that they have had "no issues, problems or lawsuits as a result of [a] policy" in place since 2004 requiring that students have access to restrooms consistent with their gender identity.[19] And the Massachusetts Chiefs of Police Association reported that allowing people to use bathrooms consistent with their gender identity in places of public accommodation actually "improve[s] public safety."[20]

These States' experiences are consistent with experience nationwide. The National Task Force to End Sexual and Domestic Violence Against Women (NTF) is an organization of more than 200 rape crisis centers, shelters, and other service providers in forty-three States that works to reduce sexual assault and domestic violence.[21] NTF has member providers in each of the nineteen jurisdictions with antidiscrimination laws covering transgender people. NTF affirms that service providers in "[n]one of those jurisdictions have seen a rise in sexual violence or other

---

[18] David Crary, *Debate over transgender bathroom access spreads nationwide*, Salt Lake Trib., May 10, 2016, http://www.sltrib.com/home/3875520-155/debate-over-transgender-bathroom-access-spreads.

[19] Cal. Sen. Comm. on Educ., Rep. on Assem. Bill No. 1266, at 8, 2013-2014 Reg. Sess., *as amended*, Apr. 25, 2013, http://www.leginfo.ca.gov/pub/13-14/bill/asm/ab_1251-1300/ab_12 66_cfa_20130610_160930_sen_comm.html; *see also* Los Angeles Unified School District, http://achieve.lausd.net/about (last visited July 25, 2016).

[20] Letter from Chiefs William G. Brooks III & Bryan Kyes to Senator William N. Brownsberger & Rep. John V. Fernandes re: Protecting Transgender Individuals in Places of Public Accommodation (Oct. 1, 2015), http://www.mass.gov/ago/docs/policy/2016/ew-le.pdf.

[21] *See* NTF, *Full And Equal Access For The Transgender Community* (Apr. 21, 2016), http://4vawa.org/ (last visited July 21, 2016).

public safety issues due to nondiscrimination laws."[22] Even in Texas, the lead Plaintiff here, officials in Austin, Dallas, and El Paso went on record denying any increase in restroom safety incidents as a result of their cities' policies allowing transgender people to use restrooms consistent with their gender identity.[23] Simply put, Plaintiffs' anxiety about possible, future bathroom crime is nothing more than unsupported speculation.[24]

## 2.   Plaintiffs' Complaints About Construction Costs Misconstrue the Federal Requirements and Ignore Effective Alternatives

Plaintiffs contend that compliance with antidiscrimination protections for transgender people would require costly new construction. One school district claims that "the only possible way" to provide safe, non-discriminatory school facilities is to tear down existing facilities and "build 'single user' restrooms."[25] Any new construction Plaintiffs undertake, however, would be entirely voluntary. Federal law does not require such measures, and the Amici States have identified successful ways to avoid gender identity discrimination without costly renovations or new construction.

---

[22] *Id.*

[23] Equality Matters, *Texas Experts Debunk The Transgender "Bathroom Predator" Myth Ahead Of HERO Referendum* (Oct. 15, 2015), http://equalitymatters.org/factcheck/ 201510150001 (last visited July 21, 2016); *see also, e.g.*, Fox News Sunday, *Gov. McCrory on showdown over NC's transgender bathroom law* (May 8, 2016), http://www.foxnews.com/trans cript/2016/05/08/manafort-on-trump-fight-to-rally-gop-defeat-democrats-gov-mccrory-on-show down/ (no known cases of people in North Carolina committing crimes in bathrooms under the cover of protections provided to transgender individuals). Of course, this is not to say that individual instances of misconduct are impossible, but nothing in the federal guidance would preclude Plaintiffs or the Amici States from taking appropriate steps to address any actual misconduct, without regard to a perpetrator's gender identity.

[24] *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016) (reversing grant of preliminary injunction for lack of an "imminent, non-speculative" injury).

[25] Pls.' Mot. at 8; *see also id.* (arguing that this district "does not have the money" to "reconfigur[e] all of its intimate facilities").

As an initial matter, none of the challenged guidance from the Department of Justice, Department of Education, Equal Employment Opportunity Commission, or Occupational Safety and Health Administration carries bathroom remodeling requirements.[26] Instead, federal guidance offers ideas and solutions for employers and schools wishing to maximize privacy while avoiding gender discrimination.[27] Plaintiffs' argument that federal antidiscrimination law obligates States to undertake costly construction projects mischaracterizes the federal guidance.

Moreover, for any employer or school district that, like the Amici States, seeks to maximize privacy while avoiding discrimination, state experience offers a variety of cost-efficient options. In Washington, the state agency charged with enforcing gender identity protections explains that state rules "do not require businesses to make any [structural] changes or to add additional facilities."[28] Instead, "[b]usinesses are encouraged to provide private areas for changing or showering whenever feasible," and "may wish to explore installing partitions or curtains for persons desiring privacy."[29]

---

[26] *See id.* at 4–6 (listing six guidance documents Plaintiffs challenge).

