## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 7:16-cv-54-O |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND.................................................................................................................... 3

ARGUMENT ....................................................................................................................... 6

   I.   Plaintiffs Cannot Demonstrate a Likelihood of Irreparable Harm....................................... 6

   II.   Plaintiffs Have Not Established a Likelihood of Success on the Merits ........................... 12

       A.  *The Court does not have subject matter jurisdiction over plaintiffs' challenges to defendants' guidance documents* .................................................................................. 12

           1.   Plaintiffs do not have standing and their claims are not ripe..................................... 12

           2.   Plaintiffs have an adequate alternate remedy and district court review is precluded..16

       B.  *Defendants' actions do not violate the APA*.................................................................. 17

           1.   The guidance documents are interpretive rules exempt from notice and comment requirements ........................................................................................................ 17

           2.   The guidance documents are valid interpretations of the statutory and regulatory authorities on which they are premised ...................................................................... 20

       C.  *The Spending Clause is not violated by Title IX, the guidance documents, or the interpretations contained in the guidance*...................................................................... 24

   III.   Granting a Preliminary Injunction Would Harm Defendants, Third Parties, and the Public Interest.................................................................................................................... 26

   IV.   If the Court Determines that a Preliminary Injunction is Warranted, Such Relief Should be Narrowly Tailored to Plaintiffs in the Fifth Circuit ...................................................... 28

CONCLUSION.................................................................................................................. 30

TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner,*
   387 U.S. 136 (1967) ...................................................................................................13

*Am. Mining Cong. v. Mine Safety & Health Admin.,*
   995 F.2d 1106 (D.C. Cir. 1993) ................................................................................20

*Anderson v. Jackson,*
   556 F.3d 351 (5th Cir. 2009) ...............................................................................6, 26

*ADT, LLC v. Capital Connect, Inc.,*
   145 F. Supp. 3d 671 (N.D. Tex. 2015) .....................................................................11

*Animal Legal Def. Fund v. Espy,*
   23 F.3d 496 (D.C. Cir. 1994) ....................................................................................14

*Aquifer Guardians in Urban Areas v. Fed. Highway Admin.,*
   779 F. Supp. 2d 542 (W.D. Tex. 2011)...............................................................7, 8, 9

*Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,*
   950 F.2d 1401 (9th Cir. 1991) ..................................................................................14

*Atkinson v. Inter-Am. Dev. Bank,*
   156 F.3d 1335 (D.C. Cir. 1998) ...............................................................................24

*Auer v. Robbins,*
   519 U.S. 452, 461 (1997)..........................................................................................21

*Bennett v. Ky. Dep't of Educ.,*
   470 U.S. 656 (1985) ..................................................................................................25

*Benning v. Georgia,*
   391 F.3d 1299 (11th Cir. 2004) ................................................................................25

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ..................................................................................................17

*Brooks v. Wells Fargo Home Mortg.,*
   2004 WL 1800750 (N.D. Tex. Aug. 11, 2004) *report and recommendation adopted,* 2004
   WL 1982522 (N.D. Tex. Sept. 2, 2004)......................................................................8

*Byrum v. Landreth,*
   566 F.3d 442 (5th Cir. 2009) ....................................................................................12

*Butts v. NCAA*,
   600 F. Supp. 73 (E.D. Pa. 1984) .................................................................22

*Califano v. Yamasaki*,
   442 U.S. 682 (1979).....................................................................................28

*Cent. Bank of Denver, N.A. v. First Interstate Bank*,
   511 U.S. 164 (1994).....................................................................................24

*Chacon v. Granata*,
   515 F.2d 922 (5th Cir. 1975) .........................................................................7

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979).....................................................................................19

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983).........................................................................................7

*Connection Distrib. Co. v. Reno*,
   154 F.3d 281 (6th Cir. 1998) .......................................................................28

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008) ...............................................................28

*Davis v. Monroe County Bd. of Educ.*,
   526 U.S. 629 (1999)...............................................................................23, 25

*Doe v. Regional School Unit 26*,
   86 A.3d 600 (Me. 2014)...............................................................................21

*Dist. Adult Prob. Dep't v. Dole*,
   948 F.2d 953 (5th Cir. 1991) .......................................................................16

*Dressner v. Meba Med. & Benefits Plans*,
   628 F.3d 705 (5th Cir. 2010) .......................................................................17

*E. Ky. Welfare Rights Org. v. Simon*,
   506 F.2d 1278 (D.C. Cir. 1974)...................................................................19

*EEOC v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991).......................................................................................3

*EEOC v. Boh Bros. Const. Co., LLC*,
   731 F.3d 444 (5th Cir. 2013) .......................................................................24

*Elgin v. Dep't of Treasury*,
    132 S. Ct. 2126 (2012) ................................................................................................11, 17

*Ellipse Comm'cns v. Caven*,
    2009 WL 497268 (N.D. Tex. Feb. 26, 2009) ................................................................11

*Fabian v. Hosp. of Central Conn.*,
    2016 WL 1089178 (D. Conn. March 18, 2016) ...........................................................30

*Fair Assessment in Real Estate Ass'n, Inc. v. McNary*,
    454 U.S. 100 (1981) .....................................................................................................29

*Fitzpatrick v. Bitzer*,
    427 U.S. 445 (1976) .....................................................................................................25

*Friends of the Earth v. Laidlaw Envt'l Servs.*,
    528 U.S. 167 (2000) .....................................................................................................28

*FTC v. Standard Oil Co.*,
    449 U.S. 232 (1980) .....................................................................................................10

*Gardebring v. Jenkins*,
    485 U.S. 415 (1988) .....................................................................................................22

*Gearhart Indus. v. Smith Int'l, Inc.*,
    741 F.2d 707 (5th Cir. 1984) .......................................................................................29

*Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*,
    781 F.3d 710 (4th Cir. 2015) .......................................................................................29

*G.G. ex rel.Grimm v. Gloucester Cty. Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016) .................................................................................*passim*

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ...............................................................................22-23

*Gonannies, Inc. v. Goaupair.com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) ........................................................................12

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) .........................................................................................7

*Haines v. Fed. Motor Carrier Safety Admin.*,
    814 F.3d 417 (6th Cir. 2016) .......................................................................................17

*Hart v. Massanari,*
    266 F.3d 1155 (9th Cir. 2001) ................................................................30

*Hoctor v. USDA,*
    82 F.3d 165 (7th Cir. 1996) ..................................................................18

*Holland v. Nat'l Mining Ass'n,*
    309 F.3d 808 (D.C. Cir. 2002) ..............................................................30

*House the Homeless, Inc. v. Widnall,*
    94 F.3d 176 (5th Cir. 1996) ....................................................................6

*In re Navy Chaplaincy,*
    534 F.3d 756 (D.C. Cir. 2008) ..............................................................14

*Innovation Ventures, LLC v. Ultimate Lifestyles, LLC,*
    2009 WL 1490588 (E.D. Tex. May 27, 2009) ......................................12

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005) ..............................................................................25

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ..................................................................6

*Lopez v. City of Houston,*
    617 F.3d 336 (5th Cir. 2010) ................................................................13

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................13, 14

*Luminant Generation Co. v. EPA,*
    757 F.3d 439 (5th Cir. 2014) ..........................................................15, 16

*Lusardi v. McHough,*
    EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015)..............5, 8

*Matrix Partners VIII v. Nat. Res. Recovery,*
    2009 WL 175132 (E.D. Tex. Jan. 23, 2009) ..........................................6

*Med. Ctr. Pharmacy v. Mukasey,*
    536 F.3d 383 (5th Cir. 2008) ................................................................24

*Metro Found. Contractors, Inc. v. Arch Ins. Co.,*
    2011 WL 2947003 (S.D.N.Y. July 18, 2011) ......................................22

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
  760 F.2d 618 (5th Cir. 1985) ........................................................................12

*Morgan v. Fletcher*,
  518 F.2d 236 (5th Cir. 1975) ...................................................................9, 10

*Morton v. Ruiz*,
  415 U.S. 199 (1974)......................................................................................19

*Munaf v. Green*,
  553 U.S. 674 (2008)......................................................................................12

*NAACP v. Meese*,
  615 F. Supp. 200 (D.D.C. 1985) ............................................................16, 17

*Nat'l Fed. of Indep. Bus. v. Sebelius,*
  132 S. Ct. 2566 (2012)..................................................................................26

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
  538 U.S. 803 (2003)......................................................................................13

*Nevada Dept. of Human Resources v. Hibbs*,
  538 U.S. 721 (2003)......................................................................................25

*N. Haven Bd. of Educ. v. Bell*,
  456 U.S. 512 (1982) ......................................................................................10

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) ..................................................................................24, 25

*Pace v. Bogalusa City Sch. Bd.*,
  403 F.3d 272 (5th Cir. 2005) ........................................................................26

*Pension Benefit Guar. Corp. v. LTV Corp.*,
  496 U.S. 633 (1990)......................................................................................24

*Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the United States*,
  362 F.3d 333 (5th Cir. 2004) ........................................................................16

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 119 (2015)..............................................................................18, 19

*Phillips Petrol. Co. v. Johnson*,
  22 F.3d 616, 619 (5th Cir. 1994)...................................................................18

*Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*,
   734 F.3d 406 (5th Cir. 2013) ...................................................................................8

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989)...........................................................................................22, 23

*Roberts v. Colo. State Bd. of Agric.*,
   998 F.2d 824 (10th Cir. 1993).................................................................................27

*Rogers v. Windmill Pointe Vill. Club Ass'n*,
   967 F.2d 525 (11th Cir. 1992).................................................................................27

*Rosa v. Park W. Bank & Trust Co.*,
   214 F.3d 213 (1st Cir. 2000)..............................................................................23, 29

