**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:16-cv-00054-O** |
| | § | |
| **UNITED STATES OF AMERICA et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## PRELIMINARY INJUNCTION ORDER

Before the Court are Plaintiffs' Application for Preliminary Injunction (ECF No. 11), filed July 6, 2016; Defendants' Opposition to Plaintiffs Application for Preliminary Injunction (ECF No. 40), filed July 27, 2016; and Plaintiffs' Reply (ECF No. 52), filed August 3, 2016. The Court held a preliminary injunction hearing on August 12, 2016, and counsel for the parties presented their arguments.  *See* ECF No. 56.[1]

This case presents the difficult issue of balancing the protection of students' rights and that of personal privacy when using school bathrooms, locker rooms, showers, and other intimate facilities, while ensuring that no student is unnecessarily marginalized while attending school. The sensitivity to this matter is heightened because Defendants' actions apply to the youngest child attending school and continues for every year throughout each child's educational career. The resolution of this difficult policy issue is not, however, the subject of this Order.  Instead, the

---

[1] The Court also considers various amicus briefs filed by interested parties.  *See* ECF Nos. 16, 28, 34, 36-1, 38-1.

1

Constitution assigns these policy choices to the appropriate elected and appointed officials, who must follow the proper legal procedure.

That being the case, the issues Plaintiffs present require this Court to first decide whether there is authority to hear this matter.  If so, then the Court must determine whether Defendants failed to follow the proper legal procedures before issuing the Guidelines in dispute and, if they failed to do so, whether the Guidelines must be suspended until Congress acts or Defendants follow the proper legal procedure.  For the following reasons, the Court concludes that jurisdiction is proper here and that Defendants failed to comply with the Administrative Procedures Act by: (1) foregoing the Administrative Procedures Act's notice and comment requirements; and (2) issuing directives which contradict the existing legislative and regulatory texts.  Accordingly, Plaintiffs' Motion should be and is hereby **GRANTED.**

## I.      BACKGROUND

The following factual recitation is taken from Plaintiffs' Application for Preliminary Injunction (ECF No. 11) unless stated otherwise.  Plaintiffs are composed of 13 states and agencies represented by various state leaders, as well as Harrold Independent School District of Texas and Heber-Overgaard Unified School District of Arizona.[2]  They have sued the U.S. Departments of Education ("DOE"), Justice ("DOJ"), Labor ("DOL"), the Equal Employment Opportunity Commission ("EEOC"), and various agency officials (collectively "Defendants"), challenging Defendants' assertions that Title VII and Title IX require that all persons must be afforded the opportunity to have access to restrooms, locker rooms, showers, and other intimate

---

[2] Plaintiffs include: (1) the State of Texas; (2) Harrold Independent School District (TX); (3) the State of Alabama; (4) the State of Wisconsin; (5) the State of West Virginia; (6) the State of Tennessee; (7) Arizona Department of Education; (8) Heber-Overgaard Unified School District (Arizona); (9) Paul LePage, Governor of the State of Maine; (10) the State of Oklahoma; (11) the State of Louisiana; (12) the State of Utah; (13) the state of Georgia; (14) the State of Mississippi, by and through Governor Phil Bryant; (15) the Commonwealth of Kentucky, by and through Governor Matthew G. Bevin.

facilities which match their gender identity rather than their biological sex.[3]  Plaintiffs claim that on May 13, 2016, Defendants wrote to schools across the country in a Dear Colleague Letter on Transgender Students (the "DOJ/DOE Letter") and told them that they must "immediately allow students to use the bathrooms, locker rooms and showers of the student's choosing, or risk losing Title IX-linked funding."  Mot. Injunction 1, ECF No. 11.  Plaintiffs also allege Defendants have asserted that employers who "refuse to permit employees to utilize the intimate areas of their choice face legal liability under Title VII."   *Id.*   Plaintiffs complain that Defendants' interpretation of the definition of "sex" in the various written directives (collectively "the Guidelines")[4] as applied to Title IX of the Education Amendments of 1972 ("Title IX") and Title VII of the Civil Rights Act of 1964 ("Title VII") is unlawful and has placed them in legal jeopardy.

Plaintiffs contend that when Title IX was signed into law, neither Congress nor agency regulators and third parties "believed that the law opened all bathrooms and other intimate facilities to members of both sexes."  Mot. Injunction. 1, ECF No. 11.  Instead, they argue one of Title IX's initial implementing regulations, 34 C.F.R. § 106.33 ("§ 106.33" or "Section 106.33"),

---

[3] Plaintiffs refer to a person's "biological sex" when discussing the differences between males and females, while Defendants refer to a person's sex based on the sex assigned to them at birth and reflected on their birth certificate *or* based on "gender identity" which is "an individual's internal sense of gender." *See* Am. Compl. 12, ECF No. 6; Mot. Injunction 1, ECF No. 11; Am. Compl. Ex. C (Holder Transgender Title VII Memo) ("Holder Memo 2014") App. 1 n.1, ECF No. 6-3 ("'[G]ender identity' [is defined] as an individual's internal senses of being male or female."); *Id.* at Ex. J. (DOJ/DOE Letter) 2, ECF No. 6-10. When referring to a transgendered person, Defendants' Guidelines state "transgender individuals are people with a gender identity that is different from the sex assigned to them at birth . . . ." Am. Compl., Ex. C (Holder Memo 2014), App. 1 n.1, ECF No. 6-3. "For example, a transgender man may have been assigned female at birth and raised as a girl, but identify as a man." *Id.* at Ex. D (OSHA Best Practices Guide to Restroom Access for Transgender Employees) ("OSHA Best Practice Guide"), App. 1, ECF No. 6-4. The Court attempts to use the parties' descriptions throughout this Order for the sake of clarity.
[4] The Guidelines refer to the documents attached to Plaintiffs' Amended Complaint: (1) Ex. A (DOE Bullying Memo 2010), ECF No. 6-1; (2) Ex. B (DOE Questions and Answers on Title IX and Sexual Violence Memo) ("DOE Q&A Memo"), ECF No. 6-2; (3) Ex. C ("Holder Memo 2014"), ECF No. 6-3, (4) Ex. D (OSHA Best Practice Guide), ECF No. 6-4; (5) Ex. H (EEOC Fact Sheet), ECF No. 6-8; and (6) Ex. J (DOJ/DOE Dear Colleague Letter), ECF No. 6-10.

expressly authorized separate restrooms on the basis of sex.   Section 106.33 provides: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."   34 C.F.R. § 106.33.   Plaintiffs assert the term sex in the pertinent statutes and regulations means the biological differences between a male and female.   Mot. Injunction 2, ECF No. 11.   Plaintiffs state that Defendants' swift move to supplant the traditional, biological meaning of sex with a definition based on gender identity through the Guidelines, coupled with Defendants' actions to enforce these new agency policies through investigations and compliance reviews, causes Plaintiffs to suffer irreparable harm for which a preliminary injunction is needed.   *Id.* at 3–8; Pls.' Reply 3–7, ECF No. 54.

Defendants contend that the Guidelines and recent enforcement actions are designed to prohibit sex discrimination on the basis of gender identity and are "[c]onsistent with the nondiscrimination mandate of [Title IX]," and that "these guidance documents . . . are merely expressions of the agencies' views as to what the law requires."   Defs.' Resp. 2–4, ECF No. 40. Defendants also contend that the Guidelines "are not legally binding, and they expose [P]laintiffs to no new liability or legal requirements" because DOE "has issued documents of this nature for decades, across multiple administrations, in order to notify schools and other recipients of federal funds about how the agency interprets the law and how it views new and emerging issues."   *Id.* at 4–5.[5]   Defendants also state that the "[g]uidance documents issued by [DOE] 'do not create or confer any rights for or on any person and do not impose any requirements beyond those required under applicable law and regulations'" and these documents expressly state that they do

---

[5] Defendants cited to U.S. Dep't of Educ., Office for Civil Rights, Sex Discrimination Policy Guidance, http://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/sex.html (last visited August 5, 2016) (discussing the purpose of guidance documents and providing links to guidance documents).

not carry the force of law.  *Id.* at 5 (citing Holder Memo 2, ECF No. 6-10, to clarify that "the best reading of Title VII's prohibition of sex discrimination is that it encompasses discrimination based on gender identity, including transgender status," but the memo "is not intended to otherwise prescribe the course of litigation or defenses that should be raised in any particular employment discrimination case").

