# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 7:16-CV-00054-O |
| | § | |
| UNITED STATES OF AMERICA, ET AL., | § | |
| | § | |
| *Defendants.* | § | |

---

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR CLARIFICATION OF THE COURT'S PRELIMINARY INJUNCTION ORDER

---

### TABLE OF CONTENTS

Introduction ........................................................................................................... 1

I.   The Court Enjoined Defendants' Rule, Not Merely a Few Documents .......... 1

II.  The Scope of the Injunction ............................................................................ 3

    A.   The Injunction Impacts Access to Intimate Areas ................................. 3

    B.   Title VII, DOL, and OSHA ..................................................................... 5

    C.   "Transgender" .......................................................................................... 8

    D.   Geography ................................................................................................. 9

III. Nature of Future Advocacy by Defendants—What Can Defendants *Do* From This Point Forward? ...................................................................................... 10

IV.  Future Use of the Enjoined Guidances—What Can Defendants *Use* From This Point Forward? ...................................................................................... 12

Conclusion ........................................................................................................... 16

Certificate of Service .......................................................................................... 18

TABLE OF AUTHORITIES

## Cases

*Ayotte v. Planned Parenthood of N. New England,*
   546 U.S. 320 (2006) ........................................................................ 13–14

*Cent. & S. W. Servs., Inc. v. EPA,*
   220 F.3d 683 (5th Cir. 2000) ...................................................... 13

*Davis v. Monroe County Bd. of Educ.,*
   526 U.S. 629 (1999) ...................................................................... 6

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
   No. 2:14-cv-13710 (E.D. Mich.) ................................................. 4

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.,*
   822 F.3d 709 (4th Cir. 2016) ...................................................... 9

*Her Majesty the Queen in Right of Ontario v. EPA,*
   912 F.2d 1525 (D.C. Cir. 1990) ................................................ 12

*Lightfoot v. D.C.,*
   339 F. Supp. 2d 78 (D.D.C. 2004) ............................................. 3

*Milk Indus. Found. v. Glickman,*
   949 F. Supp. 882 (D.D.C. 1996) ............................................ 2, 8

*Mora-Meraz v. Thomas,*
   601 F.3d 933 (9th Cir. 2010) ...................................................... 2

*Nat'l Pork Producers Council v. EPA,*
   635 F.3d 738 (5th Cir. 2011) .................................................... 12

*Osborne v. Ohio,*
   495 U.S. 103 (1990) .................................................................... 14

*Phillips Petroleum Co. v. Johnson,*
   22 F.3d 616 (5th Cir. 1994) ........................................................ 2

*Shell Offshore Inc. v. Babbitt,*
   238 F.3d 622 (5th Cir. 2001) ...................................................... 2

*Stellas v. Esperdy,*
   366 F.2d 266 (2d Cir. 1966) ........................................................ 3

*United States v. Nat'l Treasury Emps. Union,*
   513 U.S. 454 (1995) .................................................................... 13

*United States v. Reese,*
   92 U.S. 214 (1875) ...................................................................... 14

*United States v. Southeastern Okla. State Univ.,*
   No. 5:15-cv-324 (W.D. Okla.) ...................................................... 4

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) ................................................................................... 13

## Statutes

29 U.S.C. § 657–59 ....................................................................................... 7

29 U.S.C. § 662 ............................................................................................. 7

## Rules

Fed. R. Civ. P. 11 ......................................................................................... 11

## Other Authorities

OSHA's 2015 Statistics, *available online at*
  https://www.osha.gov/dep/2015_enforcement_summary.html ................................ 7

Tr. of Hr'g on Mot. for Inj. at 5–7, 77–78 (Aug. 12, 2016) ......................................... 11

Tr. of Hr'g on Mot. for Inj. at 61 (Aug. 12, 2016) ....................................................... 12

www.stopbullying.org ....................................................................................... 15

## INTRODUCTION

Perhaps unable to find a law or command they find unambiguous, Defendants now interpret the Court's injunction so as to allow them to continue down the path that the Court blocked them from taking. Defendants, as Article II agencies accustomed to deference, demonstrate an artful inability to recognize an unambiguous directive of an Article III court. While this case illustrates that the nature of deference to executive agencies can breed a certain insouciance toward the rule of law, the purpose of Article III courts is to resolve disputes and not engage in perpetual tinkering. Indeed, Defendants' motion demonstrates that accountability for their unchecked mischief is something they are not fully willing to embrace.

