IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

STATE OF TEXAS, et al.,                    )
                                           )
    Plaintiffs,                            )
                                           )
        v.                               )    Case No. 7:16-cv-54-O
                                           )
UNITED STATES OF AMERICA, et al.,          )
                                           )
    Defendants.                            )
_____)

## DECLARATION OF CATHERINE E. LHAMON

I, Catherine E. Lhamon, hereby make the following declaration with respect to the above-captioned

matter:

1.      I am the Assistant Secretary for Civil Rights in the U.S. Department of Education (ED or the

        Department), Office for Civil Rights (OCR), in Washington, D.C. I have held this position

        since August 2013. My current work address is 400 Maryland Avenue, SW, Washington,

        D.C.

2.      In my current capacity as Assistant Secretary for Civil Rights, I am the principal advisor to

        the Secretary of Education on civil rights matters. I oversee a full-time staff of nearly 600

        employees in OCR's headquarters in Washington, D.C., and OCR's 12 regional enforcement

        offices around the country.

3.      I make this declaration on the basis of personal knowledge and information made available to

        me in the course of my official duties.

<u>The Department's Mission and Title IX Enforcement</u>

4.      The Department's mission is to promote student achievement and preparation for global

        competitiveness by fostering educational excellence and ensuring equal access. Congress

created the Department to strengthen the federal commitment to equal educational opportunity for every individual.[1] In support of the Department's mission, OCR's core purpose is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights.[2]

5.  OCR enforces several federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department. Discrimination on the basis of race, color, and national origin is prohibited by Title VI of the Civil Rights Act of 1964; sex discrimination is prohibited by Title IX of the Education Amendments of 1972 (Title IX); discrimination on the basis of disability is prohibited by Section 504 of the Rehabilitation Act of 1973; and age discrimination is prohibited by the Age Discrimination Act of 1975. These civil rights laws enforced by OCR extend to all state educational agencies, elementary and secondary school systems, colleges and universities, vocational schools, proprietary schools, state vocational rehabilitation agencies, libraries, and museums that receive ED funds (recipients). Areas covered may include, but are not limited to: admissions, recruitment, financial aid, academic programs, student treatment and services, counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, housing, and employment. OCR also enforces Title II of the Americans with Disabilities Act of 1990 (prohibiting disability discrimination by public entities, whether or not they receive federal financial assistance). In addition, as of January 8, 2002, OCR enforces the Boy Scouts of America Equal Access Act (Section 9525 of the Elementary and Secondary Education Act of 1965, as amended by the No Child Left Behind Act of 2001).

6.  OCR's core activities include: (i) responding to civil rights complaints filed by the public and conducting proactive investigations, typically called compliance reviews; (ii) monitoring

---

[1] U.S. Department of Education Organization Act, 20 U.S.C. § 3402(1).
[2] *See* U.S. Department of Education, About OCR, www.ed.gov/ocr/aboutocr.html.

recipients' adherence to resolution agreements reached with OCR; (iii) answering stakeholder inquiries and issuing policy guidance to increase recipients' understanding of their civil rights obligations and students' awareness of their civil rights; (iv) responding to requests for information from and providing technical assistance to the public; and (v) administering and disseminating the Civil Rights Data Collection (data on key education and civil rights issues in U.S. public schools, including student enrollment and educational programs and services).

7.     Virtually all of the civil rights violations that OCR finds are resolved through voluntary agreements, known as "resolution agreements." It is the strong preference of OCR, consistent with the statute, to seek voluntary compliance by recipients. Under a resolution agreement, a recipient of federal funds who is the subject of a complaint (such as a school district) voluntarily agrees to take remedial actions that, when fully and effectively implemented, will address all of OCR's compliance concerns and any identified violations.

8.     If OCR determines that a fund recipient is not complying with its civil rights obligations, including its Title IX obligations, OCR can initiate administrative proceedings to withhold further funds; or it can refer the matter to the U.S. Department of Justice (DOJ) to file a civil action to enjoin further violations. See 20 U.S.C. § 1682; 34 C.F.R. § 100.8(a).

9.     Resolution agreements are effective to the extent that they are implemented. To ensure that parties follow through with their commitments, OCR actively monitors cases that have resolution agreements until the recipient meets all provisions. When a case is in monitoring, OCR's role is to assess the recipient's implementation of the resolution agreement to ensure that the institution effectively implements its commitments and that the recipient is in compliance with the statute(s) and regulation(s) at issue. This monitoring function is a significant and important tool in OCR's overall enforcement scheme and is essential to OCR's mission of ensuring compliance with civil rights laws and ensuring equal access to educational excellence for all students.