[27] *See, e.g.*, Catherine E. Lhamon & Vanita Gupta, *Dear Colleague Letter on Transgender Students* 3 (U.S. Dep't of Educ. & U.S. Dep't of Just. May 13, 2016), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf ("A school may . . . make individual-user options available to all students who voluntarily seek additional privacy."); Ann Whalen & David Esquith, *Examples of Policies and Emerging Practices for Supporting Transgender Students* 8 (U.S. Dep't of Educ. May 2016), http://www2.ed.gov/about/offices/list/oese/oshs/emergingpractices.pdf (identifying options like "examin[ing] the changing facility and determin[ing if] curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them," and offering students who desire additional privacy use of a "nearby restroom stall with a door or an area separated by a curtain").

[28] Wash. State Human Rights Comm'n, *Frequently Asked Questions Regarding WAC 162-32-060 Gender-segregated Facilities* 3 (Jan. 15, 2016), http://www.hum.wa.gov/admin/functions/file_views.php?media_id=223.

[29] *Id.*

States use similar approaches in the school context. Eleven States and the District of Columbia offer guidance to help schools comply with laws prohibiting gender identity discrimination.[30] Upon any student's request for added privacy, Rhode Island's Department of Education encourages schools to offer options like "a privacy partition or curtain, permission to

---

[30] Wash. Office of Super. of Pub. Instruction, *Prohibiting Discrimination in Washington Public Schools* 30 (Feb. 2012), http://www.k12.wa.us/Equity/ProhibitingDiscrimination.aspx; R.I. Dep't of Educ., *Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students* 8-9 (June 2016), http://www.thriveri.org/documents/Guidance.for.Rh odeIsland.Schools.on.Transgender.and.Gender.Nonconforming.Students-2016.pdf; Conn. Safe Sch. Coal., *Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws* 8 (Apr. 2012), http://www.ct.gov/chro/lib/chro/Guidelines_for_ Schools_on_Gender_Identity_and_Expression_final_4-24-12.pdf; D.C. Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance* 9 (June 2015), http://dcps.dc.gov/sites/default/ files/dc/sites/dcps/publication/attachments/DCPS%20Transgender%20Gender%20Non%20Conf orming%20Policy%20Guidance.pdf; Iowa Dep't of Educ., *Equality for transgender students (February 2015 School Leader Update)*, https://www.educateiowa.gov/resources/laws-and-regulations/legal-lessons/equality-transgender-students-february-2015-school; Vt. Agency of Educ., *Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* 10 (2016), http://education.vermont.gov/documents/edu-transgender-guidelines-for-schools.pdf ("A transgender student should not be required to use a locker room or restroom that conflicts with the student's gender identity."); Or. Dep't of Educ., *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* 10 (May 5, 2016), http://www.ode.state.or.us/groups/supportstaff/hklb/schoolnurses/transgenderstudent guidance.pdf; Colo. Ass'n of Sch. Bds., Colo. Ass'n of Sch. Execs., Colo. Educ. Ass'n & One Colo., *Guidance for Educators Working with Transgender and Gender Nonconforming Students* 4 (2013), https://cdpsdocs.state.co.us/safeschools/Resources/One%20Colorado/One CO%20Transgender_Guidance.pdf; Mass. Dep't of Elementary and Secondary Educ., *Guidance for Massachusetts Public Schools, Creating a Safe and Supportive School Environment* 9-10 (2013), http://www.doe.mass.edu/ssce/GenderIdentity.pdf; Calif. Sch. Bds. Ass'n, *Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities* 2 (Mar. 2014), https://www.csba.org/Advocacy/~/media/CSBA/Files/ Advocacy/ELA/2014_03_AB1266_FinalGuidance.ashx; Md. State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* 13-14 (Oct. 2015), http://marylandpublicschools.org/MSDE/ divisions/studentschoolsvcs/student_services_alt/docs/ProvidingSafeSpacesTransgendergenderN onConformingYouth012016.pdf; N.Y. State Educ. Dep't, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* 9-10 (July 2015), http://www.p12.nysed.gov/dignityact/documents/ Transg_GNCGuidanceFINAL.pdf.

use a nearby private restroom or office, or a separate changing schedule."[31] Guidance from Connecticut suggests that schools consider options like "a bathroom stall with a door, an area separated by a curtain, a PE instructor's office in the locker room, [or] a separate changing schedule."[32] Maryland's Department of Education recommends that students desiring privacy be offered a bathroom stall with a door, a privacy curtain, a separate changing schedule, or the use of the health office restroom.[33] And New York's Education Department similarly suggests that alternative accommodations, such as single "unisex" bathrooms, private changing spaces, or curtained areas should be made available to students who request them.[34] These low-cost options provide additional privacy to any student—transgender or not—who may desire it. Plaintiffs' argument that federal antidiscrimination rules will result in overwhelming construction costs is without merit.