*Schauss v. Metals Depository Corp.*,
   757 F.2d 649 (5th Cir. 1985)...................................................................................29

*Schroer v. Billington*,
   577 F. Supp. 2d 293 (D.D.C. 2008) ....................................................................23, 29

*Schwenk v. Hartford*,
   204 F.3d 1187 (9th Cir. 2000) ............................................................................23, 29

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995)...................................................................................................19

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)..................................................................................................22

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001)...................................................................................27

*Smith v. City of Salem*,
   378 F.3d 566 (6th Cir. 2004) .............................................................................23, 29

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001)..................................................................................................24

*South Dakota v. Dole*,
   483 U.S. 203 (1987)..................................................................................................26

*Southdown, Inc. v. Moore*,
   686 F. Supp. 595 (S.D. Tex. 1988)..........................................................................27

*Star Satellite, Inc. v. City of Biloxi,*
  779 F.2d 1074 (5th Cir. 1986) ...................................................................27

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ....................................................................................13

*Suter v. Artist M,*
  503 U.S. 347 (1992) ..................................................................................25

*Texas v. EEOC,*
  --- F.3d ---, 2016 WL 3524242 (5th Cir. June 27, 2016)................................15, 16

*Texas v. United States,*
  95 F. Supp. 3d 965 (N.D. Tex. 2015) ...........................................................8, 9, 13

*Thomas Jefferson Univ. v. Shalala,*
  512 U.S. 504 (1994) ..................................................................................22

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ..................................................................................11, 17

*TJM Corp. v. Xerox Corp.,*
  1992 WL 125374 (E.D. La. May 18, 1992)....................................................11

*U.S. Army Corps of Engineers v. Hawkes Co.,*
  136 S. Ct. 1807 (2016)...............................................................................16

*United States v. AMC Entm't, Inc.,*
  549 F.3d 760 (9th Cir. 2008).......................................................................29

*United States v. Estate of Romani,*
  523 U.S. 517 (1998)...................................................................................24

*United States v. Hayes Int'l Corp.,*
  415 F.2d 1038 (5th Cir. 1969).....................................................................27

*United States v. Holy Land Found.,*
  445 F.3d 771 (5th Cir. 2006) ......................................................................13

*United States v. Mendoza,*
  464 U.S. 154 (1984) ..................................................................................30

*United Transp. Union v. Foster,*
  205 F.3d 851 (5th Cir. 2000) ......................................................................13

*U.S. Bank Nat'l Ass'n v. Lakeview Retail Prop. Owner LLC,*
2016 WL 626548 (S.D. Miss. Feb. 16, 2016) .................................................................8

*Va. Society for Human Life, Inc. v. FEC,*
263 F.3d 379 (4th Cir. 2001) ......................................................................................30

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) ...................................................................................................28

*Whitmore v. Arkansas,*
495 U.S. 149 (1990) ...................................................................................................13

*Winter v. NRDC,*
555 U.S. 7 (2008) ....................................................................................................6, 7

## Statues and Regulations

5 U.S.C. § 553(b)(3)(A) ..................................................................................................18

5 U.S.C. § 704 ................................................................................................................16

5 U.S.C. § 706(2) ...........................................................................................................17

20 U.S.C. § 1681 ..............................................................................................................3

20 U.S.C. § 1682 ......................................................................................................10, 17

20 U.S.C. § 1683 ......................................................................................................10, 16

42 U.S.C. § 2000e .....................................................................................................3, 23

49 U.S.C. § 521(b)(9) .....................................................................................................17

28 C.F.R § 0.51 ................................................................................................................3

28 C.F.R. pt. 54 ................................................................................................................3

28 C.F.R. § 54.400(b) ......................................................................................................3

28 C.F.R. § 54.410 ......................................................................................................4, 21

34 C.F.R. §§ 100.8-100.11 ........................................................................................10, 16

34 C.F.R. pt. 106 ..............................................................................................................3

34 C.F.R. § 106.31(b) .......................................................................................................3

34 C.F.R. § 106.33 ...................................................................................................4, 21

34 C.F.R. § 106.72 .........................................................................................................10

Colo. Rev. Stat. § 24-34-401  ........................................................................................30

Conn. Gen. Stat. § 46a ...................................................................................................30

Del. Code Ann. tit. 19 § 711 ..........................................................................................30

Me. Rev. Stat. Ann. Tit. 20-a, § 6501 ...........................................................................21

N.M. Stat. Ann. § 28-1-7 ...............................................................................................30

Wash. Rev. Code § 49.60.040.........................................................................................30

**Legislative Material**

Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 4, 1980) .............................................3

U.S. Const., art. I, § 8, cl. 1...........................................................................................25

**Other**

Am. Heritage Dictionary 1605 (5th ed. 2011) ......................................................................21

Black's Law Dictionary 1583 (10th ed. 2014).......................................................................21

U.S. Dep't of Educ., Office for Civil Rights, Sex Discrimination Policy Guidance,
http://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance /sex.html (last visited
July 26, 2016).....................................................................................................................5

U.S. Dep't of Educ., Types of Guidance Documents, http://www2.ed.gov/policy/gen/guid/types-
of-guidance-documents.html (last visited July 26, 2016) ......................................................5

Webster's Third New Int'l Dictionary 2081 (1971) ..............................................................21

## INTRODUCTION

Plaintiffs bring this action against the U.S. Departments of Education (ED), Justice (DOJ), and Labor (DOL), as well as the Equal Employment Opportunity Commission (EEOC) and various agency officials (collectively, "defendants"), challenging their interpretations of Title VII of the Civil Rights Act of 1964 ("Title VII") and Title IX of the Education Amendments of 1972 ("Title IX") as prohibiting discrimination against transgender individuals and, in certain cases, requiring employers and schools to treat a transgender individual's gender identity as the individual's sex for purposes of these statutes and their implementing regulations. Plaintiffs now ask this Court to issue a nationwide injunction to prevent this interpretation, and certain guidance documents issued by the defendant agencies reflecting this interpretation, from having any legal effect. But plaintiffs have entirely failed to establish that they are entitled to preliminary relief. They cannot demonstrate by a clear showing that they face irreparable harm absent the injunction, much less a likelihood of success on the merits or a balance of interests tipping in their favor. Because plaintiffs cannot carry the burden of persuasion on any of these necessary elements, their motion for preliminary injunctive relief should be denied.

As an initial matter, plaintiffs have not demonstrated that they will suffer irreparable harm—or any harm at all—in the absence of emergency relief. Instead, they simply allege that the interpretations of Titles VII and IX outlined in defendants' guidance documents conflict with their own understanding of what these statutes require. But the guidance documents impose no independent legal requirements on plaintiffs. Indeed, plaintiffs have identified no enforcement action threatened or taken against them as a result of defendants' interpretations, nor have they established that the guidance documents have any binding legal effect. Because plaintiffs have adduced no evidence to substantiate their assertion of any harm absent the injunction—much less substantial, immediate, and likely irreparable harm—their motion must be denied.

Nor can plaintiffs establish that they are likely to succeed on the merits of their claims. Plaintiffs lack Article III standing and their claims are not ripe for substantially the same reasons that they cannot establish irreparable harm. Specifically, because the defendant agencies have

merely set forth their non-binding views of what the law requires, plaintiffs cannot show that they have suffered any concrete injury that is fit for judicial review. Instead, they have alleged no more than an abstract disagreement with the agencies' interpretation of the law. Furthermore, plaintiffs have an adequate alternate remedy, which is to simply defend any enforcement action taken against them, and so this Court does not have jurisdiction under the Administrative Procedure Act (APA). Plaintiffs are also unlikely to succeed on their procedural claims under the APA, as the challenged guidance documents are interpretive rules that are exempt from the APA's notice-and-comment requirements. Plaintiffs' substantive APA claims fare no better, as defendants' interpretations are consistent with Titles VII and IX and the implementing regulations, as well as other statutory and constitutional commands. Indeed, the only Circuit to have considered defendants' interpretation has found it to be reasonable—an outcome that suggests that plaintiffs' claims are unlikely to succeed here. Finally, the challenged interpretations do not implicate the constitutional Spending Clause requirement of clear notice nor the prohibition on coercion, and so plaintiffs are unlikely to succeed on this claim.

Although plaintiffs' failure to demonstrate irreparable harm or any likelihood of success on the merits more than suffices to defeat their motion, the final two factors of the preliminary injunction analysis also militate against preliminary relief. Specifically, the balance of the equities and the public interest weigh overwhelmingly against plaintiffs and their request for relief. Plaintiffs' disagreement with defendants' interpretation of Titles VII and IX is not a sufficient basis for this Court to take the extraordinary step of enjoining defendants from following their guidance documents and explaining to the public their understanding of the law.

Finally, even if the Court were to determine that preliminary relief is warranted, any injunction should be limited to plaintiffs in the Fifth Circuit that face irreparable harm. A nationwide injunction would violate fundamental principles of judicial comity, purporting to supersede the Fourth Circuit's recent decision deferring to ED's challenged interpretation of its Title IX regulations, as well as the conclusion of numerous courts—including at least four courts of appeal—that discrimination against transgender individuals constitutes unlawful sex

discrimination under Title VII. Moreover, a nationwide injunction would improperly impose this Court's view of the law on the many other courts presently considering defendants' challenged interpretations and on the many other states that have opted not to join this lawsuit, thereby preventing fuller development of the law on these important questions of statutory and regulatory construction. Accordingly, plaintiffs' request for nationwide injunctive relief should be denied.