### A.     TITLE IX

Title IX, enacted in 1972, is the landmark legislation which prohibits discrimination among federal fund recipients by providing that no person "shall, on the basis of sex, . . . be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 USC § 1681.  The legislative history shows Congress hailed Title IX as an indelible step forward for women's rights.  Mot. Injunction at 2–4.  After its passage, the DOE and its predecessor implemented a number of regulations which sought to enforce Title IX, chief among them, and at issue here, § 106.33.  *See G.G. ex rel Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 721 (4th Cir. 2016) (stating that the Department of Health, Education, and Welfare ("HEW") adopted its Title IX regulations in 1975 pursuant to 40 Fed. Reg. 24,128 (June 4, 1975), and DOE implemented its regulations in 1980 pursuant to 45 Fed. Reg. 30802, 30955 (May 9, 1980)).  Section 106.33, as well as several other related regulations, permit educational institutions to separate students on the basis of sex, provided the separate accommodations are comparable.

## II.     LEGAL STANDARDS

### A.     The Administrative Procedure Act (the "APA")

"The APA authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'"

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702).  "Where no other statute provides a private right of action, the 'agency action' complained of must be *final* agency action.'"  *Id*. at 61–62 (quoting 5 U.S.C. § 704).[6]  In the Fifth Circuit, "final agency action" is a jurisdictional threshold, not a merits inquiry.  *Texas v. Equal Employment Opportunity Comm'n*, No. 14-10949, 2016 WL 3524242 at *5 (5th Cir. June 27, 2016) ("*EEOC"*); s*ee also Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the United States*, 362 F.3d 333, 336 (5th Cir. 2004) ("If there is no 'final agency action,' a federal court lacks subject matter jurisdiction." (citing *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999))).

An administrative action is "final agency action" under the APA if: (1) the agency's action is the "consummation of the agency's decision making process;" and (2) "the action [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp*., 333 U.S. 103, 113 (1948); and *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  "In evaluating whether a challenged agency action meets these two conditions, this court is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'"  *EEOC*, 2016 WL 3524242, at *5; *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting

---

[6] Agency action is defined in 5 U.S.C. § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 551(13)).  "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear: 'an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy' (rule); 'a final disposition . . . in a matter other than rule making' (order); a 'permit . . . or other form of permission' (license); a 'prohibition . . . or . . . taking [of] other compulsory or restrictive action' (sanction); or a 'grant of money, assistance, license, authority,' etc., or 'recognition of a claim, right, immunity,' etc., or 'taking of other action on the application or petition of, and beneficial to, a person' (relief)."  *Id*. (quoting § 551(4), (6), (8), (10), (11)).

*Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)).   When final agency actions are presented for judicial review, the APA provides that reviewing courts should hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150–151 (1991).

### B.  Preliminary Injunction

The Fifth Circuit set out the requirements for a preliminary injunction in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  To prevail on a preliminary injunction, the movant must show: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest.  *Id.*; *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

To qualify for a preliminary injunction, the movant must clearly carry the burden of persuasion with respect to all four requirements.   *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).  If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001).  A movant who obtains a preliminary injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction.  Fed. R. Civ. P. 65(c).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court.  *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621

(5th Cir. 1985) (citing *Canal*, 489 F.2d at 572).  A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion."  *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  Even when a movant satisfies each of the four *Canal* factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court.  *Miss. Power & Light Co.*, 760 F.2d at 621.  The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.  *Id.*

## III.   ANALYSIS

Plaintiffs argue that: (1) Defendants skirted the notice and comment process—a necessity for legislative rules; (2) the new mandates are incompatible with Title VII and Title IX and the agencies are not entitled to deference; (3) the mandates violate the clear notice and anti-coercion requirements which the federal government may attach to spending programs; and (4) nationwide relief is necessary to prevent the irreparable harm Defendants will cause Plaintiffs. Mot. Injunction 2–3, ECF No. 11.

Defendants assert that Plaintiffs are not entitled to a preliminary injunction because: (1) Plaintiffs do not have standing to bring their claims; (2) this matter is not ripe for review; (3) Defendants' Guidelines do not violate the APA; (4) Plaintiffs cannot demonstrate irreparable harm and they have an alternative remedy; (5) Defendants did not violate the Spending Clause; (6) and an injunction would harm Defendants and third parties.  Defs.' Resp. 1–3, ECF No. 40. Defendants allege that should an injunction be granted, it should be implemented only to

Plaintiffs in the Fifth Circuit. *Id.* The Court addresses these issues, beginning with Defendants' jurisdictional arguments.[7]

### A. Jurisdiction

#### 1. Standing

Defendants allege that "[P]laintiffs' suit fails the jurisdictional requirements of standing and ripeness . . . because they have not alleged a cognizable concrete or imminent injury." Defs.' Resp. 12, ECF No. 40 (citing *Lopez v. City of Hous.*, 617 F.3d 336, 342 (5th Cir. 2015)). Defendants allege "a plaintiff must demonstrate that it has 'suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Defendants contend that "[t]he agencies have merely set forth their views as to what the law requires" regarding whether gender identity is included in the definition of sex, and "[a]t this stage, [P]laintiffs have alleged no more than an abstract disagreement with the agencies' interpretation of the law," since "[n]o concrete situation has emerged that would permit the Court to evaluate [P]laintiffs' claims in terms of specific facts rather than abstract principles." *Id.* at 13–14.

Defendants also allege that Plaintiffs "have [not] identified any enforcement action to which they are or are about to be subject in which a defendant agency is seeking to enforce its

---

[7] The parties have requested that the Court provide expedited consideration of the preliminary injunction. The briefing on this request was completed on August 3, 2016, and the matter was not ripe until after the hearing was completed on August 12, 2016. Because further legal issues concerning the basis for Plaintiffs' Spending Clause claim were raised at the hearing and require further briefing, the Court will not await that briefing at this time. *See* Hr'g Tr. 35, 44, 52–53 (discussing new program requirements and whether a new program is the same as annual grants). Therefore, the Spending Clause issue is not addressed in this Order. *See* ECF Nos. 11–12. Finally, where referenced, Title VII is used to help explain the legislative intent and purpose of Title IX because the two statutes are commonly linked. *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 546 (1982).

view of the law. As such, any injury alleged by plaintiffs is entirely speculative, as it depended

on the initiation of some kind of enforcement action . . . which may never occur." Defs.' Resp.

14, ECF No. 40.

Plaintiffs state that Defendants are affirmatively using the Guidelines to force compliance

as evidenced by various resolution agreements reached in enforcement cases across the country

and from the litigation against the state of North Carolina, all of which is designed to force

Plaintiffs to amend their policies to comply or place their federal funding in jeopardy.  Hr'g Tr.

at 78.  Plaintiffs argue they are clearly the object of the Defendants' Guidelines, and those

directives run afoul of various state constitutional and statutory codes which permit Plaintiffs to

exercise control of their education premises and facilities.[8]  Hr'g Tr. at 77.  Plaintiffs contend all

---

[8] Plaintiffs' motion provides the following citations to their state laws which give them legal control over the management of the safety and security policies of educational buildings in their states and which the Guidelines will compel them to disregard.  Texas cites to Tex. Const. art 7 § 1 ("[I]t shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."); Tex. Educ. Code §§ 4.001(b) (stating the objectives of public education, including Objective 8: "School campuses will maintain a safe and disciplined environment conducive to student learning."); 11.051 ("An independent school district is governed by a board of trustees who, as a corporate body, shall: (1) oversee the management of the district; and (2) ensure the superintendent implements and monitors plans, procedures, programs, and systems to achieve appropriate, clearly defined, and desired results in the major areas of district operations."); 11.201 (listing the duties of the superintendent including "assuming administrative responsibility and leadership for planning, organization, operation, supervision, and evaluation of the education programs, services, and facilities of the district . . . ."); and 46.008 ("The commissioner shall establish standards for adequacy of school facilities. The standards must include requirements related to space, educational adequacy, and construction quality."); Pls.' Reply Ex. (Belew Decl.) 4, ECF No. 52-1 (stating the Texas Education Agency ("TEA") is responsible for "[t]he regulation and administration of physical buildings and facilities within Texas public schools" among other duties).  Plaintiffs also provided an exhaustive list of similar state constitution citations, statutes, codes, and regulations that grant each Plaintiff the power to control the regulations that govern the administration of public education and public education facilities. *See* Mot. Injunction 9–11 n. 9-22, ECF No. 11 (quoting Ala. Code §§ 16-3-11, 16-3-12, 16-8-8–16-8-12 ("Alabama law authorizes state, county, and city boards of education to control school buildings and property."); Wis. stat. chs. 115, 118 ("In Wisconsin, local school boards and officials govern public school operations and facilities . . . with the Legislature providing additional supervisory powers to a Department of Public Instruction."); Wis. Stat. § 120.12(1) ("School boards and local officials are vested with the 'possession, care, control and management of the property and affairs of the school district, and must regulate the use of school property and facilities."); Wis. Stat. § 120.13(17) ("Wisconsin law also requires school boards to '[p]rovide and maintain enough suitable and separate toilets and other sanitary

of this confers standing according to the Fifth Circuit's opinion in *Texas v. Equal Employment Opportunity Commission*, No. 14-10940, 2016 WL 3524242 (5th Cir. June 27, 2016). Hr'g Tr. 78.