If granted, Defendants' motion (ECF No. 65) functionally vacates the Court's thorough and unambiguous injunction. Conveniently to their ends, Defendants contend that the injunction "could be read to extend well beyond the appropriate scope of relief." ECF No. 65 at 1. But the injunction is neither ambiguous nor burdensome. Appropriately, it is narrowly tailored as to geographic extent, parties, and proscribed conduct so as to preserve the status quo until final disposition of this case. ECF No. 58 at 37. The Court should deny Defendants' motion.

## I.      The Court Enjoined Defendants' Rule, Not Merely a Few Documents

In a creative endeavor to avoid the Court's injunction, Defendants suggest that they should be able to argue their rule—that all intimate areas are open to everyone—so long as they don't expressly reference the guidances.[1] ECF No. 65 at 2, 4, 7–8. This argument misapprehends both the problem that forms the basis for Plaintiffs' request for relief as well as the relief provided by the Court.

While Defendants implicitly assert that their various guidances are the fundamental problem at issue, they are not. The rule at issue, because it was not

---

[1] For the sake of clarity and simplicity, Plaintiffs employ the word "guidance" to refer to all of the regulatory "dark matter" (guidances, memos, interpretations, etc.), both known and unknown, that evidence the rule at issue in this matter.

properly promulgated in accordance with the APA, possesses no clear or distinct form. Like gravity, the rule may not be visible, but the evidence of its existence is overwhelming. Thus, Defendants' guidances are not the rule itself, as the actual rule lurks somewhere beneath.

Defendants admit as much to the Court, in articulating that "the challenged guidance documents simply *announce* the federal government's interpretations of Titles VII, IX, and applicable regulations," ECF No. 40 at 29 (emphasis added), and that "they merely *explain* what the defendant agencies understand," *id*. at 30 (emphasis added). Plaintiffs agree that the Defendants' guidances are best considered evidences of the rule, but not the rule itself. ECF No. 52 at 8, 14 (discussing "the documents that evidence [the rule]").

Much of the evidence, of course, is in the enforcements of the rule across the country. And the uniformity of these enforcements demonstrates that there is an actual binding rule—that no matter the circumstances, individuals should be given access to the intimate spaces that conform to their chosen "gender identity," without regard to the privacy, dignity, or safety needs of others. Thus, evidence abounds of the rule's existence as well as its finality in the minds and actions of Defendants.

Of course, the existence of unwritten rules that run afoul of the APA is hardly new. In *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994), the Fifth Circuit addressed an unpublished rule of the Department of Interior that changed the procedure for determining oil and gas royalties. In *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2001), the Fifth Circuit addressed an unwritten "alteration of an existing practice." This why it is "the substance of what the [agency] . . . has done which is decisive," *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 893–94 (D.D.C. 1996), and not the form in which that action has occurred.[2]

---

[2] *See also*, *e.g.*, *Mora-Meraz v. Thomas*, 601 F.3d 933, 938 (9th Cir. 2010) (addressing a so-called

Wherever a rule is unwritten, there is nonetheless documentary evidence of the rule's existence. However, it is not always the case that an agency fully promulgates what looks like, smells like, and acts like a rule, while merely avoiding notice and comment. Indeed, non-APA rulemaking appears in a multitude of forms—some recognizable, others not—precisely because the APA was not followed.

By contending that the guidances themselves are the rule, instead of merely evidence of the rule, Defendants obscure the nature of the injunction as well as the line distinguishing permissible from impermissible behavior moving forward. Thus, Defendants misapprehend the injunction when they say that "based on the explicit terms of the Preliminary Injunction, it appears that Defendants are not prohibited from enforcing . . . the underlying statute against Plaintiffs and their public educational institutions, provided that they do not rely on the Guidelines." ECF No. 65 at 18. If "enforcement" involves putting the sexes together in intimate areas, then the injunction proscribes Defendants from enforcing Titles VII or IX to that end. If "enforcement" involves, for example, the EEOC adjudicating a workplace claim of racial discrimination, nothing about the injunction precludes Defendants from doing their job in that regard.