10.     OCR also provides technical assistance in the form of presentations to educators, students,

        families, and other stakeholders, as well as answering individual questions about the laws that

        OCR enforces. Providing technical assistance is a core part of OCR's enforcement of federal

        civil rights laws and helps to better inform recipients, students, and others, about what the law

        is and how OCR interprets these laws.

ED's Interpretation of Discrimination on the Basis of Sex and

Issuance of the May 2016 Dear Colleague Letter

11.     ED has proactively sought to better understand the educational experiences and challenges

        facing a diverse range of students, including transgender students. "Transgender" is a term

        describing those individuals whose gender identity is different from the sex they were

        assigned at birth. For instance, a transgender male is someone who identifies as male, but was

        assigned the sex of female at birth.

12.     As part of its examination of the application of civil rights laws to transgender students, OCR

        and other ED representatives, including then-Secretary Arne Duncan, held listening sessions

        beginning in 2010 with various stakeholders, including transgender students and parents or

        guardians of both transgender and non-transgender students, as well as representatives from

        school board organizations, school administrators, faith leaders, athletics associations,

        educators, and institutions of higher education. Through these numerous engagements, ED

        chiefly learned about the issues transgender students and their peers face at school, the

        concerns of parents or guardians of transgender students as well as of parents or guardians of

        students who are not transgender, and the various ways that school administrators have

        ensured equal treatment of and created supportive environments for transgender students, and

        all students, in their schools.

13.     ED also received many inquiries from educators, state education agencies, students, families,

        legislators, and the public about the application of Title IX to transgender students. In

        addition, many stakeholders wrote letters documenting the challenges transgender students

4

face and urging the Department to issue guidance clarifying recipients' obligations under Title IX. For example, in May 2014, "a diverse group of advocates in the education, civil rights, youth development and mental health communities, including educators and school-based professionals, parents, and consumers of educational and mental health services" signed a letter urging the Department "to release guidance clearly outlining the appropriate treatment of transgender and gender non-conforming students under Title IX." *See* Exhibit 1, Letter to Catherine Lhamon, Assistant Secretary for Civil Rights (May 15, 2014). The letter laments that "[w]ithout explicit guidance on this issue, transgender students must attend school in an unwelcoming, or harmful, school environment while school administrators and parents attempt to negotiate a solution." The letter cites the 2011 School Climate Survey conducted by the Gay, Lesbian and Straight Education Network (GLSEN), which found that "[a]mong the more than 700 transgender students in grades 6 through 12 who responded to the survey, 80% reported feeling unsafe at school, 75.4% reported being verbally harassed, and 16.8% reported being physically assaulted. This and other surveys have found that this victimization contributes to a host of negative outcomes for transgender youth, including decreased educational aspirations, academic achievement, self-esteem, and sense of belonging in school, and increased absenteeism and depression. Transgender youth experience serious negative mental health outcomes as the result of factors such as discrimination and victimization; nearly half of young transgender people have seriously thought about taking their lives and one quarter report having made a suicide attempt. Without proper guidance, school policies can often contribute to negative outcomes for transgender youth in schools."

14.     ED analyzed current medical and scientific information regarding gender identity, gender dysphoria, and gender transition. For example, OCR consulted the American Psychological Association's *Answers to Your Questions about Transgender People, Gender Identity, and Gender Expression*, www.apa.org/topics/lgbt/transgender.aspx ("Transgender people

experience their transgender identity in a variety of ways and may become aware of their transgender identity at any age." … "It is not helpful to force the child to act in a more gender-conforming way."), and the World Professional Association for Transgender Health's *Standards of Care*,

www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=3926 ("Children as young as two may show features that could indicate gender dysphoria" … "Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role.").

15.    ED also reviewed relevant decisions from numerous federal courts as well as federal agency decisions related to sex discrimination under laws such as Title VII of the Civil Rights Act of 1964 and under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

16.    Finally, ED met with employees of DOJ and other federal agencies in developing its interpretation of Title IX's application to transgender students.

17.    Under ED's Title IX implementing regulations, which were originally promulgated by ED's predecessor agency in 1975, a recipient may provide separate facilities – *e.g.,* toilet, locker room, and shower facilities – on the basis of sex, provided that any facilities provided for students of one sex are comparable to such facilities provided for students of the other sex. *See* 34 C.F.R. § 106.33. Nonetheless, ED's regulations do not define "one sex" and "the other sex," nor do they state whether transgender students must be provided access to sex-segregated facilities consistent with their gender identity.