### 3.     Plaintiffs' Potential Loss of Title IX Funds Is Not Imminent, and Could be Avoided Through a Stay

Plaintiffs contend that they face "drastic financial consequences" if preliminary relief is not granted because they will be "forced to forfeit Title IX-linked subsidies."[35] But any potential

---

[31] R.I. Dep't of Educ., *Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students* 9 (June 2016), http://www.thriveri.org/documents/Guidance.for.Rh odeIsland.Schools.on.Transgender.and.Gender.Nonconforming.Students-2016.pdf.

[32] Conn. Safe Sch. Coal., *Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws* 8 (Apr. 2012), http://www.ct.gov/chro/lib/ chro/Guidelines_for_Schools_on_Gender_Identity_and_Expression_final_4-24-12.pdf.

Md. State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* 14 (Oct. 2015), http://marylandpublicschools.org/MSDE/divisions/studentschoolsvcs/student_services_alt/docs/ ProvidingSafeSpacesTransgendergenderNonConformingYouth012016.pdf.

[34] N.Y. State Educ. Dep't, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* 10 (July 2015), http://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf.

[35] *See* Pls.' Mot. at 11, 21.

loss of Title IX funding is not imminent, and if it ever became imminent Plaintiffs could avoid this result by moving to stay suspension of funds pending the outcome of this litigation.

"To be considered irreparable, the injury in question must [be] imminent and cannot be speculative."[36] Here, Plaintiffs face no imminent threat of losing Title IX funding. Under federal rules, "[s]everal procedural requirements must be satisfied before an agency may deny or terminate federal funds to an applicant/recipient," including notice to "the recipient that it is not in compliance with the statute," "an opportunity for a hearing on the record," review and approval by the director of the relevant federal agency, and notice to Congress followed by a 30-day waiting period.[37] Plaintiffs fail to allege that even the first of these steps has occurred. Thus, Plaintiffs are a long way from actually losing any funding, and there is no reason to grant the extraordinary remedy of preliminary injunctive relief.

Even if Plaintiffs did face an imminent loss of federal funding, they could avoid that result by negotiating a stay, as has occurred in other cases. *United States v. North Carolina* is an ongoing federal lawsuit that, like this one, involves the applicability of federal civil rights protections to transgender people at school and work.[38] In that case, the United States alleges that a North Carolina law denying transgender persons access to multiple-occupancy bathrooms and changing facilities consistent with their gender identity violates federal law, including the Violence Against Women Reauthorization Act of 2013 (VAWA), which prohibits discrimination on the basis of sex in programs receiving VAWA funding.[39] In order to avoid immediate

---

[36] *ADT, LLC*, 145 F. Supp. at 694.

[37] U.S. Dep't of Justice, *Title IX Legal Manual*, https://www.justice.gov/crt/title-ix#VII.%C2%A0%20Federal%20Funding%20Agency%20Methods%20to%20Enforce%20Compliance (citing 42 U.S.C. § 2000d-1, 20 U.S.C. § 1682).

[38] *United States v. North Carolina*, No. 1:16-cv-00425-TDS-JFP (M.D.N.C. May 9, 2016).

[39] *Id.*, Complaint ¶¶ 1, 56 (May 9, 2016), ECF No. 1.

suspension of funding North Carolina receives under VAWA, the court granted the parties' joint motion to stay suspension until the court rules on the merits of the claims.[40] Here, Plaintiffs do not represent that they unsuccessfully asked the federal government to agree to a similar stay of Title IX funding suspension, and did not request one from the Court, apparently preferring to move directly for an order enjoining civil rights protections nationwide. Plaintiffs have available a less sweeping, sufficient remedy to avoid any funding loss, and their failure to seek it makes their request for a preliminary injunction inappropriate.[41]

### 4.    Plaintiffs' Alleged "Sovereignty" Harm is Not Legally Cognizable

Finally, Plaintiffs argue that federal antidiscrimination rules cause irreparable harm to their "sovereign interest" because they restrict Plaintiffs' ability to "create and enforce their own rules and regulations for their workplaces and educational environments."[42] Plaintiffs' claimed "sovereignty" injury is just a repackaging of their disagreement with federal antidiscrimination law as applied to Plaintiffs' covered schools and workplaces. Plaintiffs can, and do, challenge the federal law on the merits. But Plaintiffs' unhappiness with the federal government does not create some type of separate, additional "sovereignty" harm that merits the "extraordinary and drastic remedy" of a preliminary injunction.[43]

---

[40] *Id.*, Memorandum Order (June 23, 2016), ECF No. 53.