## BACKGROUND

Title VII makes it "an unlawful employment practice" for an employer to discriminate against any individual with respect to his "compensation, terms, conditions, or privileges of employment" or "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to . . . adversely affect [any individual's] status as an employee" because of the individual's sex. 42 U.S.C. § 2000e-2(a). The EEOC and DOJ are tasked with enforcement of Title VII. *See generally* 42 U.S.C. §§ 2000e-5 & 2000e-6.[1]

Title IX, in turn, prohibits sex discrimination in education programs or activities by recipients of federal financial assistance. DOJ and ED share primary responsibility for enforcing Title IX and its implementing regulations. *See* 20 U.S.C. § 1681; 34 C.F.R. pt. 106; 28 C.F.R. pt. 54.[2] Consistent with the nondiscrimination mandate of the statute, ED's and DOJ's regulations prohibit recipients from providing "different aid, benefits, or services," or "[o]therwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity" on the basis of sex. 34 C.F.R. § 106.31(b); 28 C.F.R. § 54.400(b). The regulations further explain that recipients may "provide separate toilet, locker room, and shower facilities on the basis of sex" without running afoul of Title IX, so long as the "facilities provided for students of one sex" are

---

[1] Although Congress granted the EEOC express authority to promulgate procedural regulations to implement Title VII, the Commission lacks authority to issue substantive rules and regulations and cannot file an enforcement action against a state employer directly. *See* 42 U.S.C. § 2000e-12(a); 42 U.S.C. § 2000e-5(f)(1); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991), *superseded by statue as stated in Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006).

[2] Under this grant of authority, ED's Office for Civil Rights (OCR) investigates complaints and conducts compliance reviews, promulgates regulations, and issues guidance to clarify how OCR evaluates a school's compliance with its statutory and regulatory obligations. DOJ, through its Civil Rights Division, coordinates the implementation and enforcement of Title IX by ED and other executive agencies. Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 4, 1980); 28 C.F.R § 0.51 (1998).

"comparable to [the] facilities provided for students of the other sex." 34 C.F.R. § 106.33; 28 C.F.R. § 54.410.

In a series of guidance documents issued over the past six years, defendants have explained how educational institutions and employers should comply with these statutes and their implementing regulations with respect to transgender individuals. For example, in 2010, ED's Office for Civil Rights stated in a Dear Colleague Letter ("2010 DCL") that Title IX protects "all students, including . . . transgender (LGBT) students, from sex discrimination"; and in April 2014 ("April 2014 Guidance"), it further explained that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity." Am. Compl., ECF No. 6, Exs. A & B. Similarly, in a December 2014 memorandum issued to United States Attorneys and heads of DOJ components ("Holder Memo"), then Attorney General Eric Holder explained that "the best reading of Title VII's prohibition of sex discrimination is that it encompasses discrimination based on gender identity, including transgender status." *Id.* Ex. C. In June 2015, the Occupational Safety and Health Administration ("OSHA") released a Best Practices guide ("OSHA Guide") explaining that "all employees should be permitted to use the facilities that correspond with their gender identity," and on May 3, 2016, EEOC released a "Fact Sheet" ("EEOC Fact Sheet") summarizing the holding in an EEOC administrative appeal decision that "denying an employee equal access to a common restroom corresponding to the employee's gender identity is sex discrimination." *Id.* Exs. D & H. Finally, on May 13, 2016, DOJ and ED issued a joint Dear Colleague Letter ("2016 DCL"), explaining that "[w]hen a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity." *Id.* Ex. J.

These guidance documents—which are the focal point of plaintiffs' claims—are merely expressions of the agencies' views as to what the law requires. They are not legally binding, and they expose plaintiffs to no new liability or legal requirements. ED has issued guidance documents for decades, across multiple administrations, in order to notify schools and other

4

recipients of federal funds about how the agency interprets the law and how it views new and emerging issues. *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights, Sex Discrimination Policy Guidance, http://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance /sex.html (last visited July 26, 2016) (describing purpose of guidance documents and providing links to guidance documents back to 1975). Guidance documents issued by ED "do not create or confer any rights for or on any person and do not impose any requirements beyond those required under applicable law and regulations." U.S. Dep't of Educ., Types of Guidance Documents, http://www2.ed.gov/policy/gen/guid/types-of-guidance-documents.html (last visited July 26, 2016). The guidance documents at issue in this case are explicit about the fact that they do not have the force of law. *See, e.g.*, 2016 DCL at 2 ("This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how the Departments evaluate whether covered entities are complying with their legal obligations."); April 2014 Guidance at 1 n.1 (same). Similarly, the Holder Memo merely clarifies that "the best reading of Title VII's prohibition of sex discrimination is that it encompasses discrimination based on gender identity, including transgender status" and states explicitly that it "is not intended to otherwise prescribe the course of litigation or defenses that should be raised in any particular employment discrimination case." Holder Memo at 2.[3]

On May 25, 2016, plaintiffs initiated this lawsuit, challenging defendants' interpretation of the term "sex" as used in Title VII and Title IX and implementing regulations. Plaintiffs filed an Amended Complaint on June 15, 2016, asserting nine claims under the APA and one claim

---

[3] The Holder Memo was issued in response to evolving case law on the issue of what constitutes sex discrimination under Title VII and, in particular, the conclusion of several courts that Title VII prohibits discrimination based on gender identity (including in cases in which DOJ took the opposite position, which was rejected). *See* Holder Memo at 2-3. In light of this emerging case law, the memo stated that DOJ would change its litigating position in cases in which a federal agency is being sued. By its own terms, the memo has no force or effect outside of that context. The EEOC Fact Sheet and the OSHA Guide also have no binding legal effect. The EEOC Fact Sheet is simply a short summary of the agency's interpretation of Title VII, which previously had been reached through its normal adjudicative processes. *See Lusardi v. McHough*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015). And the OSHA Guide simply offers advice for employers on best practices regarding restroom access for transgender workers. However, as explained in the disclaimer on the last page of the Guide, it is "not a standard or [a] regulation, and it creates no new legal obligations." OSHA Guide at 4. It merely contains recommendations that "are advisory in nature, informational in content, and are intended to assist employers in providing a safe and healthful workplace." *Id.*

under the Regulatory Flexibility Act. On July 6, 2016, plaintiffs moved for a preliminary

injunction on their procedural APA claim, as well as their APA claims that defendants'

interpretation exceeds congressional authorization and violates the Spending Clause. Although

plaintiffs' motion does not specify the nature of the injunction they seek, it appears from the

Amended Complaint that they seek to enjoin the above-referenced guidance documents from

"having any legal effect." Am. Compl. ¶ 120. Strikingly, plaintiffs seek a nationwide injunction,

despite contrary law in other circuits, as well as ongoing, previously-filed litigation in other

circuits presenting the same questions raised here—including circuits in which many of the

plaintiff states are located.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008).

Indeed, the Fifth Circuit "frequently cautions" that "the decision to grant a preliminary injunction

is to be treated as the exception rather than the rule." *Matrix Partners VIII v. Nat. Res. Recovery*,

2009 WL 175132, at *6 (E.D. Tex. Jan. 23, 2009); *House the Homeless, Inc. v. Widnall*, 94 F.3d

176, 180 (5th Cir. 1996). To obtain a preliminary injunction, a movant must demonstrate
> (1) a substantial likelihood of success on the merits, (2) a substantial threat of
> irreparable injury if the injunction is not issued, (3) that the threatened injury if the
> injunction is denied outweighs any harm that will result if the injunction is granted,
> and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Relief "should only be granted when the

movant has clearly carried the burden of persuasion" on all four requirements. *Anderson v.*

*Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). Plaintiffs cannot satisfy this heavy burden.

## ARGUMENT

## I.    **Plaintiffs Cannot Demonstrate a Likelihood of Irreparable Harm**

The Supreme Court has made clear that a preliminary injunction cannot be entered based

on a mere "possibility" of irreparable harm; rather, a plaintiff must "demonstrate that irreparable

injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The threat of irreparable

injury must be "real," "substantial," and "immediate," not speculative or conjectural. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983); *see als, e.g.*, *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975); *Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011) (a plaintiff must "demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence"). In short, "an injunction is an equitable remedy that should only issue when essential to prevent an otherwise irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 221 (5th Cir. 2016).

Plaintiffs challenge the agencies' interpretations of Title VII and Title IX, as expressed in various guidance documents over the last six years. *See* Pls.'App. for Prelim. Inj. ("Pls.' App.") at 4-5, ECF No. 11. But those guidance documents are merely expressions of the agencies' views as to what the law requires. The documents themselves do not have a legally-binding effect and they expose plaintiffs to no new liability or legal requirements. Nor have plaintiffs identified any pending or imminent enforcement action in which a defendant agency is seeking to enforce its view of the law, *see Google*, 822 F.3d at 227 (vacating a preliminary injunction that "covers a fuzzily defined range of enforcement actions that do not appear imminent"), much less sanction or penalize any past conduct that does not or did not conform with the agencies' interpretations. Plaintiffs fail to show—indeed, they cannot hope to show—that they face significant and immediate injury merely because the agencies have articulated their interpretations of the law.