Defendants counter that *EEOC* was wrongly decided and, regardless, the facts here are distinguishable from that case.[9] *Id.* Defendants primarily distinguish *EEOC* from this case based on the *EEOC* majority's view that the "guidance [at issue] contained a 'safe harbor' [provision]" and "the [guidance at issue had] the immediate effect of altering the rights and obligations of the 'regulated community' . . . by offering them [] detailed and conclusive means

---

facilities for both sexes.'"); W. Va. Const. art. XII, § 2; W. Va. code § 18-5-1, 18-5-9(4) ("West Virginia law establishes state and local boards of education . . . and charges the latter to ensure the good order of the school grounds, buildings, and equipment."); Tenn. Code Ann. §§ 49-12, 1-302, 49-1-201 ("In Tennessee, the state board of education sets statewide academic policies, . . . and the department of education is responsible for implementing those polices[, while] [e]ach local board of education has the duty to "[m]anage and control all public schools established or that may be established under its jurisdiction."); Tenn. Code Ann. §§ 49-1-201(a)-(c)(5), 49-2-203(a)(2) ("The State Board is also responsible for "implementation of law" established by the General Assembly, . . . and ensuring that the 'regulations of the state board of education are faithfully executed.'"); Ariz. Rev. Stat. §§ 15-203(A)(1), 15-341(A)(1), 15-341(A)(3) ("Arizona law establishes state and local boards of education, . . . and empowers local school districts to '[m]anage and control the school property within its district.'"); Me. Rev. Stat. tit. 20-A, §§ 201–406, 1001(2), 6501 ("Maine provides for state and local control over public education. While state education authorities supervise the public education system, control over management of all school property, including care of school buildings[,] . . . [a]nd Maine law provides requirements related to school restrooms."); Okla. Const. art. XIII, §§ 5, 5-117 ("Oklahoma law establishes a state board of education to supervise public schools. Local school boards are authorized by the board to operate and maintain school facilities and buildings."); La. Const. art VIII, § 3, LSA-R. Stat. § 17:100.6 ("In Louisiana, a state board of education oversees public schools, . . .while local school boards are charged with the management, administration, and control of buildings and facilities within their jurisdiction."); Utah Code §§ 53A-1-101, 53A-3-402(3) ("Utah law provides for state and local board of educations, . . . and authorizes the local boards to exercise control over school buildings and facilities."); Ga. Code § 20-2-59, 520 ("Georgia places public schools under the control of a board of education, . . . and delegates control over local schools, including the management of school property, to county school boards govern local schools."); Miss. Code Ann. § 37-7-301 ("In Mississippi, the state board of education oversees local school boards, which exercise control over local school property."); Ky. Rev. Stat. §§ 156.070, 160.290 ("In Kentucky, the state board of education governs the state's public school system, . . . while local boards of education control "*all* public school property" within their jurisdictions, . . and can make and adopt rules applicable to such property.").

[9] *Id.* at 14 ("[T]he government respectfully disagrees with that decision for many of the reasons stated in Judge Higginbotham's dissenting opinion, and . . . EEOC is distinguishable from this case in important respects."); Hr'g Tr. 53 ("Let me say at the outset . . . the Government disagrees with that decision.").

to avoid an adverse EEOC finding."   Defs.' Resp. 15, ECF No. 40.   Defendants claim that the same kind of facts are not present here.   Defendants contend further that "the [transgender] guidance documents do not provide 'an exhaustive procedural framework,' [or] . . . a safe harbor, but merely express[] the agencies' opinion about the proper interpretation of Title VII and Title IX."   *Id.*   Thus, they argue, the Court lacks jurisdiction and should decline to enter a preliminary injunction.   *Id.*[10]

The Court finds that Plaintiffs have standing.   "The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).   Constitutional standing requires a plaintiff to establish that she has suffered an injury in fact traceable to the defendant's actions that will be redressed by a favorable ruling.   *Lujan*, 504 U.S. at 560–61.   The injury in fact must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical."   *Id.* at 560.   When "a plaintiff can establish that it is an 'object' of the agency regulation at issue, 'there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'"   *EEOC*, 2016 WL 3524242 at *2; *Lujan*, 504 U.S. at 561–62.   The Fifth Circuit provided, "[w]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense."   *Id.* at *6 (quoting *Contender Farms LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015)).

In *EEOC*, Texas sued the EEOC over employment guidance the EEOC issued to employers concerning their Title VII obligations.   In response, the EEOC argued Texas lacked standing because the guidance was advisory only and imposed no affirmative obligation.   The

---

[10] The Court addresses Defendants' claim that Plaintiffs have an adequate alternate remedy in Section III.A.4.

Fifth Circuit held that Texas had standing to seek relief because it was an object of the EEOC's guidance as the guidance applied to Texas as an employer. *Id*. at *4.

This case is analogous. Defendants' Guidelines are clearly designed to target Plaintiffs' conduct. At the hearing, Defendants conceded that using the definition in the Guidelines means Plaintiffs are not in compliance with their Title VII and Title IX obligations. Hr'g Tr. 74. Defendants argue that that this does not confer standing because the Guidelines are advisory only. Defs.' Resp. 14, ECF No. 40. But this conflates standing with final agency action and the Fifth Circuit instructed district courts to address the two concepts separately. *See EEOC*, 2016 WL 3524242 at *3. Defendants' Guidelines direct Plaintiffs to alter their policies concerning students' access to single sex toilet, locker room, and shower facilities, forcing them to redefine who may enter apart from traditional biological considerations.[11] Plaintiffs' counsel argued the Guidelines will force Plaintiffs to consider ways to build or reconstruct restrooms, and how to accommodate students who may seek to use private single person facilities, as other school districts and employers who have been subjected to Defendants' enforcement actions have had to do. Hr'g Tr. 80–81. That the Guidelines spur this added regulatory compliance analysis satisfies the injury in fact requirement. *EEOC*, 2016 WL 3524242 at *4 ("[T]he guidance does, at the very least, force Texas to undergo an analysis, agency by agency, regarding whether the certainty of EEOC investigations . . . overrides the State's interest . . . . [T]hese injuries are sufficient to confer constitutional standing, especially when considering Texas's unique position as a sovereign state . . . ."). That Plaintiffs have standing is strengthened by the fact that Texas and

---

[11] For example, Plaintiffs list Wisconsin's state statutes regarding this matter, which state that school boards are required to "[p]rovide and maintain enough suitable and separate toilets and other sanitary facilities for both sexes." Mot. Injunction 10 n.9, ECF No. 11 (citing Wis. Stat. s. 120.12(12)). Plaintiffs interpret this to mean that Wisconsin has the authority to maintain separate intimate facilities that correspond to a person's biological sex. *Id.*

other Plaintiffs have a "stake in protecting [their] quasi-sovereign interests . . . [as] special solicitude[s]." *Mass. v. E.P.A.*, 549 U.S. 497, 520 (2007) ("Congress has moreover recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious. § 7607(b)(1).  Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis.").

Accordingly, Plaintiffs have standing to pursue this lawsuit.