## II.   The Scope of the Injunction

The scope of the injunction is clear. It applies to intimate areas in both Title VII and IX contexts and enjoins Defendants across the country.

### A.   The Injunction Impacts Access to Intimate Areas

Plaintiffs' application for preliminary injunction (ECF Nos. 11 & 52), and their

---

"twelve-month rule" which the Court acknowledged was a "specific unwritten rule."); *Stellas v. Esperdy*, 366 F.2d 266, 269 (2d Cir. 1966), *vacated and remanded on other grounds*, 388 U.S. 462 (1967) (acknowledging that determinations on whether applicants qualify for investor visas may involve "written or unwritten rules"); *Lightfoot v. D.C.*, 339 F. Supp. 2d 78, 94 (D.D.C. 2004), *clarified on denial of reconsideration*, 355 F. Supp. 2d 414 (D.D.C. 2005), *and rev'd and remanded*, 448 F.3d 392 (D.C. Cir. 2006) ("This policy determination process—which Defendants are clearly undertaking when setting out *unwritten* termination, suspension and modification procedures which affect Plaintiffs' property interests—is clearly substantive rule-making." (emphasis added)).

Notice of Pending Litigation (ECF No. 64), turns on access to, and the expectations of privacy in, intimate areas. This necessarily means that the injunction does not extend to Defendants' involvement in, for example, a Title VII dispute that does not involve access to intimate areas. *See, e.g., EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, No. 2:14-cv-13710, ECF No. 76 ("Opinion & Order") (E.D. Mich. Aug. 18, 2016). However, Defendants have a well-documented history of taking disputes that do not involve intimate areas, and turning them into intimate area battles. This is seen most clearly in the Oklahoma case, where DOJ decided to deeply explore access to intimate areas, though it never raised that issue in its pleadings. *See United States v. Southeastern Okla. State Univ.*, No. 5:15-cv-324 (W.D. Okla.); ECF No. 64 at 3–6.

In any dispute, the complaint or pleadings contains only the initial allegations of wrongdoing. Indeed, where a case oftentimes ends varies from where it began. Thus, while Plaintiffs agree that the scope of the injunction regards only access to intimate areas, Plaintiffs maintain well-founded concerns that Defendants are nonetheless undeterred by the injunction in their quest to mix the sexes in intimate areas. Accordingly, as Plaintiffs already indicated, as to any investigation, dispute, or litigation that involves the interpretation of "sex" under Titles VII or IX, Defendants should be prohibited from raising access to intimate areas as a material aspect of the dispute, or otherwise participating in discovery, briefing, or argumentation regarding access to intimate areas.

Moreover, the Court should further require Defendants to affirmatively disavow in all matters not identified in their Notice of Pending Litigation (ECF No. 61) that access to intimate areas is at issue. If, as in the Oklahoma case, access to intimate areas is raised only by a private litigant, Defendants should be precluded from participating in discovery regarding, or otherwise advancing argument, regarding access to intimate areas.

### B.      Title VII, DOL, and OSHA

The focal point of the case *sub judice* is intimate area access under Titles IX *and* VII. The injunction, the various filings discussing this discrete issue at length (*see*, *e.g.*, ECF Nos. 6, 11, 40, 52, 61 & 64), and the factual realities of what is involved in this matter make clear that Title VII is a substantive part of the injunction.

Take, for example, the Plaintiffs, Harrold ISD and Heber-Overgaard Unified School District. As the Court knows, schools are not merely institutions of education, but also workplaces and subject to Title VII. Indeed, schools strive not only to provide safe and reasonable educational environments for children, but also safe and reasonable workplaces for their employees. *See* Exhibit P, ECF No. 11-2 at ¶ 5. The evidence before the Court shows that, in many educational institutions, intimate areas are accessed simultaneously by both students and teachers (employees). *See*, *e.g.*, *id.* at ¶ 6.