18.    After multiple years of studying this issue in consultation with school administrators, educators, transgender students and students who are not transgender, other federal agencies, among others, and after consulting existing case law and scientific research, ED concluded that preserving transgender students' equal access to sex-segregated facilities required that

they have access to the facilities that match their gender identity. ED also reviewed and considered the accommodations provided by recipients to transgender students and other students who may wish additional privacy, and found that recipients have been able to accommodate the privacy concerns of transgender and non-transgender students alike while still allowing transgender students to access sex-segregated facilities consistent with their gender identity. ED has indicated that schools may make individual-user options available to all students who voluntarily seek additional privacy.

19.     Thus, for the first time, in 2013, after a two-year investigation, OCR, jointly with DOJ, resolved a Title IX complaint against Arcadia Unified School District in California. In that case, a transgender boy alleged that he had been denied access to the boys' restroom and locker room, and instead was required to use the private restroom in the school health office as both a restroom and a changing area for physical education class. The Student reported that:

- Because the school health office was located some distance away from the school gym and the location of the Student's classes, the Student regularly missed class time.

- On several occasions, the Student missed instructions not to change into gym clothes because the Student was not in the locker room, which attracted unwanted attention.

- Because he was required to store his gym clothes in a bin under the cot used by students who were not feeling well, when retrieving his gym clothes the Student sometimes faced questions from other students in the health office.

- To use the restroom during class time, the Student was required to walk across campus, missing class time and facing questions from classmates about the length of time he was away.

- The Student occasionally found the health office locked, requiring him to find an employee to unlock it for him.

The Student also reported that similar difficulties occurred on other occasions, such as during an evening dance, when the Student was unwilling to ask for special permission to leave the dance area and look for an employee to unlock the health office for him. Eventually, the Student reported that he avoided using the restroom altogether. The Student also alleged that he was not allowed to stay with other boys during a class trip, and instead was required to stay in a separate cabin with his parent. Before the trip, the Student was very upset by the District's decision to require him to stay in his own cabin and became very distracted from his school work. Until several days before the camp, the Student told OCR he considered not participating in the trip at all. He told OCR that during the trip, he was sad and upset. The Student reported that he faced questions from other students about his cabin arrangement and that because the Student was not comfortable being truthful about his circumstances, the Student felt that this dishonesty created a distance between him and his peers. Among other measures, the resolution agreement[3] provided the transgender boy with access to sex-segregated facilities designated for male students consistent with his gender identity, ensured that he would be treated the same as other male students in all respects in the education programs and activities offered by the District, and ensured that any school records containing the Student's birth name or reflecting the Student's assigned sex would be treated as confidential and maintained separately from the Student's records, and would not be disclosed without written consent. The resolution agreement also included District-wide measures, including revised policies, procedures, regulations, and documents and materials related specifically to discrimination based on a student's gender identity, gender expression,

---

[3] OCR Case No. 09-12-1020, *Arcadia Unified Sch. Dist., CA* (July 24, 2013), www.justice.gov/crt/about/edu/documents/arcadialetter.pdf (closure letter); and www.justice.gov/crt/about/edu/documents/arcadiaagree.pdf (resolution agreement).

gender transition, transgender status, or gender nonconformity. In addition, the District agreed to revise existing policies to ensure that all students are provided with equal access to its programs and activities, modify current policies or develop a comprehensive gender-based non-discrimination policy, and develop an implementation guide addressing the application of the District's gender-based discrimination policy. I also read the *amicus curiae* brief filed by several school administrators in *G.G. v. Gloucester County School Board*, 822 F.3d 709 (4th Cir. 2016) (No. 15-2056), in which the Superintendent of Arcadia Unified School District, David Vannasdall, is quoted as saying that, "If [students are] worrying about the restroom, they're not fully there to learn, but instead just trying to navigate their day. Give students the opportunity to just be a kid, to use the bathroom, and know that it's not a disruption, it just makes sense."

20.     Consistent with the majority of recent judicial decisions and agency determinations described above, in April 2014, OCR issued policy guidance explicitly articulating the broad notion that—just like other federal sex discrimination laws—Title IX protects against discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity.[4] This policy guidance, as with all of OCR's significant guidance documents,[5] underwent interagency review.