[41] *See Orth v. Wis. State Emps. Union Council*, No. 07-C-149, 2007 WL 1029220, at *2 (E.D. Wis. Mar. 29, 2007) ("[Plaintiffs] have apparently not explored any alternatives to insurance . . . a fact which undermines their claim that the absence of preliminary relief here would cause them irreparable harm.").

[42] Pls.' Mot. at 22.

[43] *See Digital Generation, Inc.*, 869 F. Supp. 2d at 772 (quoting *Holland Am. Ins. Co.*, 777 F.2d at 997).

**B.      The Balance of Equities and Public Interest Favor Denying Plaintiffs' Motion**

Plaintiffs must show that granting their requested injunction is in the public interest and that the balance of equities tilts in their favor.[44] They can show neither. Where, as here, "an injunction is asked which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."[45] In fact, "courts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[46]

Plaintiffs give scant treatment to the equity and public interest prongs, racing through both without a single mention of the impact their proposed injunction would have on 1.5 million transgender people nationwide.[47] The Court should not be so cavalier. When the interest of the public as a whole is considered, including the interests of transgender and gender nonconforming people, the equities and public interest tip decisively against granting a preliminary injunction.

**1.      The Federal Guidance Will Help Reduce the Significant Levels of Discrimination Transgender People Experience and the Harms that Flow From Such Discrimination**

Transgender people experience high rates of discrimination. Civil rights protections like the ones at issue here combat the known, detrimental consequences of gender identity discrimination and harassment. The Court should not preliminarily enjoin them.

---

[44] *Winter*, 555 U.S. at 20; *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010); *see also Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (party seeking preliminary injunction bears burden of persuasion on all four elements).

[45] *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).

[46] *Id.* at 312.

[47] Andrew R. Flores et al., *How Many Adults Identify as Transgender in the United States?* 3-4 (Williams Inst. June 2016), http://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf.

a.   **Transgender people experience harassment that causes serious damage**

Transgender individuals endure striking levels of discrimination, violence, and harassment, with enormous attendant negative consequences. By reducing such discrimination, the federal guidance will immensely benefit transgender people and their communities.

In school, transgender students face levels of discrimination, violence, and harassment that are much higher than for non-transgender students.[48] In the 2011 National Transgender Discrimination Survey (NTDS), the largest survey of transgender people to date, 78% of respondents who expressed a transgender identity or gender non-conformity in grades K–12 reported experiencing harassment by students, teachers, or staff.[49] Nearly half of transgender students (49.5%) reported physical harassment, and a third (34.1%) reported physical assault.[50] Harassment leads to absenteeism and trouble graduating. In one national survey, 46% of transgender students reported missing at least one day of school in the last month because they

---

[48] Joseph G. Kosciw et al., *The 2013 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools*, at xxiii (GLSEN 2014), http://www.glsen.org/sites/default/files/2013%20National%20School%20Climate%20Survey%20Full%20Report_0.pdf ("Compared to other LGBT students, transgender, genderqueer, and other non-cisgender students faced the most hostile school climates."); *see also* Emily A. Greytak et al., *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools, Gay, Lesbian and Straight Education Network* at xi (GLSEN 2009), http://www.glsen.org/sites/default/files/Harsh%20Realities.pdf ("Although LGBT students overall reported high levels of harassment and assault in school, transgender students experienced even higher levels than non-transgender students.").

[49] Jaime M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 36 (Nat'l Ctr. for Transgender Equality and Nat'l Gay and Lesbian Task Force 2011), http://www.transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf; *see also Harsh Realities* at xi *supra* note 48 (finding that number to be even higher: 87% of transgender students were verbally harassed in the past year at school due to their gender expression).

[50] Tonei Glavinic, *Research Shows Lack of Support for Transgender and Gender-Nonconforming Youth in U.S. School Systems*, 2 Inquiries J. 1, 2 (2010), http://www.inquiriesjournal.com/articles/135/research-shows-lack-of-support-for-transgender-and-gender-nonconforming-youth-in-us-school-systems.

felt unsafe or uncomfortable at school.[51] In another survey, nearly 60% of lesbian, gay, bisexual, and transgender (LGBT) students who did not expect to graduate high school said that it was due to a hostile or unsupportive school environment, hostile peers, unsupportive school staff, and gendered school practices that caused them constant discomfort.[52] In another survey, 40% of students who experienced frequent verbal harassment because of their gender expression did not intend to go to college.[53] Of transgender students who left school due to harassment, 48% experienced homelessness at some point in their lives.[54]