With respect to Title VII, plaintiffs' Amended Complaint and brief are notable for the complete absence of allegations, much less evidence, of injury. Plaintiffs do not identify a single action being taken against them as employers under Title VII. Nor have they identified a single way that their conduct has changed as a result of the agencies' interpretation of Title VII as embodied in the Holder Memo, the OSHA Guide, the EEOC Fact Sheet, or any other action taken by the defendant agencies.[4] The only arguable allegation of harm related to Title VII is

---

[4] Indeed, as previously explained, the guidance documents challenged by plaintiffs could never serve as the basis for an enforcement action, and thus they do not cause plaintiffs any injury whatsoever, let alone irreparable injury that would justify a preliminary injunction. Any enforcement action would have to be brought directly under the statute. For example, the Holder Memo merely clarifies that DOJ "will no longer assert that Title VII's prohibition against discrimination based on sex does not encompass gender identity per se (including transgender discrimination)," and

plaintiffs' vague assertion that defendants' interpretation "threatens Plaintiffs' interest in establishing policies and managing their own workplaces." Pls.' App. at 22. But again, plaintiffs do not provide any allegations—let alone evidence—regarding any employment-related policy that has been changed or must be changed as a result of the challenged interpretation of Title VII. Instead, they offer nothing more than generalized assertions of injury, which fall far short of the necessary showing to warrant preliminary relief. *See Aquifer Guardians*, 779 F. Supp. 2d at 574; *see also, e.g.*, *U.S. Bank Nat'l Ass'n v. Lakeview Retail Prop. Owner LLC*, 2016 WL 626548, at *2 (S.D. Miss. Feb. 16, 2016) (rejecting bare allegations of irreparable harm as "the exact type of [u]nsupported conclusory statements that courts have found insufficient to demonstrate entitlement to the extraordinary relief of a TRO and preliminary injunction"); *Brooks v. Wells Fargo Home Mortg.*, 2004 WL 1800750, at *1 (N.D. Tex. Aug. 11, 2004) ("Conclusory allegations are not sufficient to support a claim for injunctive relief."), *report and recommendation adopted*, 2004 WL 1982522 (N.D. Tex. Sept. 2, 2004).[5]

Plaintiffs' allegations with respect to Title IX fare no better. Although plaintiffs do identify a small number of specific "policies and practices" that they claim are in conflict with defendants' interpretation of Title IX, they have identified no enforcement action being taken

---

states explicitly that it "is not intended to otherwise prescribe the course of litigation or defenses that should be raised in any particular employment discrimination case." Holder Memo at 2. The memo imposes no independent obligations on plaintiffs and does not purport to regulate the conduct of third parties in any way. Similarly, the EEOC Fact Sheet is simply a short summary of the agency's interpretation of Title VII, which had previously been reached through its normal adjudicative processes. *See Lusardi*, 2015 WL 1607756. Title VII does not give the EEOC the authority to issue binding, legislative regulations on the statute's substantive provisions. *See* 42 U.S.C. § 2000e-12(a) (limiting EEOC's legislative rulemaking authority to "procedural regulations"). Finally, the OSHA Guide offers advice for employers on best practices regarding restroom access for transgender workers. However, as explained in the disclaimer on the last page of the Guide, it is "not a standard or regulation, and it creates no new legal obligations." OSHA Guide at 4. It merely contains recommendations that "are advisory in nature, informational in content, and are intended to assist employers in providing a safe and healthful workplace." *Id.*

[5] Plaintiffs cite *Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*, 734 F.3d 406 (5th Cir. 2013), and a recent decision of this Court, *Texas v. United States*, 95 F. Supp. 3d 965 (N.D. Tex. 2015), among other cases, for the proposition that "[s]overeigns suffer an irreparable harm when their duly enacted laws or policies are enjoined." Pls.' App. at 22. As an initial matter, despite plaintiffs' reference to "policies," the cases cited by plaintiffs involve only duly enacted state statutes. More importantly, those cases all involved an actual conflict between federal law and a particular state law, such that the state would be forced to choose between violating state law or violating federal law. *See, e.g.*, *Texas*, 95 F. Supp. 3d at 981. Here, plaintiffs have not identified a single state policy—let alone a state law—that would run afoul of defendants' interpretation of Title VII.

against them—now or in the future—as a result of those policies. *See* Pls.' App. at 21. Thus, plaintiffs' suggestion that they are "present[ed] with a Hobson's choice" between complying with federal law or following "longstanding policies and practices," *id.*, is entirely speculative, and certainly does not amount to a showing of the type of immediate and substantial injury required to justify preliminary injunctive relief. *See, e.g.*, *Aquifer Guardians*, 779 F. Supp. 2d at 556 ("As a matter of law . . . simply alleging some possibility of irreparable injury does not support the issuance of a preliminary injunction, which is an extraordinary remedy never awarded as of right."); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975).

Plaintiffs' primary allegation of harm is that "public schools that maintain separate intimate facilities for male and female students" risk losing all of their federal funding. Pls.' App. at 21. But even apart from plaintiffs' unfounded assumptions as to what "male and female students" are, the Title IX guidance documents identified by plaintiffs—the 2010 DCL, the April 2014 Guidance, and the 2016 DCL—do not have the force of law. Instead, they simply inform the public about how ED and DOJ interpret Title IX and its implementing regulations, and how the agencies evaluate whether covered entities are complying with their legal obligations. *See, e.g.*, 2016 DCL at 2 (stating that "[t]his guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how the Departments evaluate whether covered entities are complying with their legal obligations"). The guidance documents are not binding and, as particularly relevant to this discussion, do not state that the agencies have withheld or will be withholding federal funding from any of the plaintiffs. Thus, the risk identified by plaintiffs is entirely speculative.

Furthermore, were ED to decide to bring an administrative enforcement action against plaintiffs for noncompliance with Title IX (based on ED's interpretation of Title IX and its implementing regulations) at some point in the future, plaintiffs *still* would be unable to make a showing of irreparable harm because they would have an opportunity to challenge the interpretation in an administrative process prior to any loss of federal funds. *See Morgan*, 518 F.2d at 240 ("The possibility that adequate compensatory or other corrective relief will be

available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").[6] Title IX and its implementing regulations set forth a detailed administrative process for terminating federal funds. Prior to any enforcement action, ED is required to seek voluntary compliance. *See* 20 U.S.C. § 1682. If voluntary compliance could not be reached and ED were to initiate an enforcement action, the agency would provide notice and an opportunity for an administrative hearing before a Departmental hearing officer and there would be an administrative appeals process.[7] Plaintiffs could then seek judicial review of the final agency decision. *See* 20 U.S.C. § 1683; 34 C.F.R. § 106.72 (incorporating by reference 34 C.F.R. §§ 100.8-100.11); *see also N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 515 n.2 (1982) ("Funding may not be terminated, however, until after the agency determines that noncompliance cannot be achieved by voluntary means; the recipient is given a hearing before an administrative law judge, who makes a recommendation subject to administrative and judicial review; and a report is filed with the appropriate House and Senate committees and no action is taken on that report for 30 days."). Ultimately, if plaintiffs disagreed with any final agency determination of non-compliance, ED would have to convince a court that its interpretation of Title IX is reasonable in the context of a live controversy, where the court would have the benefit of concrete facts to inform its interpretation of the underlying legal principles. Permitting plaintiffs' abstract challenge to proceed now would circumvent the administrative scheme that Congress intended to precede any judicial review of an enforcement action. *See Elgin v. Dep't of Treasury*, 132 S. Ct. 2126 (2012); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).

Moreover, in the event that any of the plaintiffs ever faced a challenge to their employment practices under Title VII, that plaintiff would have ample opportunity to raise its

---

[6] To the extent that plaintiffs may argue that they would face costs in challenging any future enforcement action, the Supreme Court has made clear that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980).

[7] Even if an enforcement action were brought in the future, ED would not seek penalties or the return of federal funds already provided based on plaintiffs' prior conduct that was inconsistent with the agencies' interpretation of the statutes or regulations. Instead, if ED sought to terminate funds at all, it would seek to terminate future funding until compliance. *See* 34 C.F.R. § 100.8(c).

arguments at that time and would incur no injury unless and until a court rejected those arguments. If a plaintiff did not prevail in any such challenge, it would be because the court determined that its interpretation of the law was not correct, rather than because of what the EEOC and OSHA have respectively stated in a fact sheet and best practices guide.

Finally, plaintiffs' unjustified and lengthy delay in seeking relief belies their claim of irreparable harm with respect to at least some of their claims. As this Court has noted, "[a]bsent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Ellipse Comm'cns v. Caven*, 2009 WL 497268, at *2 (N.D. Tex. Feb. 26, 2009) (O'Connor, J., accepting Findings and Recomm. of Kaplan, M.J.); *see also, e.g.*, *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 698 (N.D. Tex. 2015) (same). "Where parties fail to explain or justify the delay between the facts underlying the need for the preliminary injunction and the motion for the injunction, courts readily decline motions to enjoin for lack of urgency." *ADT*, 145 F. Supp. 3d at 698. Here, some of the documents cited by plaintiffs as articulating the defendant agencies' allegedly unlawful interpretations of Title VII and Title IX were promulgated years ago. Based on their own allegations, plaintiffs should have been well aware of the agencies' interpretations of Title VII and Title IX for years, yet they did nothing. This fact alone undermines any claim of irreparable harm. *See, e.g.*, *TJM Corp. v. Xerox Corp.*, 1992 WL 125374, at *4 (E.D. La. May 18, 1992) (14-month delay in filing suit and further delay in moving for preliminary injunction refutes claim of irreparable injury); *Gonannies, Inc. v. Goaupair.com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (6-month delay); *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*, 2009 WL 1490588, at *3 (E.D. Tex. May 27, 2009) (9-month delay).

"[P]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 629 (5th Cir. 1985). Because plaintiffs have not established by a

clear showing—or even provided a shred of evidence—that they will suffer irreparable harm in the absence of injunctive relief, their motion should be denied.

## II.     Plaintiffs Have Not Established a Likelihood of Success on the Merits

Even if plaintiffs faced irreparable harm in the absence of preliminary relief, their motion should nonetheless be denied because they have not established a substantial likelihood of success. *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Plaintiffs assert that they are entitled to injunctive relief because various guidance documents were issued without notice and comment and, they argue, exceed statutory authority and violate the Spending Clause of the U.S. Constitution. As discussed below, these claims are not ripe, plaintiffs lack standing to press them, there is an adequate alternate remedy to plaintiffs' claims under the APA, and even if the Court were to reach the merits of plaintiffs' claims, none is likely to succeed.