2.   Ripeness

Defendants also argue that this case is not ripe for review.  According to Defendants, this Court should avoid premature adjudication to avoid entangling itself in abstract disagreements over administrative policies.  Defs.' Resp. 13, ECF No. 40 (citing *Nat'l Park Hosp. Ass'n v. Dep.'t Interior*, 538 U.S. 803, 807 (2003)).  Defendants argue that more time should be given to allow the administrative process to run its course and develop more facts before the Court can address this case.  *Id.* at 13 (citing *Abbott Labs*, 387 U.S. 136, 149 (1967)); Hr'g Tr. 62. Plaintiffs counter that, taking into account recent events where Defendants have investigated other entities that do not comply with the Guidelines, this case is ripe.  Pls.' Reply 4–7, ECF No. 52; Hr'g Tr. 79.

"A challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'"  *Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir. 2007) (citing *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812).

14

The Court finds that Plaintiffs' case is ripe for review. Here, the parties agree that the questions at issue are purely legal. Hr'g Tr. 61. Defendants asserted at the hearing that Plaintiffs are not in compliance with their obligations under Title IX given their refusal to change their policies. Hr'g Tr. 74. Furthermore, for the reasons set out below, the Court finds that Defendants' actions amount to final agency action under the APA.[12] *EEOC*, 2016 WL 3524242 at *11 n.9 ("Having determined that the Guidance is 'final agency action' under the APA, it follows naturally that Texas's APA claim is ripe for review. Texas's challenge to the EEOC Guidance is a purely legal one, and as such it is unnecessary to wait for further factual development before rendering a decision.") (Internal citations omitted).

Finally, the facts of this case have sufficiently developed to address the legal impact Defendants' Guidelines have on Plaintiffs' legal questions in this case. *Texas*, 497 F.3d at 498–99. The only other factual development that may occur, given Defendants' conclusion Plaintiffs are not in legal compliance, is whether Defendants actually seek to take action against Plaintiffs. But it is not clear how waiting for Defendants to actually take action would "significantly advance [the court's] ability to deal with the legal issues presented." *Texas*, 497 F.3d at 498–99. As previously stated, Defendants' Guidelines clash with Plaintiffs' state laws and policies in relation to public school facilities and Plaintiffs have called into question the legality of those Guidelines. Mot. Injunction 9–12, ECF No. 11. Therefore, "further factual development would not 'significantly advance the courts ability to deal with the legal issues presented.'" *Texas*, 497 F.3d at 498−99. Accordingly, the Court finds that this case is ripe for review.

3.    Final Agency Action under the APA

---

[12] The Court further addresses this issue in section III.A.3.

The Court now evaluates whether the Guidelines are final agency action meeting the jurisdictional threshold under the APA. *EEOC*, 2016 WL 3524242 at \*5. Defendants argue that there has been no final agency action as the documents in question are merely "paradigmatic interpretive rules, exempt from the notice-and-comment requirements of the APA." Defs.' Resp. 18, ECF No. 40. Defendants also allege that the Guidelines are "[v]alid interpretations of the statutory and regulatory authorities on which they are premised" because although Title IX and § 106.33 provide that federal recipients may provide for separate, comparable facilities, the regulation and statute "do not address how they apply when a transgender student seeks to use those facilities . . . ." *Id.* at 20–21.

Plaintiffs allege that the agencies' Guidelines are binding nationwide and the Defendants' enforcement patterns in various states clearly demonstrate that legal actions against those that do not comply will follow. Mot. Injunction 9–12, ECF No. 11; Reply 2–8, ECF No. 52. Plaintiffs identify a number of similar cases where Defendants have investigated schools that refused to comply with the new Guidelines and where they sued North Carolina over its state law which, in part, made it legal to require a person to use the public restroom according to their biological sex. Reply 6, ECF No. 52.

An administrative action is "final agency action" under the APA if: (1) the agency's action is the "consummation of the agency's decision making process;" and (2) "the action [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78. "In evaluating whether a challenged agency action meets these two conditions, the court is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *EEOC*, 2016 WL 3524242 at \*5 (quoting *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011)).

The Court finds that the Guidelines are final agency action under the APA. Defendants do not dispute that the Guidelines are a "consummation" of the agencies' decision-making process. Hr'g Tr. 61; *Nat'l Pork Producers Council v. E.P.A.*, 635 F.3d 738, 755–56 (5th Cir. 2011) (citing *Her Majesty the Queen in Right of Ontario v. Envtl. Prot. Agency*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (deciding that EPA guidance letters constitute final agency actions as they "serve[d] to confirm a definitive position that has a direct and immediate impact on the parties . . . .")).

The second consideration is also satisfied in this case because legal consequences flow from the Defendants' actions. Defendants argue no legal consequences flow to Plaintiffs because there has been no enforcement action, or threat of enforcement action. Hr'g Tr. 71. The Fifth Circuit held in *EEOC* however that "an agency action can create legal consequences even when the action, in itself, is disassociated with the filing of an enforcement proceeding, and is not authority for the imposition of civil or criminal penalties." 2016 WL 3524242 at *8. According to the Fifth Circuit, "'legal consequences' are created whenever the challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself to potential liability." *Id.* (citing *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1814–15 (May 31, 2016) (holding that using the pragmatic approach, an agency action asserting that plaintiff's land was subject to the Clean Water Act's permitting process was a final agency action which carried legal consequences). The Fifth Circuit concluded that "[i]t is also sufficient that the Enforcement Guidance [at issue in *EEOC*] has the immediate effect of altering the rights and obligations of the 'regulated community' (i.e. virtually all state and private employers) by offering them a detailed and conclusive means to avoid an adverse EEOC finding . . . ." 2016 WL 3524242 at * 6.

In this case, although the Guidelines provide no safe harbor provision, the DOJ/DOE Letter provides not only must Plaintiffs permit individuals to use the restrooms, locker rooms, showers, and housing consistent with their gender identity, but that they find *no* safe harbor in providing transgender students individual-user facilities as an alternative accommodation. Indeed, the Guidelines provide that schools may, consistent with Title IX, make individual-user facilitates available for *other* students who "voluntarily seek additional privacy." *See* DOJ/DOE Letter 3, ECF No. 6-10. Using a pragmatic and common sense approach, Defendants' Guidelines and actions indicate that Plaintiffs jeopardize their federal education funding by choosing not to comply with Defendants' Guidelines.[13] *EEOC*, 2016 WL 3524242 at *8 ("Instead, 'legal consequences' are created whenever the challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself to potential liability."); *Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1056–57 (5th Cir. 1993) (stating that "[w]ere HUD to formally define the phrase [at issue] . . . [the plaintiffs] would undoubtedly have the right to review HUD's final agency action under § 702 [of the APA]"); *Frozen Foods Express v. United States*, 351 U.S. 40, 44–45 (1956) (holding an order specifying which commodities the Interstate Commerce Commission believed were exempt was final agency action, even though the order simply gave notice of how it would interpret the statute and would apply only when an action was brought): *compare with AT&T Co. v. E.E.O.C*, 27 F.3d 973, 975–76 (D.C. Cir. 2001) (holding that the EEOC's compliance manual was not a final agency action because the policy guidance did not intend to bind EEOC staff in their official conduct, the

---

[13] The Holder Memorandum concludes, "For these reasons, the [DOJ] will no longer assert that Title VII's prohibition of discrimination based on sex does not encompass gender identity *per se* (including transgender discrimination)." Holder Memo 2, ECF No. 6-3. Other guidance from Defendants take similar actions. *See also* DOJ/DOE Letter 4–5, ECF No. 6-10.

manual simply expressed the agency's view with respect to employers' actions and compliance with Title VII).

Accordingly, the Court finds that Defendants' Guidelines are final agency action such that the jurisdictional threshold is met. *EEOC*, 2016 WL 3524242 at *5.