Even in educational institutions where students and faculty possess designated facilities, it is unavoidable that students and teachers (or coaches) will sometimes share the same facilities. *See*, *e.g.*, Exhibit N, ECF No. 6-14 at 3 ("For example, if a physical education teacher repeatedly made remarks about students' bodies whenever students changed clothes in a locker room, that conduct would likely create a hostile environment and be considered unlawful sexual harassment."). This type of student/teacher interaction can occur, for example, when football players and their coaches share the same facilities at the football stadium, or when a separate fieldhouse or athletic facility requires track athletes and their adult coaches to share intimate facilities. Regardless of the particular circumstance afoot, the intimate nature of education—where children and employee adults acting *in loco parentis* are constantly together—means that Titles VII and IX and inextricably intertwined as to the Court's injunction. This is why all Defendants are proper parties and enjoined

from using both Title VII and Title IX in a way contrary to the injunction.[3]

In an effort to undermine the injunction, Defendants reference various ministerial duties that EEOC must perform in receiving and processing Title VII complaints by private individuals. ECF No. 65 at 22–23. In reading Defendants' motion, one would think that the Court's injunction has ground due process in the employment discrimination context to a halt.[4] Defendants go too far.

Clearly, the EEOC's performance of various ministerial duties is unimpeded by the injunction. EEOC may receive private complaints, issue its notices, and gather the necessary facts, as it always does. However, in cases alleging discrimination on the basis of "sex," and involving access to intimate areas, EEOC may not suggest, conclude (via reasonable cause determinations or otherwise), or adjudicate that Title VII requires employers to mix the sexes in intimate areas. This modest restriction on EEOC's enforcement powers, of course, does not impede the right of an individual that brings a complaint to full due process. Regardless of the EEOC's substantive determinations, an individual that files a complaint will have a right to argue his/her theory of the case and continue their litigation into federal court. But the injunction is clear that EEOC does not get to substantively side with private litigants when access to intimate areas is part of the equation—a reasonably narrow restriction for a limited set of circumstances.

All of this application necessarily extends to Defendants, United States Department of Labor, Thomas E. Perez, in his Official Capacity as United States Secretary of Labor, and David Michaels, in his Official Capacity as the Assistant

---

[3] Indeed, the relationship between Title VII and Title IX is so strong that courts routinely look to Title VII case law for guidance in Title IX matters, and vice versa. *See, e.g., Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651 (1999). Thus, any ruling regarding Title IX functionally, if not directly, applies to Title VII. Therefore, in any instance—Title VII or Title IX—where access to intimate areas is at issue, Defendants are enjoined.

[4] Defendants contend that "nonperformance of these actions by the EEOC could result in depriving individuals of their right to pursue relief on their own behalf in Court." ECF No. 65 at 28. This is nonsense.

Secretary of Labor for the Occupational Safety and Health Administration. As the Court is aware, in 2015, OSHA published a "guide" for employers regarding restroom access. OSHA's so-called "guide" evidences the rule enjoined by the Court, as the "guide" concludes that "all employees should be permitted to use the facilities that correspond with their gender identity," which is "internal" and could be "different from the sex they were assigned at birth." Exhibit D, ECF No. 6-4. And OSHA postures this "guide" as clearly reflecting an underlying, enforceable rule. It cites to one of DOL's own final rules as supportive, along with a CFR regarding "toilet facilities," as well as enforcements by EEOC. *Id.* at 4.

Furthermore, DOL and OSHA possess powerful enforcement mechanisms.[5] This regards public employers and their workers where there is an OSHA-approved State Plan. Twenty-two states and territories, including several Plaintiffs, have such plans.[6] In 2015, OSHA conducted 35,820 inspections and found 65,044 violations.[7] No matter why OSHA visited each of the 35,820 job sites in 2015, every single visit provides it with an opportunity to find a new violation for its "Core principle"—that "[a]ll employees, including transgender employees, should have access to restrooms that correspond to their gender identity." Exhibit D, ECF No. 6-4 at 1.

As Plaintiffs articulated from the outset, what is before the Court is a rule on which *all* "Defendants have conspired to turn workplaces and educational settings across the country into laboratories for a massive social experiment, flouting the democratic process, and running roughshod over commonsense policies protecting children and basic privacy rights." ECF No. 6 at 3. The rule at issue, though not

---

[5] *See, e.g.*, 29 U.S.C. §§ 657–59, 662.