21.     The number of complaints filed with OCR that allege discrimination against transgender students has increased significantly in the time since OCR opened its investigation of Arcadia Unified School District in 2011, and clarified its interpretation of Title IX and its implementing regulations with respect to discrimination based on gender identity. OCR received two such complaints in 2011, three such complaints in 2012, nine such complaints in 2013, seven such complaints in 2014, 46 such complaints in 2015, and 84 such complaints in

---

[4] OCR, Questions and Answers on Title IX and Sexual Violence (2014), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf.
[5] Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), www.whitehouse.gov/sites/default/files/omb/memoranda/fy2007/m07-07.pdf.

9

2016 (as of October 20, 2016). This may result from an increase in students' willingness to acknowledge to school officials that they are transgender, and that they seek being treated consistent with their gender identity, including being given access to facilities consistent with their gender identity.

22.    Between 2013 and June 2016, OCR entered into nine other resolution agreements with recipients to resolve allegations of discrimination against transgender students. Six of those cases involved allegations that transgender students were denied access to sex-segregated facilities consistent with gender identity and suffered harm as a result. All of the schools involved in those resolutions are located in non-plaintiff states. For example:

a.    In August 2015, after an investigation that lasted over a year, OCR settled with Central Piedmont Community College in North Carolina.[6] The complaint alleged that the College discriminated against the Student based on her gender when College personnel asked her to provide identification and medical documentation to verify her sex and suspended her as a result of her failure to do so. Because of this incident, the Student told OCR that she failed all of her classes that semester, would be required to retake them, and had to attend regular psychotherapy. Under the resolution agreement, the College has voluntarily agreed to notify all students of their right to use the restroom corresponding with their gender identity, ensure personnel honor requests by students wishing to be referred to by a different name and/or gender, and establish a policy for students requesting to change the name and gender in their official school records. As a result of the agreement, students at the College, including transgender students, are permitted to use sex-segregated facilities and their chosen names and pronouns without presenting medical records or identification documents and without fear of reprisal.

---

[6] OCR Case No. 11-14-2265, *Cent. Piedmont Cmty. Coll., SC* (Aug. 14, 2015), www.ed.gov/ocr/docs/investigations/more/11142265-a.pdf (letter of findings); and www.ed.gov/ocr/docs/investigations/more/11142265-b.pdf (resolution agreement).

b.  In December 2015, after a two-year investigation, OCR settled with Township High School District 211 in Illinois.[7] OCR determined that the District denied a 14-year-old transgender girl access to the girls' locker room and instead required her to use separate facilities to change clothes for her mandatory physical education classes. As result of the District's denial of access for the Student to its girls' locker rooms, the Student not only received an unequal opportunity to benefit from the District's educational program, but also experienced an ongoing sense of isolation and ostracism throughout her high school enrollment. In addition, the Student missed receiving information and access to rental gym uniforms provided to other students in the locker rooms and missed opportunities for bonding with her teammates in the locker rooms. In the resolution agreement, the District agreed to provide the Student with access to female locker room facilities consistent with her gender identity, and to take steps to protect the privacy of all its students by installing and maintaining sufficient privacy curtains within the girls' locker rooms to accommodate the Student and any other student who wishes to be assured of privacy while changing.

c.  In December 2015, after a two-year investigation, OCR resolved a complaint against Broadalbin-Perth Central School District in New York. In that case a 9-year-old transgender girl alleged that she was required to use a gender-neutral restroom in the nurse's office or a family restroom. As OCR noted in its letter of findings in this case, "The Student was reluctant to use the nurse's office or the family restroom because the student felt stigmatized and 'like a freak.'" In addition, the Student's mother reported that the Student had limited trips to the restroom and on some school days did not even visit

---

[7] OCR Case No. 05-14-1055, *Township High School Dist. 211, IL* (Dec. 3, 2015). www.ed.gov/ocr/docs/investigations/more/05141055-a.pdf (closure letter); and www.ed.gov/ocr/docs/investigations/more/05141055-b.pdf (resolution agreement).

the restroom at all, in order to avoid feelings of isolation. This case was resolved on December 22, 2015. Under the resolution agreement, the District voluntarily agreed to adopt and publish revised grievance procedures and notices of nondiscrimination in all relevant policies, and to provide assurance that the District will take steps that will prevent the recurrence of discrimination and harassment and will remedy the effects of discriminatory actions.