Discrimination and harassment follow transgender people into the workplace. The NTDS found that transgender people report "[n]ear universal harassment on the job," with 90% of those surveyed reporting "harassment or mistreatment on the job or t[aking] actions to avoid it."[55] Mistreatment includes verbal harassment, inappropriate questions about surgical status, denial of access to restrooms, and physical and sexual assault.[56] In order to avoid discriminatory actions and workplace abuse, 57% of NTDS respondents reported delaying their gender transition and 71% reported hiding their gender identity for some period of time.[57]

Job-related discrimination has negative consequences for transgender people and the economy. Harassment can result in transgender workers changing or quitting jobs, experiencing

---

[51] *Harsh Realities* at 14 *supra* note 48.

[52] *The 2013 National School Climate Survey* at 43 *supra* note 48.

[53] *Harsh Realities* at 27 fig. 16 *supra* note 48.

[54] *Injustice at Every Turn* at 33 *supra* note 49.

[55] *Id.* at 51; *see also Qualified and Transgender: A report on resume testing for employment discrimination based on gender identity* (District of Columbia Office of Human Rights 2015), http://ohr.dc.gov/sites/default/files/dc/sites/ohr/publication/attachments/Qualified AndTransgender_FullReport_1.pdf.

[56] *Injustice at Every Turn* at 56 *supra* note 49.

[57] *Id.* at 63.

poor job performance, and having excessive absences and tardiness.[58] The unemployment rate for transgender people is double the national average.[59] Nearly half of transgender people report being underemployed due to gender identity or expression, because they are working either in a field or in a position for which they are over-qualified.[60] Transgender people are disproportionately likely to live in extreme poverty, and one in five transgender individuals experiences homelessness at some point in their lives.[61] All of these factors are more severe for transgender people of color, who fare worse than others across the board.[62]

In addition to affecting school and work outcomes, gender identity harassment can have serious health consequences. The high level of suicide attempts by transgender people has been widely reported.[63] Transgender people have a 41% rate of lifetime suicide attempts, a level drastically higher than the rate of suicide attempts for the overall U.S. population (4.6%) or for lesbian, gay, and bisexual people (10-20%).[64]

---

[58] *See* Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives* 75 (Williams Inst. June 2013), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Herman-Gendered-Restrooms-and-Minority-Stress-June-2013.pdf.

[59] *Injustice at Every Turn* at 55 *supra* note 49.

[60] *Id.*

[61] *Id.* at 22; Nat'l Ctr. for Transgender Equality, *Housing & Homelessness*, http://www.transequality.org/issues/housing-homelessness (last visited July 21, 2016).

[62] *Injustice at Every Turn* at 2 *supra* note 49.

[63] *See, e.g.*, Luke Malone, *Transgender Suicide Attempt Rates are Staggering* (Vocativ Mar. 5, 2015), http://www.vocativ.com/culture/lgbt/transgender-suicide/; Laura Ungar, *Transgender people face alarmingly high risk of suicide*, USAToday (Aug. 16, 2015), http://www.usatoday.com/story/news/nation/2015/08/16/transgender-individuals-face-high-rates--suicide-attempts/31626633/.

[64] Ann P. Haas et al., *Suicide Attempts among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey* 2 (Am. Found. for Suicide Prevention and Williams Inst. Jan. 2014), http://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf.

There are direct links between bathroom access and transgender health. A recent study analyzing the relationship between access to college bathrooms and suicidality found a correlation: transgender people who had been denied access to bathroom facilities were nearly 20% more likely to have attempted suicide in their lifetime than transgender people who had not.[65] And suicide is not the only health risk. Research shows that transgender people often avoid using the bathroom because they feel unsafe or uncomfortable.[66] In one recent study, almost two-thirds of transgender students reported avoiding using the bathroom at school.[67] Attempting to avoid going to the bathroom for an entire school day can cause a variety of health problems, including dehydration, urinary tract infection, kidney infection, and other kidney-related problems.[68] Indeed, in a recent study of transgender individuals, 54% of respondents reported negative health effects from avoiding public restrooms.[69]

---

[65] Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, J. of Homosexuality 1, 11 tbl. 2 (2016), http://www.tandfonline.com/doi/pdf/10.1080/00918369.2016.1157998 (rate of lifetime suicide attempts for transgender survey respondents who had been denied access to bathroom facilities was 60.5%, compared to 43.2% for transgender people who had not been denied access).

[66] *The 2013 National School Climate Survey* at 85 *supra* note 48.

[67] *Id.* (finding that 63.4% of transgender students reported avoiding bathrooms); *see also 2015 U.S. Transgender Survey* (Nat'l Ctr. for Transgender Equality July 2016), http://www.ustranssurvey.org/s/USTS-Preliminary-Findings-July-2016-2.pdf.