A.     *The Court does not have subject matter jurisdiction over plaintiffs' challenges to defendants' guidance documents*

1.     <u>Plaintiffs do not have standing and their claims are not ripe</u>

Serious questions regarding a court's subject matter jurisdiction weigh against entry of a preliminary injunction because "potential impediments to even reaching the merits" make a plaintiff's claim less likely to succeed. *Munaf v. Green*, 553 U.S. 674, 690 (2008). Here, for reasons similar to those that undermine plaintiffs' claim of irreparable harm, plaintiffs' suit fails the jurisdictional requirements of standing and ripeness. In short, plaintiffs lack standing and this case is not ripe for judicial review because they have not alleged a cognizable concrete or imminent injury. *See Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010) (observing that the "doctrines of ripeness and standing often overlap in practice, particularly in an examination of whether a plaintiff has suffered a concrete injury").

To meet its burden to establish standing, a plaintiff must demonstrate that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The harm must be "distinct and palpable" and "actual or

imminent." *United States v. Holy Land Found.*, 445 F.3d 771, 779 (5th Cir. 2006). Allegations of possible future injury do not suffice; rather "[a] threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). An abstract disagreement about the wisdom or legality of a federal policy is not the kind of "concrete and particularized" injury needed to meet the "injury in fact" requirement, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106-09 (1998), but that is all that plaintiffs here can show.

Similarly, "[t]he ripeness doctrine is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). The doctrine "separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review." *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000). It is particularly apt where agency policy statements or legal interpretations are involved, as it "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Nat'l Park*, 538 U.S. at 807. It also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807-08. Accordingly, a party's claim "is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). In assessing ripeness, courts evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967).

Plaintiffs lack standing and their claims are not ripe for judicial review for substantially the same reasons that plaintiffs cannot establish irreparable harm.[8] The agencies have merely set

---

[8] The showing required to establish irreparable harm is significantly more stringent than the showing required to establish standing. *See, e.g.*, *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) ("[T]o show irreparable harm '[a] plaintiff must do more than merely allege . . . harm sufficient to establish standing.'" (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991))). Thus, even if the Court were to determine that plaintiffs have alleged an injury sufficient for jurisdictional purposes, plaintiffs' allegations would still fall well short of establishing irreparable harm.

forth their views as to what the law requires. The agencies' interpretations of the law—as set forth in the guidance documents referenced by plaintiffs, and elsewhere—are not legally binding, and a disagreement over statutory or regulatory interpretation does not, in and of itself, create a case or controversy. Nor have plaintiffs identified any enforcement action to which they are or are about to be subject in which a defendant agency is seeking to enforce its view of the law. As such, any injury alleged by plaintiffs is entirely speculative, as it depends on the initiation of some kind of enforcement action against plaintiffs, which may never occur. Particularly in the absence of such an enforcement action, this Court would merely be "render[ing]" an advisory opinion in 'a case in which no injury would have occurred at all,'" *Animal Legal Def. Fund v. Espy*, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting *Lujan*, 504 U.S. at 564 n.2), which is precisely the kind of academic exercise that Article III forbids.

The fact that the defendant agencies have taken no action against plaintiffs underscores the conclusion that their claims are unfit for judicial review. At this stage, plaintiffs have alleged no more than an abstract disagreement with the agencies' interpretation of the law. No concrete situation has emerged that would permit the Court to evaluate plaintiffs' claims in terms of specific facts rather than abstract principles. And because plaintiffs do not face any legal consequences at this time related to the agencies' guidance documents, they face no hardship from the withholding of judicial review.

In a recent decision, the Fifth Circuit held that a challenge to an EEOC Title VII Enforcement Guidance document was ripe for review and that the plaintiff, the State of Texas, had standing. *See Texas v. EEOC*, --- F.3d ---, 2016 WL 3524242 (5th Cir. June 27, 2016). As an initial matter, the government respectfully disagrees with that decision for many of the reasons stated in Judge Higginbotham's dissenting opinion, *see id.* at *11-17, and is considering whether to seek rehearing. In any event, *EEOC* is distinguishable from this case in important respects. The guidance document at issue set forth the EEOC's views on the application of Title VII to an employer's use of criminal history records in employment decisions. The Fifth Circuit noted that it was "over fifty pages in length" and "routinely uses mandatory language to convey the conduct

14

expected of both EEOC staff and employers." *Id.* at \*10 n.8. Thus, the court understood the EEOC guidance at issue to be "an exhaustive procedural framework for EEOC officials to follow." *Id.* at \*10. The majority described the guidance as "a blanket policy that the EEOC has committed itself to applying with respect to virtually all public and private employers." *Id.* at \*6; *see also id.* at \*10 (describing the guidance as "mandat[ing] . . . investigations across the entire regulated community"). Furthermore, in the majority's view, the guidance contained a "safe harbor," under which parties that satisfy the safe harbor's requirements "will not be deemed to be in violation of Title VII by EEOC investigators" and thus "will avoid referral to the U.S. Attorney General for prosecution." *Id.* As a result, the majority concluded that "the Enforcement Guidance has the immediate effect of altering the rights and obligations of the 'regulated community' . . . by offering them a detailed and conclusive means to avoid an adverse EEOC finding, and, by extension, agency referral and a government-backed enforcement action." *Id.*

Here, by contrast, the various guidance documents do not provide "an exhaustive procedural framework" and they do not contain any safe harbor. They speak in largely hortatory and explanatory language. Nor do they commit any of the defendant agencies to any particular course of action or, for that matter, any action at all with respect to these plaintiffs. Instead, they "merely express[] the agency's opinion" about the proper interpretation of Title VII and Title IX. *Id.* at 9 (discussing *Luminant Generation Co. v. EPA*, 757 F.3d 439 (5th Cir. 2014)). If the defendant agencies seek to apply this interpretation to plaintiffs in a future enforcement proceeding, plaintiffs will have ample opportunity to raise the arguments that they prematurely seek to assert in this case. Until such time, the agencies' mere articulation of their understanding of the law "does not injure [plaintiffs] in any way," and they "cannot show that [they] will suffer any hardship if this Court withholds adjudication." *Id.* at \*15 (Higginbotham, J., dissenting). As such, the Court lacks jurisdiction and should decline to enter a preliminary injunction.[9]

---

[9] The Court also lacks jurisdiction because plaintiffs have identified no final agency action under the APA. *See Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the United States*, 362 F.3d 333, 336 (5th Cir. 2004) ("If there is no 'final agency action' a federal court lacks subject matter jurisdiction."). Agency action is final where it determines rights or obligations and imposes legal consequences. *See Luminant*, 757 F.3d at 441. Because

2.      Plaintiffs have an adequate alternate remedy and district court review is
        precluded

This Court also lacks jurisdiction because plaintiffs have another "adequate remedy in a

court," 5 U.S.C. § 704, which is to simply defend any enforcement action taken against them. If

DOJ filed suit against any of the plaintiff states based on its interpretation of Title VII or Title

IX, the state would

> almost by definition [] have an adequate remedy in a court, that is, the remedy of
> opposing the Attorney General's motions in the court in which [s]he files h[er]
> papers. Not only would the filing of such an opposition there be a judicial remedy
> obviating the need for resort to the APA in this District, but it is a far more
> appropriate, far more logical remedy than a lawsuit here seeking injunctive relief.

*NAACP v. Meese*, 615 F. Supp. 200, 203 (D.D.C. 1985). Plaintiffs would suffer no harm in the

meantime. The Fifth Circuit has held that defense against an enforcement action constitutes an

adequate remedy under the APA. *Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953, 959 (5th Cir.

1991) ("In [an] enforcement action, whether brought by [employees] or the [agency], the District

may defend on the basis that the" agency's interpretation is wrong.).

Likewise, if ED sought to withhold funds from a plaintiff state, the state would have an

opportunity for multiple layers of administrative review, *see* 34 C.F.R. § 100.8-10, followed by

judicial review in the court of appeals, *see id.* § 100.11; 20 U.S.C. § 1683. As the Fifth Circuit

has held, "[r]eview by a court of appeals is 'an adequate remedy' within the meaning of the

APA." *Dressner v. Meba Med. & Benefits Plans*, 628 F.3d 705, 711 (5th Cir. 2010); *see id.* at

711 n.39 (collecting cases); *see also Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417,

428 (6th Cir. 2016) (holding that 49 U.S.C. § 521(b)(9) provided an adequate remedy that

precluded APA review "[b]ecause the statute provides for review by an appellate court following

administrative review"). Section 704 of the APA thus prevents plaintiffs from circumventing the

administrative and judicial process Congress has provided them. *See* 20 U.S.C. § 1682

---

the challenged documents impose no legal consequences, they do not constitute final agency action. *Texas v. EEOC*
is distinguishable on this point as well because, as discussed above, the majority concluded that the EEOC
Enforcement Guidance had immediate legal consequences for Texas as a result of the safe harbor. The Supreme
Court's recent decision in *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016), on which the *Texas
v. EEOC* majority relied, is distinguishable for similar reasons. *See Texas v. EEOC*, 2016 WL 3524242, at *16
(Higginbotham, J., dissenting) (distinguishing *Hawkes*).

(administrative process); *id.* § 1683 (judicial review); *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").

Moreover, by providing an elaborate administrative scheme that culminates in judicial review, Congress has precluded district court jurisdiction over pre-enforcement actions like this one. *See Thunder Basin*, 510 U.S. at 207, 216. In *Thunder Basin*, the Supreme Court held that a statute providing for administrative proceedings, followed by judicial review in the court of appeals, foreclosed parallel district court jurisdiction. *See id.* at 207-08. Like here, no action had yet been taken against the plaintiff in *Thunder Basin*. Like here, the claims "turn[ed] on a question of statutory interpretation." *Id.* at 216. Here, just as in *Thunder Basin*, "[n]othing in the language and structure of the Act or its legislative history suggests that Congress intended to allow [regulated parties] to evade the statutory-review process by enjoining the [agency] from commencing enforcement proceedings" based on the challenged rule. *Id.* The same rule applies for plaintiffs' constitutional claims. *See Elgin*, 132 S. Ct. 2126. As a result, "[t]his District Court is not the appropriate forum for a nation-wide determination of the meaning of [Titles VII and IX] by way of an injunction against the Attorney General." *NAACP*, 615 F. Supp. at 206.