### 4.   Alternative Legal Remedy

Defendants also contend that district court review is precluded and Plaintiffs should not be allowed to avoid the administrative process by utilizing the APA at this time. Defs.' Resp. 16, ECF No. 40. Defendants allege that "review by a court of appeals is an 'adequate remedy' within the meaning of the APA," and "[s]ection 704 of the APA thus prevents plaintiffs from circumventing the administrative and judicial process Congress provided them." *Id.* Defendants argue "Congress has precluded district court jurisdiction over pre-enforcement actions like this." *Id.* at 17. Defendants cite several cases, including the Supreme Court's opinions in *Thunder Basin v. Reich*, 510 U.S. 200 (1994) and *Elgin v. Department of Treasury*, 132 S.Ct. 2126 (2012), in support of this argument.[14]

Defendants' assertion that there is no jurisdiction to review Plaintiffs' APA claims fails and their reliance on *Thunder Basin*, *Elgin*, and the other cited cases is misplaced. In *Thunder Basin*, the Supreme Court held that the Mine Act's statutory review scheme precluded the district

---

[14] Defendants also assert *NAACP v. Meese* supports this argument but the Court disagrees. In that case, the plaintiffs sought to enjoin the Attorney General from reopening or agreeing to reopen any consent decree in any civil rights action pending in any other court. The district court denied this request, holding such actions would violate principles of separation of powers and comity. 615 F. Supp. 200, 201–02 (D.D.C. 1985) ("Plaintiffs' action must fail (1) under the principle of the separation of powers, and (2) because this Court lacks authority to interfere with or to seek to guide litigation in other district courts throughout the United States."). The *Meese* court also concluded there was no final agency action to enjoin and, by definition, there would be an alternative legal remedy related to those cases where a consent decree existed because those decrees were already subject to a presiding judge. *Id.* at 203 n.9. Additionally, Defendants reliance on *Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953 (5th Cir. 1991) does not apply because there was no final agency action in that case.

court from exercising subject-matter jurisdiction over a pre-enforcement challenge. To determine whether pre-enforcement challenges are prohibited courts look to whether this "intent is 'fairly discernible in the statutory scheme.'" *Thunder Basin*, 510 U.S. at 207 (quoting *Block v. Community Nutrition Institute*, 467 U.S. 340, 351 (1984)). The Supreme Court held that "[w]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history . . . and whether the claims can be afforded meaningful review." *Id.* (internal citation omitted).

Although the Mine Act was silent about pre-enforcement claims, the Supreme Court held that "its comprehensive enforcement structure demonstrate[d] that Congress intended to preclude challenges," and the Mine Act "expressly authorize[d] district court jurisdiction in only two provisions . . . [which allowed] the Secretary [of Labor] to enjoin [] violations of health and safety standards and to coerce payment of civil penalties." *Id.* at 209. Thus, plaintiffs had to "complain to the Commission and then to the court of appeals." *Id.* (italics omitted).

*Elgin* reached a similar conclusion, holding that the Civil Service Reform Act ("CSRA") was the exclusive avenue to judicial review for petitioners' claims against the Treasury Department. 132 S. Ct. 2126, 2128 ("Just as the CSRA's 'elaborate' framework [citation omitted] demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA *grants* administrative and judicial review.").

No similar elaborate statutory framework exists covering Plaintiffs' claims. Neither Title VII nor Title IX presents statutory schemes that would preclude Plaintiffs from bringing these claims in federal district court. Indeed, the Supreme Court has held that Title IX's enforcement provisions, codified at Title 20 U.S.C. §§ 1681–1683, does not provide the exclusive statutory

remedy for violations. *See Cannon v. Univ. of* Chicago, 441 U.S. 677 (1979) (holding that Title

IX did not preclude a private right of action for damages).  Given Defendants lack of authority to

the contrary, the presumption of reviewability for all agency actions applies.  *EEOC*, 2016 WL

3524242 at *11 (citing *Abbott Labs.*, 387 U.S. at 140) ("To wholly deny judicial review,

however, would be to ignore the presumption of reviewability, and to disregard the Supreme

Court's instruction that courts should adopt a pragmatic approach for the purposes of

determining reviewability under the APA.").

Having concluded that Plaintiffs claims are properly subject to judicial review, the Court

next evaluates whether a preliminary injunction is appropriate.

### B.      Preliminary Injunction

#### 1.      Likelihood of Success on the Merits

The first consideration is whether Plaintiffs have shown a likelihood of success on the

merits for their claims.  Plaintiffs aver that they have shown a substantial likelihood that they

will prevail on the merits because Defendants have violated the APA by (1) circumventing the

notice and comment process and (2) by issuing final agency action that is contrary to law.  Mot.

Injunction 12–16, ECF No. 11.  Furthermore, Plaintiffs contend that Defendants' new policies

are not valid agency interpretations that should be granted deference because "[a]gencies do not

receive deference where a new interpretation conflicts with a prior interpretation."  Pls.' Reply

11, ECF No. 52 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)).

Defendants contend that their actions do not violate the APA because the Guidelines are

interpretive rules and are therefore exempt from the notice and comment requirements.  Defs.'

Resp. 12–18, ECF No. 40.  Defendants argue the Guidelines are exempt because they do not

carry the force of law, even though "the agencies' interpretations of the law are entitled to some

deference." Further, they argue because their interpretation is reasonable, this interpretation is entitled to deference.[15] Defendants also assert they did not act contrary to law because the Guidelines are valid interpretations of Title IX as the statute and regulations "do not address how [the laws] apply when a transgender student seeks to use those facilities" or "how a school should determine a transgender student's sex when providing access to sex-segregated facilities." *Id.* at 20–21. Thus, according to Defendants, this situation presents an ambiguity in the regulatory scheme and Defendants are allowed to provide guidelines to federal fund recipients on this matter. *Id.* at 21.[16]

In their Reply, Plaintiffs counter that DOE's implementing regulation, § 106.33, is not "ambiguous[,] [a]s a physiologically-grounded regulation, it covers every human being and therefor all those within the reach of Title IX." Reply 8, ECF No. 52. They contend further, "[t]o create legal room to undo what Congress (and preceding regulators) had done, Defendants

---

[15] Defendants argue the Court should be guided in this decision by the Fourth Circuit's decision in *G.G. ex rel Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016) ("*G.G.*"). Defendants contend the Fourth Circuit's majority opinion in *G.G.* should be followed as it provides the proper analysis. The Supreme Court recalled the Fourth Circuit's mandate and stayed the preliminary injunction entered by the district court in that case. *See Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, No. 16-A-52, 2016 WL 4131636 at *1 (Aug. 3, 2016) (Breyer, J. concurring) ("In light of the facts that four Justices have voted to grant the application referred to the Court by THE CHIEF JUSTICE, that we are currently in recess, and that granting a stay will preserve the status quo (as of the time the Court of Appeals made its decision) until the Court considers the forthcoming petition for certiorari, I vote to grant the application as a courtesy."). The Supreme Court takes such actions only on the rarest of occasions. *Bd. of Ed. of City School Dist. of City of New Rochelle v. Taylor*, 82 S.Ct. 10, 10 (1961) ("On such an application, since the Court of Appeals refused the stay '* * *' this court requires an extraordinary showing, before it will grant a stay of the decree below pending the application for a certiorari."); *Russo v. Byrne*, 409 U.S. 1219, 1221 (1972) ("If the application presents frivolous questions it should be denied. If it tenders a ruling out of harmony with our prior decisions, or questions of transcending public importance, or issues which would likely induce this Court to grant certiorari, the stay should be granted."). Because it is impossible to know the precise issue (s) that prompted the Supreme Court to grant the stay, it is difficult to conclude that *G.G.* would control the outcome here. *See New Motor Vehicle Bd. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (declaring it is very difficult to predict anticipated Supreme Court decision). Nevertheless, the Court has reviewed the opinion and considers the well-expressed views of each member of the panel in reaching the decision in this case.

[16] Defendants characterize their Guidelines as, "supply[ing] 'crisper and more detailed lines' than the statutes and regulations that they interpret," without "alter[ing] the legal obligations of regulated entities." *Id.* at 20 (citing *Am. Mining Cong. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)).

manufacture an ambiguity, claiming that 'these regulations do not address how they apply when a transgender student seeks to use those facilities . . . .'" *Id.* (citing Defs.' Response 20–21, ECF No. 40). Plaintiffs continue, "[i]n enacting Title IX, Congress was concerned that women receive the same opportunities as men, [t]hus, Congress utilized 'sex' in an exclusively biological context[,] [and] "[t]he two sexes are not fungible." *Id.* at 8–9 (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946). It is the biological differences between men and women, Plaintiffs allege, that led Congress in 1972 to "permit differential treatment by sex only[,]" provide a basis for DOE "to approve 'separate toilet, locker rooms, and shower facilities on the basis of sex" in § 106.33, and led the Supreme Court "to conclude that educational institutions must 'afford members of each sex privacy from the other sex.'" *Id.* at 9 (quoting 118 Cong. Rec. 5807 (1972)); *United States v. Virginia*, 518 U.S., 550 n.19 (1996)).