[6] Alaska, Arizona, California, Hawai'i, Indiana, Iowa, Kentucky, Maryland, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, and Wyoming all have state plans that cover both private and public sector workers. List *available online at* https://www.osha.gov/dcsp/osp/index.html.

[7] *See* OSHA's 2015 Statistics, *available online at* https://www.osha.gov/dep/2015_enforcement_summary.html.

formalized, is nonetheless being implemented and enforced by *all* Defendants.[8] To succeed, Defendants' regulatory shell game depends not only upon a clandestine rule, but for the rule to become ubiquitous through the collective efforts of all Defendants. It is, perhaps, by design that no single agency purports to assume ownership over it such that every Defendant can always argue, as they do here, that they are not responsible. But to enjoin only some Defendants, and not all, permits the rule to live at the expense of the Court's authority.

### C.    "Transgender"

Neither Plaintiffs' amended complaint (ECF No. 6), nor its application for preliminary injunction (ECF Nos. 11 & 52), turns on whether an individual describes themselves as "transgendered." In fact, Plaintiffs do not employ the word as operative in any of their filings. And in the injunction, the Court only mentions the term in recognizing and reciting Defendants' arguments.[9] The substance of the injunction does not turn on whether one identifies themselves as "transgender."

This, of course, is because the laws and regulations at issue are unambiguous *biological* categories, as the Court recognized. Thus, as to any dispute or question regarding intimate areas, any application of "sex" by Defendants that runs contrary to the biologically-grounded nature of the term is enjoined. Because the laws and regulations at issue are unambiguous, and cover every member of the human race (whether male and female), they necessarily cover anyone that, for example, identifies with a particular national origin, or identifies with a certain political party. There is no need for the Court to digress into various additional categories.

Defendants' invitation for the Court to "clarify" its injunction as to how it

---

[8] The APA defines "rule" broadly, and what it or is not a rule cannot be evaded by giving it a different name(s). Indeed, it is "the substance of what the [agency] . . . has done which is decisive." *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 893–94 (D.D.C. 1996).

[9] The subject matter of this litigation, as recognized by the Court, is "Defendants' swift move to supplant the traditional, biological meaning of sex with a definition based on gender identity through the Guidelines," ECF No. 58 at 37, and not on whether someone defines themselves as "transgendered."

impacts those that define themselves as "transgender" should be acknowledged for what it is—a surreptitious effort to get the Court to contrive an ambiguity in the applicable laws and regulations. Indeed, this was Defendants' formula for success before the Fourth Circuit. That court, citing *only* to Defendants' "dark matter," concluded that the applicable laws and regulations were ambiguous. *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 722–23 (4th Cir. 2016) (concluding that the DOE has "consistently enforced" the rule since 2014 and that these enforcement efforts are "in line with the existing guidances and regulations of a number of federal agencies," including OSHA and EEOC), *stayed and mandate recalled pending disposition of petition for cert.*, 136 S. Ct. 2442 (U.S. Aug. 3, 2016) (No. 16A52), *petition for cert. filed*, (U.S. Aug. 29, 2016) (No. 16-273).

### D.   Geography

Arguably the most audacious part of Defendants' motion is their request that the Court "confirm" that its injunction, which is "nationwide," is not nationwide. ECF No. 65 at 22–25. Defendants ask the Court to adopt their bad habit of rewriting terms to mean something other than their plain, ordinary meaning. Here, Defendants ask the Court to agree that "nationwide" means "plaintiff states."

There at least two problems with Defendants' cavalier approach. First, Defendants misapprehend the Court's admonition regarding "Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions." ECF No. 58 at 37. As Plaintiffs explained in their Notice of Pending Litigation (ECF No. 64), this language is not temporally limited regarding when litigation began. While the Court concerns itself with when certain litigation was initiated in other matters, the language at issue ("Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions") applies irrespective of when any given litigation commenced. This language, thus, emphasizes the absence of a temporal restriction regarding the Plaintiff States. It does not exist to transform the

clear meaning of "nationwide" into "plaintiff states."