d.   In June 2016, after a nine-month investigation, OCR settled with Dorchester County School District in South Carolina.[8] In that case, parents of a transgender girl filed a complaint with OCR because their daughter was denied access to the sex-segregated restrooms in the third grade, and instead was required to use the private restroom in the nurse's office, which was located in a different wing of the school, or the private restroom in the assistant principal's office, which was at the end of the hallway from where the Student's classroom was located. During group restroom breaks on their way to or from lunch or recess, the Student was required to leave her female friends and to use the private restroom in the assistant principal's office. This embarrassed the Student because she was forced to separate from her friends, who would often request to accompany her to the restroom, and because it required the Student to address questions from her classmates about why she was using a different restroom. The resolution agreement provided that the District would allow the Student access to sex-segregated facilities designed for female students and equal access to other programs and activities, as well as District-wide measures: to include gender-based discrimination in its nondiscrimination notice, revise and ensure all policies, procedures and regulations provide equal access to transgender and gender-nonconforming students, provide training

---

[8] OCR Case No. 11-15-1348, *Dorchester Cnty. Sch. Dist., SC* (June 21, 2016). www.ed.gov/ocr/docs/investigations/more/11151348-a.pdf (letter of findings); and www.ed.gov/ocr/docs/investigations/more/11151348-b.pdf (resolution agreement).

on gender-based discrimination, and include gender-based discrimination in student

bullying prevention materials.

23.     During that same time period, resolution agreements were reached in eight complaints

involving transgender students through OCR's Early Complaint Resolution process (ECR).

ECR facilitates the resolution of complaints by providing an early opportunity for the parties

involved to voluntarily resolve the complaint allegations. Unlike other resolution agreements

with recipients, OCR does not sign, approve, endorse, or monitor any agreement reached

between the parties.

24.     On May 13, 2016, OCR and DOJ jointly issued a Dear Colleague Letter (DCL) on

transgender students' rights under Title IX. In the DCL, OCR and DOJ articulated our

interpretation that Title IX and its implementing regulations require recipients to allow a

transgender student access to restrooms and other sex-separate facilities that match the

student's gender identity.[9]

25.     Also in May 2016, in conjunction with the DCL, the Department's Office of Elementary and

Secondary Education released a document, entitled *Examples of Policies and Emerging*

*Practices for Supporting Transgender Students*, that is a compilation of policies and practices

that schools across the country were already using to support transgender students.[10] The

policies and practices highlighted in that document include examples of state and local efforts

to support transgender students in the context of sex-segregated facilities.  For example:

a.  In Washington State, guidelines provide: "School districts should allow students to use

the restroom that is consistent with their gender identity consistently asserted at school."

In addition, no student "should be required to use an alternative restroom because they

are transgender or gender nonconforming." These guidelines further provide that any

---

[9] OCR, DCL on Transgender Students (2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf.
[10] Examples of Policies and Emerging Practices for Supporting Transgender Students (May 13, 2016),
www.ed.gov/oese/oshs/emergingpractices.pdf.

student who wants increased privacy should be provided access to an alternative restroom or changing area.

b.  A regulation issued by Nevada's Washoe County School District provides: "Students shall have access to use facilities that correspond to their gender identity as expressed by the student and asserted at school, irrespective of the gender listed on the student's records, including but not limited to locker rooms."

c.  In Alaska, the Anchorage School District's Administrative Guidelines emphasize the following provision: "However, staff should not require a transgender or gender nonconforming student/employee to use a separate, nonintegrated space unless requested by the individual student/employee."

d.  The New York State Department of Education guidance gives an example of accommodating all students' interest in privacy: "In one high school, a transgender female student was given access to the female changing facility, but the student was uncomfortable using the female changing facility with other female students because there were no private changing areas within the facility. The principal examined the changing facility and determined that curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them. After the school put up the curtains, the student was comfortable using the changing facility."

Effect of the Injunction on OCR's Title IX Enforcement

26.  Before the October 18, 2016, clarification, OCR had suspended investigations and monitoring of resolution agreements for 73 pending matters involving transgender students to comply with the Court's August 21, 2016, preliminary injunction, including 37 pending complaints filed from states that are not involved in this litigation as Plaintiffs.

27.  In light of the October 18, 2016, clarification, OCR has continued to suspend investigation and monitoring of 21 pending matters in full and 14 pending matters in part because they

involve allegations related to access to sex-segregated facilities. Of those pending matters that continue to be suspended, there are 25 pending complaints suspended in whole (13) or in part (12) that were filed from states that are not involved in this litigation as Plaintiffs.