[68] *See G.G. by Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 717 (2016) (due to school board policy which required students to use facilities that aligned with their biological genders, not gender identities, student said that he experiences "severe and persistent emotional and social harms . . . avoids using the restroom while at school and has, as a result of this avoidance, developed multiple urinary tract infections"); *see also* Kristie L. Seelman et al., *Invisibilities, Uncertainties and Unexpected Surprises: The Experiences of Transgender and Gender Non-Conforming Students,Sstaff, and Faculty at Colleges and Universities in Colorado* 143 (2012), https://portfolio.du.edu/downloadItem/221246 (transgender students in Colorado reported not using bathrooms as frequently as they would if they felt safe and not drinking water on campus to avoid needing to use the bathroom).

[69] *Gendered Restrooms and Minority Stress* at 75 *supra* note 58.

In summary, the data about the experiences of transgender people paint a stark picture. Transgender people experience significant discrimination and harassment, with severe negative consequences for themselves, their schools, their employers, and their communities.

### b.   Policies that promote tolerance and inclusion of transgender people can reduce harms caused by discrimination

Psychologists and psychiatrists recognize that emotional harms suffered by transgender people are not related to the fact of being transgender, but rather from harassment and stigma inflicted by their communities.[70] Antidiscrimination laws, including laws allowing transgender people to use the restroom consistent with their gender identity, help ease stigma and mitigate negative educational, work, and health outcomes.

Supportive educational environments increase the likelihood of success for transgender students. Data from one national survey show that transgender students who were often or frequently harassed had an average GPA of 2.3, but the average GPA increased to 2.8 for transgender students who were never, rarely, or sometimes harassed.[71] Inclusive school policies create an expectation of general respect and tolerance. For example, a survey of 31,000 Oregon students found that lesbian and gay students living in counties with the least number of school districts with inclusive anti-bullying policies were 2.25 times

---

[70] *See* Am. Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity and Gender Expression: Is Being Transgender a Mental Disorder?*, http://www.apa.org/topics/lgbt/transgender.aspx (last visited July 21, 2016); Wynne Parry, *Gender Dysphoria: DSM-5 Reflects Shift In Perspective On Gender Identity*, HuffingtonPost (June 4, 2013), http://www.huffingtonpost.com/entry/gender-dysphoria-dsm-5_n_3385287 ("[T]he distress that accompanies gender dysphoria arises as a result of a culture that stigmatizes people who do not conform to gender norms[.]").

[71] *Harsh Realities* at 27 fig. 15 *supra* note 48.

more likely to attempt those living suicide than in counties with many school districts adopting inclusive policies.[72] These data are consistent with the NTDS finding that transgender people who had not experienced being denied access to bathrooms and facilities based on gender identity were 20% less likely to have attempted suicide in their lifetime than those who had.[73]

Anecdotal evidence also demonstrates the importance of allowing transgender students to live consistent with their gender identity. California adopted its protections against gender-identity discrimination in schools after legislators received reports of harms suffered by transgender students, including students not drinking or eating during the school day to avoid having to use the restroom.[74] Clear Creek Independent School District in Houston allowed a transgender boy to use the boys' bathroom at school after learning that he was trying to "hold it in for the entire school day."[75] A district spokeswoman confirmed that the district "ha[s] been successful in balancing the rights of all students without issue and offer restrooms, showers and changing areas for students seeking privacy, regardless of their gender or gender identity."[76]

---

[72] Mark L. Hatzenbuehler & Katherine M. Keyes, *Inclusive Anti-bullying Policies and Reduced Risk of Suicide Attempts in Lesbian and Gay Youth*, 53 J. Adolescent Health S21, S23 (2012 & Supp. 2013), http://www.jahonline.org/article/S1054-139X(12)00354-0/fulltext.

[73] *Transgender Adults' Access to College Bathrooms* at 11 tbl. 2 *supra* note 65.

[74] Cal. Assem. Com. on Educ., Rep. on Assem. Bill No. 1266, at 5, 2013-2014 Reg. Sess., *as introduced,* Feb. 22, 2013, https://leginfo.legislature.ca.gov/faces/billHistory Client.xhtml?bill_id=201320140AB1266.

[75] Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Texas Trib. (June 14, 2016), https://www.texastribune.org/2016/06/14/transgender-boy-normalcy-trumps-bathrooms/.