B.   *Defendants' actions do not violate the APA*

Plaintiffs are also unlikely to succeed on their claims under the APA. As relevant here, the APA permits agency action to be set aside only if it is "in excess of statutory jurisdiction, authority or limitations," "without observance of procedure required by law," "or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C), (D). Plaintiffs have not met their heavy burden to show that defendants' interpretations are likely to be found procedurally deficient or contrary to the authorities on which they are founded.

1.   The guidance documents are interpretive rules exempt from notice and comment requirements

The APA does not require agencies to follow notice-and-comment procedures in all situations. Instead, the statute specifically excludes interpretive rules and statements of agency

policy from these procedures.[10] 5 U.S.C. § 553(b)(3)(A); *Perez v. Mortg. Bankers Ass'n*, 135 S.

Ct. 1199, 1204 (2015). The Supreme Court has explained that the "critical feature of interpretive

rules is that they are issued by an agency to advise the public of the agency's construction of the

statutes and rules which it administers." *Perez*, 135 S. Ct. at 1204. The Fifth Circuit has similarly

said that interpretive rules "are statements as to what the administrative officer thinks the statute

or regulation means." *Phillips Petrol. Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir. 1994).

Interpretive rules encourage predictability in the administrative process. An agency that

enforces "less than crystalline" statutes and regulations must interpret them, "and it does the

public a favor if it announces the interpretation in advance of enforcement, whether the

announcement takes the form of a rule or of a policy statement, which the [APA] assimilates to

an interpretive rule." *Hoctor v. USDA*, 82 F.3d 165, 167 (7th Cir. 1996). Courts should not

"discourage the announcement of agencies' interpretations by burdening the interpretive process

with cumbersome formalities." *Id.* Here, by announcing their interpretations of Title VII as well

as Title IX and its regulations, the defendant agencies have informed the public about their

understanding of the law—and no more. The challenged guidance documents simply announce

the federal government's interpretations of Titles VII, IX, and applicable regulations; they are

non-binding, do not have the force and effect of law, and do not add substantively to existing

laws, but simply "advise the public of the agency's construction of the statutes and rules which it

administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995). The guidance

documents are therefore paradigmatic interpretive rules, exempt from the notice-and-comment

requirements of the APA. *Id.* Whether defendants' interpretations of Title VII or IX are or are

not correct, however, they remain interpretations, *see Perez*, 135 S. Ct. at 1204, and it is for a

court to decide in the context of a final administrative action whether to accept those

interpretations.

Plaintiffs make two arguments to the contrary. First, they argue that the challenged

---

[10] The challenged EEOC Fact Sheet is a statement of agency policy, but for convenience, this brief refers to it as an interpretive rule along with the other agencies' documents.

interpretations are subject to notice and comment because they affect rights and obligations, and are binding. Pls.' App. at 12-14. But that is simply not so: unlike the statutes and regulations on which they are premised, the interpretations themselves do not carry the force of law. Rather, as explained above, they merely explain what the defendant agencies understand the requirements of Title VII, Title IX, and the applicable regulations to be. Although the agencies' interpretations of the law are entitled to some deference, courts will not enforce them "unless they choose to accept" the agency's "interpretation of the meaning" of the statute or regulation interpreted. *E. Ky. Welfare Rights Org. v. Simon*, 506 F.2d 1278, 1290 (D.C. Cir. 1974), *vacated for lack of standing*, 426 U.S. 26 (1976). Valid interpretations of binding authorities necessarily implicate rights and obligations, but that does not make the explications themselves legislative rules. If an agency ever attempts to enforce its understanding of the law against plaintiffs, they will be able to oppose the agency's interpretation.[11]

Second, plaintiffs argue that the challenged interpretations are subject to notice and comment because they are contrary to regulatory authority and prior agency practice. Both premises are mistaken. As discussed at greater length below, the Fourth Circuit recently—and correctly—concluded that ED's interpretation of the single-sex facility regulations implementing Title IX is reasonable, and does not conflict with those regulations in any way. *See G.G. ex rel.Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016). Nor does the agencies' interpretation of Title VII conflict with that statute, as discussed below. The Fourth Circuit also properly concluded that ED's interpretation of the Title IX sex-segregated facility regulations did not alter preceding agency practice. As that court explained, for most of their existence, Title IX's regulations were understood simply to mean that a school may provide sex-segregated facilities. *Id.* In recent years, as schools have confronted the reality that some students' gender identities do not align with their birth-assigned sex, schools have begun to look to ED for

---

[11] The cases on which plaintiffs rely have little to do with the questions at issue here. Neither *Morton v. Ruiz*, 415 U.S. 199, 232-36 (1974), nor *Chrysler Corp. v. Brown*, 441 U.S. 281, 313-16 (1979), suggests that an interpretation of pre-existing authority is subject to notice and comment.

guidance on the question of how its regulations apply to transgender students. *Id.* at *5-6. It was also only recently that schools started citing Title IX's regulations as the basis for excluding transgender students from facilities consistent with their gender identity. *Id.* Providing guidance regarding the application of its regulations in this new context is precisely the role of a federal agency, and does not transform a non-binding interpretation into a legislative rule subject to notice-and-comment rulemaking.[12]

In sum, although the guidance documents supply "crisper and more detailed lines" than the statutes and regulations that they interpret, they do not alter the legal obligations of regulated entities. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). Accordingly, they are interpretative rules, and are not subject to the notice-and-comment requirements of the APA.[13]

> 2.   The guidance documents are valid interpretations of the statutory and
>      regulatory authorities on which they are premised

Plaintiffs also cannot establish that they are likely to succeed in their claims that the interpretations in the guidance documents violate the substantive provisions of the APA.

**Title IX.** As noted above, Title IX prohibits sex discrimination in education programs or activities by recipients of federal financial assistance. Implementing regulations, in turn, allow schools to "provide separate toilet, locker room, and shower facilities on the basis of sex" without running afoul of the statute, so long as the "facilities provided for students of one sex" are "comparable to [the] facilities provided for students of the other sex." 34 C.F.R. § 106.33; 28 C.F.R. § 54.410. But these regulations do not address how they apply when a transgender student

---

[12] Although the Holder Memo revised DOJ's legal position on the scope of Title VII, as previously explained, this change was made in response to adverse court decisions rejecting the Department's previous litigating position, as well as evolving case law. *See supra* at note 3. In any event, an interpretive rule is not subject to notice and comment, neither when it is first announced nor when it is changed. *See Perez*, 135 S. Ct. at 1206.

[13] Plaintiffs' argument to the contrary is premised on the misguided notion that when transgender students are allowed to use facilities that accord with their gender identity, those facilities are no longer sex-segregated. Pls.' App. at 14 (suggesting that the interpretations require "schools . . . to open all intimate facilities to both sexes"). That argument is better considered via the plaintiffs' substantive challenge, addressed in the next section, as any objection to defendants' challenged interpretation does not give rise to a procedural deficiency.

seeks to use those facilities—that is, how a school should determine a transgender student's sex when providing access to sex-segregated facilities. This substantial ambiguity in the regulatory scheme is central to the issues before the Court. On the one hand, as the Fourth Circuit has explained, 34 C.F.R. § 106.33 could be understood to mean that a school should determine "maleness or femaleness with reference exclusively to genitalia"; on the other hand, it could mean that a school should "determin[e] maleness or femaleness with reference to gender identity." *Gloucester*, 822 F.3d at 720.[14]

Indeed, in authorizing sex-segregated facilities, the Title IX regulation at issue in *Gloucester* "assumes a student population composed of individuals of what has traditionally been understood as the usual 'dichotomous occurrence' of male and female where the various indicators of sex all point in the same direction." *Id.* at 722. It "sheds little light on how exactly to determine the 'character of being either male or female' where those indicators diverge," as they sometimes do. *Id.*.[15] For that reason, as the Fourth Circuit concluded, ED's Title IX regulation is "ambiguous as applied to transgender individuals." *Id.* at 6.[16] And, as the Fourth Circuit also found, ED's interpretation offers a reasonable resolution of that ambiguity. *Gloucester*, 822 F.3d at 721-22. Foundational principles of administrative law instruct this Court to give controlling weight to the defendant agencies' interpretations of their own ambiguous regulations unless those interpretations are plainly erroneous. *See Auer v. Robbins*, 519 U.S. 452,

---

[14] As the Fourth Circuit concluded, interpreting "sex" in light of gender identity accounts for "the varying physical, psychological, and social aspects . . . included in the term 'sex.'" *Gloucester*, 822 F.3d at 722 (citing Webster's Third New Int'l Dictionary 2081 (1971)). The court further explained that "[m]odern definitions of 'sex' also implicitly recognize the limitations of a nonmalleable, binary conception of sex. For example, Black's Law Dictionary defines 'sex' as '[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; gender.' The American Heritage Dictionary includes in the definition of 'sex' '[o]ne's identity as either female or male.'" *Id.* at *7 n.7 (quoting Black's Law Dictionary 1583 (10th ed. 2014) and Am. Heritage Dictionary 1605 (5th ed. 2011)).