The Court finds that Plaintiffs have shown a likelihood of success on the merits because: (1) Defendants bypassed the notice and comment process required by the APA; (2) Title IX and § 106.33's text is not ambiguous; and (3) Defendants are not entitled to agency deference under *Auer v. Robbins*, 519 U.S. 452 (1997).[17]

i.      *Notice and Comment under the APA*

Defendants state that "[t]he APA does not require agencies to follow notice and comment procedures in all situations [, and the APA] specifically excludes interpretive rules and statements of agency policy from these procedures." Defs.' Resp. 17–18, ECF No. 40. Defendants allege "[t]he guidance documents are . . . paradigmatic interpretive rules, exempt from the notice-and-comment requirements of the APA." *Id.* at 18. According to Defendants,

---

[17] Defendants' counsel stated at the hearing that Defendants would not be entitled to *Chevron* deference for the Guidelines. *See* Hr'g Tr. 72. Thus, the Court addresses only Defendants' claim that they are entitled to *Auer* deference when interpreting § 106.33.

"the interpretations themselves do not carry the force of law . . . ." *Id.* at 19.  Defendants rely on *G.G.*, 822 F.3d 709, 720 (4th Cir. 2016) to support their claim that DOE's "interpretation of the single-sex facility regulation implementing Title IX is reasonable, and does not conflict with those regulations in any way." *Id.*

Plaintiffs contend that Defendants' rules are legislative because: "(1) they grant rights while also imposing significant obligations; (2) they amend prior legislative rules or longstanding agency practice; and (3) bind the agencies and regulated entities," requiring them to go through the notice and comment process.  Mot. Injunction 12, ECF No. 11.

The APA requires agency rules to be published in the Federal Register and that the public be given an opportunity to comment on them.  5 U.S.C. §§ 553(b) −(c).  This is referred to as the notice and comment requirement.  The purpose is to permit the agency to understand and perhaps adjust its rules based on the comments of affected individuals.  *Prof'ls and Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir.1995).  However, not every action an agency takes is required to go through the notice and comment process.  "The APA divides agency action, as relevant here, into three boxes: legislative rules, interpretive rules, and general statements of policy."  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).  "Legislative rules generally require notice and comment, but interpretive rules and general statements of policy do not."  *Id.* (citing 5 U.S.C. § 553).  "In order for a regulation to have the 'force and effect of law,' it must have certain substantive characteristics and be the product of certain procedural requisites."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–03, (1979).

The APA does not define a legislative or "substantive" rule, but in *Morton v. Ruiz*, 415 U.S. 199, 234 (1974), the Supreme Court held that a substantive rule or "a legislative-type rule," is one that "affect[s] individual rights and obligations."  *Id.* at 232.  The Supreme Court also

held, "the promulgation of these regulations must conform with any procedural requirements imposed by Congress." *Chrysler Corp.*, 441 U.S. at 303.  Thus, agency discretion is limited not only by substantive, statutory grants of authority, but also by the procedural requirements which "assure fairness and mature consideration of rules of general application." *Id.* (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969)).   If a rule is substantive, notice and comment requirements must be adhered to scrupulously.  *Prof'ls and Patients for Customized Care*, 56 F.3d at 595.

"[L]egislative rules (and sometimes interpretive rules) may be subject to pre-enforcement review" because they subject a party to a binding obligation which can be the subject of an enforcement action.  *McCarthy*, 758 F.3d at 251. ("An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule . . . .").  The APA treats interpretive rules and general statements of policy differently.  *Id.*  ("As to interpretive rules, an agency action that merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties, is an interpretive rule.").[18]

Courts have focused on several factors to evaluate whether rules are interpretative or legislative.  Courts analyze the agency's characterization of the guidance and post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties.  *McCarthy*, 758 F.3d at 252−53.  However, "the most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated

---

[18] *Catawba Cty.* provides: "An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy.")

entities." *McCarthy*, 758 F.3d at 252 (quoting *Catawba Cty. v. EPA*, 571 F.3d 20, 33–34; *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)).   "A touchstone of a substantive rule is that it establishes a binding norm." *Prof'ls and Patients for Customized Care*, 56 F.3d at 596; *see also Texas v. United States*, 809 F.3d 134, 202 (5th Cir. 2015) (King, J., dissenting) (declaring that an agency action establishing binding norms which permit no discretion is a substantive rule requiring notice and comment).   If agency action "draws a 'line in the sand' that, once crossed, removes all discretion from the agency" the rule is substantive.  *Id.* at 601.

Here, the Court finds that Defendants rules are legislative and substantive.   Although Defendants have characterized the Guidelines as interpretive, post-guidance events and their actual legal effect prove that they are "compulsory in nature."  *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000);[19] *see also Prof'ls and Patients for Customized Care*, 56 F.3d at 596 (the label an agency places on its exercise of administrative power is not conclusive, rather it is what the agency does with that policy that determines the type of action). Defendants confirmed at the hearing that schools not acting in conformity with Defendants' Guidelines are not in compliance with Title IX.  Hr'g Tr. 71.  Further, post-Guidelines events, where Defendants have moved to enforce the Guidelines as binding, buttress this conclusion.  *Id.* at 7; Mot. Injunction 15–16, ECF No. 11; Reply 4–8, ECF No. 52.   The information before the Court demonstrates Defendants have "drawn a line in the sand" in that they have concluded Plaintiffs must abide by the Guidelines, without exception, or they are in breach of their Title IX obligations.   Thus, it would follow that the "actual legal effect" of the Guidelines is to force

---

[19] In *Appalachian Power*, the D.C. Circuit held that an EPA guidance was a legislative rule despite the guidance document's statement that it was advisory.  The Court analyzed the document as a whole and found that "the entire Guidance, from beginning to end—except the last paragraph—reads like a ukase. It commands, it requires, it orders, it dictates."  208 F.3d at 1022-23.  Similarly, the DOJ/DOE Letter uses the words "must," and various forms of the word "require" numerous times throughout the document. Am. Compl. Ex. J (DOJ/DOE Letter), ECF No. 6-10.

Plaintiffs to risk the consequences of noncompliance.  *McCarthy*, 758 F.3d at 252; *Catawba Cty.*, 571 F.3d at 33–34; *Gen. Elec. Co.*, 290 F.3d at 382; *see also Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).  Plaintiffs, therefore, are legally affected in a way they were not before Defendants issued the Guidelines.  The Guidelines are, in practice, legislative rules—not just interpretations or policy statements because they set clear legal standards. *Panhandle Producers and Royalty Owners Ass'n v. Econ. Regulatory Admin*, 847 F.2d 1168, 1174 (5th Cir. 1988) (stating that a substantive rule is one that establishes standards of conduct that carry the force of law).  As such, Defendants should have complied with the APA's notice and comment requirement.  5 U.S.C. § 553; *Nat'l Min. Ass'n*, 758 F.3d at 251; *Chrysler Corp.*, 441 U.S. at 301–03.  Permitting the definition of sex to be defined in this way would allow Defendants to "create de facto new regulation" by agency action without complying with the proper procedures.  *Christensen v. Harris Cty.*, 529 U.S. 576, 586−88 (2000).  This is not permitted.

Accordingly the Court finds that Plaintiffs would likely succeed on the merits that Defendants violated the notice and comment requirements of the APA.

ii.      *Agency Action Contrary to Contrary to Law (5 U.S.C. § 553)*

Plaintiffs contend that Defendants' Guidelines are contrary to the statutory and regulatory text, Congressional intent, and the plain meaning of the term.  Mot. Injunction 14, ECF No. 11. When an agency acts contrary to law, its action must be set aside.  5 U.S.C. § 706(2)(A). Plaintiffs argue that Defendants' interpretation of the meaning of the term "sex" as set out in the Guidelines contradicts its meaning in Title VII, Title IX, and § 106.33.  They assert "the meaning of the terms 'sex,' on the one hand, and 'gender identity,' on the other, both now and at the time

27

Titles VII and IX were enacted, forecloses alternate constructions."  Mot. Injunction 16, ECF

No. 11 (citing *Thomas Jefferson Univ.*, 512 U.S. at 512.  They also allege that the ordinary

meaning of the term controls.  *Id.* at 17 (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179,

187 (1995)).