Secondly, Defendants completely forget to whom the Court's injunction is directed—them. Defendants are federal administrators and agencies, with footings in every state and territory. Discussing whether the injunction applies in "the Fifth Circuit" or "plaintiff states" is a clever way to remove the focus of the Court's relief from the wrongdoers. But, as here, where Defendants are collectively and systematically engaged in enforcing a pervasive and unlawful rule across the country, an injunction that precludes Defendants from acting everywhere is quite clear.[10]

## III.   Nature of Future Advocacy by Defendants—What Can Defendants *Do* From This Point Forward?

Defendants are correct that the injunction precludes them from advancing arguments, or otherwise advocating guidance, legal positions, or otherwise, that relate to or rely upon all of their "dark matter" regarding access to intimate areas (regardless of whether that "dark matter" is specifically identified by Plaintiffs or the Court). All such guidances suffer from the same legal flaw. Thus, it would be nonsensical for the injunction to not apply to guidances unidentified by Plaintiffs (in its pleadings or other filings) that rely upon the same substance or draw the same conclusions enjoined by the Court.

Defendants nonetheless ask the Court to bless their continued mission to force the sexes to share intimate areas, in particular through litigation. In this ruse, Defendants intend to appropriate court dockets as the new publishers of its rule. Yet, by permitting Defendants to broadcast their rule through court filings, Defendants are able to circumvent the injunction. Indeed, by allowing Defendants to articulate their rule in court briefs, or the filing of new Statements of Interest, Defendants can

---

[10] Defendants' additional concern about whether the "burden" of the Court's injunction is ironic. An injunction that applies "nationwide" carries with it the absence of burden. Defendants do not have to engage in enforcement gymnastics or difficult mathematics to figure out where the Court's prohibition does and does not apply. Rather, Defendants are, quite simply, enjoined everywhere.

subsequently publicize or circulate that new Statement of Interest to every public school in the country. This allows Defendants to accomplish the same purpose they sought to accomplish through their various pieces of "dark matter"—veiled threats of the removal of Title IX-linked funds, which generally leads to DOE getting its way. *See*, *e.g.*, Exhibit J, ECF No. 6-10 at 8–9 nn. 9, 23; Tr. of Hr'g on Mot. for Inj. at 5–7, 77–78 (Aug. 12, 2016).

Thus, it is the rule itself, along with the evidence of it, which is enjoined. Without the injunction of the rule itself, Defendants may republish their rule and continue down the same path, relegating this Court to a bump in the road rather than a judicial check on executive power. The Court's judicial power is reduced to nothing if it can only enjoin a certain document which, as Defendants now believe, can be reissued the next day without running afoul of the Court's directive.

To be sure, the injunction does not preclude Defendants from engaging in legitimate judicial advocacy in certain to-be-determined limited fora. *See* ECF No. 64; n.12, *infra*. However, as made clear by the rules, arguments to a tribunal must be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11. As the Court has found, when it comes to access to intimate areas, individuals may be separated based on "the biological and anatomical differences between male and female students as determined at their birth." ECF No. 58 at 31. What the term "sex" means in Titles VII and IX is clear, as the Court found. The evidence of the meaning of "sex" as a biologically-based category is overwhelming, ECF No. 6 at ¶¶ 23–37, and not even something Defendants contest. ECF No. 40.

If Defendants are able to craft an appropriate textual argument about the meaning of "sex" at the time that Titles VII or IX were enacted, or locate legislative history that supports an alternate meaning, they should be encouraged to present such arguments in ongoing litigation that the Court is expected to determine is not

within the purview of its injunction. But to allow Defendants carte blanche to continue to argue their rule in other locations, and essentially ignore what this Court did, would functionally rescind the Court's injunction.

## IV. Future Use of the Enjoined Guidances—What Can Defendants *Use* From This Point Forward?

Unlike the prior section regarding what Defendants may do, this section addresses how the guidances already produced may be employed, if at all, from this point forward. Because the various guidances are stained with the taint of their illegality, no aspect of them should be permitted any use (outside of perhaps historical storage or reference). That any portion or section of the guidances may be lawful does not remove them from the ambit of the Court's ruling or otherwise authorize their future use. Under the injunction, Defendants may not use, create, proliferate, or otherwise distribute any guidance or writing that prohibits separating the sexes in intimate areas.[11]

The Court found that the Defendants' rule is "final agency action under the APA" and that the Defendants do not dispute that the rule is a "consummation" of the agencies' decision-making process. Tr. of Hr'g on Mot. for Inj. at 61 (Aug. 12, 2016); *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755–56 (5th Cir. 2011) (citing *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (deciding that EPA guidance letters constitute final agency actions as they "serve[d] to confirm a definitive position that has a direct and immediate impact on the parties . . . .")). *Id.* at 17. Thus, all of the guidances at issue embody a rule that, now enjoined, forever taints them.