28.   Despite the August 21, 2016, preliminary injunction, OCR continues to receive Title IX complaints alleging discrimination against transgender students, including six complaints since August 21, 2016. Many of those complaints allege harms similar to the harms that have been remedied in the resolution agreements OCR negotiated before the preliminary injunction was issued. Those allegations related to access to sex-segregated facilities cannot be investigated in light of the preliminary injunction and the clarification order.

29.   Because OCR has not opened any of these complaints for investigation, OCR has been unable to assist any of the affected recipients (i.e., schools or school districts) in reaching the kinds of resolution agreements that have proven successful in the past, such as in the cases described above. Therefore, as a result of the preliminary injunction, even recipients who would be entirely willing to work with OCR to find ways to accommodate the needs of their transgender students consistent with federal law are unable to obtain OCR's assistance in doing so. The preliminary injunction thus frustrates OCR's ability to apply its resources and expertise to assist schools in achieving these cooperative outcomes, even in states that are not plaintiffs to this litigation (and, indeed, even in those states that have participated as amicus curiae in this litigation to emphasize their agreement with OCR's interpretation of federal law).

30.   OCR has received and continues to receive many requests for technical assistance from schools, state education agencies, students, and parents—including many from entities or individuals in non-plaintiff states—regarding the Title IX rights and obligations related to transgender students. OCR has declined to answer these requests, including hundreds of letters and emails, because of the uncertainty created by the preliminary injunction.

31.     The scope of the preliminary injunction prevents OCR from satisfying our regulatory charge to enforce, and ensure recipients' compliance with, Title IX. OCR's regulatory charge is to take action "whenever" we have evidence that a student's rights may be being violated.[11] Because OCR now operates pursuant to the August 21, 2016, injunction as clarified by the October 18, 2016, Order, OCR cannot provide Title IX anti-discrimination protection to a discrete group of students, setting them apart from all other students.

32.     In addition, the August 21, 2016, injunction imposes particular harm on transgender elementary and secondary students because, by law, they must attend school every day but, because of the injunction, they no longer enjoy the federal civil rights protection to which all other students are entitled.  For these students, there is no time to wait and determine how to treat them equitably; their state laws mandate their school attendance now and every school day.

33.     Facts from OCR investigations confirm the concrete harms daily experienced by transgender students who are denied access to sex-segregated facilities consistent with their gender identity. Our investigations have confirmed, for example, elementary school students have been required to line up by gender before a teacher grants permission for the students to go to restrooms.  Today, and every school day, transgender students in this situation must either line up consistent with their sex assigned at birth or, if a specific teacher so decides, line up consistent with their gender identity. That daily choice of course, as OCR investigations confirm, leaves a student subject to commentary and questions from peers if the student joins a line that is inconsistent with the student's apparent gender identity, or if the transgender student does not join a line at all. Students and their families have reported to OCR, during

---

[11] *See* 34 C.F.R. § 100.7 ("The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part.") and 34 C.F.R. § 106.71 ("The procedural provisions applicable to title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference. These procedures may be found at 34 CFR 100.6–100.11 and 34 CFR, part 101.").

investigations, that the students feel shame, humiliation, and experience depression resulting from these harms. In addition, students as young as elementary school students as well as high school and college students, and their families have reported to OCR that the students have attempted death by suicide, among other self-injurious expressions and consequences of these harms. Furthermore, through OCR's investigations and ED's analysis of reports and medical and scientific literature—including material from the APA and WPATH—ED is aware that transgender students who are denied access to restrooms and other sex-segregated facilities that match their gender identity, and who are otherwise not treated consistent with their gender identity, may suffer significant dignitary, psychological, medical, and other harms. By being prohibited from working on these cases, we are unable to fulfill the Department's mission and OCR's core purpose because we cannot protect the civil rights of all students at school, including those students who must face such discriminatory environments daily. Given that practical reality, the August 21, 2016, injunction imposes harm on all students in schools because it sends them a message that discrimination against an identifiable group is permissible and without federal redress. That discriminatory message conflicts directly with the equality principle in Title IX.