[76] *Id.*

In the context of employment, antidiscrimination protections benefit employees and employers alike. Recently, 68 companies, including some of the largest in the United States, submitted a brief as amicus curiae in the *United States v. North Carolina* litigation.[77] These employers recognize that LGBT-friendly policies offer tangible advantages for employee recruitment and retention.[78] As those companies note, three-fourths of the Fortune 500 and 92% of U.S. companies surveyed by the Human Rights Campaign in 2016 provide explicit gender identity non-discrimination protections.[79] These policies attract desirable workers: research demonstrates that LGBT and non-LGBT workers alike, particularly those who are young and highly educated, prefer to work in States and for companies with supportive policies and laws.[80]

Like the 68 companies in the North Carolina case, the Amici States are employers who want to maximize employee health, productivity, and retention. When employees are able to

---

[77] Amicus Curiae Brief By 68 Companies Opposed To H.B. 2 And In Support Of Plaintiff's Motion For Preliminary Injunction, *United States v. North Carolina*, No. 1:16-cv-00425-TDS-JFP (M.D.N.C. July 8, 2016), ECF No. 85-1, http://hrc-assets.s3-website-us-east-1.amazonaws.com//files/assets/resources/As-Filed_-_Unopposed_Motion_for_Leave_and_Prop osed_Amicus_Curiae_Brief_by_68_Companies_in_Support_of_United_States.pdf.

[78] *Id.* at 16 (citing Christy Mallory & Brad Sears, *Discrimination, Diversity, and Development: The Legal and Economic Implications of North Carolina's HB2* 2, 38-39 (Williams Inst. May 2016), http://tinyurl.com/gtuelbq; Matt Motyl et al., *How ideological migration geographically segregates groups*, 51 J. Experimental Soc. Psychol. 1 (2014), http://tinyurl.com/j8pkoul (individuals are moving from ideologically unfriendly communities to congruent communities)); Pew Research Ctr., *Data Trend: Gay Marriage*, http://tiny url.com/zyl3s48 (last visited July 21, 2016) (70% of millennials favor same-sex marriage).

[79] *See* Amicus Curiae Brief By 68 Companies at 4 *supra* note 77 (citing Human Rights Campaign Found., *Corporate Equality Index 2016*, at 4, http://tinyurl.com/p2mfq9m (last visited July 20, 2016)).

[80] *Id.* at 16.

express their true gender identity at work, they can bring more to their jobs.[81] The NTDS data confirm the benefits of inclusionary workplace policies. When transgender workers can safely transition and have their gender identity respected, they experience increased job performance and satisfaction.[82] The overwhelming majority, 86%, of survey respondents who had not been forced to leave a job due to discrimination or harassment reported that they were able to use work restrooms consistent with their gender identity.[83] Finally, data show that reducing levels of harassment by leaders and peers correlates with lower suicide rates for transgender people.[84] And, of course, all workers benefit from a workplace environment that is civil and free of harassment. By protecting workers from discrimination, employers in all States benefit from an economy that maximizes everyone's contributions.

On balance, the benefits from the federal government's antidiscrimination rules easily outweigh Plaintiffs' asserted harms. Plaintiffs allege only speculative or avoidable injuries. The educational, employment, and health risks for transgender people when discrimination goes unchecked are very real. The balance of equities tips decisively against enjoining existing federal civil rights protections while this case proceeds.

---

[81] *Id.* at 6 (citing Deloitte point of view, *Only Skin Deep? Re-examining the business case for diversity* 7 (Sept. 2011), http://tinyurl.com/hs3wef6 (last visited July 20, 2016)).

[82] *Id.*

[83] *Injustice at Every Turn* at 61 *supra* note 49.

[84] *See* Greta R. Bauer et al., *Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada* (BMC Public Health June 2015), http://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-015-1867-2 (Finding high levels of social support from parents, family, leaders, and peers were significantly associated with a 49% reduction in thoughts of suicide and a further 82% reduction in risk of attempted suicide among those who thought of suicide. Lower levels of transphobic experiences, including harassment, were associated with a 66% reduction in thoughts of suicide and a 76% reduction in attempts of suicide among those who had thoughts of suicide.).

### 2. The Public Interest Weighs Against Granting an Injunction Based on Negative Attitudes or Fear

At bottom, the absence of data or evidence in support of Plaintiffs' proffered harms points to the more likely basis underlying their position: negative attitudes, misunderstandings, or misplaced fear about transgender people. Granting a preliminary injunction on any of these bases would conflict with the public interest.