[15] The Maine Supreme Court reached a similar conclusion when evaluating a state law requiring restrooms in school buildings to be "[s]eparated according to sex." Me. Rev. Stat. Ann. Tit. 20-a, § 6501 (2013). In *Doe v. Regional School Unit 26*, that court determined that the statute "does not mandate, or even suggest, the manner in which transgender students should be permitted to use sex-segregated facilities." 86 A.3d 600, 605-06 (Me. 2014).

[16] In reaching this conclusion, the Fourth Circuit consulted contemporaneous dictionaries from the drafting era, which also "suggest that a hard-and-fast binary division on the basis of reproductive organs—although useful in most cases—was not universally descriptive [of the term 'sex']." *Id.* at *7.

461 (1997); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Gardebring v. Jenkins*, 485 U.S. 415, 429-30 (1988). And interpretative rules construing ambiguous statutes are likewise "entitled to respect," such that, should the Court also find Title IX itself ambiguous, the Court should still respect the agency's interpretation of the statute as covering discrimination against transgender people. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

The Fourth Circuit's decision in *Gloucester* should weigh heavily in this Court's consideration of plaintiffs' likelihood of success on their Title IX claims. Indeed, that court's clear rejection of plaintiffs' primary argument—that the word "sex" is unambiguous and must be based on one's genitalia and/or birth certificate in all cases—is strong evidence that those claims will also fail here. *See, e.g.*, *Butts v. NCAA*, 600 F. Supp. 73, 74 (E.D. Pa. 1984) (where plaintiff's argument was "considered, and firmly rejected" by a court of appeals, likelihood of success was low); *see also Metro Found. Contractors, Inc. v. Arch Ins. Co.*, 2011 WL 2947003, at *1 (S.D.N.Y. July 18, 2011) (finding no likelihood of success on the merits of appeal where "other courts of appeals . . . have rejected" plaintiff's argument).

**Title VII.** Plaintiffs' argument that sex is unambiguous fares no better in the context of Title VII. As Judge Davis recognized in *Gloucester*, "the weight of circuit authority" recognizes that "discrimination against transgender individuals constitutes discrimination 'on the basis of sex'" under Title IX and "analogous statutes," including Title VII. *Gloucester*, 822 F.3d at 727 (Davis, J., concurring) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989); *Glenn v. Brumby*, 663 F.3d 1312, 1316-19 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000)). The challenged interpretation merely draws the logical conclusion of this principle.[17]

Discrimination against transgender people because they are transgender denies them an opportunity or benefit based on a consideration related to sex. *See, e.g., Schwenk*, 204 F.3d at

---

[17] Courts look to case law interpreting Title VII for guidance in evaluating a claim brought under Title IX. *See, e.g.*, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651 (1999).

1202. Since the Supreme Court's decision in *Price Waterhouse*, it is well-established that discrimination on the basis of "sex" is not limited to preferring males over females (or vice-versa), but includes differential treatment based on "sex-based considerations." 490 U.S. at 242 (plurality); *see also Schwenk*, 204 F.3d at 1202 (citing *Price Waterhouse* for the proposition that a prohibition on sex discrimination encompasses any differential treatment based on a consideration "related to the sex of" the individual). Indeed, denying transgender people benefits based on their transgender status "literally discriminat[es] 'because of . . . sex.'" *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008). This is true whether viewed as discrimination based on the divergence between gender identity and the sex assigned at birth or as discrimination due to an individual's gender transition. As the *Schroer* court aptly analogized, firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,'" even if the employer "harbors no bias toward either Christians or Jews but only 'converts,'" because "[n]o court would take seriously the notion that 'converts' are not covered" by a prohibition against religious discrimination. *Id.* at 306. By the same logic, discrimination against people because they have "changed" their sex—*i.e.*, they are living as a different sex from the one assigned at birth—is a "clear case" of discrimination because of sex. *Id.* Denying transgender employees access to sex-segregated facilities consistent with their gender identity violates Title VII both because it discriminates with respect to a term, condition, or privilege of employment, *see* 42 U.S.C. § 2000e-2(a)(1), and because it limits, segregates, or classifies employees in a way that deprives them of opportunities and adversely affects them, *id.* § 2000e-2(a)(2). The challenged interpretations say no more than this.

In arguing that they are likely to prevail in their challenge to defendants' interpretations, plaintiffs first suggest that "sex" has a plain meaning pursuant to which transgender individuals are obviously members of the sex they were assigned at birth. Pls.' App. at 16-18. For all of the reasons discussed above, in the four courts of appeals and the district court cases cited above, and in *Gloucester*, that simply is not so. Plaintiffs then point to legislative history, noting that Congress has repeatedly rejected efforts to extend Title VII's protections to cover gender

identity. Pls.' App. at 18. But "Congress does not express its intent by a failure to legislate." *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1342 (D.C. Cir. 1998) (citing *United States v. Estate of Romani*, 523 U.S. 517, 534 (1998) (Scalia, J., concurring)); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank*, 511 U.S. 164, 187 (1994). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). Indeed, an amendment can be rejected as superfluous because Congress believes its substance to be included in the existing statute. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990).

Nor is it particularly relevant that the Congresses that enacted Title VII in 1964 and Title IX in 1972 may not have had transgender individuals in mind. *See* Pls.' App. at 17-18. The Supreme Court has explicitly rejected the notion that Title VII (and, by extension, Title IX) proscribes only the types of discrimination specifically contemplated by Congress at the time the statute was enacted. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

> Male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.

*Id.*; *see also, e.g.*, *EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 454 (5th Cir. 2013) (discussing *Oncale*); *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 397-98 (5th Cir. 2008) (same). In sum, neither of plaintiffs' substantive arguments against the challenged interpretation of Title VII suggests that they are likely to succeed on the merits of their claim.[18]

C.    *The Spending Clause is not violated by Title IX, the guidance documents, or the interpretations contained in the guidance*

Finally, plaintiffs argue that they are likely to show that the challenged interpretation of Title IX violates the Spending Clause, U.S. Const., art. I, § 8, cl. 1, either by failing to provide

---

[18] In a footnote, plaintiffs suggest that state sovereign immunity is implicated in the agencies' interpretation of Title VII. Pls.' App. at 19 n.28. But Title VII clearly and validly abrogates state sovereign immunity. *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 729-30 (2003); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 457 (1976). If the challenged interpretation of Title VII is valid, state sovereign immunity poses no bar to its enforcement against plaintiffs; if invalid, there is no reason to reach the issue of immunity in the first place.

clear notice of the conditions on which federal funding was predicated, or by unconstitutionally coercing the states that receive Title IX funding. Neither argument is likely to succeed.

The Constitution vests Congress with the power to "fix the terms under which it disburses federal money to the States." *Suter v. Artist M*, 503 U.S. 347, 356 (1992). "The Supreme Court has explained that so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). For example, in *Davis v. Monroe County Board of Education*, the Supreme Court held that Title IX's prohibition on sex discrimination in schools provided adequate notice that severe student-on-student sexual harassment was actionable, even though "the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" 526 U.S. 629, 651 (1999) (quoting *Oncale*, 523 U.S. at 82); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 1509 (2005) (noting that Title IX's conditions have been "broadly" interpreted "to encompass diverse forms of intentional sex discrimination"). Recipients of federal funds are clearly on notice that they must comply with the antidiscrimination provisions of Title IX, and "the possibility that application of [the condition] might be unclear in [some] contexts" does not render it unenforceable under the Spending Clause. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665-66, 673 (1985) (where statute makes clear that conditions apply to receipt of federal funds, Congress need not "specifically identif[y] and proscribe[]" each action that will violate its terms). In any event, there has never been a threat by ED (or DOJ) to seek a repayment of any federal funds already provided. And even if ED took action to seek compliance, as noted above, the agency would follow its administrative process that includes both notice and an opportunity for hearing prior to final agency action. *See* 20 U.S.C. § 1682.

Moreover, a coercion claim has no viability here. The Supreme Court has explained "that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion." *South Dakota v. Dole*, 483 U.S. 203, 211 (1987); *see also Nat'l Fed. of Indep. Bus. v. Sebelius* ("*NFIB*"), 132 S. Ct. 2566, 2606

(2012). But there is no coercion implicated here, where the only issue is the interpretation of a longstanding condition on federal funding. Coercion may occur when Congress leverages an old and large program to force states to participate in a new one. *See NFIB*, 132 S. Ct. at 2607 ("What Congress is not free to do is to penalize States that choose not to participate in [a] new program by taking away their existing . . . funding."). But Title IX is not new, nor is it some separate program. To the contrary, Title IX is an integral part of federal education spending, which has always prohibited sex discrimination. *See id.* at 2603-04 (reaffirming Congress's authority to place "restrictions on the use of [federal] funds"). No court has ever suggested that coercion might occur when an existing statutory condition is interpreted in a new context—a routine task for courts and agencies applying cooperative spending statutes. This Court should not be the first. *See Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 (5th Cir. 2005) (en banc) (rejecting claim that analogous federal statute prohibiting disability discrimination by recipients of federal funds is unduly coercive); *id.* at 299 n.2 (Edith H. Jones, J., dissenting) (agreeing with majority that statute "is not unconstitutionally coercive").

### III. Granting a Preliminary Injunction Would Harm Defendants, Third Parties, and the Public Interest

Because plaintiffs have not made the threshold showings of either irreparable harm or a likelihood of success on the merits, there is no need for the Court to consider the final factors in the preliminary injunction analysis. *See, e.g.*, *Jackson*, 556 F.3d at 360. However, even if the Court were to consider the balance of equities and public interest, it should still deny plaintiffs' motion because these factors tip sharply in defendants' favor. Indeed, plaintiffs have failed to demonstrate—as they must—that the allegedly irreparable injury outweighs the harm that the injunction would cause defendants and unrepresented third parties, and that granting the injunction would not "be adverse to public interest." *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986); *Southdown, Inc. v. Moore*, 686 F. Supp. 595, 596 (S.D. Tex. 1988).