Defendants contend that Plaintiffs' arguments for legislative history and intent at the time

of passage are irrelevant.  Hr'g Tr. 33 ("But it may very well be that Congress did not intend the

law to protect transgender individuals. [But,] . . . as the Supreme Court has made it absolutely

clear in *Oncale*, the fact that Congress may have understood the term sex to mean anatomical sex

at birth is largely irrelevant.")  Defendants also allege that "Title IX and Title VII should be

construed broadly" to protect any person, including transgendered persons, from discrimination.

Hr'g Tr. 33–34.

The starting point to analyze this dispute begins with the actual text of the statute or

regulation, where the words should be given their ordinary meaning.  *Desert Palace, Inc. v.

Costa*, 539 U.S. 90, 98 (2003) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–

54 (1992)).  When the words are unambiguous, the "judicial inquiry is complete."  *Id.* (quoting

*Rubin v. United States*, 449 U.S. 424, 430 (1981)).  The pertinent statutory text at issue in this

case provides: "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681.  Title IX

expressly permits educational institutions to maintain separate living facilities for the different

sexes.  *Id.* at § 1686.  The other language at issue comes from one of the DOE regulations

promulgated to implement Title IX, which states: "A recipient may provide separate toilet,

locker room, and shower facilities on the basis of sex, but such facilities provided for students of

one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

Defendants assert the Guidelines simply provide clarity to an ambiguity in this regulation, and that ambiguity is how to define the term sex when dealing with transgendered students. Defs.' Resp. 20, ECF No. 40. Because they contend the regulation is ambiguous, Defendants argue "[f]oundational principles of administrative law instruct [the Court] to give controlling weight to [their] interpretations of their own ambiguous regulations unless [they are] plainly erroneous." *Id.*

Plaintiffs contend the text of both Title VII and Title IX is not ambiguous. Mot. Injunction 16–19, ECF No. 11. They argue when Congress passed both statutes it clearly intended sex to be defined based on the biological and anatomical differences between males and females. *See id.* at 17–18 (citing legislative history and common understanding of its meaning at the time of passage). Plaintiffs likewise assert § 106.33 is unambiguous, for the same reason, as it was designed to separate students based on their biological differences because they have a privacy right to avoid exhibiting their "nude or partially nude body, genitalia, and other private parts" before members of the opposite sex. Pls.' Reply 8–9, ECF No. 52. Based on this, they argue Defendants have manufactured an ambiguity so they can then unilaterally change the law to suit their policy preferences. *Id.* at 8.

### iii.    Auer Deference

Because Defendants assert their regulation is ambiguous, the Court must determine whether their interpretation is entitled to deference. Defendants contend an agency may interpret its own regulation by issuing an opinion letter or other guidance which should be given controlling weight if: (1) the regulation is ambiguous; and (2) the interpretation is not plainly

erroneous or inconsistent with the regulation.  Defs.' Resp. 21, ECF No. 40; *Christensen*, 529 U.S. at 588 ("*Auer* deference is warranted only when the language of the regulation is ambiguous."); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) ("[An agency's] interpretation of [its regulation] is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation.'") (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)).

This deference is only warranted however when the language of the regulation is ambiguous.  *Moore v. Hannon Food Services, Inc.*, 317 F.3d 489, 495 (5th Cir. 2003). Legislation is ambiguous if it is susceptible to more than one accepted meaning.  *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015).  "Multiple accepted meanings do not exist merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'"  *Id.* (citing *Moore*, 317 F.3d at 497 *and* applying this rule of construction to regulations).

If a regulation is not ambiguous, the agency's interpretation may be considered but only according to its persuasive power.  *Moore*, 317 F.3d at 495.  "Thus, a court must determine whether 'all but one of the meanings is ordinarily eliminated by context.'"  *Calix*, 784 F.3d at 1005 (quoting *Deal v. United States*, 508 U.S. 129, 132–33 (1993)).  When a term is not defined, courts may generally give the words their common and ordinary meaning in accordance with legislative intent.  *D.C. Bd. of Elections & Ethics v. D.C.*, 866 A.2d 788, 798 n.18 (D.C. 2005) ("In finding the ordinary meaning, 'the use of dictionary definitions is appropriate in interpreting undefined statutory terms.'"); *1618 Twenty–First St. Tenants Ass'n, Inc. v. Phillips Collection*, 829 A.2d 201, 203 (D.C. 2003) (same).  Furthermore, "an agency is not entitled to deference when it offers up an interpretation of [a regulation] that [courts] have already said to be

30

unambiguously foreclosed by the regulatory text." *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014) (citing *Christensen*, 529 U.S. at 588).

Based on the foregoing authority, the Court concludes § 106.33 is not ambiguous. It cannot be disputed that the plain meaning of the term sex as used in § 106.33 when it was enacted by DOE following passage of Title IX meant the biological and anatomical differences between male and female students as determined at their birth. *See* 34 C.F.R. § 106.33; 45 Fed. Reg. 30955 (May 9, 1980); *Thomas Jefferson Univ.*, 512 U.S. at 512 (holding that intent determined at the time the regulations are promulgated). It appears Defendants at least tacitly agree this distinction was the intent of the drafter. *See* Holder Memo 1, ECF No. 6-3 ("The federal government's approach to this issue has also evolved over time."); *see also* Hr'g Tr. 33 ("[I]t may very well be that Congress did not intend the law to protect transgender individuals.").

Additionally, it cannot reasonably be disputed that DOE complied with Congressional intent when drawing the distinctions in § 106.33 based on the biological differences between male and female students. Pls.' Mot. Injunction 17–18, ECF No. 11 (citing legislative history and common understanding of its meaning at the time of passage). As the support identified by Plaintiffs shows, this was the common understanding of the term when Title IX was enacted, and remained the understanding during the regulatory process that led to the promulgation of § 106.33. *See* Pls.' Am. Compl. ¶¶ 8–13, ECF No. 6; *see also G.G.*, 822 F.3d at 736 (Niemeyer, J., dissenting) (providing comprehensive list of various definitions from the 1970s which demonstrated "during that time period, virtually every dictionary definition of 'sex' referred to the *physiological* distinctions between males and females, particularly with respect to their reproductive functions."). This undoubtedly was permitted because the areas identified by the regulations are places where male and female students may have to expose their "nude or

partially nude body, genitalia, and other private parts," and separation from members of the opposite sex, those whose bodies possessed a different anatomical structure, was needed to ensure personal privacy.  *See G.G.*, 822 F.3d at 723.

This conclusion is also supported by the text and structure of the regulations.  Section 106.33 specifically permits educational institutions to provide separate toilets, locker rooms, and showers based on sex, *provided* that the separate facilities are comparable.  The sections immediately preceding and following § 106.33 likewise permit educational institutions to separate students on the basis of sex.  For instance, § 106.32 permits educational institutions to provide separate housing for students on the basis of sex, again so long as the separate housing is comparable, and § 106.33 permits separate educational sessions for boys and girls when dealing with instruction concerning human sexuality.  34 C.F.R. §§ 106.32, 106.34.  Without question, permitting educational institutions to provide separate housing to male and female students, and separate educational instruction concerning human sexuality, was to protect students' personal privacy, or discussion of their personal privacy, while in the presence of members of the opposite biological sex.  *G.G.*, 822 F.3d at 723.  Accordingly, this interpretation of § 106.33 is consistent with the structure and purpose of the regulations.

Based on the foregoing, the Court concludes § 106.33 is not ambiguous.  Given this regulation is not ambiguous, Defendants' definition is not entitled to *Auer* deference, meaning it does not receive controlling weight.  *Auer*, 519 U.S. at 461.  Instead, Defendants' interpretation is entitled to respect, but only to the extent it has the power to persuade.  *Christensen*, 529 U.S. at 587.  In his dissent in *G.G.*, Judge Niemeyer characterized Defendants' definition as "illogical and unworkable."  *G.G.*, 822 F.3d at 737.  He outlined a number of scenarios, which need not be repeated here, where the Defendants' interpretation only causes more confusion for educational

institutions.  *Id.*  A definition that confuses instead of clarifies is unpersuasive.  Additionally, since this definition alters the definition the agency has used since its enactment, its persuasive effect is decreased.  *See Morton*, 415 U.S. at 237; *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) (holding that an agency announcement of an interpretation preceded by a very lengthy period with no interpretation indicates agency considered prior practice lawful).  Accordingly, the Court concludes Defendants' interpretation is insufficient to overcome the regulation's plain language and for the reasons stated above is contrary to law.