Defendants note that many of the guidances that describe the rule mention other areas of discrimination, such as "race, national origin, or disability . . . distinct

---

[11] An exception may exist if the Court permits Defendants to continue to advocate their rule in a handful of cases, already identified, where Defendants' argument was well-established with the federal court at the time of this Court's injunction on Aug. 21, 2016.

from the subject of Plaintiffs' request for relief." ECF No. 65 at 12. Defendants claim that the injunction thus ". . . could be read to limit Defendants' ability to enforce and interpret anti-discrimination statutes . . . " *Id.* But there is nothing in the injunction substantiating this concern. The injunction does not prevent Defendants from relying on statutes or other actual law or validly adopted regulations to undertake lawful anti-discrimination enforcement actions.

Because the injunction does not "disrupt" these other laws, the Court was correct in enjoining the guidances in their entirety. *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (explaining that vacating a rule is appropriate where the consequences are not "disruptive."). It is not the duty of the Court to rewrite the various administrative documents in the record so that they comply with Titles VII and IX, and the applicable regulations. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) (holding that the entirety of an unconstitutional law fails unless it is "readily susceptible" to a narrowing construction); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 (1995) (citing the "obligation to avoid judicial legislation" and declining to modify statute).

Under the APA, courts are not charged with engaging in remedial measures like reformation or redaction. Indeed, were findings under the APA to be applied in piecemeal fashion, the APA would hardly be a deterrent to improper agency action. If courts only struck down improper sentences or paragraphs within agency guidances, there would be no incentive for agencies to comply with the APA and enact wholly proper regulations, interpretations, and the like. To the contrary, agencies would be imbued with the desire to continually "enact" that which is proper with that which is not, knowing that a discerning court would only strike down the improper part and functionally allow the entire guidance to survive.

Yet the Supreme Court has repeatedly admonished against relying on judicial intervention in this manner. *Ayotte v. Planned Parenthood of N. New England*, 546

U.S. 320, 330 (2006) (providing that "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside" to announce to whom the statute may be applied.") (quoting *United States v. Reese,* 92 U.S. 214, 221 (1875)); *see also Osborne v. Ohio,* 495 U.S. 103, 121 (1990) (judicial rewriting of statutes would derogate Congress' "incentive to draft a narrowly tailored law in the first place"). The Court should not indulge Defendants' invitation to do their work for them.

Moreover, under Defendants' view of how its guidances should be treated, there is no basis upon which individuals and entities would know what elements of the guidances are enjoined or improper. Only the citizen distinctly aware of the injunction, imbued with the legal training necessary to understand the parameters, and who takes the time to compare the injunction against the voluminous guidances, could potentially discern the parts of the "dark matter" that are improper versus those that are not. This, of course, assumes that separating the proper from the improper is an easy or clear exercise, devoid of confusion or tough choices.

Missing from Defendants' argument is the representation of any actual *need* for its enjoined guidances to survive for the legitimate purposes of Defendants' enforcement authority. Defendants' argument appears to presume that, apart from the survival of the guidances enjoined by the Court, there is no basis upon which anyone would know that invidious discrimination on the basis of race is unlawful, or that violence against students is improper. But the Court knows this to be untrue. The volumes of material produced by Defendants that address these, and other topics, are virtually unlimited.[12] Moreover, since Defendants' preferred method of

---

[12] Defendants are, indeed, experts at producing "dark matter." For example, Defendants contend that a certain guidance enjoined by the Court (Plaintiffs' Exhibit A, ECF No. 6-1) also "concerns harassment and bullying based on race, national origin, and disability." ECF No. 65 at 14. However, DOE has released volumes of other "dark matter" that addresses the topic. A search for "bullying" on DOE's website (www.ed.gov) brings up no less than a dozen documents, in addition to Exhibit A, that address

rulemaking and publication avoids the inconvenience of notice, public comment, and the timelines associated therewith, reconstituting and releasing the permissible substance of any enjoined guidance, if Defendants so desired, should be easy.