4 November 2016
_____
Date

_____
Catherine E. Lhamon

17

Exhibit 1

Letter to Catherine Lhamon,

Assistant Secretary for Civil Rights

(May 15, 2014)

May 15, 2014

Assistant Secretary Catherine Lhamon
Office for Civil Rights
U.S. Department of Education
Lyndon Baines Johnson Department of Education Bldg.
400 Maryland Avenue, SW
Washington, DC 20202-1100

Dear Assistant Secretary Lhamon,

The undersigned organizations represent a diverse group of advocates in the education, civil rights, youth development and mental health communities, including educators and school-based professionals, parents, and consumers of educational and mental health services. We thank you for the Department of Education Office for Civil Rights' (OCR) continuing work to ensure that all students have equal access to education, regardless of background, circumstances, or identity. We write you today to express our gratitude for your recent clarification that Title IX protections against sex-based discrimination extend to discrimination based on gender identity and failure to conform to sex stereotypes. This clarification is an important step towards ensuring that transgender and gender non-conforming students have access to a safe and equal education. We urge you to take the next step and release guidance clearly outlining the appropriate  treatment of transgender and gender non-conforming students under Title IX of the Education Amendments of 1972.

Transgender youth and young adults are increasingly visible in our schools, with an estimated 225,000 of our pre-K through postsecondary students identifying as transgender. As you are aware, the legal landscape reflecting the treatment of transgender and gender non-conforming people under federal non-discrimination law has changed significantly in recent years. Many courts, along with the EEOC, have recognized that discrimination on the basis of a person's gender identity, gender transition, or transgender status constitutes sex discrimination under statutes such as Title VII of the Civil Rights Act of 1964.[i] Courts and state and federal agencies, including the Department of Justice's Office on Violence against Women, are also consistently taking the view that gender identity nondiscrimination requires equal access to programs and facilities that are consistent with a person's gender identity.[ii]

Many states (such as Massachusetts, Colorado, Connecticut, Maine, and Washington), universities, colleges, and school districts (including Los Angeles Unified School District, one of the nation's largest school districts) have already adopted clear policies to protect transgender students. Unfortunately, many school districts continue to ignore this vulnerable student population due to uncertainty about whether Title IX extends to transgender students. Without explicit guidance on this issue, transgender students must attend school in an unwelcoming, or harmful, school environment while school administrators and parents attempt to negotiate a solution. Our collective constituents would all benefit from guidance in this area from OCR.

We ask you to clarify the scope of Title IX's prohibition on discrimination based on a student's gender identity, transgender status, or gender transition, specifically the extent to which the law:

- Requires schools to respect students' gender identity for all purposes;
- Protects the private nature of a student's transgender status;
- Requires existing dress code policies to be enforced based on a student's gender identity and gender expression;
- Ensures access to all school programs, activities, and facilities based on gender identity; and
- Obligates schools to offer participation on athletic teams based on gender identity.

The Department of Education has already been confronted with these issues. For example, this past July, the Office of Civil Rights announced an historic resolution agreement in *Student v. Arcadia Unified School District*, which has resulted in that district developing and implementing comprehensive board policies and administrative regulations that provide transgender students the opportunity to succeed in school. Providing guidance and clarification in this regard would be more efficient and cost-effective for all parties than continued costly litigation under Title IX. Beyond the practical and financial benefits of such guidance, clarification of these rights is critical to protect the health and wellbeing of transgender and gender non-conforming youth in schools, and is consistent with accepted medical and mental health standards. Discrimination against transgender and gender non-conforming students often leads to lower academic achievement, poor psychological outcomes, and school push out.

GLSEN's 2011 School Climate Survey found that while LGBT students often faced hostile school climates, transgender students face the most hostile climates. Among the more than 700 transgender students in grades 6 through 12 who responded to the survey, 80% reported feeling unsafe at school, 75.4% reported being verbally harassed, and 16.8% reported being physically assaulted. This and other surveys have found that this victimization contributes to a host of negative outcomes for transgender youth, including decreased educational aspirations, academic achievement, self-esteem, and sense of belonging in school, and increased absenteeism and depression.[iii] Transgender youth experience serious negative mental health outcomes as the result of factors such as discrimination and victimization; nearly half of young transgender people have seriously thought about taking their lives and one quarter report having made a suicide attempt.[iv]

Without proper guidance, school policies can often contribute to negative outcomes for transgender youth in schools. Dress codes, access to sex-segregated spaces, use of proper names and pronouns, and participation on athletics teams are all school policy issues that have the potential to either powerfully affirm or stigmatize a transgender student.

Based on case law development of Title VII and Title IX, it is clear that transgender and gender non-conforming youth are protected from discrimination and harassment, but many school districts do not have a clear understanding about how these legal protections should translate to non-discriminatory school policies. As a result, transgender and gender non-conforming youth are experiencing significant health and educational disparities. Schools, parents, professionals, and most importantly, students, would benefit significantly if schools nation-wide were informed and equipped to accommodate these students in a safe, appropriate, and non-discriminatory way.