As the Supreme Court has long recognized, "mere negative attitudes, or fear . . . are not permissible bases" for restricting the rights of people viewed as "different."[85] Courts should critically evaluate state efforts to restrict minority rights through vague references to majority rights.[86] Likewise, concerns about future lawsuits do not serve as a proper basis for state action to restrict protections for transgender people.[87]

Here, Plaintiffs seek an order blocking federal civil rights protections for transgender youth and adults in all fifty States while this case proceeds, during which time the developmental, educational, employment, and health outcomes of thousands of transgender people may be compromised.[88] The Amici States respectfully submit that the harms that

---

[85] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

[86] *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011) (affirming finding of unlawful discrimination by state employer that fired transgender woman over concerns that "other women might object to [the employee's] restroom use"); *Romer v. Evans*, 517 U.S. 620, 635 (1996) (rejecting State's citation to "other citizens' [constitutional rights]" as a valid justification for inflicting "immediate, continuing, and real injuries" on the legal protections for gays and lesbians).

[87] *Compare* Pls.' Mot. at 7 ("complying with Defendants' mandates opens the district itself to lawsuits from parents and students"), *with Brumby*, 663 F.3d at 1321 (rejecting State's "speculative concern about lawsuits" as a valid justification for discrimination).

[88] *Injustice at Every Turn* at 10 *supra* note 49. (Sixty-three percent (63%) of transgender people experienced a serious act of discrimination, defined as "events that would have a major impact on a person's quality of life and ability to sustain themselves financially or emotionally.").

discrimination inflicts on transgender people are too known and severe to be outweighed by negative attitudes or speculative fears from opponents of transgender protections. On balance, the public interest weighs in favor of denying the preliminary injunction and leaving civil rights protections in place while this litigation proceeds.

## C.     Nationwide Injunctive Relief Is Inappropriate

The Fifth Circuit has long held that a preliminary injunction may not "reach[] further than is necessary to serve [its] purpose."[89] Put another way, "any relief granted should be no broader than necessary to cure the effects of the harm caused."[90]

Plaintiffs' request ignores these principles. They ask the Court to enjoin federal antidiscrimination guidance not only in the Plaintiff States, but even in the Amici States, which not only welcome and support the guidance but also already have laws on the books providing similar protections. While Plaintiffs' claims of harm are speculative and unsupported even as to themselves, they are simply untenable when it comes to the Amici States. It would be absurd for this Court, in the name of "federalism," to tell the Amici States that a policy those States have determined is beneficial is actually harming them. Plaintiffs speak only for themselves, not the whole country. Even if the Court chooses to credit their speculative claims, "any relief granted should be no broader than necessary to cure the effects of the harm caused,"[91] making any injunction extending beyond the Plaintiff States inappropriate.

---

[89] *Hollon v. Mathis Indep. Sch. Dist.*, 491 F.2d 92, 93 (5th Cir. 1974) (per curiam).

[90] *Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (quoting *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987)).

[91] *Id.*

## CONCLUSION

Plaintiffs have failed to meet their burden to justify the extraordinary remedy of injunctive relief. Granting their requested injunction will save them from no real harm, and would be antithetical to the public interest. The Court should decline.

Respectfully submitted this 27th day of July 2016.

ROBERT W. FERGUSON
  *Attorney General of Washington*

Noah G. Purcell, WSBA 43492
  *Solicitor General*

*s/ Alan D. Copsey*

Alan D. Copsey, WSBA 23305
  *Deputy Solicitor General*
  **Counsel* of Record*

Colleen M. Melody, WSBA 42275
  *Assistant Attorney General*

PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200 (office)
(360) 664-2963 (fax)
alan.copsey@atg.wa.gov

ERIC T. SCHNEIDERMAN
  *Attorney General of New York*

Barbara D. Underwood
  *Solicitor General*

Anisha S. Dasgupta
  *Deputy Solicitor General*

Holly A. Thomas
  *Special Counsel to the Solicitor General*

Claude S. Platton
  *Senior Assistant Solicitor General*

120 Broadway
New York, NY 10271
(212) 416-8020


Kamala D. Harris
Attorney General
State of California

George Jepsen
Attorney General
State of Connecticut

Matthew P. Denn
Attorney General
State of Delaware

Karl A. Racine
Attorney General
District of Columbia

Lisa Madigan
Attorney General
State of Illinois

Brian E. Frosh
Attorney General
State of Maryland

Maura Healey
Attorney General
State of of Massachusetts

Joseph A. Foster
Attorney General
State of New Hampshire

Hector H. Balderas
Attorney General
State of New Mexico

Ellen F. Rosenblum
Attorney General
State of Oregon

William H. Sorrell
Attorney General
State of Vermont

## CERTIFICATE OF SERVICE

I certify that on this 27th day of July 2016, I electronically filed the foregoing motion using the CM/ECF system, which I understand to have caused service of the counsel for all parties.

ROBERT W. FERGUSON
  *Attorney General of Washington*

*s/Alan D. Copsey*

Alan D. Copsey, WSBA 23305
  *Deputy Solicitor General*

Washington Office of the Attorney General
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200 (office)
(360) 664-2963 (fax)
alan.copsey@atg.wa.gov