As explained above, plaintiffs fail to make *any* showing of injury here, let alone irreparable injury that is substantial, immediate, and likely. Against this non-existent showing of

26

harm weighs the substantial public interest in achieving Title VII and Title IX's goals of eliminating discrimination in workplace and educational settings. It is well-established that violations of federal civil rights statutes constitute irreparable harm as a matter of law. *See United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993); *Rogers v. Windmill Pointe Vill. Club Ass'n*, 967 F.2d 525, 528 (11th Cir. 1992). Moreover, many school districts and other stakeholders have sought guidance on the treatment of transgender students. *See* 2016 DCL at 1 ("In recent years, we have received an increasing number of questions from parents, teachers, principals, and school superintendents about civil rights protections for transgender students."). Enjoining the documents and interpretations challenged here arguably would prevent defendants from explaining to the public and regulated entities their understanding of the requirements imposed by Titles VII and IX and the implementing regulations. This not only would leave regulated entities confused about their legal obligations, but could have deleterious effects on transgender individuals, who have the right to be free from discrimination in workplace and educational settings and who face harm to their health and well-being when excluded from public facilities available to the gender with which they identify.[19] *See, e.g.*, *Gloucester*, 822 F.3d at 728 (Davis, J., concurring) (discussing the "extreme risk for immediate and long-term psychological harm" that transgender individuals may face when forced to use restrooms that do not comport with their gender identity). Plaintiffs have made no showing of any irreparable harm that would justify inflicting these injuries or perpetuating discrimination. Accordingly, the requested injunction should be denied.[20]

---

[19] Reduced compliance could also lead to more litigation brought by private plaintiffs seeking to vindicate their rights under Title VII and Title IX against school districts and state and local employers. While plaintiffs seek to enjoin the defendant agencies from explaining their view of the law, they cannot prevent private plaintiffs from appealing to the courts.

[20] Furthermore, even if the Court were to conclude that the guidance documents challenged by plaintiffs impose legal obligations on them or amount to some kind of enforcement action against them, there is "inherent harm to an agency" in preventing it from enforcing statutes and regulations that "Congress found it in the public interest to

IV.    **If the Court Determines that a Preliminary Injunction is Warranted, Such Relief Should be Narrowly Tailored to Plaintiffs in the Fifth Circuit**

Finally, even if this Court determines that injunctive relief is proper, it should deny plaintiffs' request for a nationwide injunction and should enjoin enforcement actions based on the challenged interpretations only against plaintiffs in the Fifth Circuit that have demonstrated that they face irreparable harm.

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the Plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Friends of the Earth v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 193 (2000) (courts should ensure "the framing of relief no broader than required by the precise facts"). Here, plaintiffs ask this Court to issue a nationwide injunction against defendants' guidance documents and prevent defendants from interpreting the statutes and regulations they administer in the manner set forth in the challenged guidance. But such relief is completely disproportionate to the harm demonstrated or even alleged. As explained above, plaintiffs have failed to establish that they face any imminent harm, as they have identified no enforcement action against them as a result of the challenged policies and have not established that the guidance otherwise has any legal effect. *See Gearhart Indus. v. Smith Int'l, Inc.*, 741 F.2d 707, 715 (5th Cir. 1984) ("[I]njunctive relief is drastic medicine indeed. . . . [I]t should be carefully tailored to the situation presented.").

Moreover, a nationwide injunction would violate well-established principles of comity, under which federal district courts—courts of coordinate jurisdiction and equal rank—must exercise care to avoid interference with each other's affairs. *See, e.g.*, *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985). Indeed, "[c]omity has an established and substantial role in informing the exercise of the court's discretion" when a federal court "is asked

---

direct that [it] develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 296 (6th Cir. 1998) ("[T]he granting of an injunction against the enforcement of a likely constitutional statute would harm the government.").That harm is all the greater here, where the agency action being challenged helps to protect the rights of unrepresented minors. As Judge Davis stated in *G.G. v. Gloucester County School Board*, "[e]nforcing [a transgender student's] right to be free from discrimination on the basis of sex in an educational institution is plainly in the public interest." 822 F.3d at 729 (Davis, J., concurring); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("[Courts] should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

to employ its historic powers as a court of equity, and is called upon to decide whether to exercise the broadest and potentially most intrusive form of judicial authority." *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 119-20 (1981). Here, if the Court were to issue an injunction that applied outside the Fifth Circuit, it would substantially interfere with the sovereignty of other federal courts. For example, the Fourth Circuit has already concluded that ED's interpretation of Title IX is reasonable; any injunction enjoining defendants' interpretation of Titles VII and IX in West Virginia would therefore, "as a practical matter, create a direct and perhaps irreconcilable conflict" between the Fourth Circuit and this Court, "leaving litigants and others in those States confused." *Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 716 (4th Cir. 2015); *see also United States v. AMC Entm't, Inc.*, 549 F.3d 760, 772 (9th Cir. 2008) ("A district court in the Ninth Circuit should not negate something that has already been determined in adversary proceedings before the United States Court of Appeals of the Fifth Circuit.") (collecting cases). Many circuit and district courts—including those with jurisdiction over some of the plaintiff states—have similarly agreed with defendants' conclusion that discrimination against transgender individuals constitutes discrimination "on the basis of sex" under Title VII. *See, e.g.*, *Brumby*, 663 F.3d at 1316-19; *Smith*, 378 F.3d at 573-76; *Rosa*, 214 F.3d at 214-16; *Schwenk*, 204 F.3d at 1201-02; *Schroer*, 577 F. Supp. 2d at 308; *Fabian v. Hosp. of Central Conn.*, 2016 WL 1089178, *11-12 (D. Conn. March 18, 2016). This Court lacks authority to override those decisions.

Additionally, there are at least eight other lawsuits in federal courts across the country challenging the same agency guidance at issue here.[21] A nationwide injunction would interfere with the ability of courts in those jurisdictions to bring their own expertise to bear on the issues raised in those litigations. Especially when confronted with a conflicting decision on a legal issue

---

[21] *See Carcaño v. McCrory*, No. 1:16-cv-236 (M.D.N.C.); *McCrory v. United States*, No. 5:16-cv-238 (E.D.N.C.); *United States v. State of North Carolina*, No. 1:16-cv-425 (M.D.N.C.); *Berger v. United States Dep't of Justice*, No. 1:16-cv-844 (M.D.N.C.); *North Carolinians for Privacy v. U.S.*, No. 1:16-cv-845 (M.D.N.C.); *Students and Parents for Privacy v. U.S. Dep't of Education*, No. 1:16-cv-4945 (N.D. Ill.); *Bd. of Education of the Highland Local School District v. U.S. Dep't of Education*, No. 2:16-cv-524 (S.D. Ohio); *Nebraska v. United States*, No. 4:16-cv-3117 (D. Neb.).

from another jurisdiction (such as the Fourth Circuit's decision in *Gloucester*), a district court should be cautious in assuming that other circuits that have not yet ruled would adopt its interpretation of the law. *See, e.g.*, *Va. Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).[22]

Furthermore, by effectively precluding further consideration of defendants' interpretations by any court other than the Fifth Circuit or the Supreme Court, a nationwide injunction could "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *United States v. Mendoza*, 464 U.S. 154, 160 (1984). Such an outcome would "deprive [the Supreme Court] of the benefit it receives from permitting several courts of appeals to explore a difficult question before [it] grants certiorari." *Id.*; *see also Hart v. Massanari*, 266 F.3d 1155, 1173 (9th Cir. 2001). As the D.C. Circuit has cautioned, "[a]llowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit," would "squelch the circuit disagreements that can lead to Supreme Court review." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002).

Accordingly, plaintiffs' request for an injunction should be denied in its entirety, but if it is granted it should be limited in scope, barring enforcement actions on the basis of the challenged interpretations only against plaintiffs within the Fifth Circuit.

## CONCLUSION

For the reasons discussed above, the Court should deny plaintiffs' motion for a preliminary injunction.

---

[22] Moreover, not every state is a plaintiff in this action and some states may not agree with plaintiffs' legal challenge. Indeed, many state laws protect transgender individuals from discrimination. *See, e.g.*, Colo. Rev. Stat. § 24-34-401 *et seq.*; Conn. Gen. Stat. § 46a; Del. Code Ann. tit. 19 § 711; N.M. Stat. Ann. § 28-1-7; Wash. Rev. Code § 49.60.040. Although a nationwide injunction may be appropriate if necessary to afford relief to the prevailing party, here there is no such necessity that could possibly justify nationwide injunctive relief. Accordingly, if the Court were to issue an injunction, it should not apply in states that are not parties to this action. *See, e.g.*, *Va. Society*, 263 F.3d at 392.

Dated: July 27, 2016                    Respectfully submitted,


                                        BENJAMIN C. MIZER
                                        Principal Deputy Assistant Attorney General

                                        JENNIFER D. RICKETTS
                                        Director, Federal Programs Branch

                                        SHEILA M. LIEBER
                                        Deputy Director, Federal Programs Branch

                                        */s/ Benjamin L. Berwick*
                                        BENJAMIN L. BERWICK (MA Bar No. 679207)
                                        MEGAN A. CROWLEY (NY Bar No. 4930376)
                                        JAMES BICKFORD (NY Bar No. 5163498)
                                        Trial Attorneys, U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1 Courthouse Way, Suite 9200
                                        Boston, MA 02210
                                        Telephone: (617) 748-3129
                                        Facsimile: (617) 748-3965
                                        Email: Benjamin.L.Berwick@usdoj.gov

                                        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2016, a copy of the foregoing Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction was filed electronically via the Court's ECF system, which effects service upon counsel of record.

*/s/ Benjamin L. Berwick*
 Benjamin L. Berwick