## 2.  Threat of Irreparable Harm

The Court next addresses irreparable harm.  Defendants allege that Plaintiffs have not identified any pending or imminent enforcement action, and the Guidelines "expose [P]laintiffs to no new liability or legal requirements."  Defs.' Resp. 7, ECF No. 40 (citing *Google v. Hood*, 822 F.3d 212, 227 (5th Cir. 2016).  Defendants argue that, "[a]lthough [P]laintiffs *do* identify a small number of specific 'policies and practices' that they claim are in conflict with [D]efendants' interpretation of Title IX, they have identified no enforcement action being taken against them—now or in the future—as a result of these polices."  Defs.' Resp. 8–9, ECF No. 40.  They assert that even if DOE were "to decide to bring an administrative enforcement action against plaintiffs for noncompliance . . . at some point in the future, [P]laintiffs *still* would be unable to make a showing of irreparable harm because they would have an opportunity to challenge the interpretation in an administrative process prior to any loss of federal funds."  *Id.* at 9 (quoting *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975)).

Plaintiffs counter that "Defendants' actions cause irreparable harm by forcing policy changes, imposing drastic financial consequences, and usurping [Plaintiffs'] legitimate authority."  Mot. Injunction 21, ECF No. 11.  According to Plaintiffs, Defendants' actions

present "a Hobson's choice between violating federal rules (labeled as regulations, guidance, and interpretations) on the one hand, and transgressing longstanding policies and practices, on the other." *Id.* Thus, Plaintiffs characterize Defendants' administrative letters and notices as "mandates" which effectively carry the force of law. *Id.* Plaintiffs also allege that Defendants' rules are "irreconcilable with countless polices regarding restrooms, showers, and intimate facilities," while threatening to override the practices of "countless schools," which had previously been allowed to differentiate intimate facilities on the basis of biological sex consistent with Title IX, federal regulations, and laws protecting privacy and dignity. *Id.* (citing Mot. Injunction, Ex. P. (Thweatt Dec.) 5–7, ECF No. 11-2).

Defendants' appear to concede the Guidelines conflict with Plaintiffs' policies and practices, *see* Defs.' Resp. 8–9; ECF No. 40 ("[P]laintiffs do identify a small number of specific 'policies and practices' . . . ."); however, they argue that additional threats of enforcement are required before irreparable harm exists. Case law does not support this contention. Instead the authorities hold, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *See Coalition for Econ. Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997) (stating, whenever an enactment of a state's people is enjoined, the state suffers irreparable injury); *accord Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., *in chambers*) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

34

As Defendants have conceded the conflict between the Guidelines and Plaintiffs' policies, and Plaintiffs have identified a number of statutes that conflict, the Court concludes Plaintiffs have sufficiently demonstrated a threat of irreparable harm.[20]

3.    Balance of Hardships and Public Interest[21]

The Court next considers whether the threatened injury to the Plaintiffs outweighs whatever damage the proposed injunction may cause Defendants and its impact on the public interest.  *Nichols*, 532 F.3d at 372.  Plaintiffs risk either running afoul of Defendants' Guidelines or complying and violating various state statutes and, in some cases, their state constitutions. Mot. Injunction 21, ECF No. 11.  Plaintiffs also state that they likely risk legal action from parents, students, and other members of their respective communities should they actually comply with Defendants' Guidelines.  Defendants argue these harms do not outweigh the damage that granting the injunction will cause because it will impede their ability to eliminate discrimination in the workplace and educational settings, prevent them from definitively explaining to the public the rights and obligations under these statutes, and it would have a deleterious effect on the transgendered.

The Court concludes Plaintiffs have established that the failure to grant an injunction will place them in the position of either maintaining their current policies in the face of the federal government's view that they are violating the law, or changing them to comply with the Guidelines and cede their authority over this issue.  *See* DOJ/DOE Letter, ECF No. 6-10 ("This letter summarizes a school's Title IX obligations regarding transgender students and explains

---

[20] Defendants also contend the injunction should be denied because Plaintiffs delayed in seeking this relief.  The DOJ/DOE Letter is dated May 13, 2016.  This case was filed very soon after on May 25, 2016, and the parties reached an agreement on a briefing schedule to consider this request.  The Court concludes Plaintiffs did not fail to act timely.

[21] The Parties address the third and fourth Canal factors together, therefore they are treated together in this Order as well.

how [DOE and DOJ] evaluate a school's compliance with these obligations.").  Plaintiffs' harms

in this regard outweigh those identified by Defendants, particularly since the Supreme Court

stayed the Fourth Circuit's decision supporting Defendants' position, and a decision from the

Supreme Court in the near future may obviate the issues in this lawsuit.  As a result, Plaintiffs

interests outweigh those identified by Defendants.   Further, Defendants have not offered

evidence that Plaintiffs are not accommodating students who request an alternative arrangement.

Indeed, the school district at issue in *G.G.* provided its student an accommodation.

Accordingly, the Court finds that Plaintiffs have met their burden and these factors weigh

in favor of granting the preliminary injunction.

### C.        Scope of the Injunction

Finally, the Court must determine the scope of the injunction.  Plaintiffs seek to apply the

injunction nationwide.  Mot. Injunction 3, ECF No. 11; Pls.' Reply 13, ECF No. 52.  Defendants

counter that the injunction should be narrowly tailored to Plaintiffs in the Fifth Circuit.  Defs.'

Resp. 28, ECF No. 40.

"Absent the clearest command to the contrary from Congress, federal courts retain their

equitable power to issue injunctions in suits over which they have jurisdiction."  *Califano v.*

*Yamasaki*, 442 U.S. 682, 705 (1979).  "[T]he scope of injunctive relief is dictated by the extent

of the violation established, not by the geographical extent of the plaintiff class."  *Id.* at 702

(permitting a nationwide injunction because the class action was proper and finding that a

nationwide injunction was not more burdensome than necessary to redress plaintiffs'

complaints).

The Court concludes this injunction should apply nationwide.  As the separate facilities

provision in § 106.33 is permissive, states that authorize schools to define sex to include gender

identity for purposes of providing separate restroom, locker room, showers, and other intimate facilities will not be impacted by it.   Those states who do not want to be covered by this injunction can easily avoid doing so by state law that recognizes the permissive nature § 106.33. It therefore only applies to those states whose laws direct separation.   However, an injunction should not unnecessarily interfere with litigation currently pending before other federal courts on this subject regardless of the state law.   As such, the parties should file a pleading describing those cases so the Court can appropriately narrow the scope if appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs' application for a preliminary injunction (ECF No. 11) should be and is hereby **GRANTED**.   *See* Fed. R. Civ. P. 65.   It is **FURTHER ORDERED** that bond is set in the amount of one hundred dollars.[22]   *See* Fed. R. Civ. P. 65(c).   Defendants are enjoined from enforcing the Guidelines against Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions.   Further, while this injunction remains in place, Defendants are enjoined from initiating, continuing, or concluding any investigation based on Defendants' interpretation that the definition of sex includes gender identity in Title IX's prohibition against discrimination on the basis of sex. Additionally, Defendants are enjoined from using the Guidelines or asserting the Guidelines carry weight in any litigation initiated following the date of this Order.   All parties to this cause of action must maintain the status quo as of the date of issuance of this Order and this preliminary injunction will remain in effect until the Court rules on the merits of this claim, or until further direction from the Fifth Circuit Court of Appeals.   This preliminary injunction shall be binding on Defendants and any officers, agents, servants, employees, attorneys, or other

---

[22] Neither party addressed the appropriate bond amount should an injunction be entered.

persons in active concert or participation with Defendants, as provided in Federal Rule of Civil

Procedure Rule 65(d)(2).

**SO ORDERED** on this **21st day** of **August, 2016.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**