Even if there were a demonstrable need for parts of the guidances to survive, the only way to attempt to move forward along those lines begins with redaction. The Court would need to engage in the laborious exercise of identifying those parts of the guidances that must be **blacked out** before continued usage.[13] Similarly, all enjoined guidances would need to have a new cover page added to each item that explains the nature of the guidance's taint, and why certain matter is **blacked out**.

Even if the Court were inclined to engage in piecemeal redactions and oversight of the circumstantial use of the enjoined "dark matter," it is impossible to redact the guidances already distributed. Undoubtedly, copies of now improper guidances exist on countless computers, endless e-mail strings, and in hard copy forms in various files across the country. There is no way, practical or otherwise, for the Court to reach its editorial hand into those places and properly revise the guidances, or even notify the owners of those guidances about what is or is not. Thus, while the Court can control what "dark matter" may look like moving forward, properly redacting the endless distribution of unredacted copies already distributed isn't realistically possible.

Therefore, the Court should not entertain Defendants clever efforts to breathe

---

bullying. DOE also links to a bullying website, listed as www.bullyinginfo.org, which links to www.stopbullying.org. The bottom line is this—that over several years, Defendants have released countless publications which more that educate the public, and others, on everything that may be properly discussed or covered within the enjoined guidances. Defendants cannot make a credible case that there is any actual *need* for the enjoined guidances, or parts thereof, to survive. The request to permit the use of some of the guidances is nothing more than a ploy to circumvent the injunction.

[13] This raises an additional problem in that Defendants would need to first identify the universe of the "dark matter" to be redacted. Plaintiffs identify many of the most significant documents in their Amended Complaint, ECF No. 6, but it will likely take Defendants some time to fully marshal every memo, press release, web page, blog post, guidance, and the like that evidences the rule, and then present them to the Court in a cogent fashion for redaction.

post-injunctive life into its stained guidances. Indeed, the Court's adjudication serves as an enduring blemish on the guidances akin to a scarlet letter.

## Conclusion

Defendants' propensity to interpret what they read in the way that they want to read it is well-established. The Court should resist this latest attempt to have its injunction interpreted by Defendants in a way that avoids the Court's judicial authority, is self-serving only to Defendants' policy agenda regarding intimate areas agenda, and contravenes the clear federal law that the Court's order is designed to uphold.

Respectfully submitted this the 19th day of September, 2016,

| | |
|---|---|
| LUTHER STRANGE<br>Attorney General of Alabama | KEN PAXTON<br>Attorney General of Texas |
| BRAD D. SCHIMEL<br>Attorney General of Wisconsin | JEFFREY C. MATEER<br>First Assistant Attorney General |
| PATRICK MORRISEY<br>Attorney General of West Virginia | BRANTLEY STARR<br>Deputy First Assistant Attorney General |
| HERBERT SLATERY, III<br>Attorney General of Tennessee | PRERAK SHAH<br>Senior Counsel to the Attorney General |
| MARK BRNOVICH<br>Attorney General of Arizona | ANDREW LEONIE<br>Associate Deputy Attorney General for the<br>Office of Special Litigation |
| SCOTT PRUITT<br>Attorney General of Oklahoma | AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for the<br>Office of Special Litigation |
| JEFF LANDRY<br>Attorney General of Louisiana | |
| SEAN REYES<br>Attorney General of Utah | */s/ Austin R. Nimocks*<br>AUSTIN R. NIMOCKS<br>Texas Bar No. 24002695<br>austin.nimocks@texasattorneygeneral.gov |
| SAM OLENS<br>Attorney General of Georgia | MICHAEL TOTH<br>Senior Counsel for the Office of Special<br>Litigation |
| | Office of Special Litigation<br>Attorney General of Texas<br>P.O. Box 12548, Mail Code 009<br>Austin, Texas 78711-2548<br>Tel: 512-936-1414 |
| | *Attorneys for Plaintiffs* |

## CERTIFICATE OF SERVICE

I, Austin R. Nimocks, hereby certify that on this the 19th day of September, 2016, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Austin R. Nimocks
Austin R. Nimocks