All transgender and gender non-conforming students deserve an education free from discrimination and harassment. We strongly urge you to stand by this principle and issue guidance clarifying the application of Title IX to gender identity and expression.

Respectfully,

Advocates for Youth
African American Ministers In Action-Equal Justice Task Force
American Civil Liberties Union
American Foundation for Suicide Prevention/SPAN USA
American Group Psychotherapy Association
American Psychiatric Association
American School Counselor Association
Anti-Defamation League
CenterLink: The Community of LGBT Centers
Disability Rights Education & Defense Fund
Equality Federation
Families United Against Hate (FUAH)
Family Equality Council
Gay-Straight Alliance Network
GLMA: Health Professionals Advancing LGBT Equality
GLSEN (Gay, Lesbian and Straight Education Network)
Human Rights Campaign
Ithaca LGBT Task Force
Jewish Council for Public Affairs
Keshet
League of United Latin American Citizens
NAADAC, the Association for Addiction Professionals
National Association for Children's Behavioral Health
National Association for Multicultural Education
National Association for the Education of Homeless Children and Youth
National Association of County Behavioral Health and Developmental Disability
National Association of School Psychologists
National Association of Secondary School Principals
National Center for Lesbian Rights
National Center for Transgender Equality
National Council of Jewish Women
National Disability Rights Network
National Education Association
National Gay and Lesbian Task Force
National Queer Asian Pacific Islander Alliance
PFLAG National
Safe Schools Coalition (SSC)
School Social Work Association of America
Sexuality Information and Education Council of the U.S. (SIECUS)
Sikh American Legal Defense and Education Fund (SALDEF)

Southeast Asia Resource Action Center (SEARAC)
The International Foundation for Gender Education
The Trevor Project
TransActive Gender Center
Transgender Law Center
Youth Guardian Services

---

[i] See, e.g., Glenn v. Brumby, 663 F.3d 1312 (11th Cir. 2011); Barnes v. City of Cincinnati, 401 F.3d 729 (6th Cir. 2005); Smith v. City of Salem; 378 F.3d 566 (6th Cir. 2004); Rosa v. Park W. Bank & Trust Co., 214 F.3d 213 (1st Cir. 2000); Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000); Schroer v. Billington, 577 F. Supp. 2d 293 (D.D.C. 2008); Lopez v. River Oaks Imaging & Diag. Group, Inc., 542 F. Supp. 2d 653 (S.D. Tex. 2008); Mitchell v. Axcan Scandipharm, Inc., No. Civ. A. 05-243, 2006 WL 456173 (W.D. Pa. Feb. 17, 2006); Tronetti v. TLC HealthNet Lakeshore Hosp., No. 03-CV-0375E(SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003); Doe v. United Consumer Fin. Servs., No. 1:01 CV 1112, 2001 WL 34350174 (N.D. Ohio Nov. 9, 2001); Rentos v. OCE-Office Systems, No. 95 Civ. 7908, 1996 WL 737215, *8 (S.D.N.Y. Dec. 24, 1996); Maffei v. Kolaeton Industry, Inc., 626 N.Y.S.2d 391 (N.Y. Sup. Ct. 1995); Macy v. Holder, E.E.O.C. Appeal No. 0120120821 (Apr. 23, 2012).

[ii] See, e.g., U.S. Dept. of Justice, Office on Violence Against Women, *Frequently Asked Questions: Nondiscrimination Grant Condition of the Violence Against Women Reauthorization Act of 2013* (Apr. 9, 2014), available at: http://www.ovw.usdoj.gov/docs/faqs-ngc-vawa.pdf; Doe v. Regional School Unit 26, 86 A.3d 600 (Me. 2014); Dept. of Fair Employment & Housing v. Amer. Pacific Corp., Case No. 34-2013-00151153-CU-CR-GDS (Cal. Sup. Ct. Mar. 13, 2014); Mathis v. Fountain-Fort Carson Sch. Dist. 8, Charge No. P20130034X (Col. Div. Civ. Rts. Jun. 17, 2013); Jones v. Johnson County Sheriff's Department, CP # 12-11-61830, Finding of Probable Cause (Iowa Ct. Rts. Comm'n Feb. 11, 2013).

[iii] Greytak, E. A., Kosciw, J. G., and Diaz, E. M. (2009). Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools. New York: GLSEN.

[iv] Arnold H. Grossman & Anthony R. D'Augelli, *Transgender Youth and Life-Threatening Behaviors*, 37(5) SUICIDE LIFE THREAT BEHAV. 527 (2007).